# Exhibit B - Amended Complaint

IN THE CIRCUIT COURT OF THE
15TH JUDICIAL CIRCUIT IN AND FOR
PALM BEACH COUNTY, FLORIDA

GENERAL JURISDICTION DIVISION

CASE NO.50-2019-CA-005121-XXXX-MB

ILLOOMINATE MEDIA, INC., a Florida
Corporation, and LAURA LOOMER, a Florida
Individual,

       *Plaintiffs,*

       *vs.*

CAIR FLORIDA, INC., a Florida Corporation,
CAIR FOUNDATION, d/b/a COUNCIL ON
AMERICAN ISLAMIC RELATIONS, an
Oklahoma Corporation, TWITTER, INC., a
Delaware Corporation, and JOHN DOES 1-5,

       *Defendants.*

**FIRST AMENDED
COMPLAINT
AND JURY DEMAND**

---

## INTRODUCTION

1.    This is an action for breach of contract, tortious interference with an advantageous

business relationship, restraint of trade in violation of Fla. Stat. § 542.18, civil conspiracy and

violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq*.

2.    Plaintiff is a journalist and activist.  In order to suppress plaintiff's views

regarding certain controversial political topics – in particular, the role of radical Islam and its

proponents American public life and policy – defendants CAIR Florida, Inc. and CAIR

Foundation, which have been established by the U.S. government and adjudicated as essentially

American branches of the Mideast terrorist group Hamas, have acted in concert and conspired

1

with defendant Twitter, Inc. ("Twitter") to cause her to be banned from, and prevented her from making a living through the use of, the majority of social media platforms.

3.      These include not only Twitter, Facebook, Instagram and the blog platform Medium.com, but also major payment processors PayPal.com and Venmo, ride-sharing systems Uber (including Uber Eats) and Lyft, crowdfunding website GoFundMe, online custom merchandise platform Teespring.

4.      Twitter claims that Ms. Loomer was banned because she violated Twitter's Terms of Service ("TOS"). But, as set forth below, this claim is implausible because the TOS provide essentially no substantive guidance to all but the most extreme users regarding whether they will or will not be censored on Twitter.

5.      The reason for this is that the TOS are not only vague but are applied with so selectively and in such bad faith that they are meaningless except for purposes of providing Twitter with a pretext for wrongful, bad faith conduct such as is alleged here.

6.      Moreover, innumerable Twitter users, ranging from little-known or anonymous users with a handful of followers to major media organizations, non-governmental human rights and social activist organizations and popular commentators and celebrities, have made the same statements as Ms. Loomer at various times – and in many cases, repeatedly – without adverse action by Twitter.

7.      This conduct by Twitter demonstrates that its pretext for banning Ms. Loomer – because her tweets violated the TOS – is false, and that Twitter's ban on her as well as Twitter's explanation of it were made in bad faith.

8.      In fact, there is little serious debate that the Twitter TOS are mere window-dressing, pretexts for employing censorship policies that are either arbitrary and capricious or,

4823-3435-1254, v. 1

far more frequently, and in the facts set forth here, driven by ideology or in coordination with favored or commercially influential advocacy groups, or both.

9.    Rather than being the result of a TOS violation, Ms. Loomer's ban from Twitter was, upon information and belief, proximately caused by defendants CAIR Florida, organization the Federal Bureau of Investigation has identified as the U.S. "face" of the Mideast terrorist group Hamas, and CAIR National (collectively, "CAIR" or "CAIR / Hamas"), which on information and belief acted in concert with Twitter to procure her elimination as a voice in opposition to them and their favored politicians and causes.

10.    As alleged further herein, the TOS are merely a pretext to place a "progressive" and positive gloss on Twitter's bad faith, unjustified and unprivileged elimination of plaintiffs' predominant publishing and fundraising platform, in concert with and at the behest of CAIR Florida and CAIR National, acting with or on behalf of their affiliate Hamas and their financial sponsor the Kingdom of Qatar and, on information, other parties not presently known to plaintiff, thereby effectively silencing Ms. Loomer, eliminating a vigorous and courageous journalistic and investigatory adversary from the public square, enabling defendants to benefit unfairly thereby and causing Ms. Loomer and Illoominate the harm set forth herein.

**PARTIES AND JURISDICTION**

11.    Plaintiff Illoominate Media, Inc., is, and all times hereinafter described has been, a corporation of the State of Florida with its primary place of business in the County of Palm Beach.

12.    Plaintiff Laura Loomer, is, and all times hereinafter described has been, a resident of the State of Florida and County of Palm Beach.

13.    Defendant CAIR Florida, Inc. is a Florida Corporation.

3

14.     Defendant CAIR Foundation, doing business as the Council on American Islamic Relations, is an Oklahoma Corporation that transacts business in the State of Florida and which has committed acts, as alleged below, that subject it to the jurisdiction of the State of Florida and this Court.

15.     Defendant Twitter, Inc., is a Delaware Corporation which transacts business in the State of Florida and which has committed acts, as alleged below, that subject it to the jurisdiction of the State of Florida and this Court.

16.     Various individuals not made defendants herein participated in the violations alleged below and performed acts and made statements in furtherance of the alleged violations.

17.     Plaintiff seeks and is entitled to damages in an amount to be determined at trial, but in no event less than $15,000 exclusive of interest, special damages, costs or attorney fees, by reason of which this Court has jurisdiction over this action.

FACTS COMMON TO ALL COUNTS

**Laura Loomer, Illoominate and Her Role as an Independent Journalist**

18.     Plaintiff Laura Elizabeth Loomer is a conservative American political activist, journalist and Internet personality.

19.     Ms. Loomer is also Jewish and has made Jewish issues and advocacy on behalf of Jewish causes, including the security of the State of Israel, a prominent part of her work and public persona.

20.     Ms. Loomer received a degree in journalism from Barry University in Miami in 2015.

4

21.     Following her graduation, Ms. Loomer worked with James O'Keefe, an award-winning investigative journalist, filmmaker and New York *Times* bestselling author, at Project Veritas.

22.     After approximately three years at Project Veritas and a brief period at The Rebel Media, another online media website, Ms. Loomer focused on developing an independent media identity and established plaintiff Illoominate Media, LLC ("Illoominate").

23.     Ms. Loomer conducts her business affairs primarily through Illoominate.

24.     Neither Ms. Loomer nor Illoominate have been involved in criminal conduct, violence, obscenity, illegal narcotics, sexual misconduct, hate crimes or other any other illicit matter; nor have they ever advocated such conduct.

**Plaintiff Tweets Forbidden Criticism of CAIR's Rep. Omar**

25.     The signal event providing the pretext for Twitter's ban of Ms. Loomer and which subsequently resulted in the damages described herein took place in November of 2018, when Ms. Loomer, using her @LauraLoomer account, published a tweet in which she referred to then–Minnesota Representative-elect Ilhan Omar, a Democrat, as, among other things which will be addressed *seriatim*, "anti-Jewish."

26.     Ms. Loomer's claim that Rep. Omar is "anti-Jewish" was based on an extensive factual record available at that time, and is a claim that subsequent events have readily borne out.

27.     In 2012, the future Rep. Omar stated, on Twitter, "Israel has hypnotized the world, may Allah awaken the people and help them see the evil doings of Israel."

28.     She has also referred to Israel as an "apartheid" regime, a notoriously inflammatory comparison, and, last fall, used her Twitter account to explain the historical

bipartisan support for Israel in the U.S. Congress by stating, "It's all about the Benjamins baby," a reference to hundred-dollar bills.

