<pre>
 1              IN THE UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF FLORIDA
 2                      WEST PALM BEACH
                    CASE NO. 19-CV-81179-RAR
 3    _____

 4     ILLOOMINATE MEDIA, INC.; AND
       LAURA LOOMER,
 5                      Plaintiff,          November 18, 2019
                vs.
 6
       CAIR FLORIDA, INC.; CAIR
 7     FOUNDATION; TWITTER, INC.; AND
       JOHN DOES 1-5.
 8                      Defendants.

 9    _____

10                      MOTION HEARING

11        BEFORE THE HONORABLE RODOLFO A. RUIZ, II,

12        UNITED STATES DISTRICT COURT JUDGE
      _____
13
                      A P P E A R A N C E S
14
      FOR THE PLAINTIFF:    RONALD D. COLEMAN, ESQ  (via phone)
15    ILLOOMINATE MEDIA,    Mandelbaum Salsburg
      INC.                  3 Becker Farm Rd, Suite 105
16                          Roseland, NJ 07068
                            (646) 946-5659
17                          Rcoleman@lawfirm.ms

18    FOR THE DEFENDANT:    DARREN J. SPIELMAN, ESQ
      CAIR FLORIDA          Kain Spielman PA
19                          900 SE Third Avenue, Suite 205
                            Fort Lauderdale, FL 33316
20                          (954) 768-9002
                            Dspielman@complexip.com
21
      FOR THE DEFENDANT:    CAROLYN M. HOMER, ESQ
22    CAIR NATIONAL         C. DANETTE ZAGHARI-MASK, ESQ
                            Council on American-Islamic Relations
23                          453 New Jersey Avenue SE
                            Washington, DC 20003
24                          (202) 742-6420
                            Chomer@cair.com
25                          Dzaghari-mask@cair.com
</pre>

```
 1   REPORTED BY:        GIZELLA BAAN-PROULX, RPR, FCRR
                         United States Court Reporter
 2                       400 North Miami Avenue, 8th Floor
                         Miami  FL  33128
 3                       (305) 523-5634
                         gizella_baan-proulx@flsd.uscourts.gov
 4

 5

 6              P R O C E E D I N G S

 7         (The following proceedings were held in open court.)

 8         THE COURT:  Please be seated, everyone.

 9         MR. COLEMAN:  Thank you, Judge.

05:22 10         THE COURT:  We are here this afternoon in Case Number

11   19-81179, Illoominate Media, Inc., and Laura Loomer versus CAIR

12   Florida, et al.  I understand that we have folks who are

13   appearing telephonically.  So who do I have on the line on

14   behalf of the plaintiff?

05:22 15         MR. COLEMAN:  This is Ronald Coleman on behalf of the

16   plaintiff.  I think Mr. Teppler is on the way to court, but I

17   don't know if he's going to get there on time.

18         THE COURT:  Okay.  All right.  Well, we'll go ahead

19   and get started.  It was set, I think, for 4:00 o'clock.  It's

05:22 20   about 4:20.  So we're going to get underway just -- because I

21   understand there may have been some confusion on the part of

22   the plaintiffs today about the setting of our hearing.

23         I want the record to be very clear that this was set

24   in the order on the remand issue back in October.  So I don't

05:23 25   want the record to reflect -- yeah, I don't know if maybe
```

1 plaintiff's counsel didn't get to the end of the order and see

2 it, but it's memorialized in there.

3          So, again, I have no problem allowing you to appear by

4 phone, but my hope is that -- we hadn't heard from anybody so

05:23  5 we all assumed there was no concerns.

6          **MR. COLEMAN:**  Thank you.

7          **THE COURT:**  And I do have defense counsel present in

8 court.  So let me go ahead and allow them to state their

9 appearances for the record.  On behalf of what I believe is

05:23 10 just the remaining defendant CAIR National, I believe, if I got

11 that right.  I'm not sure.

12          **MR. SPIELMAN:**  I'll just go real quick.  Your Honor,

13 Darren Spielman on behalf of CAIR Florida.  And the only reason

14 we are here today is to make sure that we can witness the

05:23 15 hearing, because, despite my clients being dismissed with

16 prejudice on your October 22nd, docket 19 order, in the October

17 31st document, the papers that plaintiffs filed, they continue

18 to refer to my clients as co-conspirators involved in this

19 action.

05:23 20          So we're here merely for purposes of noting our

21 presence on the record, but we're not going to be arguing

22 anything today.

23          **THE COURT:**  Very good.  And then on behalf of CAIR

24 National.

05:24 25          **MS. ZAGHARI-MASK:**  Good afternoon, Your Honor.  I'm

1  Danette Zaghari-Mask for CAIR National.  My colleague who is

2  pro hac vice, Carolyn Homer, is going to present the arguments

3  today.  Thank you.

4        **THE COURT**:  Ms. Homer.  Okay.  All right.  So let me

05:24  5  -- and you can remain seated, Ms. Homer, as long as I can get

6  you on the microphone.  So let me do what I think is a brief

7  recap so I know where we're at.

8        My understanding from reviewing the pleadings, and

9  this is a question, really, for plaintiff's counsel so that we

05:24 10  don't have any confusion, is in light of my October order on

11  the remand issue where CAIR Florida was essentially let out of

12  the suit, my review indicates that what remains should just be

13  one count, Count 2 for tortious interference regarding CAIR

14  National.  That is my understanding of what's left in this

05:24 15  lawsuit to address today.  On the line, plaintiff's counsel,

16  Mr. Coleman, is that your understanding for the record as well?

17        **MR. COLEMAN**:  Yes, Your Honor.

18        **THE COURT**:  Okay.  So for purposes of CAIR Florida and

19  any concerns they're no longer in the suit, and there may have

05:25 20  been references to other codefendants, for example, Twitter, at

21  one point was in the suit, too, and got dropped, I assume

22  that's more for context than for anything else, but really,

23  with that concession and now clarifying that, what we have is

24  simply a motion to dismiss Count 2, tortious interference, and

05:25 25  let me just kind of bring up just to get right to it, the two

1   concerns that the Court has, and then I'll entertain some

2   argument on it to see if I missed anything.

3        So the first concern I have is much more straight

4   forward and it's what it takes under Florida law to allege a

05:25   5   claim for tortious interference of business relationships.  I'm

6   going to cite, I don't necessarily think they were in the

7   moving papers, but just two cases from colleagues here in the

8   Southern District of Florida, Coach Services versus 777 Lucky

9   Accessories, 752 F.Supp. 2nd 1271, and that's a 2010 case, and

05:26   10   then, more recently, I have another matter also, again, from

11   the Middle District in this case, and that is the Hill

12   Dermaceuticals versus Anthem, 228 F.Supp. 3rd 1292 in 2017,

13   both of them stand for the same proposition and reference the

14   same Florida law pertaining to tortious interference with

05:26   15   business relationships.  And let me read the key part of it.

16   Really, what it tells us is that the plaintiff has to establish

17   four elements:  And the existence of a business relationship

18   between the plaintiff and the third party; the defendant's

19   knowledge of the relationship; the defendant's intentional and

05:26   20   justified interference with the relationship; and damages

21   resulting from the defendant's interference.

22        Now, the business relationship, okay, is really where

23   I'm having a bit of a problem in how the complaint has been

24   structured and, in particular, my concern is that -- and

05:27   25   reading again from the cases I've cited, the tortious

1    interference with present or perspective customers may be

2    alleged, but no cause of action exists for tortious

3    interference with the business's relationship to the community

4    at large.  And that cites to Ethan Allen, a case from our

05:27   5    Florida Supreme Court.

6           It goes on to state that as a general rule, an action

7    for tortious interference with a business relationship requires

8    a business relationship evidenced by an actual and identifiable

9    understanding or agreement which, in all probability, would

05:27  10    have been completed if the defendant had not interfered.

11           And going further, to establish the tortious

12    interference with a business relationship, the plaintiff must

13    prove a business relationship with identifiable customers.

14           So I share that because trying to divine what the

05:28  15    claim is here, this is, from my understanding, Ms. Loomer's

16    relationship with Twitter, and in no uncertain terms, her

17    relationship with Twitter followers who may follow her brand,

18    whether they follow her campaign or her advocacy, whatever it

19    may be, but it seems that the Twitter community at large by way

05:28  20    of followers is what has been allegedly interfered and there

21    are no customers there.  There is no identifiable business

22    relationship there.

23           And so my concern and I'll hear from the defense, it's

24    your motion, we'll get a response, my understanding is how

05:28  25    could I and how could there even be, quite frankly, any theory

1  pled, period?  There's no real amendment that could cure this.

2  The relationship between Loomer and Twitter is of such a nature

3  that it would never sustain a tortious interference claim

4  because we don't have any sort of a business relationship with

05:28  5  identifiable customers, they're anonymous Twitter followers,

6  and then on top of that the knowledge element where Twitter

7  would have to know of that relationship, as I just stated, and

8  the defendant's knowledge relationships is paramount.

9       So I'm missing two key elements.  Can you tell me, I

05:29 10 think you guys have indicated you're similarly not sure what

11  relationship is being identified.  But I can only guess it's

12  Loomer's relationship with her Twitter followers, not Twitter

13  as an entity, which I don't think she has a business

14  relationship with to begin with, certainly not under the terms

05:29 15 of service, that's not a contract that would exist tortious

16  interference.

17      What do you guys think about this on the defense?

18  Tell me what part of you agree with that or am I missing

19  something, or is your understanding the same as mine.  Where

05:29 20 are you at?

21      **MS. HOMER:**  Your Honor, Carolyn homer.  Our

22  understanding is basically the same as yours.  It's that under

23  state law, the tortious interference has to be with essentially

24  a contract with a person, and I believe in our reply brief we

05:29 25 cite Atlas Van Lines for that proposition -- sorry, North

1  American Van Lines.  So it has to be a contract with the

2  person.

3        So the two possible theories that we came up with to

4  respond to plaintiff's motion were, one) that she was alleging

05:30  5  that we interfered with her contract with Twitter pursuant to

6  the terms of service and we believe that's categorically barred

7  both by the terms of contract's clause and Section 230 of the

8  Communications Decency Act.

9        And the alternative theory is that she is alleging

05:30  10  that we interfered with the prospect of her receiving donations

11  from these anonymous Twitter followers and we believe that's

12  categorically barred by the State law that requires specificity

13  in the relationship.

14        THE COURT:  And that's the latter point that I'm

05:30  15  worried about, because we can talk about the CDA in a minute as

16  what has been advanced, really an alternative ground that has

17  been advanced to dismiss this remaining claim, but, I think,

18  just a more disconcerting and a cleaner argument that I think

19  is very visible on its face is this breakdown of tortious

05:31  20  interference because there is, and again, both cases I cited

21  cite to North American Van Lines and they both point out that

22  it is well settled that a business relationship or business's

23  relationship with the general consuming public is not

24  protected, instead the asserted relationship must be with an

05:31  25  identifiable customer.

1          So, for example, had you had, I think, hypothetically

2    speaking, some sort of argument that she had actual

3    identifiable contracts with certain Twitter users and those

4    Twitter users only availed themselves through Twitter, the

05:31  5    defendant gets some bargains of that contract, which, again,

6    would strain credulity.  That's not how Twitter works, as my

7    understanding is.  But I think that maybe there we would have

8    something here.

9          But here, it is a kind of group of followers.  There's

05:31 10    no real contract between her and her followers.  She generated,

11    I think, whether it be contributions, awareness, business, that

12    may be very well true and that happens with a lot of social

13    media influencers and business generated through Twitter

14    followings, but for purposes of substantiating a tortious

05:32 15    interference claim, the case law seems to indicate we need

16    more.  We can't establish the tort and allege it by just

17    generally, as they say, trying to say it's a community at large

18    relationship.  And that's what I think I'm getting.  The

19    Twitter community at large, you're getting in the way of by

05:32 20    urging that they kick us off Twitter, basically, and I

21    understand that's what has been alleged and we're accepting it

22    under 12(b)(6) as true, but I just don't know that with that

23    accepted fact we would get to the specificity that you need

24    under the case law.  Right?  I mean, we would fall short.

05:32 25          MS. HOMER:  We agree, Your Honor.

           1          **THE COURT:**  So, counsel on the line, Mr. Coleman, how

           2   would you have me get around Ethan Allen from our Florida

           3   Supreme Court that seem to require this, I want to call it

           4   maybe specificity or the identifiable customers?  Because I

05:33      5   looked at your client complaint and I just don't see enough

           6   alleged to bridge that gap.

           7          **MR. COLEMAN:**  Well, Your Honor, I don't understand,

           8   first of all, why it would be that the case, in its present

           9   posture, would not be able to be seen as the business

05:33     10   relationship, the one between Twitter and Laura Loomer and

          11   Illoominate Media, indirectly through her.

          12          **THE COURT:**  Okay.  So let me take that theory because

          13   that was -- so why don't we do it this way:  Do you agree with

          14   me, then, that you have a fundamental problem as pled if your

05:33     15   theory is between Loomer and her followers, and that was

          16   interfered with by CAIR?  Do you agree?  Do you see a problem

          17   on that one.  Correct?

          18          **MR. COLEMAN:**  Well, business relationship from donors,

          19   from donors who are voluntary donors, would not be -- obviously

05:34     20   not contractual, although, of course, the cases don't require

          21   that it be a matter of a written contract.  But, you know, can

          22   I say -- can we say that there -- Florida law doesn't

          23   contemplate any tortious interference claim with prospective

          24   economic advantage, that it has to be specified?

05:34     25          If it's specified, then, obviously, we're talking

1   about donors, we're not.  But if there is -- if it can't be

2   said that a charity or someone who is supported by donations or

3   nonprofit, which doesn't necessarily know where its next

4   customer or donation was coming from, cannot have its business

05:35   5   interfered with, I'm not so sure that that's what an outcome of

6   the Florida law requires.

7           **THE COURT:**  Mr. Coleman, let me tell you what it does

8   require.  What it requires is a business relationship evidenced

9   by an actual and identifiable understanding or agreement,

05:35   10  which, in all probability, would have been completed if the

11  defendant had not interfered.  So what you're giving me is, I

12  think, a true hypothetical, that there could be a possible

13  donor base that there's knowledge of that.

14          First of all, there just is nothing identifiable

05:35   15  there.  It's Twitter followers.  I'm not saying they can't be

16  monetized, but the problem is a theory like that, number one)

17  has not been pled, and number two) it's not been established as

18  an identifiable understanding or agreement.  In fact, I would

19  go as far as to say the last time I checked, a donor wouldn't

05:35   20  translate into the contractual type of agreement to support the

21  tort.

22          This isn't about interfering with donors.  So I don't

23  know that that theory makes sense, even giving you the benefit

24  of the doubt, that they would be donating because there's

05:36   25  nothing identifiable.  You are almost trying to say that it is

interference with the future possibility of having followers
that would generate either whether it be awareness, or generate
business, and I'm not saying that's not necessarily true
because Twitter can be used that way and is often used that
05:36   5   way.  The problem is to establish a pleading requirement for
this particular tort, it needs more because we're not going to,
for example, hold the defendant liable or bring them into a
lawsuit unless they themselves have knowledge or targeting or
know that this is a relationship that they're going to
05:36   10  interfere with, not the potential to generate business.

11          I mean, that identifiable understanding or agreement
12  problem is pretty strong.  And it's fairly well established
13  that we can't have this tort lie unless we have an identifiable
14  customer.  That's how it's been worded by our Supreme Court in
05:36   15  Florida.  So that's why I have a bit of a problem.

16          Now your second argument where you're saying to me,
17  well, Twitter is identifiable, okay, if that's the theory, then
18  my question to you is, what's the contract?  Because as far as
19  I know, you have terms of service like every other Twitter
05:37   20  follower, which Twitter ultimately decided you violated.  Then
21  Loomer gets removed from Twitter.

22          But I'm trying to figure out what contract did you
23  have with Twitter.  You are using a social media platform, but
24  I don't see that as contractual obligation for a business
05:37   25  relationship.  In fact, everybody that uses Twitter then -- I

1  mean, think about it this way, I think you would argue that

2  this claim would lie in anybody that gets removed from Twitter.

3  I mean, if we treated it as a business contract or

4  relationship, how would I qualify it that way I guess,

05:37  5  especially as pled?

6          MR. COLEMAN:  Well, Your Honor, if I may.

7          THE COURT:  Yeah.

8          MR. COLEMAN:  First of all, to go back to the first

9  point.  You know, we cited in our brief Go TV, Inc. versus Fox

05:38 10  Sports Latin America Ltd., 2018 Westlaw 1393790, which

11  describes the elements of the existence of a business

12  relationship, not necessarily evidenced by an enforceable

13  contract.  A relationship is a concept that cases have

14  recognized and we did cite several cases that do not -- the

05:38 15  cases do not require a specific contract between A and B, but

16  rather a relationship.

17          So we would argue, Your Honor, that this would -- that

18  we're showing as an established track record, not a speculative

19  one, but where they can say that they have quarter of a million

05:38 20  Twitter followers and it has resulted in X amount of revenue

21  that was generated through Twitter that that's an ongoing

22  relationship, at least one that is amenable to proof as opposed

23  to a pleading deficiency.

24          THE COURT:  Okay.

05:39 25          MR. COLEMAN:  That that's a relationship there, then

1   we fail a summary judgment.

2           But we maintain, Your Honor, that we could prove that.

3   That we would demonstrate that there are people who were repeat

4   donors to Laura Loomer, from time to time, based on her Twitter

05:39   5   activity.  They interacted with her.  They accessed her fund-

6   raising facilities through Twitter.  And that relationship and

7   the Florida law does sustain that, you know, that sort of

8   relationship under the more recent case.

9           THE COURT:  Okay.  Let me get -- yeah, go ahead,

05:39   10   Counsel, why don't you respond to that?  I think that that

11   argument is fatally flawed, quite honestly, because it's not

12   identifiable.  You can't just tell me it's general Twitter

13   followers who give money and now I've satisfied pleading

14   requirements.  I mean, literally, the cases I cited on Lucky

05:40   15   Accessories points out that exact problem.  The tortious

16   interference claim there failed because it identified a

17   business relationship with the community at large, ergo Twitter

18   followers.  Some of which may donate here and there but, by the

19   way, those allegations are not present in the complaint, as I

05:40   20   remember it.  In fact, I don't know that anybody has been

21   specifically identified at all.