29.     On February 11, 2019, House Majority Leader Nancy Pelosi issued a statement saying, "Congresswoman Omar's use of antisemitic tropes and prejudicial accusations about Israel's supporters is deeply offensive." The statement was also signed by House Majority Leader Steny Hoyer, House Majority Whip Jim Clyburn and other Democrat leaders in the House.    The statement continued, "We condemn these remarks and we call upon Congresswoman Omar to immediately apologize for these hurtful comments."

30.     Because of this pressure from the House leadership, Rep. Omar reluctantly apologized for circulating what she admitted was an "antisemitic trope."

31.     Rep. Omar later suggesting that AIPAC, a pro-Israel lobbying group, forced Congressional leaders to demand that she apologize.

32.     As a result, in March of 2019, bipartisan demands again arose for Rep. Omar to apologize for these comments, which were widely understood as implying that American Jews' were primarily loyal to the State of Israel and only secondarily to the U.S.

33.     These remarks that caused Representative Eliot L. Engel, Democratic chairman of the House Foreign Affairs Committee, to issue a public statement that it is "unacceptable and deeply offensive to call into question the loyalty of fellow American citizens because of their political views, including support for the US-Israel relationship. Her comments were outrageous and deeply hurtful . . . attacks that have no place in the Foreign Affairs Committee or the House of Representatives."

34.     On March 7, 2019, the House of Representatives voted overwhelmingly to condemn the antisemitic comments by Rep. Omar as part of a broader resolution decrying bigotry in all its forms.

35.     Twitter, however, did not suspend or ban the Twitter accounts of Rep. Omar despite her comments about Jews.

36.     Moreover, Twitter did not suspend the account of Rep. Engel despite his comments about Rep. Omar's comments about Jews.

37.     Nor did Twitter suspend any of the other millions of Twitter users who found, as the House of Representatives did, that Rep. Omar's antisemitic comments were antisemitic.

38.     Twitter did, however, suspend Ms. Loomer on the pretext that her tweet – stating that Rep. Omar was an antisemite – was "hateful" content.

39.     On information and belief, Twitter did so not because of the reason it gave as a pretext, but did so in bad faith and in concert with the other defendants herein for purposes of her silencing Ms. Loomer's criticism of an elected official, to deprive her and Illoominate of their reasonable expectations of economic gain, and for reasons otherwise set forth herein.

**Plaintiff's Statement that Islam Encourages Repression of Homosexuals**

40.     The tweet by Ms. Loomer that supposedly caused her to lose her account on Twitter also asserted that Rep. Omar is an adherent of a belief system in which "homosexuals are oppressed."

41.     The oppression of homosexuals under many Islamic regimes, however, is an empirical fact.

42.     For example, as recently as March 22, 2019, for example, the Islamic Republic of Iran publicly hanged a 31-year-old Iranian man after he was found guilty of charges related to

7

violations of Iran's anti-gay laws. The unidentified man was hanged on January 10 based on criminal violations of '*lavat-e be onf*' – sexual intercourse between two men, as well as kidnapping charges, according to the Iranian Students' News Agency

43. On March 30, 2019, far-left U.S. news network CNN tweeted, via its account @cnn, "Brunei's new anti-gay law goes into effect this week. Here's how the world is reacting https://cnn.it/2UahVcb." The story linked to states, "A law goes into effect Wednesday in Brunei that will punish adultery and homosexual sex with death. Anyone found guilty of the offenses will be stoned to death, according to a new penal code based on Sharia law, an Islamic legal system that outlines strict corporal punishments."

44. CNN's Twitter account was not suspended or banned because of this tweet.

45. Similarly, the *Economist* magazine reported in 2018, in article that it promoted on Twitter, that "A survey by Pew Research Centre in 2013 found that most people in the [Middle East] believe homosexuality should be rejected: 97% in Jordan, 95% in Egypt and 80% in Lebanon. In 2007 Mahmoud Ahmadinejad, then the president of Iran, told a crowd of incredulous students at Columbia University in New York that 'in Iran we don't have homosexuals. . . .'"

46. The *Economist* article continued, "In some countries, such as Egypt, where homosexuality is not an explicit offence, vaguely worded 'morality' laws are nevertheless widely used to persecute those who are accused of "promoting sexual deviancy" and the like. . . . Groups such as Islamic State have become notorious for gruesomely murdering people suspected of being gay by throwing them off buildings and stoning them to death. In Iraq, where same-sex activity is technically legal, the breakdown of order since 2003 has allowed Islamist militias and vigilantes to impose their own idea of justice. . . . Since President Abdel Fattah al-Sisi's regime

8

came to power in Egypt in 2014, arrests of gay, lesbian and transgender people have risen fivefold in an apparent bid to stave off conservative critics."

47.     "Homosexuality was made a capital offence in Iran after the Islamic revolution of 1979," according to the same article in the *Economist*, which added, "Groups such as Islamic State [ISIS] have become notorious for gruesomely murdering people suspected of being gay by throwing them off buildings and stoning them to death."

48.     Despite publishing the article quoted from above, which recounts a wide range of reports concerning the repression of homosexuals in Muslim regimes – as Ms. Loomer's tweet did – and promoting that article on Twitter, just as CNN's Twitter account was not unaffected, the *Economist*'s Twitter account was not suspended or banned.

**Plaintiff's Statement that Islam Represses Women and Regarding the Hijab**

49.     Ms. Loomer's tweet regarding Rep. Omar also stated that women in Islam are "abused" and "forced to wear the hijab," asserting two claims that can be supported by reference to extensive factual evidence.  In this case, it is sufficient to prove the bona fide basis of both claims by reference merely to reported facts concerning one, i.e., the hijab in Muslim life.

50.     In the Quran, *hijab* refers to a partition or curtain in the literal or metaphorical sense, and in particular the curtain separating visitors in Mohammed's house from the residence of his wives.

51.     In modern parlance, however, hijab is widely understood as an extensive covering of the hair, ears, neck and upper shoulder worn by many Muslim women for purposes of modesty.

52.     Many, or most, countries governed by sharia, or Islamic law, require that the hijab be worn by women at least when they are in public, and this requirement is also commonly

9

enforced informally, but frequently strictly, among Muslim communities in non-Muslim countries.

53.     Thus, for example, on March 6, 2019 the *New York Times* reported, "A prominent Iranian lawyer who defended women arrested when they defied Iran's head-covering rule has been convicted of security-related crimes in a secret trial and could face a 'very lengthy sentence,' a human-rights monitoring group reported Wednesday. . . . The Iranian authorities have never specified why they seized her in June, but at the time Ms. Sotoudeh was defending women arrested when they removed their hijabs, or Islamic head scarves, in public protests."

54.     Additionally, according to a March 15, 2019 *Washington Post* column by Nadia B. Ahmad, an associate law professor at Barry University and Asifa Quraishi-Landes, a law professor at the University of Wisconsin, "Some Muslim women cover their hair because they say the faith requires it. Others say it's not required. Muslims can find support for both approaches."