22           But my concern is there's too vague and abstract an

23   assertion here that she generates, generally, some revenues

24   through Twitter when you have basically, as identified on the

05:40   25   record now, Twitter followers.  That is exactly the amorphous

1    group that I think the case law finds to be insufficient.

2              Do you want to respond to that?

3         MS. HOMER:  Yes, Your Honor, I agree with that

4    assessment and I want to add that there's one further layer of

05:40  5    attenuation.  He does not plead that there were any direct

6    financial contributions that go through Twitter itself, and to

7    my knowledge, I do not believe that Twitter has a payment

8    processing platform, but the complaint does plead at paragraph

9    3 and paragraph 188 that PayPal, Venmo and Go Fund Me

05:41 10    separately banned Ms. Loomer after the events when Twitter

11    banned her, and I don't think there's any allegation that CAIR

12    is responsible for the loss of payments through those

13    platforms.

14         THE COURT:  Well, and I think you would agree with me

05:41 15    that there, again, we have to see how it would be crafted, but

16    I could at least see a payment processing company has much of a

17    contractual business relationship than a social media platform.

18    If you can accept payment through something, that may make more

19    sense to me.  Twitter might be a means to an end to get you

05:41 20    once you see her Twitter feed, then you maybe go to her link

21    and then maybe you get to PayPal or maybe you get somewhere

22    else and you donate, I get that.  But, again, we're dealing

23    with just the relationship to Twitter followers.  So I don't

24    know -- go ahead.

05:41 25         MR. COLEMAN:  Well, Your Honor, actually, I think it

1    is manifestly clear from the complaint that the allegation is

2    that the conduct of care did cause -- did cause the loss of

3    these -- of the payment platforms, and I don't think it could

4    be more clear.

05:42  5         In fact, I think it was just acknowledged by

6    defendant's counsel.  That is the allegation.  Yes, there

7    absolutely is another business.  Now the argument is it's too

8    attenuated, you know, that's interesting, and certainly was not

9    part of the briefing in this case.  We're now doing this on the

05:42 10   fly, but that absolutely was part of the agreement that not

11   only the loss of the payers but the loss of ability of

12   payments.  Obviously, we're not claiming that payments went

13   through Twitter, but you certainly wouldn't make the argument

14   that a reasonably foreseeable and, in fact, we believe that the

05:43 15   evidence shows and that the allegations support the argument,

16   that not only was it foreseeable, but that this was -- CAIR's

17   explicit purpose was to defame Laura Loomer and to do so by

18   removing her from platforms such as Twitter with the result

19   that there was a cascading series of loss of business

05:43 20   opportunities, including her payment arrangements with others,

21   because this was used as a rationale.  The banning from Twitter

22   was used -- we definitely plead this very explicitly -- was

23   used as a rationale for subsequent banning.

24        So that would be an argument on that point.

05:43 25        To the point of whether or not, Twitter is a business

relationship, I, frankly, don't understand the Court's

reasoning on this at all.  A contract is either a business

contract or it's not.  Terms of service are enforceable,

precisely, because they are considered to be contracts.

05:44        If the Court's ruling, if the Court is prepared to

rule that terms of service are not contracts, we'll be

absolutely intrigued by that.  But I don't think the Court

wants to go there.  If the Court wants to go there, then that

opens up all kinds of different possibilities for us.  But our

05:44 10  understanding is that the terms of service are treated like a

contract.  The reason the fact that Twitter was voluntarily,

without prejudice, dismissed from this action was because they

contacted our office and said, "Look, under the terms of

service, an enforceable contract there's a New Jersey -- I'm

05:44 15  sorry.  There's a California choice of venue clause and we tend

to enforce it.  Do you want to spend money litigating it or do

you want to stipulate," and we decided to stipulate.

     So, of course, it's a contract.

     **THE COURT:**  Can I ask you, perhaps maybe you're

05:45 20  misunderstanding where the Court's coming from.  What I've been

reading you, and I know you're not able to be here because you

didn't read my order so you didn't come to court today to let

me try to explain it, sometimes it's lost over the phone.  I

wanted to double-check.

05:45 25       I'm less concerned about a contract as I am a business

1  relationship.  At no point in time, has the Court read an

2  element from Florida law that states if you don't have a

3  contract.  You can call it terms of service, what you want.

4        What I'm trying to say is I don't see a single

05:45  5  pleading in here or a single allegation that would justify a

6  finding that use of Twitter is a protected business

7  relationship as defined by the tortious interference claim, and

8  that's -- when you have interference of business relationship,

9  I guess can you tell me what is the business relationship

05:45  10  between you and Twitter, absent using the social media platform

11  because that's where I think there's bit of a disconnect.

12        MR. COLEMAN:  The business relationship is an exchange

13  for the Twitter provides access its platform in return for

14  several things.  One) is following the terms of service.

05:46  15  Second) as is alleged in the pleadings here, that a user will

16  generate content.  The reason Twitter makes its service

17  available to users for free is because they generate the

18  content that brings other users onto the platform and in the

19  aggregate, those users are exposed to advertising and other

05:46  20  promotional value for which Twitter makes its money.

21        So Twitter doesn't charge a fee for you.  Rather,

22  Twitter says come and use the service, generate content,

23  generate -- you know, bring people who are attracted to the

24  service by virtue of your contribution, and in return, we'll

05:47  25  let you use the service, all you have to do is abide by the

1    terms of the service.

2         So that's the business relationship and we think it is

3    very clearly sketched out in the complaint.

4         **THE COURT**:  You want to respond to the argument that

05:47  5    there's a business relationship that has been set forth?

6    Again, I still think that it falls short of identifying the

7    most key element to me which continues to be identifiable

8    customers.  I think that at the end of the day, if the Court

9    grants a motion to dismiss it is because we have an amorphous

05:47  10   group of Twitter followers that cannot satisfy the identifiable

11   customer as pled and will never satisfy it, quite honestly, in

12   the way this is it structured because of the nature of the

13   general Twitter community.

14        So that is something that I don't know it is

05:47  15   insurmountable, but I want to make it very clear in the record

16   that if that's the way I go, that I have not left this point

17   unaddressed, and so I'm curious the business relationship, I

18   may not need to reach it if I think an identifiable customer

19   base is not properly pled, but I'm curious how you all respond

05:48  20   to the idea that this is a different theory, of course, where

21   we started with.  They're now saying that the relationship is

22   between Twitter.  Twitter is the identifiable customer.

23        So if that's the way we go, then they're trying to

24   cure that problem, then I need to see is there truly a business

05:48  25   relationship there.

1          Can you address that?

2          MS. HOMER:  Your Honor, so we would actually ground

3    that argument, not in the business relationship prong of

4    element one, but under this language about whether or not

05:48  5    plaintiff has any legal rights pursuant to that business

6    relationship.

7          So we do not dispute that the terms of service are a

8    contract.  But we dispute --

9          THE COURT:  Neither do I, by the way.

05:48  10          MS. HOMER:  But we dispute that the terms of service

11   create any sort of financial expectancy entitled to legal

12   rights that plaintiffs might have.  So this is, you know, we

13   have attached the Twitter terms of service in full under the

14   argument that they're incorporated by reference to our motion

05:49  15   to dismiss, and the Twitter terms of service expressly state in

16   Section 4 that we may suspend or terminate your account at any

17   time for any or no reason, and then, further, if Your Honor is

18   inclined to address Section 230, we believe that also gives

19   Twitter the absolute right to ban plaintiff, then have immunity

05:49  20   from any sort of suit, and between those two legal principles,

21   plaintiff has absolutely no legal right to maintain a Twitter

22   account and whatever consequences, donations, relationships

23   with the fan base, et cetera, that may follow from that.

24          MR. COLEMAN:  Your Honor --

05:49  25          THE COURT:  Hold on one second.  I just want to make

1    sure so I understand, so the idea being that the financial

2    expectancy element that would give rise to the business

3    relationship is absent, I guess, from the terms of service that

4    would be the contract.

05:49    5        Now what would you say as to the idea that they've

6    advanced that you don't necessarily need a contract formed,

7    there can be an agreement, perhaps not something so formal,

8    what would your response that there is some generation of

9    advertising income and things of that nature through that kind

05:50   10    of agreement?  What would you say as to that?

11        MS. HOMER:  Well, I don't see any of that sort of

12    relationship with Twitter, about the financial terms they have

13    with Twitter anywhere in the complaint, and I certainly think

14    that doesn't rise to any level to overcome the clear terms of

05:50   15    service themselves that say there's no right to have this, or

16    to maintain this platform.

17        THE COURT:  Okay.  So really one of the things is,

18    that would be any kind of allegation, in your view, that would

19    support the idea that there's some sort of financial benefit

05:50   20    was exclusively or explicitly, rather, I guess eliminated or

21    clarified by the terms of service --

22        MS. HOMER:  Yes, Your Honor.

23        THE COURT:  -- to form a basis for that.  That there

24    is no financial relationship arising from you being a Twitter

05:50   25    follower, right?  That would be clear by the terms of service

1   themselves, right?  Is that the idea?

2           **MS. HOMER:**  Yes, Your Honor.

3           **THE COURT:**  Yeah, go ahead, Mr. Coleman, you wanted to

4   add something?

05:51  5           **MR. COLEMAN:**  Yes, Your Honor.  I think that if we

6   were to consider whether or not if someone were to engage in

7   conduct that caused Nike to delete its Twitter or Instagram

8   account, the suggestion that there was no loss of a business

9   relationship, that there was no business harm there, because

05:51  10   they don't pay for their -- these companies don't pay for their

11   Twitter access and they don't pay for their Instagram access or

12   Facebook access would be preposterous.

13           The idea that -- it's no different for an individual

14   user.  These are -- these are obviously valuable assets.

05:51  15   They're -- the subject of Twitter handle has been the subject

16   of litigation in corporate breakups, breakups of non-profits,

17   and divorces who own a Twitter handle.  These are acknowledged

18   to be economically valuable properties or bundles of (inaud.)

19           If Twitter were here arguing that the point that CAIR

05:52  20   is arguing, that would be one thing.  But for CAIR to actually

21   say, you know, we don't -- you know, we don't consider Twitter,

22   we ask the Court to rule based on the terms of service

23   themselves, that there's no business -- a business relationship

24   couldn't possibly be contained by the relationship defined by

05:52  25   the terms of service, there are all kinds of terms of services

that do not require payment by a user, but which nonetheless

constitute extremely valuable consideration.  And, you know, we

would respectfully suggest that, in fact, the allegations are

very clear that that's exactly what Twitter does here, because

05:53   that's the entire basis of the FDUTPA claim that Twitter -- the

FDUTPA claim which is no longer in the case because Twitter is

out of it, but the way it was alleged is that Twitter induced

Laura Loomer to come out to the platform, to make an investment

in the platform, which she did, to build a gigantic following

05:53 10   in the platform, which she did, and then for no -- on a

pretextual basis, in other words, at the behest of CAIR removed

her from the platform after she made the contribution to the

economic benefit of the Twitter.  That's what's claimed here.

14           THE COURT:  Okay.  Why don't we move on to the

05:54 15   additional grounds because, really, there are only two, I

think, here that are being addressed that are relevant for the

remaining claim, and that is the argument that's being raised

under 47 USC Section 230(c)(2)(A).

19           Now, the issue here, I understand that the argument

05:54 20   has been made, well, Judge, Section 230 doesn't apply to us

because we're not -- as defined, we are not going to be

governed by the Communications Decency Act.  And, obviously, I

have read Mezzi, which is a case from our district which is at

2018 Westlaw 5306769 but the problem I have, and I want the

05:54 25   defense to address this, it's one of the grounds, the primary

1   grounds you've raised.  I don't think anyone here, from what

2   I've seen so far in the pleadings, can deny that no action can

3   really be maintained against Twitter for their ability under

4   their terms of service to kick people off as they deem fit.

05:55   5       In fact, I think that you've not only read in the

6   terms of service that I've seen, but they can do it almost

7   arbitrarily for any reason at all.

8       Am I correct in that?

9       **MS. HOMER:**  Yes, Your Honor.

05:55   10      **THE COURT:**  So one of the things that we know about is

11  that their decision, like an editor to publish content,

12  withdraw, postpone or alter what's been posted, to ultimately

13  kick somebody off is protected, and what the CDA is seeking to

14  do, obviously, is prevent state law from holding interactive

05:55   15  computer services, like Twitter, liable under various tortious

16  counts like the one here.

17      And so my understanding is, and I think, again, no one

18  is disputing that Twitter falls under this protection, if you

19  will, CDA.

05:55   20      So what flows from that I think is what we have to

21  talk about.  So the concern here is, we are alleging that the

22  nature of the tortious interference is CAIR's -- and accepting

23  everything, of course, as true as we must, that CAIR urged

24  Twitter to ban or de-platform, however you want to say,

05:56   25  Ms. Loomer, again, not unlike what a lot of individuals or

05:56  1   groups, I think, do on a regular basis because my limited
       2   experience indicates that to some varying degrees of success,
       3   people oftentimes allege or report people on Twitter for
       4   comments that they may have made, Twitter sometimes, and I
05:56  5   think one could obviously say maybe even arbitrarily, decides
       6   some go, some stay, some get suspended, whatever it may be, but
       7   they're protected, not only by their terms of service with that
       8   decisionmaking, but the CDA seeks to keep Twitter outside of
       9   the state law sphere because they are given that editorial
05:56 10   purview and ability and power.

      11          So the problem I think, and this is what you've raised
      12   is, if Twitter itself's decision, and by the way, I don't think
      13   anyone is saying the decision wasn't made by Twitter, it might
      14   have been, as alleged, urged by CAIR to be done.  But if there
05:57 15   can be no liability to Twitter by making that decision, how
      16   then do we create liability to third party actors who, for
      17   instance, report to Twitter and urge Twitter to de-platform
      18   someone, and my concern with this theory, if this was not the
      19   way to handle the CDA, is ostensibly, and you just heard a
05:57 20   hypothetical from the lawyer on the line, right?

      21          What happens when Nike, as they have done, supports
      22   Colin Kapernick and suddenly a bunch of followers took issue
      23   and say, de-platform Nike?  Arguably, every single person that
      24   goes after any sort of entity on Twitter could be liable for
05:57 25   tortious business interference.  Right?

1          I mean that theory would open up anyone under the CDA

2    if we just said, even though the CDA protects Twitter's

3    decision, you reporting to Twitter that someone should be

4    removed, in and of itself, would create liability, and I'm

05:58    5    having a problem, I think you guys described it as an end run

6    to try to get after this decision that was being made because

7    Twitter, and I dare acknowledge, you know, really it's because

8    we they want to follow the form selection clause in San

9    Francisco, and that's fine.

05:58   10          But my concern is how can we hold someone liable

11   theoretically when CDA is going to excuse Twitter for its

12   decision?  So how can someone else be held liable for what

13   Twitter is getting protection for it there's no liability with

14   Twitter.

05:58   15          Isn't that one of the issues you've raised?

16          MS. HOMER:  Yes, Your Honor.  And I have a few points

17   on that.

18          THE COURT:  Yes, please tell me because I'm just

19   trying to think of it in the abstract, and I used that

05:58   20   example --

21          MR. COLEMAN:  Well, Your Honor --

22          THE COURT:  Hold on just one second.

23          MR. COLEMAN:  I'm wondering --

24          THE COURT:  Hold on, Mr. Coleman, I just wanted to

05:59   25   hear -- yeah.

1          **MR. COLEMAN:**  It seems as if the Court is framing the

2    arguments, giving the opportunity to the movant to, you know,

3    to support them and, you know, as if it's very hard not to feel

4    as if I'm litigating against two sides here.

05:59    5          Can we at least address that before?  I'm sure that

6    counsel for CAIR has plenty to say, but I feel as if we have

7    already heard this argument.  It was briefed.  And there is no

8    response to it.

9          **THE COURT:**  Well, let me try to correct a couple of

05:59   10   things.  It's her motion so I tend to, in my practice as a

11   Judge in the Southern District of Florida and prior to being a

12   State Court Judge, always felt that we should have the movant

13   heard first, so it's not that you're being heard, I want to

14   hear a response, but I have gone through the moving papers and

06:00   15   I understand you believe this would be decided on the papers,

16   but I thought it best because you have just seen some of the

17   arguments are not as clear as they could be, and some of the

18   way in which they have been pled, led to multiple

19   interpretations.

06:00   20          So I thought it best before the Court made a ruling,

21   we would have kind of a clarification, as we did a moment ago,

22   regarding your two theories on the business relationship with

23   Twitter, as the entity, versus the followers, which is two

24   separate theories on that tortious count, and I just want to

06:00   25   have -- I want, and it was helpful for the Court, but I also

think that since it's her motion, I'm trying to figure out what

her argument is and I'm asking her to clarify it for me so I

make sure I'm not misunderstanding it.  And once she does that,

you can respond and perhaps, like you did with the Twitter

06:00    argument, you corrected the Court and told me you had more than

one theory there, and I think that part of the problem is they

weren't sure which one you were pursuing.  So it just seems to

make sense, since it's their motion, that I would have them

address it first.  Okay?

06:01   10    **MR. COLEMAN:**  Thank you, Your Honor.

11    **THE COURT:**  Yeah.  Okay.  So what were the points you

12   wanted to make because I may be missing some?  So give me the

13   CDA theory so that I can have Mr. Coleman respond to that one.

14    **MS. HOMER:**  And I want to be clear, it's going to be

06:01   15   two kind of separate sub CDA arguments here.  So I just wanted

16   to lay this out for you, Your Honor.

17    So, first off, as you've already acknowledged,

18   plaintiff's complaint repeatedly acknowledges that it was

19   Twitter's decision to ban her account.  And I wrote down just

06:01   20   places where she did this, as paragraphs 2, 4, 25, 59, 181, and

21   183, 184, 204.  Those are all paragraphs in which she

22   acknowledges it was Twitter's decision.  Okay?  And as Your

23   Honor has stated, and the Mezzi case supports, Twitter has the

24   absolute right under Section 230 to ban the account and to make

06:02   25   that moderation decision.  It's why Section 230 was passed.

1          As you've also acknowledged, Twitter is not in this

2    courtroom today.  They've been voluntarily dismissed.  I just

3    want to note for the record that I checked with Twitter's

4    counsel last week and plaintiff has not re-filed against them

06:02   5    in California.  So this claim is not pending anywhere against

6    them.