55.     In a February 2019 article by Iranian-born Soutiam Goodarzi in the *Spectator* of London entitled, "I was forced to wear a hijab. It wasn't liberating: Why World Hijab Day is an insult to girls like me," Goodarzi wrote, "Some argue that the hijab is liberating for women. Having come from the inside, I can tell you: the hijab, and the kind of rule I lived under, isn't about feminism. . . . It is a form of submission: the chaining up of women to the mullahs who promulgate this nonsense. For women who have been forced to wear a hijab, World Hijab Day is an insult. It's an open attempt to portray oppressors as victims, and to overlook the feelings of women who have been taught to believe throughout their lives that they are second-class beings. . . . There are brave women imprisoned in Iran for various infractions of the modesty code; there

10

are women who have been treated appallingly for wearing a hijab that is too loose or transparent. More recently, there have been women punished for not wearing a hijab."

56.    The articles quoted above, stating – as Ms. Loomer's tweet did – that in many countries governed by Muslim law, women are required to wear the hijab and are often subjected to penal or physical abuse for failing to do so, were promoted by their respective publishers on Twitter, but neither the *New York Times*, the *Washington Post* nor the *Economist* Twitter accounts were suspended or banned for tweeting these facts.

57.    For these reasons, Ms. Loomer's statement that women in Islam are "abused" and "forced to wear the hijab" was not hateful but, rather, was a statement of what is widely viewed as empirical fact.

58.    Additionally, Twitter could not have based its ban of Ms. Loomer on that statement because other prominent users that made statements on Twitter that are the same, or arguably more severe than hers on the same topic were not suspended or banned.

**The @LauraLoomer Twitter Account**

59.    Notwithstanding the foregoing, in late November of 2018, Twitter permanently banned Ms. Loomer from Twitter per the instruction of defendant CAIR, and, on information and belief, in concert with defendant CAIR Florida, using her tweet about Rep. Omar as a pretext.

60.    Prior to its destruction as a result of defendants' actions, the Twitter account on which Ms. Loomer published her controversial tweet, @LauraLoomer, had been the primary publishing platform and the vehicle for donations and other financial opportunities to flow to her operating company, Illoominate, primarily via PayPal.

61.     The Twitter account @LauraLoomer had approximately 265,000 followers when she was banned from Twitter.

62.     Ms. Loomer was banned, according to Twitter, on the ground that she had violated Twitter's Terms of Service by tweeting "hateful content," as set out above.

63.     As demonstrated above, however, each statement in Ms. Loomer's offending tweet to an elected office was either objectively factual or supported by a significant body of empirical evidence such that reasonable people could disagree as to whether or not it is an accurate generalization.

**FBI: CAIR is Hamas**

64.     CAIR's determination to silence or "deplatform" Ms. Loomer, in view of her interests and activities as an activist and journalist, is consistent with its long history of antipathy toward and activism contrary to supporters of the State of Israel, including the government of the United States and the vast majority of its citizens.

65.     Because of CAIR's extensive contacts with and knowledge of Muslim communities in the U.S., the Federal Bureau of Investigation ("FBI") originally treated CAIR as a resource in its antiterrorism efforts.

66.     In 2009, however, the FBI severed its ties with CAIR because of CAIR's links, both extensive and intensive, to Hamas.

67.     Hamas is a Mideast-based mass-murder syndicate designated a terrorist organization by the United States Department of State. It presently operates a military dictatorship in the Gaza Strip.

68.     Hamas is militantly opposed to, and openly expresses eliminationist hatred of, the State of Israel and Jews in general.

12

69.     The FBI's change of policy during the Obama Administration followed a 15-year-long FBI investigation that culminated in the conviction of Hamas fundraisers in the "Holy Land Foundation" terrorism financing case, in which CAIR itself was listed as an unindicted co-conspirator, as detailed more below.

70.     CAIR / Hamas's involvement with terrorism includes the conviction of Ghassan Elashi, a founding board member of CAIR's Texas chapter, of laundering money for Hamas terrorism; the conviction of CAIR's civil rights director, Randall Todd Royer, for conspiring to engage in terror activities, including training with the al Qaeda-linked jihad group Lashkar-e-Taiba; and the deportation of Bassem Khafagi, former CAIR community affairs director and a founder of the Islamic Assembly of North America, which promotes sharia law, back to his home country of Egypt after being convicted for bank and visa fraud.

71.     In 2014, the United Arab Emirates, a strictly Islamic regime, blacklisted CAIR / Hamas because of its ties to the radical Egyptian Muslim Brotherhood

72.     In May of 2019, it was announced that the President of the United States had instructed national security and diplomatic officials to begin the process of designating the Muslim Brotherhood a foreign terrorist organization.

73.     Hamas's attacks on civilians have been condemned as war crimes and crimes against humanity by human rights groups not known for the slightest bit of sympathy toward the State of Israel, including Human Rights Watch.

74.     A 2017 Palestinian Center for Public Opinion poll in the Palestinian territories revealed that Hamas violence and rhetoric against Israelis are unpopular and that a majority of Palestinians would rather Hamas accept a permanent two-state solution.

13

75.     On March 17, 2019, the UN's Special Coordinator for the Middle East Peace Process "strongly condemned" the response, including both arrests and violence against Palestinian protestors, by Hamas security forces in the Gaza Strip during Palestinian protests over the deteriorating economic situation there.

76.     According to the United Nations, the violent suppression of demonstrations by Hamas security forces included efforts to confiscate reporters' phones and other evidence of the heavy-handed response, including the brutal beating of journalists and staff from the Independent Commission for Human Rights and the raiding of Palestinian homes.

77.     This is the organization for which CAIR is the U.S. face.

**Qatar – Iran – Hamas – CAIR**

78.     In support of its activities, CAIR has received funding from, among others, the Kingdom of Qatar ("Qatar"), an ally of the Islamic Republic of Iran.

79.     Qatar has in the last year or so engaged in a broad-based image-building campaign, including initiatives executed via social media outlets such as Twitter and advocacy organizations such as CAIR to influence U.S. views and policies of its foreign and domestic policy and the brand of radical Islam favored by Qatar as well as that of its allies, the Islamic Republic of Iran, Hamas, the Mideast terrorist group and its affiliate, the Muslim Brotherhood.

80.     In that respect, Qatar has its work cut out for it, in part because Qatar, according to the Anti-Defamation League, is one of the world's most antisemitic regimes.

81.     In February of 2019, for example, the ADL revealed that the official Qatari media regularly publishes editorial cartoons that "blatantly demonize Jews" and which "cross the line from legitimate criticism of Israel or its policies into overt antisemitism . . . draw[ing] on the worst kind of antisemitic themes and give them new life, including conspiracy theories of Jewish

14

world domination; blood libels; the association of Zionism with Nazism; the demonization and dehumanization of Israel and Jews; the invocation of William Shakespeare's Shylock; and the use of stereotypical medieval Jewish imagery."

82.     Among the examples cited by the ADL are cartoons depicting U.S. President Donald Trump and former president Barack Obama as puppets in the hand of Israel and the U.S. flag's stars replaced by Stars of David; showing "medieval Jewish figures relishing in drinking goblets of Palestinian blood and devouring the flesh of al-Aqsa Mosque, depicted as a steak"; portraying Israel as an octopus, a snake, a pig and a wolf; and featuring a giant swastika marked with a Star of David that is shown crushing Arab figures.

83.     Similarly, a recent international book fair in Qatar's capital, Doha, featured an array of antisemitic literature, offering books with titles such as The Myth of the Nazi Gas Chambers, Lies Spread by the Jews and an Arabic-language translation of Awakening to Jewish Influence in the United States of America by white supremacist figurehead and former Ku Klux Klansman David Duke, as well as standbys such as Henry Ford's infamous The International Jew, based on The Protocols of the Elders of Zion, and a tract called, Talmud of Secrets: Facts Exposing the Jewish Schemes to Control the World.