7          So our point is, as we discussed earlier on prong one

8    of tortious interference is that plaintiff has no legal right

9    to a Twitter account under neither the contract or Section 230

06:02  10    so her claim fails on prong one because Section 230 bars that

11    legal right.

12          It also fails on prong 3, so this is regarding CAIR's

13    intentional and justifiable interference with potentially this

14    relationship with Twitter.  And CAIR cannot be liable also

06:02  15    under Section 230 because if Your Honor looks at the plain

16    language of the statute, 230(c)(2) it says, no provider or user

17    can be held liable on account of an action voluntarily taken in

18    good faith to restrict access, I'm omitting some words, but to

19    material that the provider or user considers to be offensive.

06:03  20          And so I'll note that one reason prong three fails is

21    because there's no specific facts alleged about what on earth

22    the nature of CAIR National's interference or instruction was.

23    We have no date, no times, no tweets, no documents, no people,

24    there's no nothing.  So we don't even know what to respond to

06:03  25    on that basis.  But, even more fundamentally, even if CAIR had,

1   for example, used the report -- a Tweet mechanism on CAIR

2   itself, that is CAIR participating as a user in the moderation

3   of Twitter pursuant to the moderation system that Twitter has

4   set up.  And that itself falls squarely within the immunity

06:04   5   granted by Section 230.

6         THE COURT:  So the idea being that for the second

7   theory, so let me try to make sure I understand the recap.

8   It's -- your view is the CDA, under 230, has two arguments that

9   go straight to the elements for tortious interference, the

06:04   10   first one being the existence, or let me state it

11   alternatively, it's really demonstrating the existence of a

12   relationship, a business relationship under which plaintiff has

13   legal rights, and you would say that because Twitter is

14   ultimately the one that makes the determination, correct, that

06:04   15   there really is no basis for legal rights as it pertains to

16   Ms. Loomer as a Twitter user; is that right?

17         MS. HOMER:  Yes, Your Honor, and that CAIR cannot be

18   held responsible for Twitter's ultimate decision.

19         THE COURT:  So that's one because there's no legal

06:05   20   rights that flow from Twitter's decision.  Right?  I mean

21   that's kind of the idea?

22         MS. HOMER:  Yes, Your Honor.

23         THE COURT:  And then the second one goes to the other

24   portion of the tortious interference claim and element rather

06:05   25   the intentional and justified interference, your view is

06:05

because the terms of service allow for users to request things

from Twitter, I guess, for example, a report on some use that

is objectionable, which is, actually, I think a feature of

Twitter and often used, it's kind of the self-policing

mechanism that I understand Twitter users are given, then if

that has been done, and the terms of service do not hold you

liable for reporting, basically, right?  I mean, it says no one

is going to be held liable for you engaging in your Twitter use

in that way, that you can't hold CAIR liable for any reporting

06:05

it may have done to Twitter, which ultimately made the

decision.

        Did I state that right?

        **MS. HOMER:**  Yes, Your Honor.

        **THE COURT:**  So, Mr. Coleman, I guess we can do both of

06:06

them.  What's the response?  There's two different Section 230

arguments.  What's the response to the first one, which is the

idea that there's really no legal rights.  Another way to put

it, Twitter's the end user, Twitter is the decisionmaker, so no

one can be held liable for the decisions of Twitter, that's

06:06

kind of a simplistic way.

        What would you say as to that part because there's no

real legal right is what they're saying.

        **MR. COLEMAN:**  There's a couple points in response to

that.  One is if I have a contract which gives me the right to

06:06

terminate, all I have to do is give notice and termination is

1  immediate.  That contract (inaud.) comes to law and induces,

2  without justification and otherwise, the components of tortious

3  interference, it gives (inaud.) terminate you, even though I

4  have the right to terminate you, that doesn't insulate them

06:07  5  from tortious interference.

6         THE COURT:  Okay.

7         MR. COLEMAN:  Tortious interference, by that argument,

8  if someone would blackmail Nike, again, as an example, and say,

9  if you don't -- Twitter, if you don't cancel Nike's account,

06:07  10  we're going to firebomb your offices.  We're going to firebomb

11  your offices, we're going to take hostages, name it, well,

12  that's not a problem, right, because after all, they have a

13  right to cancel them anyway.  Obviously not.

14         The subject matter, the fact that Twitter itself has

06:07  15  the absolute right, which we actually dispute and that was the

16  subject matter of our FDUTPA claim and other breach of contract

17  claim, but taking, for argument's sake in this -- on this

18  point, that Twitter has an absolute right to cancel or that --

19  or that it has -- or that which is exempt under Section 230

06:08  20  from liability, doesn't mean that any third person that affects

21  the relationship between Twitter and a user, is automatically

22  swept up in that light -- in that -- excuse me, in that

23  immunity.

24         And, in fact, it's a little disingenuous to now hear

06:08  25  an argument that this was done.  We have no idea how this

1   happened.  It's not alleged anywhere in the complaint.

2           We have alleged that CAIR made it happen.  And that

3   CAIR made it happen in order to avoid -- in order to cause

4   Laura Loomer to be de-platformed and they've admitted that.

06:09   5       What we got response to our motion to remand was a

6   series of very substantial submissions by the defendant to the

7   effect that this is all based on a misunderstanding about what

8   happened, which was reported in a Wall Street Journal article.

9           **THE COURT:**  Let me do this, Mr. Coleman, I want to let

06:09   10  you know before you go down that path, the Court is not going

11  to be considering any of the supplemental affidavits.  I don't

12  think it's -- not only is it, as you've accurately pointed out,

13  problematic in that it could convert this to a Rule 56 without

14  notice, but I'm going to focus on all pled allegations as true,

06:09   15  so I don't want you to worry that you have tell the Court to

16  disregard some of the supplemental pleadings or affidavits

17  because one thing is a 12(b)(1) issue, as you pointed out

18  correctly, another thing is a 12(b)(6).

19          So I understand there's an explanation, the prank and

06:10   20  all this other stuff, I've read everything.  So I do know that

21  that is this a theory you guys take issue with, but it really

22  doesn't form the basis for any decision I make today, which is

23  limited, really narrowly, to just whether or not you stated a

24  claim under 12(b)(6) standard for tortious business -- or

06:10   25  tortious interference, rather, of a business relationship under

1  Florida law.  That's all I'm worried about.

2         MR. COLEMAN:  Thank you, Your Honor.

3         THE COURT:  I just don't you to waste energy because I

4  am not going to consider that.  But tell me what you would

06:10  5  do -- I guess my one question is, what do you do about the

6  hypothetical that I raised that it seems that by this theory,

7  you would be arguing that anyone that reports someone on

8  Twitter could open themselves up, whether it's Ms. Loomer,

9  Nike, anybody, really, let's say any other speaker, perhaps,

06:10  10  anybody else, what would you say to the idea that essentially

11  that opens up anybody to a tortious interference of business

12  relationship claim that may be exercising their term of service

13  rights under Twitter by reporting something that they deem

14  offensive?

06:11  15        How could I fashion or allow a complaint, because the

16  theory seems, as you can imagine for me, problematic, that I

17  would be saying that terms of service allow this behavior,

18  we're not going to hold anybody liable, and the CDA, you're

19  right, is really focused on the provider like Twitter, but how

06:11  20  can I generate essentially third party liability with a theory

21  that allows anybody to be held liable?  How do I do that and

22  not open up the floodgates, right, because that's one of my

23  concerns.

24        MR. COLEMAN:  There is no allegation that the

06:11  25  complaint was made through Twitter as a user or that it was

even done through any of the Twitter methodology and, in fact,

if there were anything that the Court would feel necessary to

replead, I think it should be clear from the existing records,

it would be that, in fact, what we believe happened and the

06:12   reason it wasn't alleged is because we don't have to allege it.

We allege that CAIR did it with an improper purpose, picking up

the phone, calling Twitter, and saying, "Put this woman out of

business."

**THE COURT:**  Let me take that example, though, and

06:12   you're right.  Let's assume that it's not using the Twitter

platform to report.  But is it still your argument that

anybody, and this could happen in any situation.  Right?  Let's

assume it's someone unsophisticated, for example, someone that

is not on Twitter and sees someone disparage them or make a

06:12   comment of something that they deem offensive, right, and they

were to send a letter to Twitter, or a Facebook user sees

something on a Facebook post and complains by deciding to send

an e-mail, let's say, not an objection to the Facebook

platform, is it your position that in all of those scenarios

06:12   they open themselves up, provided it creates a de-platform

scenario where the person gets kicked off whatever it may be.

Instagram another example, someone posts a photo or

something that they deem offensive, someone sees it, a third

party finds it objectionable, writes an e-mail, makes a phone

06:13   call, writes a letter, and that person is ultimately removed,

1   they got this it through a different channel.

2          Do you believe in all those scenarios we open

3   ourselves up to tortious business interference provided that

4   person has followers that they claim have been monetized and

06:13  5   that they actually get kicked off the platform?  Is that a

6   theory that you believe is going to come into play, regardless

7   of who is complaining?

8          MR. COLEMAN:  If the plaintiff can demonstrate that

9   the other elements are present of tortious business

06:13  10   interference, the answer is yes, and it has to be because of

11   the example that I gave, but we certainly wouldn't take the

12   position that by virtue of the -- of the fact that people are

13   allowed to complain about a given user.  It can't be the case

14   that any conduct is permissible if all it does is result in the

06:14  15   removal of someone's account.  You don't say that someone can't

16   threaten.  Companies could engage in antitrust conduct or other

17   improper conduct.

18          So you have the elements of this tort which are

19   specific and require a very high standard, but one which is

06:14  20   amenable as proof as opposed to pleadings and that standard is

21   that it has to be for an improper purpose.  An improper purpose

22   is express of a point of view.  We want you to know we're

23   against this person.  We believe that it is the drawing line in

24   areas that are not black and white, but joint deciding at what

06:14  25   point is conduct taken to put a competitor out of business and

1    here is a competitor in the field of both fund raising and

2    ideas.  At what point do we say that, you know, taking

3    advantage of a privileged position within the Twitter

4    community, which CAIR did.  CAIR was on its safety council.

06:15  5    And using that to say there's someone here who is giving a hard

6    time to someone we support.  Even though -- even though there

7    is no terms of service violation, which is what we allege.

8    Pull the account.  We believe that there's got to be a point at

9    which conduct should be able to captured by the laws of

06:15 10    tortious interference and it's not to say everyone is capable

11    of holding, don't eat McDonald's Hamburgers, I hate them.

12    That's fine.

13          But if someone called up the phone of a board member

14    of McDonald's and says, "I want you to know, we hate your

06:16 15    hamburgers, and if you don't close down the store in St. Lucie,

16    we're going to start making trouble for you."

17          Can't people complain to board members?  They can.

18    But there is a point, and it is acknowledged, Your Honor, that

19    in the war of unfair competition, that point is not a black and

06:16 20    white one frequently, but to say that as a matter of -- at the

21    level of a pleading, there could be no point in which any

22    conduct could possibly be actionable in this category, we think

23    goes too far.

24          **THE COURT:**  Okay.  Okay.  Did you want to add

06:16 25    something on that brief reply.

1          MS. HOMER:  Just briefly, Your Honor.  First, I would

2    just point out that all the hypotheticals that my opposing

3    counsel is giving are all just rampant speculation about

4    hypotheticals and there are absolutely no specifics about how

06:17   5    or who or what or when CAIR relayed any instructions to Twitter

6    that he deems objectionable.

7          Second, in paragraph 181 of his plaintiff's complaint,

8    they plead that CAIR is a regular participant in the process by

9    which Twitter decides which content and users to sensor or ban

06:17  10    from its platform.  Notably there, too, there is also no

11    details about what that process is and we assumed they meant

12    kind of a regular moderation process, but it's his complaint,

13    the plaintiff should have pled that and, moreover, that it

14    acknowledges, once again, that Twitter is the ultimate decider

06:17  15    for which CAIR should not be held liable.

16          And just one last note, he briefly alluded to

17    antitrust and conspiracy liability, and I just want to note

18    that this plaintiff lost in the District of D.C. of antitrust

19    claim against Twitter on these exact same grounds earlier this

06:18  20    year in Freedom Watch versus Google.

21          THE COURT:  The only problem with that I would point

22    out that that's currently up on renew and as far as I checked

23    yesterday, the D.C. Circuit decided to not summarily affirm and

24    asked for a briefing.  So let's not get ahead of ourselves on

06:18  25    that because the D.C. Circuit seems to have something there

1  that is disconcerting to them.  It may not necessarily mean

2  that it's going to change the outcome, but I'm less persuaded

3  by that, given the current procedural posture.  But I do

4  understand that is an ancillary suit, although you would agree

06:18  5  with me, having looked at that suit and looked at what we have

6  here, because you cited it, it's a very different lawsuit.

7  That lawsuit is dealing with content restrictions on Google,

8  correct?  It's nothing like this.

9        MS. HOMER:  I will agree.  It's tangential to the

06:19  10  point, but more to say the plaintiff has chosen to sever their

11  claims here, and all that's left in this case is whether they

12  had stated a claim that CAIR instructed Twitter to ban Laura

13  Loomer and whether there is any legal basis for that to be

14  cognizable.

06:19  15        THE COURT:  I'm sorry, Mr. Coleman, you wanted to add

16  one more point.  Go ahead.

17        MR. COLEMAN:  I'll just respond that if indeed the

18  focus here is -- I don't believe it's insufficiently pled, but

19  if the focus here is we don't know what CAIR did and we don't

06:19  20  know what CAIR's relationship is with Twitter based on the

21  pleadings, we would respectfully submit if those things are not

22  necessarily in the pleadings page, but if it goes to rise and

23  fall on that, then we should be given the opportunity to

24  replead.

06:19  25        THE COURT:  My understanding is just by looking at the

1   case law on what's been requested, there has been no move to

2   amend at any point requested in any of the pleadings or

3   anything else.  I would just point that because the 11th

4   Circuit is somewhat held that there is maybe procedural issues

06:20   5   with requesting in the amendment in this fashion.  I didn't see

6   anything in the pleadings.

7          And again, I understand that this is a request, of

8   course that would also require the Court to find that this is

9   something that can be amended and is curable, and so I am

06:20   10   cognizant of that as well, because I don't necessarily know

11   that an amendment wouldn't maybe try to clarify, but the

12   problem with that is the amendment can somewhat be futile if it

13   simply cannot meet or satisfy a core element of the tort and

14   that's really where I'm struggling with it.

06:20   15          All right.  Well, here's what we're going to do.  The

16   Court is going to rule, and I'm going to grant the motion to

17   dismiss and I'm going to lay a reasoning for that granting

18   today on the bench and then I will supplement that with a brief

19   order that cites some of the cases.

06:20   20          The Court is going to lead, quite frankly, with the

21   issue of the tortious interference and the failure, in my view,

22   to specify and make clear identifiable customers.  I think

23   there is an inherent flaw in this remaining count, and that is

24   because of the very nature of this relationship between

06:21   25   Ms. Loomer and the Twitter base.  I do not see the way in which

a general loss of business and, in addition to the cases I've
cited to already, the Anthem case and the Lucky Accessories
case, I'll add another one, Astro Tel versus Verizon, this is
from the Middle District, also 979 F.Supp. 2nd 1284, and I cite
06:21    5  that one because it relies, like all the cases do, on Ethan
Allen, which I think is the seminal case from the Florida
Supreme Court, N. Ferguson versus North American Van Lines.
Those are really the two keys cases that all the federal courts
have relied on, which require that the plaintiff must prove a
06:22   10  business relationship with identifiable customers to establish
a tort of tortious interference with a business relationship,
and we can talk about, you know, how it's been pled and really
the concern is it's -- I don't want to call it the community at
large, it's the Twitter community is really what the concern
06:22   15  is.  It is a relationship between the Twitter community, and
the Astro case cites also to Sarkis from the First DCA here in
Florida that dismissed a complaint that alleged a general loss
of business and failed to identify the customers who were the
subject of the alleged interference.

06:22   20         So one of the challenges is, to me from an Iqbal and
Twombly standard on a 12(b)(6), even accepting all well pled
allegations as true, which I do because I'm assuming, for
purposes of today's argument, that CAIR did what they claim
they did, and they interfered and they called Twitter and they
06:22   25  said, "De-platform this person," I'm assuming that, as I must.

06:23   The challenge I have is there is a breakdown in identifying who
these followers are to the level necessary to satisfy a
tortious interference with business relationship claim.  The
customers are simply not identifiable.  It is, in my view, when
you look at Iqbal and Twombly pleading standards, it is
speculative to simply that it is interfering with general
business derived from the base, whether that is by way of
promotion of Loomer's ideas, whether that is as a funding
source for the campaign, whatever it may be, I just do not see
06:23   a theory that would support with these allegations maintaining
this particular count.  Because the business relationship
prong, when it comes to that specific, you know, back and forth
relationship with the customer, you know, I don't see that
there.  And to me, there really is -- there's just not enough
06:23   pled that would ever support finding any kind of identifiable
customer.  It's those that are consuming is the Twitter
followers at large that are part of her account.

So to me, when you look at Ethan Allen and you look at
Ferguson, I think that those cases really pose a very fatal
06:24   issue for the way in which this has been pled, and that is, in
my view, really a function of the platform because I think
that's what's key here.  I can see how this could survive in
other circumstances but the nature of Twitter itself and the
amorphous amount of followers and the speculation from an
06:24   Iqbal-Twombly standard that these masses were generating

1    business revenues, that kind of general loss of business

2    created by de-platforming, has been uniformly held by Florida

3    courts interpreting Florida law to be in actionable when it

4    comes to tortious interference, and that, to me, is not

06:25  5    something that be can cured.

6              Again, it is just simply too speculative, and I think

7    that that is specifically mentioned in the cases that I have

8    cited that there really is -- it's just simply insufficient.

9    The relationship, if you will, is insufficient.

06:25  10             So that's one issue I have.  And that would be the

11   first argument made when it comes to the relationship in the

12   complaint between Loomer and the followers.