84.     Besides being a center of antisemitic activity, Qatar is an extremist Muslim government that opposes the moderating trend of the leadership in Saudi Arabia, including the rapprochement between the Saudis and the government of the United States following the latter's attempts to boost Iran's influence and power.  In 2017, Saudi Arabia and its allies declared a blockade on Qatar in response to its support for terrorism in the region and its friendship with Iran.

85.     Qatar, along with its ally Iran, is also hostile to the warm relationship between the United States and the State of Israel that the administration of President Donald Trump, as compared to his predecessor, has reestablished.

86.     Qatar has, over the last decade, been one of the major supporters of Hamas, the Palestinian branch of the Muslim Brotherhood.

87.     A notoriously murderous terrorist organization, Hamas planned and executed a campaign of bloody suicide bombings in Israel in the 1990's and 2000's.  In recent years Hamas has shifted to attacking cities and villages in Israel with rockets and mortars, supplied by Iran, as well as incendiary balloons. These balloons operated by children under the age of 14 in urban areas in order to deter and, if deterrence fails, to embarrass the Israeli Defense Forces for using force to stop them.

88.     The extent of Iran's support of Hamas is estimated at approximately $70 million per year.  Similarly, Qatar, Iran's ally, has for its own part provided over $1.1 billion to the terrorist organization, largely in support of Hamas's brutal dictatorship in the Gaza strip. Much of that money was used, according to press reports, to rebuild Hamas's notorious network of terror tunnels into Israel.

89.     While many other Arab regimes have moderated their financial and logistical support for terror as well as the influence of the rabidly anti-Western regime in Iran, Qatar just cannot quit. Describing Qatar as Hamas's "financial and political patron," *Newsweek* magazine observed in 2017 that despite claiming it was not supporting terrorism, Qatar could not identify "a single specific instance of Qatar charging, convicting, and jailing a U.S. or U.N.-designated" terrorist within its borders with a crime.

16

90.     Qatar's client, CAIR, is the U.S. affiliate of Qatar's client, Hamas.     The relationship between, or identity of, CAIR and Hamas was amply demonstrated in the largest successful terrorism financing trial in U.S. history, *United States v. Holy Land Foundation for Relief and Development* (hereinafter the "Holy Land Foundation Trial"), which took place in the Northern District of Texas in 2008.

91.     Defendant CAIR was named as an unindicted co-conspirator with the defendants in the Holy Land Foundation Trial, during which the government proved that in 1993, a group of Hamas activists constituting the Muslim Brotherhood's U.S. Palestine Committee attended a meeting led by Nihad Awad and Omar Ahmad which resulted in the founding of defendant CAIR National.

92.     The Muslim Brotherhood, designated a terrorist group by Egypt, the United Arab Emirates, Bahrain and Saudi Arabia, maintains a verified Twitter account, @Ikhwanweb which has over 72,000 followers, as well as an Arab-language account, a representative tweet from which is shown below.



الإخوان المسلمون
@IkhwanwebAr                    ( Follow )   ⌄

ستظل فلسطين من البحر إلى النهر شاهدة على أن
أمة الإسلام مازالت حية، تفتدي قدسها وأقصاها
بكل ما تملك.وستظل شاهدة على دموية الصهاينة
و على انحياز القوي الكبرى للمحتل وتقاعس
المنظمات الدولية وإصابة النظام العربي بالشلل
بعد سقوطه في مستنقع التطبيع وتراجعه عن
نصرة الشعب الفلسطيني

Translated from Arabic by 🪟 Microsoft

Palestine will remain from the sea to the river, witnessing the fact that the ummah of Islam
is still alive, sanctifies its holiness and the most of its own. and will continue to witness the
deadliest of Zionists and the bias of the great powers of the occupier and the inaction of
international organizations and the paralysis of the Arab regime after its fall in the swamp
of normalization and its retreat from the victory Palestinian

6:09 AM - 30 Nov 2018

4823-3435-1254, v. 1

93.     Awad, Ahmad and the other members of the Muslim Brotherhood's U.S. Palestine Committee founded CAIR National in order to fund and create new public faces for Hamas, most immediately for purposes of undermining domestic U.S. support for a proposed Israel-PLO peace plan.

94.     One of these Hamas "faces," or fronts, in the U.S. was the Occupied Land Fund, which later given the less militant, Christian-sounding name, "Holy Land Foundation" ("HLF"), as well as the Council on American Islamic Relations, i.e., defendant CAIR National.

95.     Following this meeting, CAIR National was incorporated by Awad, Ahmad, and Rafeeq Jaber, all three of whom have also been officers in U.S.-based Hamas affiliates.

96.     The defendants in the Holy Land Foundation Trial were ultimately convicted of raising $12 million for Hamas in the U.S.

97.     CAIR subsequently challenged its designation as a co-conspirator with Hamas in a related case, *U.S. v Sabri Benkhala*,

98.     In *Benkhala*, the government told the court that, "From [the time of] its founding by the Muslim Brotherhood leaders, CAIR conspired with other affiliates of the Muslim Brotherhood to support terrorists . . . the Court has entered into evidence a wide array of testimonial and documentary evidence expressly linking CAIR and its founders to the HLF and its principals; the Islamic Association for Palestine and its principals; the Palestine Committee in the United States, headed by Hamas official Mousa Abu Marzook; and the greater Hamas-affiliated conspiracy described in the Government's case-in-chief."

99.     The Circuit Court of Appeals in *Benkhala* rejected CAIR's arguments, adopting the conclusion of former FBI Assistant Director Steve Pomeranz that, "By masquerading as a

18

mainstream public affairs organization, CAIR has taken the lead in trying to mislead the public about the terrorist underpinnings of militant Islamic movements, in particular, Hamas."

100.    As demonstrated by the allegations in this case, CAIR / Hamas's mission to mislead the public about the terrorist underpinnings of militant Islamic movements, in particular Hamas, has found ready allies among both censorious, self-appointed selective "hate" monitors and monopolistic social media juggernauts such as Twitter.

101.    Terrorist group Hamas, of course, is active on Twitter.  Its official English-language account, @HamasInfoEn, was established in March of 2015.



102.    As shown above, Hamas explicitly opposes any negotiation with the State of Israel, as well as any Palestinian Arab politician – even the head of the Palestinian authority – who accepts the concept of negotiation even in principle.

103.    Given Hamas's perspective, it is unsurprising that Hamas's U.S. organ, CAIR, has a long record of defending radical Muslims and their organizations and consistently condemns all counterterrorism efforts of the U.S. government and local law enforcement.

19

**Laura Loomer and the Representatives from CAIR**

104.    CAIR / Hamas has chapters throughout the U.S., including South Florida, where defendant CAIR Florida is based.

105.    Because of her reporting and activism on issues relating to terrorism and the State of Israel, Ms. Loomer, a resident of Palm Beach County, has been a thorn in the side of CAIR National, and of CAIR Florida in particular.

106.    For example, in March of 2018 CAIR Florida prevented Ms. Loomer from attending, as a journalist, observer or otherwise, the trial of Noor Salman, who was accused of assisting her husband, Pulse Nightclub shooter Omar Mateen, with planning and executing mass murder in the name of ISIS.