13             To the extent there is another alternative being

14   proposed, that is Loomer and the identifiable business

06:25  15   relationship is with Twitter.  The challenge I have with that

16   is I do not see anything whether, and again, I want to be very

17   clear, the Court is not wedding itself to the existence or

18   inexistence of a contract, that's not fatal, that's not the

19   basis for my ruling because we know it can be on a business

06:25  20   relationship by way of an agreement, but there's nothing pled

21   that would substantiate the existence of a business

22   relationship between Twitter and Loomer.

23             I mean, again, Twitter is being utilized, in Loomer's

24   view, as a way to generate business perhaps, but to have a

06:26  25   relationship between the parties so that CAIR interfered with

06:26    it, I mean, I don't think there's been a pleading standard met
that there exists a true business relationship as defined which
would create, for instance, legal rights, right?  That really,
to me, is the linchpin.  Without the legal rights, we don't
06:26  5  meet the first prong and there is just, simply put, no legal
right developed in this agreement in the terms of services
between Loomer and Twitter so as to substantiate a business
relationship under the first prong.

9        So whether we go with Twitter and the terms of service
06:26 10  and look at that as the identifiable customer, well, if that's
11  the theory, we don't have legal rights between Loomer and
12  Twitter in that space because the terms of service excise that
13  possibility.  Okay?  So there is no agreement there.
14  Monetizing Twitter for your own personal use doesn't
06:26 15  necessarily create a business relationship independent of the
16  terms of service which negate that very prospect because they
17  say it in the terms.  So that's if you're trying to say Twitter
18  is my identifiable customer.

19        If are trying to say my followers are my identifiable
06:27 20  customers it is too nebulous a proposition to be supported by
21  case law and it must fail as well.

22        So for those two grounds, alternative bases, the
23  tortious interference claim must fail as a matter of law and it
24  will be dismissed.

06:27 25        Now I would like the record to reflect that there's an

alternative basis for the dismissal, and it is the CDA argument
which I do think has merit.  Under Section 230, there are two
problems, they kind of dovetail the same way as it does with
the elements of the tortious interference.  The first one is
06:27 the idea that we can have a third party right flowing to the
plaintiff here, Ms. Loomer, by way of this relationship where
the plaintiff has legal rights.  It goes back to the same idea.
There are no legal rights generated by the terms of service in
my view that would give rise to holding a third party liable.
06:28 So there is a concern there the CDA has explicitly insulated
Twitter decisionmaking capability.  I do not see a theory by
which a third party speaking to Twitter could be held liable
for Twitter's own control over its content, which is explicit
in the terms of service that they can de-platform, quite
06:28 frankly, for any reason, and it can be somewhat arbitrary and I
think some people would say it is.

          And again, I profess no judgment or opinion as to
whether this individual, Ms. Loomer, deserved this de-
platforming, should have been silenced, whatever views are
06:28 viewed in the eyes if CAIR is Islamaphobic or not, the Court is
not even going to touch of delve into any of that.  I need not
do that.  I need not engage the motion to strike allegations
nor will I, nor am I going to get involved in any affidavits
that would transport this or transform it to Rule 56.
06:28           This is a very tailored ruling for what remains a very

small and narrow issue and that is one count against one

remaining defendant that I don't think has been satisfactorily

pled, and the second basis being that the CDA, because it keeps

Twitter out of this sphere under 230, means that you can't jump

06:29   5  from there and rope in CAIR for what they may have said or what

I am accepting as true they did say to Twitter.

So there is one prong of it, is the existence of the

business relationship under which plaintiff has legal rights.

If she does not have legal rights flowing from the Twitter

06:29   10  relationship by way of the term of service, we cannot then

suddenly hold third party CAIR liable for that.  There's a

breakdown there, I think, and the CDA protects them.  So I

don't know how I would do that.  I think that would be an end

run.

06:29   15  And, again, I understand the hypothetical and the

parade of horribles, firebombing stores and threatening things.

I'm not doubting that that could be a universe that exists with

these circumstances.  But looking at the four corners, looking

at what I have here, I think it's a stretch when you look at

06:30   20  Iqbal and Twombly and you look at what this would open the door

to.  What essentially this would mean is, well, it doesn't

matter that CDA covers Twitter, at the end of the day, anybody

that speaks to Twitter about someone posting something that

they take issue with could subject them to liability, and I

06:30   25  think that that is not akin to antitrust, it is not akin to

competitive legal standards.  It's just a social media

platform.  It's a very different animal, and the Mezzi case

made it very clear in my district that Twitter was covered

under the CDA.

06:30    Now, if it's the other prong I think that there is

some support for the idea that the intentional and unjustified

interference portion of the Twitter, or excuse me, the tortious

interference claim also plays a role, right, because as you

pointed out, you know, is it unjustified or intentional, I

06:30 mean, if they protest the terms of service contemplated that

you can do that, and so we're holding them liable for something

they're allowed to report on and talk about.  And, again, if

Twitter is insulated for their conduct and someone reports, it

strains credulity to believe that you could then loop in that

06:31 third party who is exercising their rights, maybe they didn't

press the button on the Twitter platform, but from an abstract

they are not necessarily interfering, they're reporting and in

that report, Twitter makes a decision, it's Twitter's decision

alone, and that's where this really, to me, the rubber hits the

06:31 road.

I mean, I think if you want to litigate against with

Twitter in San Francisco, if she feels she's been de-platformed

and she's been wronged because they have arbitrarily decided

who to elevate and who not to elevate, you know, the problem is

06:31 I look at these terms of service and they give Twitter that

right.  Right or wrong, Twitter has made that clear, and the

CDA has given them the cover to do.  So I just don't know a

universe in which the CDA would not transmit that kind of, I

don't want to call it protection, but break a causal chain in

06:31   allowing some third party to be brought in because, again, it

goes to the elements of tortious interference and they begin to

break down.

So I'm going to issue an order that repeats and says

for the reasons stated on the record, I've made my reasoning

06:32   pretty clear, but I will put a brief order together that

dismisses on these alternative bases.  It dismisses, first and

foremost, on the elements of tortious interference with either

theory, whether Twitter is the identifiable customer and, if

not, finding that the base of Twitter followers is not

06:32   identifiable enough, speculative and conclusory and cannot

support a claim.

And secondarily, that the CDA would be given a third

party cover because this decision is left up to Twitter, and

Twitter and the decisions they make is not something we can

06:32   then transport to the party that may have communicated with

them because there's an absence of legal rights.

So I will cite some of these cases, but it will really

be for the reasons stated on the record, primarily, and I think

we have left enough of a clean record that should an appellate

06:33   review be sought, that there's enough here for the 11th Circuit

to understand why I feel this is not something that be can

cured, so I don't necessarily say it's going to be dismissed

with prejudice, but I'm not going to be dismissing with leave

to amend.  It is simply dismissed.  The case is over as far as

06:33   I'm concerned on Count 2 which is the only remaining count and

I will issue something in the next few days.

            Okay.

            **MS. HOMER:**  Thank you, Your Honor.

            **THE COURT:**  All right.  Mr. Coleman, we'll issue

06:33   something so you have a record and, obviously, should you wish

to appeal, you'll have the record I just laid for my court

reporter as well to supplement my order which is where it will

be a little more specific.  Okay?

            **MR. COLEMAN:**  Thank you, Judge.

06:33   **THE COURT:**  Okay, thank you very much.  We're in

recess.

            (Thereupon, the above hearing was concluded.)


                    *           *           *

1                    **C E R T I F I C A T E**

2

3          I hereby certify that the foregoing is an accurate

4 transcription of the proceedings in the above-entitled

5 matter.

6

8       12/10/2019

9    DATE COMPLETED        GIZELLA BAAN-PROULX, RPR, FCRR

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# 0

**07068** [1] - 1:16

# 1

**1-5** [1] - 1:7
**105** [1] - 1:15
**11th** [2] - 40:3, 48:25
**12(b)(1** [1] - 33:17
**12(b)(6** [3] - 9:22, 33:24, 41:21
**12(b)(6)** [1] - 33:18
**12/10/2019** [1] - 50:8
**1271** [1] - 5:9
**1284** [1] - 41:4
**1292** [1] - 5:12
**1393790** [1] - 13:10
**18** [1] - 1:5
**181** [2] - 28:20, 38:7
**183** [1] - 28:21
**184** [1] - 28:21
**188** [1] - 15:9
**19** [1] - 3:16
**19-81179** [1] - 2:11
**19-CV-81179-RAR** [1] - 1:2

# 2

**2** [4] - 4:13, 4:24, 28:20, 49:5
**20003** [1] - 1:23
**2010** [1] - 5:9
**2017** [1] - 5:12
**2018** [2] - 13:10, 23:24
**2019** [1] - 1:5
**202** [1] - 1:24
**204** [1] - 28:21
**205** [1] - 1:19
**228** [1] - 5:12
**22nd** [1] - 3:16
**230** [14] - 8:7, 20:18, 23:20, 28:24, 28:25, 29:9, 29:10, 29:15, 30:5, 30:8, 31:15, 32:19, 45:2, 46:4
**230(c)(2** [1] - 29:16
**230(c)(2)(A)** [1] - 23:18
**25** [1] - 28:20
**2nd** [2] - 5:9, 41:4

# 3

**3** [3] - 1:15, 15:9, 29:12
**305** [1] - 2:3
**31st** [1] - 3:17
**33128** [1] - 2:2
**33316** [1] - 1:19
**3rd** [1] - 5:12

# 4

**4** [2] - 20:16, 28:20
**400** [1] - 2:2

**453** [1] - 1:23
**47** [1] - 23:18
**4:00** [1] - 2:19
**4:20** [1] - 2:20

# 5

**523-5634** [1] - 2:3
**5306769** [1] - 23:24
**56** [2] - 33:13, 45:24
**59** [1] - 28:20

# 6

**646** [1] - 1:16

# 7

**742-6420** [1] - 1:24
**752** [1] - 5:9
**768-9002** [1] - 1:20
**777** [1] - 5:8

# 8

**8th** [1] - 2:2

# 9

**900** [1] - 1:19
**946-5659** [1] - 1:16
**954** [1] - 1:20
**979** [1] - 41:4

# A

**abide** [1] - 18:25
**ability** [3] - 16:11, 24:3, 25:10
**able** [3] - 10:9, 17:21, 37:9
**above-entitled** [1] - 50:4
**absence** [1] - 48:21
**absent** [2] - 18:10, 21:3
**absolute** [2] - 20:19, 28:24, 32:15, 32:18
**absolutely** [5] - 16:7, 16:10, 17:7, 20:21, 38:4
**abstract** [3] - 14:22, 26:19, 47:16
**accept** [1] - 15:18
**accepted** [1] - 9:23
**accepting** [4] - 9:21, 24:22, 41:21, 46:6
**access** [5] - 18:13, 22:11, 22:12, 29:18
**accessed** [1] - 14:5
**Accessories** [3] - 5:9, 14:15, 41:2
**account** [10] - 20:16, 20:22, 22:8, 28:19, 28:24, 29:9, 29:17, 32:9, 36:15, 37:8, 42:17
**accurate** [1] - 50:3

**accurately** [1] - 33:12
**acknowledge** [1] - 26:7
**acknowledged** [5] - 16:5, 22:17, 28:17, 29:1, 37:18
**acknowledges** [3] - 28:18, 28:22, 38:14
**Act** [2] - 8:8, 23:22
**action** [6] - 3:19, 6:2, 6:6, 17:12, 24:2, 29:17
**actionable** [2] - 37:22, 43:3
**activity** [1] - 14:5
**actors** [1] - 25:16
**actual** [3] - 6:8, 9:2, 11:9
**add** [5] - 15:4, 22:4, 37:24, 39:15, 41:3
**addition** [1] - 41:1
**additional** [1] - 23:15
**address** [6] - 4:15, 20:1, 20:18, 23:25, 27:5, 28:9
**addressed** [1] - 23:16
**admitted** [1] - 33:4
**advanced** [3] - 8:16, 8:17, 21:6
**advantage** [2] - 10:24, 37:3
**advertising** [2] - 18:19, 21:9
**advocacy** [1] - 6:18
**affects** [1] - 32:20
**affidavits** [3] - 33:11, 33:16, 45:23
**affirm** [1] - 38:23
**afternoon** [2] - 2:10, 3:25
**aggregate** [1] - 18:19
**ago** [1] - 27:21
**agree** [8] - 7:18, 9:25, 10:13, 10:16, 15:3, 15:14, 39:4, 39:9
**agreement** [11] - 6:9, 11:9, 11:18, 11:20, 12:11, 16:10, 21:7, 21:10, 43:20, 44:6, 44:13
**ahead** [7] - 2:18, 3:8, 14:9, 15:24, 22:3, 38:24, 39:16
**akin** [2] - 46:25
**al** [1] - 2:12
**allegation** [6] - 15:11, 16:1, 16:6, 18:5, 21:18, 34:24
**allegations** [7] - 14:19, 16:15, 23:3, 33:14, 41:22, 42:10, 45:22
**allege** [6] - 5:4, 9:16, 25:3, 35:5, 35:6, 37:7
**alleged** [12] - 6:2, 9:21, 10:6, 18:15, 23:7, 25:14, 29:21, 33:1, 33:2, 35:5, 41:17, 41:19
**allegedly** [1] - 6:20
**alleging** [3] - 8:4, 8:9, 24:21
**Allen** [4] - 6:4, 10:2, 41:6, 42:18
**allow** [4] - 3:8, 31:1, 34:15,

34:17
**allowed** [2] - 36:13, 47:12
**allowing** [2] - 3:3, 48:5
**allows** [1] - 34:21
**alluded** [1] - 38:16
**almost** [2] - 11:25, 24:6
**alone** [1] - 47:19
**alter** [1] - 24:12
**alternative** [6] - 8:9, 8:16, 43:13, 44:22, 45:1, 48:11
**alternatively** [1] - 30:11
**amenable** [2] - 13:22, 36:20
**amend** [2] - 40:2, 49:4
**amended** [1] - 40:9
**amendment** [4] - 7:1, 40:5, 40:11, 40:12
**America** [1] - 13:10
**American** [4] - 1:22, 8:1, 8:21, 41:7
**American-Islamic** [1] - 1:22
**amorphous** [3] - 14:25, 19:9, 42:24
**amount** [2] - 13:20, 42:24
**ancillary** [1] - 39:4
**AND** [2] - 1:4, 1:7
**animal** [1] - 47:2
**anonymous** [2] - 7:5, 8:11
**answer** [1] - 36:10
**Anthem** [2] - 5:12, 41:2
**antitrust** [5] - 36:16, 38:17, 38:18, 46:25
**anyway** [1] - 32:13
**appeal** [1] - 49:11
**appear** [1] - 3:3
**appearances** [1] - 3:9
**appearing** [1] - 2:13
**appellate** [1] - 48:24
**apply** [1] - 23:20
**arbitrarily** [3] - 24:7, 25:5, 47:23
**arbitrary** [1] - 45:15
**areas** [1] - 36:24
**arguably** [1] - 25:23
**argue** [2] - 13:1, 13:17
**arguing** [4] - 3:21, 22:19, 22:20, 34:7
**argument** [23] - 5:2, 8:18, 9:2, 12:16, 14:11, 16:7, 16:13, 16:15, 16:24, 19:4, 20:3, 20:14, 23:17, 23:19, 27:7, 28:2, 28:5, 32:7, 32:25, 35:11, 41:23, 43:11, 45:1
**argument's** [1] - 32:17
**arguments** [6] - 4:2, 27:2, 27:17, 28:15, 30:8, 31:16
**arising** [1] - 21:24
**arrangements** [1] - 16:20
**article** [1] - 33:8

**asserted** [1] - 8:24
**assertion** [1] - 14:23
**assessment** [1] - 15:4
**assets** [1] - 22:14
**assume** [3] - 4:21, 35:10, 35:13
**assumed** [2] - 3:5, 38:11
**assuming** [2] - 41:22, 41:25
**Astro** [2] - 41:3, 41:16
**Atlas** [1] - 7:25
**attached** [1] - 20:13
**attenuated** [1] - 16:8
**attenuation** [1] - 15:5
**attracted** [1] - 18:23
**automatically** [1] - 32:21
**available** [1] - 18:17
**availed** [1] - 9:4
**Avenue** [3] - 1:19, 1:23, 2:2
**avoid** [1] - 33:3
**awareness** [2] - 9:11, 12:2

**B**

**BAAN** [2] - 2:1, 50:9
**BAAN-PROULX** [2] - 2:1, 50:9
**ban** [6] - 20:19, 24:24, 28:19, 28:24, 38:9, 39:12
**banned** [2] - 15:10, 15:11
**banning** [2] - 16:21, 16:23
**bargains** [1] - 9:5
**barred** [2] - 8:6, 8:12
**bars** [1] - 29:10
**base** [6] - 11:13, 19:19, 20:23, 40:25, 42:7, 48:14
**based** [4] - 14:4, 22:22, 33:7, 39:20
**bases** [2] - 44:22, 48:11
**basis** [11] - 21:23, 23:5, 23:11, 25:1, 29:25, 30:15, 33:22, 39:13, 43:19, 45:1, 46:3
**BEACH** [1] - 1:2
**Becker** [1] - 1:15
**BEFORE** [1] - 1:11
**begin** [2] - 7:14, 48:6
**behalf** [5] - 2:14, 2:15, 3:9, 3:13, 3:23
**behavior** [1] - 34:17
**behest** [1] - 23:11
**bench** [1] - 40:18
**benefit** [3] - 11:23, 21:19, 23:13
**best** [2] - 27:16, 27:20
**between** [17] - 5:18, 7:2, 9:10, 10:10, 10:15, 13:15, 18:10, 19:22, 20:20, 32:21, 40:24, 41:15, 43:12, 43:22, 43:25, 44:7, 44:11
**bit** [3] - 5:23, 12:15, 18:11