107.    Later, at an August 2018 event at which Rep. Omar appeared, Ms. Loomer questioned Omar and Rashida Tlaib, who were running for their first terms in Congress, about their affiliation with CAIR, their apparent comfort concerning its many established connections with terrorism, as detailed further below and her views concerning relations with the State of Israel.

108.    Tlaib refused to answer Ms. Loomer's questions, who was eventually physically prevented from continuing to question her. Tlaib then assaulted Ms. Loomer and attempted to take away her phone, prompting Ms. Loomer to file a police report.

109.    In November of 2018, Ms. Loomer was evicted from a political event featuring Democratic gubernatorial candidate Andrew Gillum in a synagogue in Plantation, Florida because of her insistence on confronting him with questions concerning his support for CAIR / Hamas.

20

110. That same month, Ms. Loomer again incurred the wrath of CAIR Florida because of her support of Hallandale Beach Commissioner Anabelle Lima-Taub in her opposition to another Muslim elected to Congress, Michigan Rep. Rashida Tlaib.

111. Although an American flag pin is considered *de rigeur* on the chests of members of Congress, Rep. Tlaib wears a pin displaying the flag of "Palestine."

112. Palestine is not in located in Rep. Tlaib's congressional district.

113. Democrat Rep. Tlaib keeps close company with unabashed anti-Semites.

114. One of Reb. Tlaib's chief fundraisers, Maher Abdel-qader, is known for promoting antisemitic conspiracy theories on social media, such as videos claiming displaying crude antisemitic caricatures entitled, "The Jews in Israel are not true Jews."

115. Abdel-qader maintains a Twitter account at @AbdelqaderMaher.

116. Rep. Tlaib also spoke at a CAIR event with Siraj Wahhaj, a co-conspirator in the 1993 World Trade Center bombing in New York who has called for the killing of gays. Imam Wahhaj's son established and headed a radical Muslim compound in New Mexico where prosecutors say he was training children to be school shooters and planning a terror attack on an Atlanta hospital.

117. Imam Wajjaj maintains a Twitter account at @SirajWahhaj.

118. Rep. Tlaib also refuses to distance herself from Abbas Hamideh, a Palestinian activist who has openly supported Hezbollah and compared Israelis to Nazis, maintains a Twitter account at @Resistance48.

119. Hamideh's Twitter account features extensive retweets of @IlhanMN, Rep. Omar's account; tweets praising Iranian "lawmakers" for their expressions of contempt for the United States; and pious, woman-friendly cultural insights such as the one reproduced below:

21



120.    Hamideh attended Tlaib's swearing-in ceremony as her guest and took a picture with her which he then posted to social media.  Rep. Tlaib also posted a "selfie" of herself with Hamideh to her Facebook account in April of 2018.

121.    Hamideh's friend Rep. Tlaib is a regular speaker at fundraising events for CAIR / Hamas.

122.    One such event was a March 2019 fundraiser for the Michigan chapter of CAIR at which she was one of two featured speakers, the other one being Imam Omar Suleiman.

123.    Iman Suleiman, has an active, verified Twitter account, with 273,000 followers, at @omarsuleiman504, where his profile describes him as "Muslim for Humanity. Lover of Justice. Bridge Builder. Scholar. Activist."

124.    An example of Iman Suleiman's humane bridge-building is the tweet below, directed to Israelis:



125.    Linked to the global Muslim Brotherhood terrorist network, Iman Suleiman has referred to homosexuality as a "disease" and a "repugnant shameless sin" that should be punished by death and endorsed mandatory hijabs for all women, also stating in a 2012 sermon that women who commit adultery run the risk of being honor-killed by their family members.

126.    The Michigan CAIR chapter hosting Imam Suleiman and Rep. Tlaib is headed by Dawud Walid, described by Dr. Zuhdi Jasser, the president of the American Islamic Forum for Democracy, as one of the "leading radicalizers of American Muslims." He has endorsed blasphemy laws that call for violent repercussions for engaging in criticism of Islam or Muhammad.

127.    Dawud Walid's Twitter account is @DawudWalid.

**Twitter, CAIR and its Allies: The Special Relationship**

128.    As might be expected from the fact that officials and friends of CAIR / Hamas are by all indications exempt from censorship by Twitter for "hateful" or "dehumanizing" speech, Twitter has a special relationship with CAIR / Hamas.

129.    That special relationship dovetails well with Twitter's well-established hard-left political bias as well as the privileged power given by Twitter to groups aligned with CAIR, such

23

as the Southern Poverty Law Center, that vociferously oppose views such as those of Ms. Loomer and are actively engaged in the promulgations of aggressive corporate censorship by social media conglomerates such as Twitter, Google and Facebook in any effort to prevent such views being expressed.

130.    More specifically, however, it is consistent with the goal of Twitter to be essentially "Sharia compliant," or at least, compared to a standard of free discourse, Sharia-friendly, with respect to certain categories of content.

131.    These categories include, upon information and belief, politics, religion and anything having to do with Islam.

132.    Twitter's commitment to this partial Sharia compliance has gone so far in recent months as to include transmitting, on behalf of Muslim states such as Pakistan, notices informing users in the United States that content they have tweeted has been flagged by state authorities as violations of Sharia-based blasphemy laws.

133.    Besides aligning well with its overall political orientation, Twitter benefits from Sharia-compliant, anti-Israel and, by and large, antisemitic-tolerant censorship policies in several ways.

134.    For one, on information and belief, Twitter has reached an accommodation with Muslim states whereby, in exchange for agreeing to censoring Muslim-, Islam- and Israel-related content and ban particularly problematic accounts, such as @lauraloomer, Twitter is permitted to operate profitably in Muslim states that tightly control media.

135.    Another reason Twitter accedes to such policies is that one of its largest stakeholders is Saudi Prince Alwaleed Bin Talal Bin Abdulaziz Alsaud, who in 2011 invested $300 million in Twitter.

24

136.   Beginning in 2015, Bin Talal became an outspoken critic of then presidential candidate Donald Trump, until, following his 2017 detention by Saudi officials, his public criticism of the President and his policies became far less conspicuous.  He remains one of the largest holders of Twitter's common stock.

137.   Twitter's censorship decisions are driven in part by these relationships and business goals, as a result of which Twitter's censorship of content bearing on Islam, Muslims and their relationships with non-Muslims – and additionally concerning the State of Israel – is heavily one-sided and bears little or no relationship to the Twitter TOS.

138.   This bias on the part of Twitter is especially the case when "hateful" content relates to Jews, Jewish issues and the State of Israel or other content that might embarrass or politically harm groups such as CAIR, or its favorite daughters, such as Rep. Omar and Rep. Tlaib.

139.   In particular, Twitter has given a special role in deciding what ideas and voices Twitter will silence concerning Islam, Muslims, the State of Israel and Jews to organizations such as the far-left Southern Poverty Law Center ("SPLC") and its ally CAIR / Hamas, whose core philosophy is that the State of Israel literally has no right to exist and that Jews who live there have no right to live.

**Twitter and the Jews: Antisemitism Central**

140.   Twitter has been effective at reducing gross, over-the-top antisemitic rhetoric and harassment in the English language on its platform, largely eliminating harassing use of Holocaust imagery, such as death camp and crematorium photographs and antisemitic caricatures and "memes" to which active English-speaking Jewish and pro-Israel users were routinely subjected less than a decade ago.

25

141.    According to a 2016 report by the ADL, however, Twitter only bans a small fraction, about a fifth, accounts of users based on antisemitic or Holocaust-themed tweets.