**black** [2] - 36:24, 37:19
**blackmail** [1] - 32:8
**board** [2] - 37:13, 37:17
**brand** [1] - 6:17
**breach** [1] - 32:16
**break** [2] - 48:4, 48:7
**breakdown** [3] - 8:19, 42:1, 46:12
**breakups** [2] - 22:16
**bridge** [1] - 10:6
**brief** [4] - 4:6, 7:24, 13:9, 37:25, 40:18, 48:10
**briefed** [1] - 27:7
**briefing** [2] - 16:9, 38:24
**briefly** [2] - 38:1, 38:16
**bring** [4] - 4:25, 12:7, 18:23
**brings** [1] - 18:18
**brought** [1] - 48:5
**build** [1] - 23:19
**bunch** [1] - 25:22
**bundles** [1] - 22:18
**business** [72] - 5:5, 5:15, 5:17, 5:22, 6:7, 6:8, 6:12, 6:13, 6:21, 7:4, 7:13, 8:22, 9:11, 9:13, 10:9, 10:18, 11:4, 11:8, 12:3, 12:10, 12:24, 13:3, 13:11, 14:17, 15:17, 16:7, 16:19, 16:25, 17:2, 17:25, 18:6, 18:8, 18:9, 18:12, 19:2, 19:5, 19:17, 19:24, 20:3, 20:5, 21:2, 22:8, 22:9, 22:23, 25:25, 27:22, 30:12, 33:24, 33:25, 34:11, 35:8, 36:3, 36:9, 36:25, 41:1, 41:10, 41:11, 41:18, 42:3, 42:7, 42:11, 43:1, 43:14, 43:19, 43:21, 43:24, 44:2, 44:7, 44:15, 46:8
**business's** [2] - 6:3, 8:22
**button** [1] - 47:16
**BY** [1] - 2:1

**C**

**CAIR** [42] - 1:6, 1:18, 1:22, 2:11, 3:10, 3:13, 3:23, 4:1, 4:11, 4:13, 4:18, 10:16, 15:11, 22:19, 22:20, 23:11, 24:23, 25:14, 27:6, 29:14, 29:22, 29:25, 30:1, 30:2, 30:17, 31:9, 33:2, 33:3, 35:6, 37:4, 38:5, 38:8, 38:15, 39:12, 39:19, 41:23, 43:25, 45:20, 46:5, 46:11
**CAIR's** [4] - 16:16, 24:22, 29:12, 39:20
**California** [2] - 17:15, 29:5
**campaign** [2] - 6:18, 42:9
**cancel** [3] - 32:9, 32:13,

32:18
**cannot** [7] - 11:4, 19:10, 29:14, 30:17, 40:13, 46:10, 48:15
**capability** [1] - 45:11
**capable** [1] - 37:10
**captured** [1] - 37:9
**care** [1] - 16:2
**Carolyn** [2] - 4:2, 7:21
**CAROLYN** [1] - 1:21
**cascading** [1] - 16:19
**case** [22] - 5:9, 5:11, 6:4, 9:15, 9:24, 10:8, 14:8, 15:1, 16:9, 23:6, 23:23, 28:23, 36:13, 39:11, 40:1, 41:2, 41:3, 41:6, 41:16, 44:21, 47:2, 49:4
**Case** [1] - 2:10
**CASE** [1] - 1:2
**cases** [15] - 5:7, 5:25, 8:20, 10:20, 13:13, 13:14, 13:15, 14:14, 40:19, 41:1, 41:5, 41:8, 42:19, 43:7, 48:22
**categorically** [2] - 8:6, 8:12
**category** [1] - 37:22
**causal** [1] - 48:4
**caused** [1] - 22:7
**CDA** [21] - 8:15, 24:13, 24:19, 25:8, 25:19, 26:1, 26:2, 26:11, 28:13, 28:15, 30:8, 34:18, 45:1, 45:10, 46:3, 46:12, 46:22, 47:4, 48:2, 48:3, 48:17
**certain** [1] - 9:3
**certainly** [5] - 7:14, 16:8, 16:13, 21:13, 36:11
**certify** [1] - 50:3
**cetera** [1] - 20:23
**chain** [1] - 48:4
**challenge** [2] - 42:1, 43:15
**challenges** [1] - 41:20
**change** [1] - 39:2
**channel** [1] - 36:1
**charge** [1] - 18:21
**charity** [1] - 11:2
**check** [1] - 17:24
**checked** [3] - 11:19, 29:3, 38:22
**choice** [1] - 17:15
**chomer@cair.com** [1] - 1:24
**chosen** [1] - 39:10
**Circuit** [4] - 38:23, 38:25, 40:4, 48:25
**circumstances** [2] - 42:23, 46:18
**cite** [5] - 5:6, 7:25, 8:21, 13:14, 41:4, 48:22
**cited** [7] - 5:25, 8:20, 13:9, 14:14, 39:6, 41:2, 43:8
**cites** [3] - 6:4, 40:19, 41:16

**claim** [27] - 5:5, 6:15, 7:3, 8:17, 9:15, 10:23, 13:2, 14:16, 18:7, 23:5, 23:6, 23:17, 29:5, 29:10, 30:24, 32:16, 32:17, 33:24, 34:12, 36:4, 38:19, 39:12, 41:23, 42:3, 44:23, 47:8, 48:16
**claimed** [1] - 23:13
**claiming** [1] - 16:12
**claims** [1] - 39:11
**clarification** [1] - 27:21
**clarified** [1] - 21:21
**clarify** [2] - 28:2, 40:11
**clarifying** [1] - 4:23
**clause** [3] - 8:7, 17:15, 26:8
**clean** [1] - 48:24
**cleaner** [1] - 8:18
**clear** [15] - 2:23, 16:1, 16:4, 19:15, 21:14, 21:25, 23:4, 27:17, 28:14, 35:3, 40:22, 43:17, 47:3, 48:1, 48:10
**clearly** [1] - 19:3
**client** [1] - 10:5
**clients** [2] - 3:15, 3:18
**close** [1] - 37:15
**co** [1] - 3:18
**co-conspirators** [1] - 3:18
**Coach** [1] - 5:8
**codefendants** [1] - 4:20
**cognizable** [1] - 39:14
**cognizant** [1] - 40:10
**Coleman** [11] - 2:15, 4:16, 10:1, 11:7, 22:3, 26:24, 28:13, 31:14, 33:9, 39:15, 49:9
**COLEMAN** [25] - 1:14, 2:9, 2:15, 3:6, 4:17, 10:7, 10:18, 13:6, 13:8, 13:25, 15:25, 18:12, 20:24, 22:5, 26:21, 26:23, 27:1, 28:10, 31:23, 32:7, 34:2, 34:24, 36:8, 39:17, 49:14
**Colin** [1] - 25:22
**colleague** [1] - 4:1
**colleagues** [1] - 5:7
**coming** [2] - 11:4, 17:20
**comment** [1] - 35:15
**comments** [1] - 25:4
**communicated** [1] - 48:20
**Communications** [2] - 8:8, 23:22
**community** [10] - 6:3, 6:19, 9:17, 9:19, 14:17, 19:13, 37:4, 41:13, 41:14, 41:15
**companies** [2] - 22:10, 36:16
**company** [1] - 15:16
**competition** [1] - 37:19
**competitive** [1] - 47:1
**competitor** [2] - 36:25, 37:1
**complain** [2] - 36:13, 37:17

complaining [1] - 36:7
complains [1] - 35:17
complaint [15] - 5:23, 10:5, 14:19, 15:8, 16:1, 19:3, 21:13, 28:18, 33:1, 34:15, 34:25, 38:7, 38:12, 41:17, 43:12
COMPLETED [1] - 50:9
completed [2] - 6:10, 11:10
components [1] - 32:2
computer [1] - 24:15
concept [1] - 13:13
concern [10] - 5:3, 5:24, 6:23, 14:22, 24:21, 25:18, 26:10, 41:13, 41:14, 45:10
concerned [2] - 17:25, 49:5
concerns [4] - 3:5, 4:19, 5:1, 34:23
concession [1] - 4:23
concluded [1] - 49:17
conclusory [1] - 48:15
conduct [9] - 16:2, 22:7, 36:14, 36:16, 36:17, 36:25, 37:9, 37:22, 47:13
confusion [2] - 2:21, 4:10
consequences [1] - 20:22
consider [3] - 22:6, 22:21, 34:4
consideration [1] - 23:2
considered [1] - 17:4
considering [1] - 33:11
considers [1] - 29:19
conspiracy [1] - 38:17
conspirators [1] - 3:18
constitute [1] - 23:2
consuming [2] - 8:23, 42:16
contacted [1] - 17:13
contained [1] - 22:24
contemplate [1] - 10:23
contemplated [1] - 47:10
content [7] - 18:16, 18:18, 18:22, 24:11, 38:9, 39:7, 45:13
context [1] - 4:22
continue [1] - 3:17
continues [1] - 19:7
contract [27] - 7:15, 7:24, 8:1, 8:5, 9:5, 9:10, 10:21, 12:18, 12:22, 13:3, 13:13, 13:15, 17:2, 17:3, 17:11, 17:14, 17:18, 17:25, 18:3, 20:8, 21:4, 21:6, 29:9, 31:24, 32:1, 32:16, 43:18
contract's [1] - 8:7
contracts [3] - 9:3, 17:4, 17:6
contractual [4] - 10:20, 11:20, 12:24, 15:17
contribution [2] - 18:24, 23:12

contributions [2] - 9:11, 15:6
control [1] - 45:13
convert [1] - 33:13
core [1] - 40:13
corners [1] - 46:18
corporate [1] - 22:16
correct [5] - 10:17, 24:8, 27:9, 30:14, 39:8
corrected [1] - 28:5
correctly [1] - 33:18
council [1] - 37:4
Council [1] - 1:22
Counsel [1] - 14:10
counsel [9] - 3:1, 3:7, 4:9, 4:15, 10:1, 16:6, 27:6, 29:4, 38:3
count [6] - 4:13, 27:24, 40:23, 42:11, 46:1, 49:5
Count [3] - 4:13, 4:24, 49:5
counts [1] - 24:16
couple [2] - 27:9, 31:23
course [5] - 10:20, 17:18, 19:20, 24:23, 40:8
COURT [45] - 1:1, 1:12, 2:8, 2:10, 2:18, 3:7, 3:23, 4:4, 4:18, 8:14, 10:1, 10:12, 11:7, 13:7, 13:24, 14:9, 15:14, 17:19, 19:4, 20:9, 20:25, 21:17, 21:23, 22:3, 23:14, 24:10, 26:18, 26:22, 26:24, 27:9, 28:11, 30:6, 30:19, 30:23, 31:14, 32:6, 33:9, 34:3, 35:9, 37:24, 38:21, 39:15, 39:25, 49:9, 49:15
Court [25] - 2:1, 5:1, 6:5, 10:3, 12:14, 17:5, 17:7, 17:8, 18:1, 19:8, 22:22, 27:1, 27:12, 27:20, 27:25, 28:5, 33:10, 33:15, 35:2, 40:8, 40:16, 40:20, 41:7, 43:17, 45:20
court [5] - 2:7, 2:16, 3:8, 17:22, 49:11
Court's [3] - 17:1, 17:5, 17:20
courtroom [1] - 29:2
courts [2] - 41:8, 43:3
cover [2] - 48:2, 48:18
covered [1] - 47:3
covers [1] - 46:22
crafted [1] - 15:15
create [5] - 20:11, 25:16, 26:4, 44:3, 44:15
created [1] - 43:2
creates [1] - 35:20
credulity [2] - 9:6, 47:14
curable [1] - 40:9
cure [2] - 7:1, 19:24
cured [2] - 43:5, 49:2

curious [2] - 19:17, 19:19
current [1] - 39:3
customer [11] - 8:25, 11:4, 12:14, 19:11, 19:18, 19:22, 42:13, 42:16, 44:10, 44:18, 48:13
customers [11] - 6:1, 6:13, 6:21, 7:5, 10:4, 19:8, 40:22, 41:10, 41:18, 42:4, 44:20

# D

D.C [3] - 38:18, 38:23, 38:25
damages [1] - 5:20
Danette [1] - 4:1
DANETTE [1] - 1:22
dare [1] - 26:7
DARREN [1] - 1:18
Darren [1] - 3:13
date [1] - 29:23
DATE [1] - 50:9
days [1] - 49:6
DC [1] - 1:23
DCA [1] - 41:16
de [9] - 24:24, 25:17, 25:23, 33:4, 35:20, 43:2, 45:14, 45:18, 47:22
De [1] - 41:25
de-platform [5] - 24:24, 25:17, 25:23, 35:20, 45:14
De-platform [1] - 41:25
de-platformed [2] - 33:4, 47:22
de-platforming [1] - 43:2
dealing [2] - 15:22, 39:7
Decency [2] - 8:8, 23:22
decided [5] - 12:20, 17:17, 27:15, 38:23, 47:23
decider [1] - 38:14
decides [2] - 25:5, 38:9
deciding [2] - 35:17, 36:24
decision [17] - 24:11, 25:12, 25:13, 25:15, 26:3, 26:6, 26:12, 28:19, 28:22, 28:25, 30:18, 30:20, 31:11, 33:22, 47:18, 48:18
decisionmaker [1] - 31:18
decisionmaking [2] - 25:8, 45:11
decisions [2] - 31:19, 48:19
deem [4] - 24:4, 34:13, 35:15, 35:23
deems [1] - 38:6
defame [1] - 16:17
DEFENDANT [2] - 1:18, 1:21
defendant [7] - 3:10, 6:10, 9:5, 11:11, 12:7, 33:6, 46:2
defendant's [5] - 5:18, 5:19, 5:21, 7:8, 16:6

defendants [1] - 1:8
defense [4] - 3:7, 6:23, 7:17, 23:25
deficiency [1] - 13:23
defined [4] - 18:7, 22:24, 23:21, 44:2
definitely [1] - 16:22
degrees [1] - 25:2
delete [1] - 22:7
delve [1] - 45:21
demonstrate [2] - 14:3, 36:8
demonstrating [1] - 30:11
deny [1] - 24:2
derived [1] - 42:7
Dermaceuticals [1] - 5:12
described [1] - 26:5
describes [1] - 13:11
deserved [1] - 45:18
despite [1] - 3:15
details [1] - 38:11
determination [1] - 30:14
developed [1] - 44:6
different [7] - 17:9, 19:20, 22:13, 31:15, 36:1, 39:6, 47:2
direct [1] - 15:5
disconcerting [2] - 8:18, 39:1
disconnect [1] - 18:11
discussed [1] - 29:7
disingenuous [1] - 32:24
dismiss [5] - 4:24, 8:17, 19:9, 20:15, 40:17
dismissal [1] - 45:1
dismissed [7] - 3:15, 17:12, 29:2, 41:17, 44:24, 49:2, 49:4
dismisses [1] - 48:11
dismissing [1] - 49:3
disparage [1] - 35:14
dispute [4] - 20:7, 20:8, 20:10, 32:15
disputing [1] - 24:18
disregard [1] - 33:16
District [5] - 5:8, 5:11, 27:11, 38:18, 41:4
district [2] - 23:23, 47:3
DISTRICT [3] - 1:1, 1:1, 1:12
divine [1] - 6:14
divorces [1] - 22:17
docket [1] - 3:16
document [1] - 3:17
documents [1] - 29:23
DOES [1] - 1:7
donate [2] - 14:18, 15:22
donating [1] - 11:24
donation [1] - 11:4
donations [3] - 8:10, 11:2, 20:22

**done** [6] - 25:14, 25:21, 31:6, 31:10, 32:25, 35:1
**donor** [2] - 11:13, 11:19
**donors** [6] - 10:18, 10:19, 11:1, 11:22, 14:4
**door** [1] - 46:20
**double** [1] - 17:24
**double-check** [1] - 17:24
**doubt** [1] - 11:24
**doubting** [1] - 46:17
**dovetail** [1] - 45:3
**down** [4] - 28:19, 33:10, 37:15, 48:7
**drawing** [1] - 36:23
**dropped** [1] - 4:21
**dspielman@complexip. com** [1] - 1:20
**dzaghari** [1] - 1:25
**dzaghari-mask@cair.com** [1] - 1:25

## E

**e-mail** [2] - 35:18, 35:24
**earth** [1] - 29:21
**eat** [1] - 37:11
**economic** [2] - 10:24, 23:13
**economically** [1] - 22:18
**editor** [1] - 24:11
**editorial** [1] - 25:9
**effect** [1] - 33:7
**either** [3] - 12:2, 17:2, 48:12
**element** [7] - 7:6, 18:2, 19:7, 20:4, 21:2, 30:24, 40:13
**elements** [9] - 5:17, 7:9, 13:11, 30:9, 36:9, 36:18, 45:4, 48:6, 48:12
**elevate** [2] - 47:24
**eliminated** [1] - 21:20
**end** [7] - 3:1, 15:19, 19:8, 26:5, 31:18, 46:13, 46:22
**energy** [1] - 34:3
**enforce** [1] - 17:16
**enforceable** [3] - 13:12, 17:3, 17:14
**engage** [3] - 22:6, 36:16, 45:22
**engaging** [1] - 31:8
**entertain** [1] - 5:1
**entire** [1] - 23:5
**entitled** [2] - 20:11, 50:4
**entity** [3] - 7:13, 25:24, 27:23
**ergo** [1] - 14:17
**especially** [1] - 13:5
**ESQ** [4] - 1:14, 1:18, 1:21, 1:22
**essentially** [5] - 4:11, 7:23, 34:10, 34:20, 46:21
**establish** [5] - 5:16, 6:11, 9:16, 12:5, 41:10

**established** [3] - 11:17, 12:12, 13:18
**et** [2] - 2:12, 20:23
**Ethan** [4] - 6:4, 10:2, 41:5, 42:18
**events** [1] - 15:10
**evidence** [1] - 16:15
**evidenced** [3] - 6:8, 11:8, 13:12
**exact** [2] - 14:15, 38:19
**exactly** [2] - 14:25, 23:4
**example** [11] - 4:20, 9:1, 12:7, 26:20, 30:1, 31:2, 32:8, 35:9, 35:13, 35:22, 36:11
**exchange** [1] - 18:12
**excise** [1] - 44:12
**exclusively** [1] - 21:20
**excuse** [3] - 26:11, 32:22, 47:7
**exempt** [1] - 32:19
**exercising** [2] - 34:12, 47:15
**exist** [1] - 7:15
**existence** [7] - 5:17, 13:11, 30:10, 30:11, 43:17, 43:21, 46:7
**existing** [1] - 35:3
**exists** [3] - 6:2, 44:2, 46:17
**expectancy** [2] - 20:11, 21:2
**experience** [1] - 25:2
**explain** [1] - 17:23
**explanation** [1] - 33:19
**explicit** [2] - 16:17, 45:13
**explicitly** [3] - 16:22, 21:20, 45:10
**exposed** [1] - 18:19
**express** [1] - 36:22
**expressly** [1] - 20:15
**extent** [1] - 43:13
**extremely** [1] - 23:2
**eyes** [1] - 45:20