142.    In fact, most Twitter accounts banned or suspended because of antisemitic content are anonymous, trivial or both, and typically include extremist rhetoric directed not only at Jews but other minority groups.

143.    Twitter's interest in restricting antisemitic content, in fact, is almost exclusively focused on content seen as originating with associated with or associated with the right or far-right.

144.    Thus, for example, in February of 2019 a French far-right magazine had its Twitter account suspended after multiple complaints of hate speech including antisemitic abuse.

145.    In contrast, however, prominent and public anti-Semites freely utilize Twitter.

146.    This toleration of antisemitism by benefits Twitter because antisemitic content and personalities generate content that brings antisemitic users to the platform and keeps them there.

147.    Twitter also benefits by tolerating antisemitism because of the special relationship between Twitter, defendant CAIR and the latter's affiliates and allies such as Hamas and the Muslim Brotherhood, which promote antisemitism under the guise of opposition to the State of Israel.

148.    For these reasons, notwithstanding the TOS, antisemitic content is not permitted by Twitter despite the fact it is hateful, but rather because it is hateful.

149.    As a result, the ADL's Center on Extremism (COE) estimates that in the one-year period ending in January, 2018, roughly 4.2 million antisemitic tweets were posted and reposted on Twitter by approximately three million unique handles.

4823-3435-1254, v. 1

150.    This volume of antisemitic commentary and content on Twitter exists, and is growing, despite Twitter's demonstrated ability to detect and quickly censor content it finds beneficial to its business interests.

151.    One leading example of this principle in action is Twitter's continued hosting of an active Twitter account by the extremist David Duke, who but for his activity on Twitter would rightly be regarded as an irrelevant lunatic.



152.    As recently as April of 2019, Duke's account, @drdavidduke, tweeted the viciously antisemitic cartoon shown at left, first published in newspaper known for its history of antisemitism.

153.    In describing the cartoon, the New York *Times* opined, "Such imagery is always dangerous, and at a time when anti-Semitism is on the rise worldwide, it's all the more unacceptable."

154.    Nonetheless, despite tweeting this offensive cartoon on Twitter, Duke remains an active Twitter user.

155.    The most prominent demonstration of Twitter's hypocrisy regarding "hateful content," however, is the case of Louis Farrakhan, a virulently antisemitic cleric and leader of the black-separatist Nation of Islam, known for decades for antipathy towards Jews and Judaism, the latter of which he famously described as a "dirty religion" in the 1980's.

156.   Farrakhan is so widely regarded as a bigot and extremist that even Facebook, which like Twitter is notoriously hypocritical with respect to the one-sided application of its "hate speech" censorship, has banned him.

157.   Twitter, in contrast, has not.

158.   Farrakhan's extremist bona fides are well documented.   According to SPLC, Farrakhan warned Jews in a 1996 speech that Allah would "crucify" them, and admonished them that, "You are wicked deceivers of the American people. You have sucked their blood. You are not real Jews, those of you that are not real Jews. You are the synagogue of Satan, and you have wrapped your tentacles around the U.S. government, and you are deceiving and sending this nation to hell."

159.   SPLC also quotes Farrakhan as writing, in his organization's magazine, *The Final Call*, "Osama Bin Laden didn't destroy the Twin Towers. That was a false flag operation to take the world's attention away from the great disunity in America after George W. Bush stole the election" and, in a February 2019 speech, as stating, "Pedophilia and sexual perversion institutionalized in Hollywood and the entertainment industries can be traced to Talmudic principles and Jewish influence. Not Jewish influence, Satanic influence under the name of Jew."

160.   SPLC also reports, "Antisemitism is only one of Farrakhan's many prejudices. Over the years, his comments have consistently been rabidly anti-gay. 'God don't like men coming to men with lust in their hearts like you should go to a female,' he told a Kansas City crowd in 1996. 'If you think that the kingdom of God is going to be filled up with that kind of degenerate crap, you're out of your damn mind.'"

4823-3435-1254, v. 1



161.   Farrakhan has not hesitated to use Twitter to spread his antisemitic views, tweeting, in June of 2018, that he was "unmasking the Satanic Jew and the Synagogue of Satan," as shown at right, and, in October of 2018, "I'm not an anti-Semite. I'm anti-Termite," as shown below.



162.   Farrakhan's Twitter account, @LouisFarrakhan, is still active and as of the date hereof had approximately 336,000 followers.

163.   Although SPLC leads the far-left "antiplatforming" movement that targets effective conservative figures such as Ms. Loomer for online banning and economic destruction, it acknowledges that Farrakhan's maintenance of a massive presence on Twitter makes a mockery of Twitter's TOS.

164.   Admitting that social media platforms such as Twitter have a double standard when enforcing "hate speech" guidelines, SPLC states, "Farrakhan has become the scapegoat for many fringe right figures as they attempt to make the case that social media platforms have a double standard when enforcing hate speech guidelines. Farrakhan remains active on both Facebook and Twitter, despite the fact that numerous extremists" – the term used for anyone who disagrees with notoriously corrupt SPLC, including plaintiff – "were removed from social media platforms in 2018."

29

165.    As SPLC's own acknowledgment of the favored treatment Twitter extends to the Nation of Islam's Farrakhan demonstrates, one need not be a "fringe-right figure" to observe that what fringe-left SPLC calls "removal" of "extremists" by Twitter is a very one-sided affair.

166.    In September 2018, for example, Twitter suspended – for "hateful conduct" – a Canadian going by the name "Laura" with the handle @womaninmedicine. "Laura" is a Coptic Christian. Egypt's Coptic Christians were terrorized by gangs linked to the Muslim Brotherhood in the wake of the Egyptian military's 2013 ouster of President Mohamed Morsi.

167.    Twitter suspended "Laura" for referring to the Muslim Brotherhood, which as alleged above is designated a terrorist group by Egypt, the United Arab Emirates, Bahrain and Saudi Arabia, as a "terrorist group."

168.    Similarly, Twitter flagged and censored an August 2017 post by Robert Spencer,[1] a noted critic of radical Islam and its political and cultural allies in the West, which stated, "Islam is not a religion of peace. The Quran exhorts Muslims to wage war against and subjugate unbelievers."

169.    Examples of similar sanctions against accounts belong to Muslims, Islamists and their supporters which tweet vicious anti-Jewish and anti-Israel content – such as those set forth above from Rep. Omar and from her associates and leading supporters and those of Rep. Tlaib – are difficult to find, however.

170.    In fact, Muslims on Twitter, and particularly those affiliated with CAIR, are essentially exempt from Twitter's "hate speech" guidelines.

171.    For example, Zahra Billoo, executive director of CAIR's San Francisco-Bay Area chapter, has used her verified Twitter account to call Israel a terrorist state, to compare American

---

[1] Robert Spencer is not to be confused with the far-right extremist and white supremacist Richard Spencer.

Jews who join the Israel Defense Forces to ISIS, to defend Hamas and Hezbollah rocket attacks against Israel, and to call for Israel's destruction.

172.    In fact, Billoo has repeatedly referred to the Jewish state on Twitter in far harsher language than that used in in the post that got the Coptic "Laura" suspended, tweeting – at least five times – that   "Israel is an apartheid, racist state, which engages in terrorism against Palestinians."

173.    So confident was she of the fact that, because of the special relationship between Twitter and CAIR / Hamas, Twitter could be trusted not to take action against a CAIR official, Billoo even "quote-tweeted" her "apartheid . . . terrorist" tweet with the introduction, "JUST IN CASE THE ZIONISTS DIDN'T HEAR ME."