## F

**F.Supp** [3] - 5:9, 5:12, 41:4
**face** [1] - 8:19
**Facebook** [4] - 22:12, 35:16, 35:17, 35:18
**facilities** [1] - 14:6
**fact** [14] - 9:23, 11:18, 12:25, 14:20, 16:5, 16:14, 17:11, 23:3, 24:5, 32:14, 32:24, 35:1, 35:4, 36:12
**facts** [1] - 29:21
**fail** [3] - 14:1, 44:21, 44:23
**failed** [2] - 14:16, 41:18
**fails** [3] - 29:10, 29:12, 29:20
**failure** [1] - 40:21
**fairly** [1] - 12:12
**faith** [1] - 29:18

**fall** [2] - 9:24, 39:23
**falls** [3] - 19:6, 24:18, 30:4
**fan** [1] - 20:23
**far** [6] - 11:19, 12:18, 24:2, 37:23, 38:22, 49:4
**Farm** [1] - 1:15
**fashion** [2] - 34:15, 40:5
**fatal** [2] - 42:19, 43:18
**fatally** [1] - 14:11
**FCRR** [2] - 2:1, 50:9
**FDUTPA** [3] - 23:5, 23:6, 32:16
**feature** [1] - 31:3
**federal** [1] - 41:8
**fee** [1] - 18:21
**feed** [1] - 15:20
**felt** [1] - 27:12
**Ferguson** [2] - 41:7, 42:19
**few** [2] - 26:16, 49:6
**field** [1] - 37:1
**figure** [2] - 12:22, 28:1
**filed** [2] - 3:17, 29:4
**financial** [6] - 15:6, 20:11, 21:1, 21:12, 21:19, 21:24
**fine** [2] - 26:9, 37:12
**firebomb** [2] - 32:10
**firebombing** [1] - 46:16
**First** [1] - 41:16
**first** [16] - 5:3, 10:8, 11:14, 13:8, 27:13, 28:9, 28:17, 30:10, 31:16, 38:1, 43:11, 44:5, 44:8, 45:4, 48:11
**fit** [1] - 24:4
**FL** [2] - 1:19, 2:2
**flaw** [1] - 40:23
**flawed** [1] - 14:11
**floodgates** [1] - 34:22
**Floor** [1] - 2:2
**FLORIDA** [3] - 1:1, 1:6, 1:18
**Florida** [20] - 2:12, 3:13, 4:11, 4:18, 5:4, 5:8, 5:14, 6:5, 10:2, 10:22, 11:6, 12:15, 14:7, 18:2, 27:11, 34:1, 41:6, 41:17, 43:2, 43:3
**flow** [1] - 30:20
**flowing** [2] - 45:5, 46:9
**flows** [1] - 24:20
**fly** [1] - 16:10
**focus** [3] - 33:14, 39:18, 39:19
**focused** [1] - 34:19
**folks** [1] - 2:12
**follow** [4] - 6:17, 6:18, 20:23, 26:8
**follower** [2] - 12:20, 21:25
**followers** [25] - 6:17, 6:20, 7:5, 7:12, 8:11, 9:9, 9:10, 10:15, 11:15, 12:1, 13:20,

14:13, 14:18, 14:25, 15:23, 19:10, 25:22, 27:23, 36:4, 42:2, 42:17, 42:24, 43:12, 44:19, 48:14
**following** [3] - 2:7, 18:14, 23:9
**followings** [1] - 9:14
**FOR** [3] - 1:14, 1:18, 1:21
**foregoing** [1] - 50:3
**foremost** [1] - 48:12
**foreseeable** [2] - 16:14, 16:16
**form** [3] - 21:23, 26:8, 33:22
**formal** [1] - 21:7
**formed** [1] - 21:6
**Fort** [1] - 1:19
**forth** [2] - 19:5, 42:12
**forward** [1] - 5:4
**FOUNDATION** [1] - 1:7
**four** [2] - 5:17, 46:18
**Fox** [1] - 13:9
**framing** [1] - 27:1
**Francisco** [2] - 26:9, 47:22
**frankly** [4] - 6:25, 17:1, 40:20, 45:15
**free** [1] - 18:17
**Freedom** [1] - 38:20
**frequently** [1] - 37:20
**full** [1] - 20:13
**function** [1] - 42:21
**Fund** [1] - 15:9
**fund** [2] - 14:5, 37:1
**fundamental** [1] - 10:14
**fundamentally** [1] - 29:25
**funding** [1] - 42:8
**futile** [1] - 40:12
**future** [1] - 12:1

## G

**gap** [1] - 10:6
**general** [8] - 6:6, 8:23, 14:12, 19:13, 41:1, 41:17, 42:6, 43:1
**generally** [2] - 9:17, 14:23
**generate** [9] - 12:2, 12:10, 18:16, 18:17, 18:22, 18:23, 34:20, 43:24
**generated** [4] - 9:10, 9:13, 13:21, 45:8
**generates** [1] - 14:23
**generating** [1] - 42:25
**generation** [1] - 21:8
**gigantic** [1] - 23:9
**given** [7] - 25:9, 31:5, 36:13, 39:3, 39:23, 48:2, 48:17
**GIZELLA** [2] - 2:1, 50:9
**gizella_baan** [1] - 2:3
**gizella_baan-proulx@flsd. uscourts.gov** [1] - 2:3

**Google** [2] - 38:20, 39:7
**governed** [1] - 23:22
**grant** [1] - 40:16
**granted** [1] - 30:5
**granting** [1] - 40:17
**grants** [1] - 19:9
**ground** [2] - 8:16, 20:2
**grounds** [5] - 23:15, 23:25, 24:1, 38:19, 44:22
**group** [3] - 9:9, 15:1, 19:10
**groups** [1] - 25:1
**guess** [8] - 7:11, 13:4, 18:9, 21:3, 21:20, 31:2, 31:14, 34:5
**guys** [4] - 7:10, 7:17, 26:5, 33:21

## H

**hac** [1] - 4:2
**Hamburgers** [1] - 37:11
**hamburgers** [1] - 37:15
**handle** [3] - 22:15, 22:17, 25:19
**hard** [2] - 27:3, 37:5
**harm** [1] - 22:9
**hate** [2] - 37:11, 37:14
**hear** [4] - 6:23, 26:25, 27:14, 32:24
**heard** [5] - 3:4, 25:19, 27:7, 27:13
**HEARING** [1] - 1:10
**hearing** [3] - 2:22, 3:15, 49:17
**held** [11] - 2:7, 26:12, 29:17, 30:18, 31:8, 31:19, 34:21, 38:15, 40:4, 43:2, 45:12
**helpful** [1] - 27:25
**hereby** [1] - 50:3
**high** [1] - 36:19
**Hill** [1] - 5:11
**hits** [1] - 47:19
**hold** [8] - 12:7, 20:25, 26:10, 26:22, 31:6, 31:9, 34:18, 46:11
**Hold** [1] - 26:24
**holding** [4] - 24:14, 37:11, 45:9, 47:11
**Homer** [1] - 4:2
**HOMER** [18] - 1:21, 7:21, 9:25, 15:3, 20:2, 20:10, 21:11, 21:22, 22:2, 24:9, 26:16, 28:14, 30:17, 30:22, 31:13, 38:1, 39:9, 49:8
**homer** [3] - 4:4, 4:5, 7:21
**honestly** [2] - 14:11, 19:11
**Honor** [31] - 3:12, 3:25, 4:17, 7:21, 9:25, 10:7, 13:6, 13:17, 14:2, 15:3, 15:25, 20:2, 20:17, 20:24, 21:22,

22:2, 22:5, 24:9, 26:16, 26:21, 28:10, 28:16, 28:23, 29:15, 30:17, 30:22, 31:13, 34:2, 37:18, 38:1, 49:8
**HONORABLE** [1] - 1:11
**hope** [1] - 3:4
**horribles** [1] - 46:16
**hostages** [1] - 32:11
**hypothetical** [4] - 11:12, 15:20, 34:6, 46:15
**hypothetically** [1] - 9:1
**hypotheticals** [2] - 38:2, 38:4

## I

**idea** [14] - 19:20, 21:1, 21:5, 21:19, 22:1, 22:13, 30:6, 30:21, 31:17, 32:25, 34:10, 45:5, 45:7, 47:6
**ideas** [2] - 37:2, 42:8
**identifiable** [29] - 6:8, 6:13, 6:21, 7:5, 8:25, 9:3, 10:4, 11:9, 11:14, 11:18, 11:25, 12:11, 12:13, 12:17, 14:12, 19:7, 19:10, 19:18, 19:22, 40:22, 41:10, 42:4, 42:15, 43:14, 44:10, 44:18, 44:19, 48:13, 48:15
**identified** [4] - 7:11, 14:16, 14:21, 14:24
**identify** [1] - 41:18
**identifying** [2] - 19:6, 42:1
**II** [1] - 1:11
**Illoominate** [2] - 2:11, 10:11
**ILLOOMINATE** [2] - 1:4, 1:15
**imagine** [1] - 34:16
**immediate** [1] - 32:1
**immunity** [3] - 20:19, 30:4, 32:23
**improper** [4] - 35:6, 36:17, 36:21
**inaud** [3] - 22:18, 32:1, 32:3
**Inc** [2] - 2:11, 13:9
**INC** [4] - 1:4, 1:6, 1:7, 1:15
**inclined** [1] - 20:18
**including** [1] - 16:20
**income** [1] - 21:9
**incorporated** [1] - 20:14
**indeed** [1] - 39:17
**independent** [1] - 44:15
**indicate** [1] - 9:15
**indicated** [1] - 7:10
**indicates** [2] - 4:12, 25:2
**indirectly** [1] - 10:11
**individual** [2] - 22:13, 45:18
**individuals** [1] - 24:25
**induced** [1] - 23:7
**induces** [1] - 32:1
**inexistence** [1] - 43:18

**influencers** [1] - 9:13
**inherent** [1] - 40:23
**Instagram** [3] - 22:7, 22:11, 35:22
**instance** [2] - 25:17, 44:3
**instead** [1] - 8:24
**instructed** [1] - 39:12
**instruction** [1] - 29:22
**instructions** [1] - 38:5
**insufficient** [3] - 15:1, 43:8, 43:9
**insufficiently** [1] - 39:18
**insulate** [1] - 32:4
**insulated** [2] - 45:10, 47:13
**insurmountable** [1] - 19:15
**intentional** [5] - 5:19, 29:13, 30:25, 47:6, 47:9
**interacted** [1] - 14:5
**interactive** [1] - 24:14
**interesting** [1] - 16:8
**interfere** [1] - 12:10
**interfered** [9] - 6:10, 6:20, 8:5, 8:10, 10:16, 11:5, 11:11, 41:24, 43:25
**interference** [47] - 4:13, 4:24, 5:5, 5:14, 5:20, 5:21, 6:1, 6:3, 6:7, 6:12, 7:3, 7:16, 7:23, 8:20, 9:15, 10:23, 12:1, 14:16, 18:7, 18:8, 24:22, 25:25, 29:8, 29:13, 29:22, 30:9, 30:24, 30:25, 32:3, 32:5, 32:7, 33:25, 34:11, 36:3, 36:10, 37:10, 40:21, 41:11, 41:19, 42:3, 43:4, 44:23, 45:4, 47:7, 47:8, 48:6, 48:12
**interfering** [3] - 11:22, 42:6, 47:17
**interpretations** [1] - 27:19
**interpreting** [1] - 43:3
**intrigued** [1] - 17:7
**investment** [1] - 23:8
**involved** [2] - 3:18, 45:23
**Iqbal** [4] - 41:20, 42:5, 42:25, 46:20
**Iqbal-Twombly** [1] - 42:25
**Islamaphobic** [1] - 45:20
**Islamic** [1] - 1:22
**issue** [14] - 2:24, 4:11, 23:19, 25:22, 33:17, 33:21, 40:21, 42:20, 43:10, 46:1, 46:24, 48:8, 49:6, 49:9
**issues** [2] - 26:15, 40:4
**itself** [7] - 15:6, 26:4, 30:2, 30:4, 32:14, 42:23, 43:17
**itself's** [1] - 25:12

## J

**Jersey** [2] - 1:23, 17:14

**JOHN** [1] - 1:7
**joint** [1] - 36:24
**Journal** [1] - 33:8
**Judge** [5] - 2:9, 23:20, 27:11, 27:12, 49:14
**JUDGE** [1] - 1:12
**judgment** [2] - 14:1, 45:17
**jump** [1] - 46:4
**justifiable** [1] - 29:13
**justification** [1] - 32:2
**justified** [2] - 5:20, 30:25
**justify** [1] - 18:5

## K

**Kain** [1] - 1:18
**Kapernick** [1] - 25:22
**keep** [1] - 25:8
**keeps** [1] - 46:3
**key** [4] - 5:15, 7:9, 19:7, 42:22
**keys** [1] - 41:8
**kick** [3] - 9:20, 24:4, 24:13
**kicked** [2] - 35:21, 36:5
**kind** [14] - 4:25, 9:9, 21:9, 21:18, 27:21, 28:15, 30:21, 31:4, 31:20, 38:12, 42:15, 43:1, 45:3, 48:3
**kinds** [2] - 17:9, 22:25
**knowledge** [6] - 5:19, 7:6, 7:8, 11:13, 12:8, 15:7

## L

**laid** [1] - 49:11
**language** [2] - 20:4, 29:16
**large** [7] - 6:4, 6:19, 9:17, 9:19, 14:17, 41:14, 42:17
**last** [3] - 11:19, 29:4, 38:16
**Latin** [1] - 13:10
**latter** [1] - 8:14
**Lauderdale** [1] - 1:19
**Laura** [7] - 2:11, 10:10, 14:4, 16:17, 23:8, 33:4, 39:12
**LAURA** [1] - 1:4
**law** [19] - 5:4, 5:14, 7:23, 8:12, 9:15, 9:24, 10:22, 11:6, 14:7, 15:1, 18:2, 24:14, 25:9, 32:1, 34:1, 40:1, 43:3, 44:21, 44:23
**laws** [1] - 37:9
**lawsuit** [4] - 4:15, 12:8, 39:6, 39:7
**lawyer** [1] - 25:20
**lay** [2] - 28:16, 40:17
**layer** [1] - 15:4
**lead** [1] - 40:20
**least** [3] - 13:22, 15:16, 27:5
**leave** [1] - 49:3
**led** [1] - 27:18

**left** [5] - 4:14, 19:16, 39:11, 48:18, 48:24
**legal** [22] - 20:5, 20:11, 20:20, 20:21, 29:8, 29:11, 30:13, 30:15, 30:19, 31:17, 31:22, 39:13, 44:3, 44:4, 44:5, 44:11, 45:7, 45:8, 46:8, 46:9, 47:1, 48:21
**less** [2] - 17:25, 39:2
**letter** [2] - 35:16, 35:25
**level** [3] - 21:14, 37:21, 42:2
**liability** [8] - 25:15, 25:16, 26:4, 26:13, 32:20, 34:20, 38:17, 46:24
**liable** [18] - 12:7, 24:15, 25:24, 26:10, 26:12, 29:14, 29:17, 31:7, 31:8, 31:9, 31:19, 34:18, 34:21, 38:15, 45:9, 45:12, 46:11, 47:11
**lie** [2] - 12:13, 13:2
**light** [2] - 4:10, 32:22
**limited** [2] - 25:1, 33:23
**linchpin** [1] - 44:4
**line** [5] - 2:13, 4:15, 10:1, 25:20, 36:23
**Lines** [4] - 7:25, 8:1, 8:21, 41:7
**link** [1] - 15:20
**literally** [1] - 14:14
**litigate** [1] - 47:21
**litigating** [2] - 17:16, 27:4
**litigation** [1] - 22:16
**Look** [1] - 17:13
**look** [7] - 42:5, 42:18, 44:10, 46:19, 46:20, 47:25
**looked** [3] - 10:5, 39:5
**looking** [3] - 39:25, 46:18
**looks** [1] - 29:15
**LOOMER** [1] - 1:4
**Loomer** [22] - 2:11, 7:2, 10:10, 10:15, 12:21, 14:4, 15:10, 16:17, 23:8, 24:25, 30:16, 33:4, 34:8, 39:13, 40:25, 43:12, 43:14, 43:22, 44:7, 44:11, 45:6, 45:18
**Loomer's** [4] - 6:15, 7:12, 42:8, 43:23
**loop** [1] - 47:14
**loss** [9] - 15:12, 16:2, 16:11, 16:19, 22:8, 41:1, 41:17, 43:1
**lost** [2] - 17:23, 38:18
**Ltd** [1] - 13:10
**Lucie** [1] - 37:15
**Lucky** [3] - 5:8, 14:14, 41:2