174.    Another example of Twitter's blind eye concerning violent and hateful speech by Muslims or Arabs is the tweet reproduced at right from the verified account of Abdullah Mugrin, a writer and journalist, advising that men strike their wives "every morning" because "if you do not know why she knows."



175.    Mugrin's verified account is still found on Twitter as of the date hereof.

176.    Despite frequent public self-congratulations for its efforts to eliminate "extremism" and "violent rhetoric" from its platform, Twitter gives continued access to some of the world's most notorious terrorist groups either officially or through popular unofficial accounts or via proxies who regularly tweet their messages supporting violence against Israel and Israelis.

31

177.     Defendant CAIR has never publicly supported the efforts of the United States government to combat terrorism committed by or for which responsibility was claimed by Muslim extremists.

178.     Consistent with CAIR's view of Muslim-related terrorism in the U.S., Rep. Omar was recently quoted, at a CAIR fundraiser in Los Angeles, that "CAIR was founded after 9/11, because they recognized that some people did something and that all of us were starting to lose access to our civil liberties."

179.     Rep. Omar's callous reference to the murder of 3,000 civilians by Muslim-inspired terrorists on September 11, 2001 as "something" that was done by "someone," and her framing of this mass murder as primarily causing Muslims to "lose access to" civil liberties, is consistent with CAIR / Hamas's philosophy and its propagandistic approach.

180.     Omar also claimed falsely, at that event, that CAIR was founded after the September 11, 2001 attacks in response to that supposed deprivation of civil liberties.  As set forth above, CAIR was founded in 1994.

181.     Notwithstanding the foregoing, CAIR / Hamas is a regular participant in the process by which Twitter decides which content and users to censor or ban from its platform.

182.     Unsurprisingly, then, Twitter has consistently turned a blind eye to violent, extreme, dehumanizing and eliminationist rhetoric by individuals and organizations close to CAIR / Hamas, including Rep. Omar.

183.     More than this, at least in part because of CAIR / Hamas's special relationship with Twitter, Twitter has, on information and belief, agreed to follow instructions from CAIR / Hamas to the effect that the most prominent and popular political and cultural icon of CAIR /

32

Hamas, Rep. Omar, receive special "protection" from what would otherwise be considered routinely assertive and even hostile online interaction with political opponents and journalists.

184.    For these reasons, therefore, when CAIR / Hamas transmitted its instructions to Twitter that Ms. Loomer be banned from the platform, Twitter complied.

185.    The proximate cause of Ms. Loomer's ban was not the result of her ideological stance or even because she is critical of radical Islam, views that are not difficult to find expressed by many Twitter users, although these factors – as well as the fact that Ms. Loomer is a Jew – cannot have helped her in the eyes of the CAIR / Twitter decision-making apparatus.

186.    Rather, Ms. Loomer was banned, on information and belief, above all because Twitter and CAIR, and on information and belief Qatar, targeted her because of her past run-ins with CAIR Florida and because her strident criticism of CAIR's "favorite daughters," Rep. Rashida Tlaib and Rep. Ilhan Omar, threatened to interfere with the success of political, legislative and cultural agendas shared by CAIR on behalf of its anti-Israel, anti-Jewish and anti-Trump constituents, including Hamas and the Kingdom of Qatar.

187.    Because Twitter was Ms. Loomer's most important publishing platform, the ban by Twitter of the @LauraLoomer account reduced her monthly income by approximately 75%.

188.    On February 6, 2019, PayPal, following Twitter, also banned Ms. Loomer, which was shortly followed by her being banned by Venmo and having her access to her online banking at Chase Bank restricted.

189.    On April 18, 2019, plaintiff filed the initial complaint in this matter.

33

190.    CAIR responded publicly the same day through the Twitter account of attorney Ahmed Mohamed, the director of litigation for CAIR's New York office, who crowed, in the April 18, 2019 tweet shown at right, that the loss of Ms. Loomer's income due to her "hate speech" was a fate he was "praying all Islamophobes suffer."



**Ahmed Mohamed**
@Ahmed4Change

Islamophobe Laura Loomer's income decreased 90% after she was banned from @Twitter @PayPal @venmo @Chase for her hate speech. Instead of taking responsibility for her disgusting actions, she's blaming #CAIR. Praying all Islamophobes suffer the same fate. Takbir!!! #StopHate

8:41 PM · 4/18/19 · Twitter Web Client

191.    That same day, Muhammad Sattaur, director of outreach for CAIR New York, reached out to Facebook in no uncertain terms, tweeting sentiments similar to those of attorney Mohamed but adding, "@Facebook, what are you waiting on?", as shown at left.



**Muhammad Sattaur**
@muhammadsattaur

#BreakingNews: Islamophobe Laura Loomer's income was reduced by 90% after she was banned from #Twitter, #Paypal, #Venmo, and #Chase. Instead of taking responsibility for her actions, she is suing & blaming our colleagues at CAIR. @Facebook, what are you waiting on?

10:09 PM · 4/18/19 from Valley Stream, NY · Twitter for iPhone

192.    Facebook waited on no more than the passage of two weeks before complying with the instruction delivered from CAIR via Sattaur's Twitter account.  On May 2, 2019, without any warning, Ms. Loomer was banned from Facebook.

193.    That same day, Ms. Loomer was banned from all other major social media platforms, including Instagram.

194.    Sattaur subsequently deleted the tweet shown above.

195.    The collective banning and restriction of Ms. Loomer's online life, which upon information and belief was proximately caused by defendants' conduct as alleged herein, has

34

caused her income to be reduced by 90% as well as other damage such as the loss of future employment and speaking opportunities as well as reduced access to online and other resources for publishing, fundraising and financial services.

**COUNT I.**

**BREACH OF CONTRACT**

196.    Plaintiffs restate all the foregoing allegations as if set forth fully herein.

197.    Plaintiff Laura Loomer and defendant Twitter entered into the Twitter Terms of Service at the time of the initial registration of her account with Twitter.

198.    Plaintiff Laura Loomer performed all her obligations under the Terms of Service.

199.    By the actions alleged above, in particular by Twitter's bad-faith employment of the Terms of Service as a pretext for banning her account for conduct it consistently tolerated on the part of others, Twitter breached the covenant of good faith and fair dealing implied as a matter of law in the Terms of Service.

200.    Ms. Loomer has been damaged by Twitter's breach in an amount to be determined at trial.

**COUNT II.**

**TORTIOUS INTERFERENCE WITH ADVANTAGEOUS BUSINESS RELATIONSHIP**

201.    Plaintiffs restate all the foregoing allegations as if set forth fully herein.

202.    At the time of the conduct complained of above, plaintiffs had a reasonable expectation of economic gain in the form of revenue that they would obtain from Ms. Loomer's use of Twitter to publish and promote her work and to seek donations that would benefit her and plaintiff Illoominate, along with other forms of financial support and opportunities, including by the use of PayPal for solicitation of donations.

35

203.    Defendants were aware of the importance of Twitter to plaintiffs' economic expectancies and relationships to Ms. Loomer and Illoominate.

204.    As alleged above, inNovember of 2018, defendant Twitter, through, in concert with or at the behest of defendants CAIR Florida, CAIR National or both of them, planned and executed out the banning of Ms. Loomer from Twitter in bad faith.