# M

**mail** [2] - 35:18, 35:24
**maintain** [3] - 14:2, 20:21, 21:16
**maintained** [1] - 24:3
**maintaining** [1] - 42:10
**Mandelbaum** [1] - 1:15
**manifestly** [1] - 16:1
**Mask** [1] - 4:1
**MASK** [2] - 1:22, 3:25
**mask@cair.com** [1] - 1:25
**masses** [1] - 42:25
**material** [1] - 29:19
**matter** [8] - 5:10, 10:21, 32:14, 32:16, 37:20, 44:23, 46:22, 50:5
**McDonald's** [2] - 37:11, 37:14
**mean** [9] - 9:24, 12:11, 13:1, 13:3, 14:14, 26:1, 30:20, 31:7, 32:20, 39:1, 43:23, 44:1, 46:21, 47:10, 47:21
**means** [2] - 15:19, 46:4
**meant** [1] - 38:11
**mechanism** [2] - 30:1, 31:5
**media** [5] - 9:13, 12:23, 15:17, 18:10, 47:1
**MEDIA** [2] - 1:4, 1:15
**Media** [2] - 2:11, 10:11
**meet** [2] - 40:13, 44:5
**member** [1] - 37:13
**members** [1] - 37:17
**memorialized** [1] - 3:2
**mentioned** [1] - 43:7
**merely** [1] - 3:20
**merit** [1] - 45:2
**met** [1] - 44:1
**methodology** [1] - 35:1
**Mezzi** [3] - 23:23, 28:23, 47:2
**Miami** [2] - 2:2, 2:2
**microphone** [1] - 4:6
**Middle** [2] - 5:11, 41:4
**might** [3] - 15:19, 20:12, 25:13
**million** [1] - 13:19
**mine** [1] - 7:19
**minute** [1] - 8:15
**missed** [1] - 5:2
**missing** [3] - 7:9, 7:18, 28:12
**misunderstanding** [3] - 17:20, 28:3, 33:7
**moderation** [4] - 28:25, 30:2, 30:3, 38:12
**moment** [1] - 27:21
**monetized** [2] - 11:16, 36:4
**monetizing** [1] - 44:14
**money** [3] - 14:13, 17:16, 18:20
**moreover** [1] - 38:13
**most** [1] - 19:7
**motion** [11] - 4:24, 6:24, 8:4, 19:9, 20:14, 27:10, 28:1,
28:8, 33:5, 40:16, 45:22
**MOTION** [1] - 1:10
**movant** [2] - 27:2, 27:12
**move** [2] - 23:14, 40:1
**moving** [2] - 5:7, 27:14
**MR** [25] - 2:9, 2:15, 3:6, 3:12, 4:17, 10:7, 10:18, 13:6, 13:8, 13:25, 15:25, 18:12, 20:24, 22:5, 26:21, 26:23, 27:1, 28:10, 31:23, 32:7, 34:2, 34:24, 36:8, 39:17, 49:14
**MS** [18] - 3:25, 7:21, 9:25, 15:3, 20:2, 20:10, 21:11, 21:22, 22:2, 24:9, 26:16, 28:14, 30:17, 30:22, 31:13, 38:1, 39:9, 49:8
**multiple** [1] - 27:18
**must** [7] - 6:12, 8:24, 24:23, 41:9, 41:25, 44:21, 44:23

# N

**name** [1] - 32:11
**narrow** [1] - 46:1
**narrowly** [1] - 33:23
**NATIONAL** [1] - 1:22
**National** [4] - 3:10, 3:24, 4:1, 4:14
**National's** [1] - 29:22
**nature** [7] - 7:2, 19:12, 21:9, 24:22, 29:22, 40:24, 42:23
**nebulous** [1] - 44:20
**necessarily** [11] - 5:6, 11:3, 12:3, 13:12, 21:6, 39:1, 39:22, 40:10, 44:15, 47:17, 49:2
**necessary** [2] - 35:2, 42:2
**need** [7] - 9:15, 9:23, 19:18, 19:24, 21:6, 45:21, 45:22
**needs** [1] - 12:6
**negate** [1] - 44:16
**never** [2] - 7:3, 19:11
**New** [1] - 1:23, 17:14
**next** [2] - 11:3, 49:6
**Nike** [5] - 22:7, 25:21, 25:23, 32:8, 34:9
**Nike's** [1] - 32:9
**NJ** [1] - 1:16
**NO** [1] - 1:2
**non** [1] - 22:16
**non-profits** [1] - 22:16
**nonetheless** [1] - 23:1
**nonprofit** [1] - 11:3
**North** [4] - 2:2, 7:25, 8:21, 41:7
**notably** [1] - 38:10
**note** [4] - 29:3, 29:20, 38:16, 38:17
**nothing** [5] - 11:14, 11:25,
29:24, 39:8, 43:20
**notice** [2] - 31:25, 33:14
**noting** [1] - 3:20
**November** [1] - 1:5
**Number** [1] - 2:10
**number** [2] - 11:16, 11:17

# O

**o'clock** [1] - 2:19
**objection** [1] - 35:18
**objectionable** [3] - 31:3, 35:24, 38:6
**obligation** [1] - 12:24
**obviously** [9] - 10:19, 10:25, 16:12, 22:14, 23:22, 24:14, 25:5, 32:13, 49:10
**October** [4] - 2:24, 3:16, 4:10
**OF** [1] - 1:1
**offensive** [4] - 29:19, 34:14, 35:15, 35:23
**office** [1] - 17:13
**offices** [2] - 32:10, 32:11
**often** [2] - 12:4, 31:4
**oftentimes** [1] - 25:3
**omitting** [1] - 29:18
**once** [3] - 15:20, 28:3, 38:14
**one** [50] - 4:13, 4:21, 8:4, 10:10, 10:17, 11:16, 13:19, 13:22, 15:4, 18:14, 20:4, 20:25, 21:17, 22:20, 23:25, 24:10, 24:16, 24:17, 25:5, 26:15, 26:22, 28:6, 28:7, 28:13, 29:7, 29:10, 29:20, 30:10, 30:14, 30:19, 30:23, 31:7, 31:16, 31:19, 31:24, 33:17, 34:5, 34:22, 36:19, 37:20, 38:16, 39:16, 41:3, 41:5, 41:20, 43:10, 45:4, 46:1, 46:7
**ongoing** [1] - 13:21
**open** [7] - 2:7, 26:1, 34:8, 34:22, 35:20, 36:2, 46:20
**opens** [1] - 17:9, 34:11
**opinion** [1] - 45:17
**opportunities** [1] - 16:20
**opportunity** [2] - 27:2, 39:23
**opposed** [2] - 13:22, 36:20
**opposing** [1] - 38:2
**order** [11] - 2:24, 3:1, 3:16, 4:10, 17:22, 33:3, 40:19, 48:8, 48:10, 49:12
**ostensibly** [1] - 25:19
**otherwise** [1] - 32:2
**ourselves** [2] - 36:3, 38:24
**outcome** [2] - 11:5, 39:2
**outside** [1] - 25:8
**overcome** [1] - 21:14
**own** [3] - 22:17, 44:14, 45:13

**P**

**PA** [1] - 1:18
**page** [1] - 39:22
**PALM** [1] - 1:2
**papers** [4] - 3:17, 5:7, 27:14, 27:15
**parade** [1] - 46:16
**paragraph** [3] - 15:8, 15:9, 38:7
**paragraphs** [2] - 28:20, 28:21
**paramount** [1] - 7:8
**part** [8] - 2:21, 5:15, 7:18, 16:9, 16:10, 28:6, 31:21, 42:17
**participant** [1] - 38:8
**participating** [1] - 30:2
**particular** [3] - 5:24, 12:6, 42:11
**parties** [1] - 43:25
**party** [12] - 5:18, 25:16, 34:20, 35:24, 45:5, 45:9, 45:12, 46:11, 47:15, 48:5, 48:18, 48:20
**passed** [1] - 28:25
**path** [1] - 33:10
**pay** [3] - 22:10, 22:11
**payers** [1] - 16:11
**payment** [6] - 15:7, 15:16, 15:18, 16:3, 16:20, 23:1
**payments** [3] - 15:12, 16:12
**PayPal** [2] - 15:9, 15:21
**pending** [1] - 29:5
**people** [9] - 14:3, 18:23, 24:4, 25:3, 29:23, 36:12, 37:17, 45:16
**perhaps** [5] - 17:19, 21:7, 28:4, 34:9, 43:24
**period** [1] - 7:1
**permissible** [1] - 36:14
**person** [9] - 7:24, 8:2, 25:23, 32:20, 35:21, 35:25, 36:4, 36:23, 41:25
**personal** [1] - 44:14
**perspective** [1] - 6:1
**persuaded** [1] - 39:2
**pertaining** [1] - 5:14
**pertains** [1] - 30:15
**phone** [6] - 1:14, 3:4, 17:23, 35:7, 35:24, 37:13
**photo** [1] - 35:22
**picking** [1] - 35:6
**places** [1] - 28:20
**plain** [1] - 29:15
**plaintiff** [20] - 1:5, 2:14, 2:16, 5:16, 5:18, 6:12, 20:5, 20:19, 20:21, 29:4, 29:8, 30:12, 36:8, 38:13, 38:18, 39:10, 41:9, 45:6, 45:7,

46:8
**PLAINTIFF** [1] - 1:14
**plaintiff's** [6] - 3:1, 4:9, 4:15, 8:4, 28:18, 38:7
**plaintiffs** [3] - 2:22, 3:17, 20:12
**platform** [24] - 12:23, 15:8, 15:17, 18:10, 18:13, 18:18, 21:16, 23:8, 23:9, 23:10, 23:12, 24:24, 25:17, 25:23, 35:11, 35:19, 35:20, 36:5, 38:10, 41:25, 42:21, 45:14, 47:2, 47:16
**platformed** [2] - 33:4, 47:22
**platforming** [2] - 43:2, 45:19
**platforms** [3] - 15:13, 16:3, 16:18
**play** [1] - 36:6
**plays** [1] - 47:8
**plead** [4] - 15:5, 15:8, 16:22, 38:8
**pleading** [7] - 12:5, 13:23, 14:13, 18:5, 37:21, 42:5, 44:1
**pleadings** [9] - 4:8, 18:15, 24:2, 33:16, 36:20, 39:21, 39:22, 40:2, 40:6
**pled** [16] - 7:1, 10:14, 11:17, 13:5, 19:11, 19:19, 27:18, 33:14, 38:13, 39:18, 41:12, 41:21, 42:15, 42:20, 43:20, 46:3
**plenty** [1] - 27:6
**point** [24] - 4:21, 8:14, 8:21, 13:9, 16:24, 16:25, 18:1, 19:16, 22:19, 29:7, 32:18, 36:22, 36:25, 37:2, 37:8, 37:18, 37:19, 37:21, 38:2, 38:21, 39:10, 39:16, 40:2, 40:3
**pointed** [1] - 33:12, 33:17, 47:9
**points** [4] - 14:15, 26:16, 28:11, 31:23
**policing** [1] - 31:4
**portion** [2] - 30:24, 47:7
**pose** [1] - 42:19
**position** [3] - 35:19, 36:12, 37:3
**possibilities** [1] - 17:9
**possibility** [2] - 12:1, 44:13
**possible** [2] - 8:3, 11:12
**possibly** [2] - 22:24, 37:22
**post** [1] - 35:17
**posted** [1] - 24:12
**posting** [1] - 46:23
**postpone** [1] - 24:12
**posts** [1] - 35:22
**posture** [2] - 10:9, 39:3
**potential** [1] - 12:10

**potentially** [1] - 29:13
**power** [1] - 25:10
**practice** [1] - 27:10
**prank** [1] - 33:19
**precisely** [1] - 17:4
**prejudice** [3] - 3:16, 17:12, 49:3
**prepared** [1] - 17:5
**preposterous** [1] - 22:12
**presence** [1] - 3:21
**present** [6] - 3:7, 4:2, 6:1, 10:8, 14:19, 36:9
**press** [1] - 47:16
**pretextual** [1] - 23:11
**pretty** [2] - 12:12, 48:10
**prevent** [1] - 24:14
**primarily** [1] - 48:23
**primary** [1] - 23:25
**principles** [1] - 20:20
**privileged** [1] - 37:3
**pro** [1] - 4:2
**probability** [2] - 6:9, 11:10
**problem** [18] - 3:3, 5:23, 10:14, 10:16, 11:16, 12:5, 12:12, 12:15, 14:15, 19:24, 23:24, 25:11, 26:5, 28:6, 32:12, 38:21, 40:12, 47:24
**problematic** [2] - 33:13, 34:16
**problems** [1] - 45:3
**procedural** [2] - 39:3, 40:4
**proceedings** [2] - 2:7, 50:4
**process** [2] - 38:8, 38:11, 38:12
**processing** [2] - 15:8, 15:16
**profess** [1] - 45:17
**profits** [1] - 22:16
**promotion** [1] - 42:8
**promotional** [1] - 18:20
**prong** [10] - 20:3, 29:7, 29:10, 29:12, 29:20, 42:12, 44:5, 44:8, 46:7, 47:5
**proof** [2] - 13:22, 36:20
**properly** [1] - 19:19
**properties** [1] - 22:18
**proposed** [1] - 43:14
**proposition** [3] - 5:13, 7:25, 44:20
**prospect** [2] - 8:10, 44:16
**prospective** [1] - 10:23
**protected** [6] - 8:24, 18:6, 24:13, 25:7
**protection** [3] - 24:18, 26:13, 48:4
**protects** [2] - 26:2, 46:12
**protest** [1] - 47:10
**PROULX** [2] - 2:1, 50:9
**proulx@flsd.uscourts.gov** [1] - 2:3

**prove** [3] - 6:13, 14:2, 41:9
**provided** [2] - 35:20, 36:3
**provider** [3] - 29:16, 29:19, 34:19
**provides** [1] - 18:13
**public** [1] - 8:23
**publish** [1] - 24:11
**pull** [1] - 37:8
**purpose** [4] - 16:17, 35:6, 36:21
**purposes** [4] - 3:20, 4:18, 9:14, 41:23
**pursuant** [3] - 8:5, 20:5, 30:3
**pursuing** [1] - 28:7
**purview** [1] - 25:10
**Put** [1] - 35:7
**put** [4] - 31:17, 36:25, 44:5, 48:10

**Q**

**qualify** [1] - 13:4
**quarter** [1] - 13:19
**quick** [1] - 3:12
**quite** [5] - 6:25, 14:11, 19:11, 40:20, 45:14

**R**

**raised** [5] - 23:17, 24:1, 25:11, 26:15, 34:6
**raising** [2] - 14:6, 37:1
**rampant** [1] - 38:3
**rather** [5] - 13:16, 18:21, 21:20, 30:24, 33:25
**rationale** [2] - 16:21, 16:23
**rcoleman@lawfirm.ms** [1] - 1:17
**Rd** [1] - 1:15
**re** [1] - 29:4
**re-filed** [1] - 29:4
**reach** [6] - 19:18
**read** [6] - 5:15, 17:22, 18:1, 23:23, 24:5, 33:20
**reading** [2] - 5:25, 17:21
**real** [4] - 3:12, 7:1, 9:10, 31:22
**really** [27] - 4:9, 4:22, 5:16, 5:22, 8:16, 21:17, 23:15, 24:3, 26:7, 30:11, 30:15, 31:17, 33:21, 33:23, 34:9, 34:19, 40:14, 41:8, 41:12, 41:14, 42:14, 42:19, 42:21, 43:8, 44:3, 47:19, 48:22
**reason** [8] - 3:13, 17:11, 18:16, 20:17, 24:7, 29:20, 35:5, 45:15
**reasonably** [1] - 16:14
**reasoning** [3] - 17:2, 40:17, 48:9
**reasons** [2] - 48:9, 48:23

**recap** [2] - 4:7, 30:7
**receiving** [1] - 8:10
**recent** [1] - 14:8
**recently** [1] - 5:10
**recess** [1] - 49:16
**recognized** [1] - 13:14
**record** [15] - 2:23, 2:25, 3:9, 3:21, 4:16, 13:18, 14:25, 19:15, 29:3, 44:25, 48:9, 48:23, 48:24, 49:10, 49:11
**records** [1] - 35:3
**refer** [1] - 3:18
**reference** [2] - 5:13, 20:14
**references** [1] - 4:20
**reflect** [2] - 2:25, 44:25
**regarding** [3] - 4:13, 27:22, 29:12
**regardless** [1] - 36:6
**regular** [3] - 25:1, 38:8, 38:12
**Relations** [1] - 1:22
**relationship** [85] - 5:17, 5:19, 5:20, 5:22, 6:3, 6:7, 6:8, 6:12, 6:13, 6:16, 6:17, 6:22, 7:2, 7:4, 7:7, 7:11, 7:12, 7:14, 8:13, 8:22, 8:23, 8:24, 9:18, 10:10, 10:18, 11:8, 12:9, 12:25, 13:4, 13:12, 13:13, 13:16, 13:22, 13:25, 14:6, 14:8, 14:17, 15:17, 15:23, 17:1, 18:1, 18:7, 18:8, 18:9, 18:12, 19:2, 19:5, 19:17, 19:21, 19:25, 20:3, 20:6, 21:3, 21:12, 21:24, 22:9, 22:23, 22:24, 27:22, 29:14, 30:12, 32:21, 33:25, 34:12, 39:20, 40:24, 41:10, 41:11, 41:15, 42:3, 42:11, 42:13, 43:9, 43:11, 43:15, 43:20, 43:22, 43:25, 44:2, 44:8, 44:15, 45:6, 46:8, 46:10
**relationships** [4] - 5:5, 5:15, 7:8, 20:22
**relayed** [1] - 38:5
**relevant** [1] - 23:16
**relied** [1] - 41:9
**relies** [1] - 41:5
**remain** [1] - 4:5
**remaining** [6] - 3:10, 8:17, 23:17, 40:23, 46:2, 49:5
**remains** [2] - 4:12, 45:25
**remand** [3] - 2:24, 4:11, 33:5
**remember** [1] - 14:20
**removal** [1] - 36:15
**removed** [5] - 12:21, 13:2, 23:11, 26:4, 35:25
**removing** [1] - 16:18
**renew** [1] - 38:22
**repeat** [1] - 14:3

**repeatedly** [1] - 28:18
**repeats** [1] - 48:8
**replead** [2] - 35:3, 39:24
**reply** [1] - 7:24, 37:25
**report** [7] - 25:3, 25:17, 30:1, 31:2, 35:11, 47:12, 47:18
**reported** [1] - 33:8
**REPORTED** [1] - 2:1
**reporter** [1] - 49:12
**Reporter** [1] - 2:1
**reporting** [5] - 26:3, 31:7, 31:9, 34:13, 47:17
**reports** [2] - 34:7, 47:13
**request** [2] - 31:1, 40:7
**requested** [2] - 40:1, 40:2
**requesting** [1] - 40:5
**require** [8] - 10:3, 10:20, 11:8, 13:15, 23:1, 36:19, 40:8, 41:9
**requirement** [1] - 12:5
**requirements** [1] - 14:14
**requires** [4] - 6:7, 8:12, 11:6, 11:8
**respectfully** [2] - 23:3, 39:21
**respond** [9] - 8:4, 14:10, 15:2, 19:4, 19:19, 28:4, 28:13, 29:24, 39:17
**response** [8] - 6:24, 21:8, 27:8, 27:14, 31:15, 31:16, 31:23, 33:5
**responsible** [2] - 15:12, 30:18
**restrict** [1] - 29:18
**restrictions** [1] - 39:7
**result** [2] - 16:18, 36:14
**resulted** [1] - 13:20
**resulting** [1] - 5:21
**return** [2] - 18:13, 18:24
**revenue** [1] - 13:20
**revenues** [2] - 14:23, 43:1
**review** [2] - 4:12, 48:25
**reviewing** [1] - 4:8
**rights** [16] - 20:5, 20:12, 30:13, 30:15, 30:20, 31:17, 34:13, 44:3, 44:4, 44:11, 45:7, 45:8, 46:8, 46:9, 47:15, 48:21
**rise** [4] - 21:2, 21:14, 39:22, 45:9
**road** [1] - 47:20
**RODOLFO** [1] - 1:11
**role** [1] - 47:8
**Ronald** [1] - 2:15
**RONALD** [1] - 1:14
**rope** [1] - 46:5
**Roseland** [1] - 1:16
**RPR** [2] - 2:1, 50:9
**rubber** [1] - 47:19
**RUIZ** [1] - 1:11