205.    The purpose and effect of this conduct was to disrupt or destroy the mutually beneficial economic relationships that plaintiffs had with Ms. Loomer's fans and readers, Illoominate's donors, fundraising resources including PayPal and other platforms and online resources as alleged above, and which did in fact disrupt or destroy those relationships.

206.    Defendants interfered with plaintiff's actual and prospective economic opportunities and for their own benefit, as set forth above.

207.    Defendants' conduct was the proximate cause of the loss or impairment of plaintiffs' business relationships as alleged above, which resulted in their loss of the expectancy and realization of economic gain.

208.    Defendants were not justified to engage in the conduct described in the preceding paragraph.

209.    Plaintiffs have been injured by the actions of defendants as alleged above in amount to be proved at trial.

## COUNT III.

## UNLAWFUL AGREEMENT IN RESTRAINT OF TRADE

210.    Plaintiffs restate all the foregoing allegations as if set forth fully herein.

211.    Pursuant to Florida Statute § 542.34, it is an unlawful restraint of trade for any person authorized to do business in the State of Florida to refuse to grant or accept any contract or other document evidencing the transfer of funds or credit on condition that it not has not dealt

36

or will not deal with any other person on the basis or a person's sex, race, color, religion, ancestry, or national origin; or on the basis of a person's lawful business association, or to support a foreign boycott or embargo imposed by a foreign nation.

212.    By virtue of the above-alleged conduct, defendants entered into a contract, combination, or conspiracy in restraint of trade on behalf of the Kingdom of Qatar because Ms. Loomer's activism on Twitter was a threat to the interests to further the goals of the so-called Boycott, Divestment, Sanctions ("BDS") movement, whose admitted purpose is to undermine international support for the State of Israel, in violation of Florida Statute § 542.18.

213.    Plaintiffs have been injured in their business or property by reason of defendants' unlawful act, combination or conspiracy in restraint of trade.

## COUNT IV.

## CIVIL CONSPIRACY

214.    Plaintiffs restate all the foregoing allegations as if set forth fully herein.

215.    In engaging in the conduct described above, defendants intended to and did act in concert for purpose the purpose of impairing or destroying plaintiffs' business relationship with their readers, donors and fundraising resources, including PayPal and other platforms and online resources as alleged above, and did in fact disrupt those relationships.

216.    The defendants engaged in the interfering conduct with malice toward plaintiffs and a desire to injure them economically, and with disregard of the plaintiffs' rights.

217.    The defendants' conduct was improper, unlawful, and unfair in that it involved a restraint of trade, an illegal boycott and a tortious interference with plaintiffs' advantageous business relationships and prospective business relationships.

218.    Plaintiffs have been injured by the actions of defendants as alleged above in amount to be proved at trial.

4823-3435-1254, v. 1

## COUNT V.

### FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT

219.   Plaintiffs restate all the foregoing allegations as if set forth fully herein.

220.   By the acts described above, defendant Twitter has engaged in unfair, deceptive and unconscionable acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq.*

221.   Defendants, among other things, unlawfully, fraudulently and in bad faith induced Ms. Loomer to enter into the Twitter TOS and to make a substantial an investment of time, resources, brand equity and other things into developing a substantial following and professional career based on her use of the @LauraLoomer Twitter account on the false premise that the Twitter TOS would be applied to all users with some cognizable degree of consistency, fairness and good faith, when in fact Twitter had no such intention and did not do so.

222.   Twitter's false representations regarding its TOS were repeated, and Ms. Loomer's reliance thereon was similarly reasonably induced by Twitter, with each successive change of its TOS during the time when she was a Twitter user.

223.   Additionally, though not a party to the Twitter TOS, plaintiff Illoominate also nonetheless relied reasonably and to its detriment on the foregoing false representations by defendant Twitter to Ms. Loomer that it would fairly, in good faith and in a manner consistent with its written terms enforce the TOS concerning the relationship between Twitter and Ms. Loomer.

224.   In addition, defendant Twitter, by banning Ms. Loomer from its service in bad faith and on the specious ground of "hateful" tweeting, has defamed Ms. Loomer or caused her wrongfully to be cast in a misleading light among the general public, to her prospective donors and above all to other social media platforms, including payment processors, crowdfunding and

38

other related resources, and by reason of which such firms have followed Twitter's lead and banned or restricted her access to such services as well.

225.    Defendant Twitter's unconscionable and deceptive acts and practices were designed to inflict injury and harm upon Illoominate and Ms. Loomer and to gain for Twitter an unfair business advantage, including, inter alia, to enhance and benefit from Twitter's special relationship with defendants CAIR and CAIR Florida and to gain for CAIR and CAIR Florida the silencing of plaintiff, or material reduction of her effectiveness as a journalist and critic, in order to enhance their fundraising and other activities.

226.    By reason of Twitter's conduct, these persons have been given the false impression that Ms. Loomer's strong opinions and political activism are so extreme that they go beyond the range of "acceptable" views "permitted" to other users of Twitter – including the anti-Jewish and anti-Israel activists, terrorism supporters and actual terrorist organizations as set forth above, which have not been banned – so that she should be, and in many cases has been, banned and shunned by them as well.

227.    In short, defendant Twitter has harmed Ms. Loomer to secure an improper business advantage, including for the purpose of ingratiating itself with CAIR / Hamas and its supporters, including the Kingdom of Qatar, as well as maliciously and malevolently interfering with Ms. Loomer's and Illoominate's business relationship with their supporters and donors, as well as prospective ones.

228.    Moreover, defendants CAIR and CAIR Florida have acted in concert with or otherwise proximately caused or induced or Twitter to cause the foregoing harm.

4823-3435-1254, v. 1

229.    Illoominate and Ms. Loomer have been injured by virtue of Twitter's and CAIR and CAIR Florida's deceptive and unfair trade practices as contemplated by Fla. Stat. § 501.204, in an amount to be proved at trial.

**PRAYER FOR RELIEF**

Wherefore, plaintiffs Illoominate and Laura Loomer pray for

(a)  judgment for damages in an amount to be proved at trial;

(b)  rescission or reformation of those provisions of the Twitter Terms of Service which, as a matter of equity, might otherwise prevent or limit this Court's ability to provide just and complete remedies for defendants' unlawful conduct;

(c)  preliminary and permanent injunctions to prevent defendants from continuing their unlawful conduct;

(d)  attorneys' fees and court costs pursuant to Fla. Stat. §§ 501.2105 and 501.211 and as may otherwise be provided by law; and

(e)  for such other and further relief as the Court deems just and proper.

**RESERVATION OF RIGHTS
REGARDING PUNITIVE DAMAGES**

Plaintiffs hereby reserve the right to plead and prove punitive damages as provided by Florida law when granted leave to do so by the Court.

**TRIAL BY JURY DEMANDED**

Plaintiffs request a trial by jury for all issues so triable for compensatory, incidental and, upon the granting of leave by the Court, punitive damages.

4823-3435-1254, v. 1

MANDELBAUM SALSBURG, PC


By: _____
        STEVEN W. TEPPLER

11891 US Highway One, Suite 100
North Palm Beach, FL 33408
steppler@lawfirm.ms
202.253.5670

Ronald D. Coleman (*pro hac vice*)
1270 Avenue of the Americas – Suite 1808
New York, NY 10020
212.776.1834
rcoleman@lawfirm.ms

*Attorneys for Plaintiffs*
*Illoominate Media, Inc. and Laura Loomer*

May 2, 2019