**rule** [4] - 6:6, 17:6, 22:22, 40:16
**Rule** [2] - 33:13, 45:24
**ruling** [4] - 17:5, 27:20, 43:19, 45:25
**run** [2] - 26:5, 46:14

**S**

**safety** [1] - 37:4
**sake** [1] - 32:17
**Salsburg** [1] - 1:15
**San** [2] - 26:8, 47:22
**Sarkis** [1] - 41:16
**satisfactorily** [1] - 46:2
**satisfied** [1] - 14:13
**satisfy** [4] - 19:10, 19:11, 40:13, 42:2
**scenario** [1] - 35:21
**scenarios** [2] - 35:19, 36:2
**SE** [2] - 1:19, 1:23
**seated** [2] - 2:8, 4:5
**second** [8] - 12:16, 18:15, 20:25, 26:22, 30:6, 30:23, 38:7, 46:3
**secondarily** [1] - 48:17
**Section** [14] - 8:7, 20:16, 20:18, 23:18, 23:20, 28:24, 28:25, 29:9, 29:10, 29:15, 30:5, 31:15, 32:19, 45:2
**see** [18] - 3:1, 5:2, 10:5, 10:16, 12:24, 15:15, 15:16, 15:20, 18:4, 19:24, 21:11, 40:5, 40:25, 42:9, 42:13, 42:22, 43:16, 45:11
**seeking** [1] - 24:13
**seeks** [1] - 25:8
**seem** [1] - 10:3
**sees** [3] - 35:14, 35:16, 35:23
**selection** [1] - 26:8
**self** [1] - 31:4
**self-policing** [1] - 31:4
**seminal** [1] - 41:6
**send** [2] - 35:16, 35:17
**sense** [3] - 11:23, 15:19, 28:8
**sensor** [1] - 38:9
**separate** [2] - 27:24, 28:15
**separately** [1] - 15:10
**series** [2] - 16:19, 33:6
**service** [40] - 7:15, 8:6, 12:19, 17:3, 17:6, 17:10, 17:14, 18:3, 18:14, 18:16, 18:22, 18:24, 18:25, 19:1, 20:7, 20:10, 20:13, 20:15, 21:3, 21:15, 21:21, 21:25, 22:22, 22:25, 24:4, 24:6, 25:7, 31:1, 31:6, 34:12, 34:17, 37:7, 44:9, 44:12, 44:16, 45:8, 45:14, 46:10,

47:10, 47:25
**Services** [1] - 5:8
**services** [3] - 22:25, 24:15, 44:6
**set** [4] - 2:19, 2:23, 19:5, 30:4
**setting** [1] - 2:22
**settled** [1] - 8:22
**sever** [1] - 39:10
**several** [2] - 13:14, 18:14
**share** [1] - 6:14
**short** [2] - 9:24, 19:6
**showing** [1] - 13:18
**shows** [1] - 16:15
**sides** [1] - 27:4
**silenced** [1] - 45:19
**similarly** [1] - 7:10
**simplistic** [1] - 31:20
**simply** [8] - 4:24, 40:13, 42:4, 42:6, 43:6, 43:8, 44:5, 49:4
**single** [3] - 18:4, 18:5, 25:23
**situation** [1] - 35:12
**sketched** [1] - 19:3
**small** [1] - 46:1
**social** [5] - 9:12, 12:23, 15:17, 18:10, 47:1
**someone** [19] - 11:2, 22:6, 25:18, 26:3, 26:10, 26:12, 32:8, 34:7, 35:13, 35:14, 35:22, 35:23, 36:15, 37:5, 37:6, 37:13, 46:23, 47:13
**sometimes** [1] - 17:23, 25:4
**somewhat** [3] - 40:4, 40:12, 45:15
**somewhere** [1] - 15:21
**sorry** [3] - 7:25, 17:15, 39:15
**sort** [8] - 7:4, 9:2, 14:7, 20:11, 20:20, 21:11, 21:19, 25:24
**sought** [1] - 48:25
**source** [1] - 42:9
**SOUTHERN** [1] - 1:1
**Southern** [2] - 5:8, 27:11
**space** [1] - 44:12
**speaker** [1] - 34:9
**speaking** [2] - 9:2, 45:12
**speaks** [1] - 46:23
**specific** [5] - 13:15, 29:21, 36:19, 42:12, 49:13
**specifically** [2] - 14:21, 43:7
**specificity** [3] - 8:12, 9:23, 10:4
**specifics** [1] - 38:4
**specified** [2] - 10:24, 10:25
**specify** [1] - 40:22
**speculation** [2] - 38:3, 42:24
**speculative** [4] - 13:18, 42:6, 43:6, 48:15

**spend** [1] - 17:16
**sphere** [2] - 25:9, 46:4
**SPIELMAN** [2] - 1:18, 3:12
**Spielman** [2] - 1:18, 3:13
**Sports** [1] - 13:10
**squarely** [1] - 30:4
**St** [1] - 37:15
**stand** [1] - 5:13
**standard** [6] - 33:24, 36:19, 36:20, 41:21, 42:25, 44:1
**standards** [2] - 42:5, 47:1
**start** [1] - 37:16
**started** [2] - 2:19, 19:21
**State** [2] - 8:12, 27:12
**state** [8] - 3:8, 6:6, 7:23, 20:15, 24:14, 25:9, 30:10, 31:12
**States** [1] - 2:1
**states** [1] - 18:2
**STATES** [2] - 1:1, 1:12
**statute** [1] - 29:16
**stay** [1] - 25:6
**still** [2] - 19:6, 35:11
**stipulate** [2] - 17:17
**store** [1] - 37:15
**stores** [1] - 46:16
**straight** [2] - 5:3, 30:9
**strain** [1] - 9:6
**strains** [1] - 47:14
**Street** [1] - 33:8
**stretch** [1] - 46:19
**strike** [1] - 45:22
**strong** [1] - 12:12
**structured** [2] - 5:24, 19:12
**struggling** [1] - 40:14
**stuff** [1] - 33:20
**sub** [1] - 28:15
**subject** [6] - 22:15, 32:14, 32:16, 41:19, 46:24
**submissions** [1] - 33:6
**submit** [1] - 39:21
**subsequent** [1] - 16:23
**substantial** [1] - 33:6
**substantiate** [2] - 43:21, 44:7
**substantiating** [1] - 9:14
**success** [1] - 25:2
**suddenly** [2] - 25:22, 46:11
**suggest** [1] - 23:3
**suggestion** [1] - 22:8
**suit** [8] - 4:12, 4:19, 4:21, 20:20, 39:4, 39:5
**Suite** [2] - 1:15, 1:19
**summarily** [1] - 38:23
**summary** [1] - 14:1
**supplement** [2] - 40:18, 49:12
**supplemental** [2] - 33:11, 33:16

**support** [9] - 11:20, 16:15, 21:19, 27:3, 37:6, 42:10, 42:15, 47:6, 48:16
**supported** [1] - 11:2, 44:20
**supports** [2] - 25:21, 28:23
**Supreme** [4] - 6:5, 10:3, 12:14, 41:7
**survive** [1] - 42:22
**suspend** [1] - 20:16
**suspended** [1] - 25:6
**sustain** [2] - 7:3, 14:7
**swept** [1] - 32:22
**system** [1] - 30:3

# T

**tailored** [1] - 45:25
**tangential** [1] - 39:9
**targeting** [1] - 12:8
**Tel** [1] - 41:3
**telephonically** [1] - 2:13
**tend** [2] - 17:15, 27:10
**Teppler** [1] - 2:16
**term** [2] - 34:12, 46:10
**terminate** [4] - 20:16, 31:25, 32:3, 32:4
**termination** [1] - 31:25
**terms** [40] - 6:16, 7:14, 8:6, 8:7, 12:19, 17:3, 17:6, 17:10, 17:13, 18:3, 18:14, 19:1, 20:7, 20:10, 20:13, 20:15, 21:3, 21:12, 21:14, 21:21, 21:25, 22:22, 22:25, 24:4, 24:6, 25:7, 31:1, 31:6, 34:17, 37:7, 44:6, 44:9, 44:12, 44:16, 44:17, 45:8, 45:14, 47:10, 47:25
**THE** [48] - 1:1, 1:11, 1:14, 1:18, 1:21, 2:8, 2:10, 2:18, 3:7, 3:23, 4:4, 4:18, 8:14, 10:1, 10:12, 11:7, 13:7, 13:24, 14:9, 15:14, 17:19, 19:4, 20:9, 20:25, 21:17, 21:23, 22:3, 23:14, 24:10, 26:18, 26:22, 26:24, 27:9, 28:11, 30:6, 30:19, 30:23, 31:14, 32:6, 33:9, 34:3, 35:9, 37:24, 38:21, 39:15, 39:25, 49:9, 49:15
**themselves** [7] - 9:4, 12:8, 21:15, 22:1, 22:23, 34:8, 35:20
**theoretically** [1] - 26:11
**theories** [3] - 8:3, 27:22, 27:24
**theory** [22] - 6:25, 8:9, 10:12, 10:15, 11:16, 11:23, 12:17, 19:20, 25:18, 26:1, 28:6, 28:13, 30:7, 33:21, 34:6, 34:16, 34:20, 36:6, 42:10,

44:11, 45:11, 48:13
**Thereupon** [1] - 49:17
**they've** [3] - 21:5, 29:2, 33:4
**Third** [1] - 1:19
**third** [12] - 5:18, 25:16, 32:20, 34:20, 35:23, 45:5, 45:9, 45:12, 46:11, 47:15, 48:5, 48:17
**threaten** [1] - 36:16
**threatening** [1] - 46:16
**three** [1] - 29:20
**today** [9] - 2:22, 3:14, 3:22, 4:3, 4:15, 17:22, 29:2, 33:22, 40:18
**today's** [1] - 41:23
**together** [1] - 48:10
**took** [1] - 25:22
**top** [1] - 7:6
**tort** [7] - 9:16, 11:21, 12:6, 12:13, 36:18, 40:13, 41:11
**tortious** [41] - 4:13, 4:24, 5:5, 5:14, 5:25, 6:2, 6:7, 6:11, 7:3, 7:15, 7:23, 8:19, 9:14, 10:23, 14:15, 18:7, 24:15, 24:22, 25:25, 27:24, 29:8, 30:9, 30:24, 32:2, 32:5, 32:7, 33:24, 33:25, 34:11, 36:3, 36:9, 37:10, 40:21, 41:11, 42:3, 43:4, 44:23, 45:4, 47:7, 48:6, 48:12
**touch** [1] - 45:21
**track** [1] - 13:18
**transcription** [1] - 50:4
**transform** [1] - 45:24
**translate** [1] - 11:20
**transmit** [1] - 48:3
**transport** [2] - 45:24, 48:20
**treated** [2] - 13:3, 17:10
**trouble** [1] - 37:16
**true** [9] - 9:12, 9:22, 11:12, 12:3, 24:23, 33:14, 41:22, 44:2, 46:6
**truly** [1] - 19:24
**try** [5] - 17:23, 26:6, 27:9, 30:7, 40:11
**trying** [10] - 6:14, 9:17, 11:25, 12:22, 18:4, 19:23, 26:19, 28:1, 44:17, 44:19
**TV** [1] - 13:9
**Tweet** [1] - 30:1
**tweets** [1] - 29:23
**TWITTER** [1] - 1:7
**Twitter** [164] - 4:20, 6:16, 6:17, 6:19, 7:2, 7:5, 7:6, 7:12, 8:5, 8:11, 9:3, 9:4, 9:6, 9:13, 9:19, 9:20, 10:10, 11:15, 12:4, 12:17, 12:19, 12:20, 12:21, 12:23, 12:25, 13:2, 13:20, 13:21, 14:4, 14:6, 14:12, 14:17,

14:24, 14:25, 15:6, 15:7, 15:10, 15:19, 15:20, 15:23, 16:13, 16:18, 16:21, 16:25, 17:11, 18:6, 18:10, 18:13, 18:16, 18:20, 18:21, 18:22, 19:10, 19:13, 19:22, 20:13, 20:15, 20:19, 20:21, 21:12, 21:13, 21:24, 22:7, 22:11, 22:15, 22:17, 22:19, 22:21, 23:4, 23:5, 23:6, 23:7, 23:13, 24:3, 24:15, 24:18, 24:24, 25:3, 25:4, 25:8, 25:12, 25:13, 25:15, 25:17, 25:24, 26:3, 26:7, 26:11, 26:13, 26:14, 27:23, 28:4, 28:23, 29:1, 29:9, 29:14, 30:3, 30:13, 30:16, 31:2, 31:4, 31:5, 31:8, 31:10, 31:18, 31:19, 32:9, 32:14, 32:18, 32:21, 34:8, 34:13, 34:19, 34:25, 35:1, 35:7, 35:10, 35:14, 35:16, 37:3, 38:5, 38:9, 38:14, 38:19, 39:12, 39:20, 40:25, 41:14, 41:15, 41:24, 42:16, 42:23, 43:15, 43:22, 43:23, 44:7, 44:9, 44:12, 44:14, 44:17, 45:11, 45:12, 46:4, 46:6, 46:9, 46:22, 46:23, 47:3, 47:7, 47:13, 47:16, 47:18, 47:22, 47:25, 48:1, 48:13, 48:14, 48:18, 48:19
**Twitter's** [9] - 26:2, 28:19, 28:22, 29:3, 30:18, 30:20, 31:18, 45:13, 47:18
**two** [16] - 4:25, 5:7, 7:9, 8:3, 11:17, 20:20, 23:15, 27:4, 27:22, 27:23, 28:15, 30:8, 31:15, 41:8, 44:22, 45:2
**Twombly** [4] - 41:21, 42:5, 42:25, 46:20
**type** [1] - 11:20

# U

**ultimate** [2] - 30:18, 38:14
**ultimately** [5] - 12:20, 24:12, 30:14, 31:10, 35:25
**unaddressed** [1] - 19:17
**uncertain** [1] - 6:16
**under** [28] - 5:4, 7:14, 7:22, 9:22, 9:24, 14:8, 17:13, 20:4, 20:13, 23:18, 24:3, 24:15, 24:18, 26:1, 28:24, 29:9, 29:15, 30:8, 30:12, 32:19, 33:24, 33:25, 34:13, 44:8, 45:2, 46:4, 46:8, 47:4
**underway** [1] - 2:20
**unfair** [1] - 37:19
**uniformly** [1] - 43:2
**UNITED** [2] - 1:1, 1:12

**United** [1] - 2:1
**universe** [2] - 46:17, 48:3
**unjustified** [2] - 47:6, 47:9
**unless** [2] - 12:8, 12:13
**unlike** [1] - 24:25
**unsophisticated** [1] - 35:13
**up** [15] - 4:25, 8:3, 17:9, 26:1, 30:4, 32:22, 34:8, 34:11, 34:22, 35:6, 35:20, 36:3, 37:13, 38:22, 48:18
**urge** [1] - 25:17
**urged** [2] - 24:23, 25:14
**urging** [1] - 9:20
**USC** [1] - 23:18
**user** [12] - 18:15, 22:14, 23:1, 29:16, 29:19, 30:2, 30:16, 31:18, 32:21, 34:25, 35:16, 36:13
**users** [8] - 9:3, 9:4, 18:17, 18:18, 18:19, 31:1, 31:5, 38:9
**uses** [1] - 12:25
**utilized** [1] - 43:23

**V**

**vague** [1] - 14:22
**valuable** [3] - 22:14, 22:18, 23:2
**value** [1] - 18:20
**Van** [4] - 7:25, 8:1, 8:21, 41:7
**various** [1] - 24:15
**varying** [1] - 25:2
**Venmo** [1] - 15:9
**venue** [1] - 17:15
**Verizon** [1] - 41:3
**versus** [8] - 2:11, 5:8, 5:12, 13:9, 27:23, 38:20, 41:3, 41:7
**via** [1] - 1:14
**vice** [1] - 4:2
**view** [9] - 21:18, 30:8, 30:25, 36:22, 40:21, 42:4, 42:21, 43:24, 45:9
**viewed** [1] - 45:20
**views** [1] - 45:19
**violated** [1] - 12:20
**violation** [1] - 37:7
**virtue** [2] - 18:24, 36:12
**visible** [1] - 8:19
**voluntarily** [3] - 17:11, 29:2, 29:17
**voluntary** [1] - 10:19
**vs** [1] - 1:5

**W**

**Wall** [1] - 33:8
**wants** [2] - 17:8
**war** [1] - 37:19

**Washington** [1] - 1:23
**waste** [1] - 34:3
**Watch** [1] - 38:20
**wedding** [1] - 43:17
**week** [1] - 29:4
**WEST** [1] - 1:2
**Westlaw** [2] - 13:10, 23:24
**white** [2] - 36:24, 37:20
**wish** [1] - 49:10
**withdraw** [1] - 24:12
**witness** [1] - 3:14
**woman** [1] - 35:7
**wondering** [1] - 26:23
**worded** [1] - 12:14
**words** [2] - 23:11, 29:18
**works** [1] - 9:6
**worried** [2] - 8:15, 34:1
**worry** [1] - 33:15
**writes** [2] - 35:24, 35:25
**written** [1] - 10:21
**wronged** [1] - 47:23
**wrote** [1] - 28:19

**Y**

**year** [1] - 38:20
**yesterday** [1] - 38:23

**Z**

**Zaghari** [1] - 4:1
**ZAGHARI** [2] - 1:22, 3:25
**Zaghari-Mask** [1] - 4:1
**ZAGHARI-MASK** [2] - 1:22, 3:25