**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| ILLOOMINATE MEDIA, INC ET AL<br><br>Plaintiffs<br><br>v.<br><br>CAIR FLORIDA, INC., et al<br><br>Defendants. | Case Number:   9:19-cv-81179 |

# **PLAINTIFFS' OBJECTIONS TO MAGISTRATE REINHART'S ORDER OF AUGUST 4, 2021**

Plaintiffs hereby files the following objections to Magistrate Bruce Reinhart's order of August 4, 2021 granting in part and denying in part Defendants' motion for attorneys fees and costs (the "Order"). Plaintiffs have already moved for leave to file these objections *nunc pro tunc* on November 9, 2021, and in the interest of judicial efficiency and to prevent any assertion of undue delay or prejudice, are submitting these objections now. Following the Court's order requiring a meet and confer, Plaintiffs sought the consent of the Defendants and predictably they did not respond, most likely given their animus toward Ms. Laura Loomer, a Jewish activist who they despise.

Magistrate Bruce Reinhart ("Magistrate Reinhart"), on referral from Judge Rodolfo Ruiz ("Judge Ruiz") clearly erred in granting Defendants' motion for attorneys' fees and costs on the basis of Florida's Offer of Judgment Statute, Fla. Stat. § 768.79. This is because (1) Defendants' offer was clearly not made in good faith, as is required under the statute and (2) Plaintiffs' Complaint sought both monetary and non-monetary relief, also rendering the offer of judgment statute inapplicable.

Even more, the amount of fees claimed by Defendants was patently hyper-inflated and

1

fraudulent, and was clearly nothing more than Defendants seeking a windfall from what they correctly perceived as a favorable venue. These are the same Defendants, CAIR, that the U.S. Department of Justice had previously named as an unindicted co-conspirator in a criminal prosecution of the Holy Land Foundation in Dallas, Texas for allegedly funneling millions of dollars to the terrorist organization Hamas. Exhibit A.

It was a clear error for the District Court to fall for what was a plain "money grab" by the Defendants, based on fraudulent records and affidavits. At a minimum, the Court must order discovery and an evidentiary hearing into Defendants' claimed fees and costs, should the Court not simply rightly find that Florida's offer of judgment statute is inapplicable and Defendants entitled to zero (0) fees and costs.

**I.     DEFENDANTS ARE NOT ENTITLED TO ANY ATTORNEYS' FEES AND COSTS UNDER FLA. STAT. § 768.79**

Defendants are not entitled to any attorneys fees and costs under Florida's Offer of Judgment statute on two grounds: (1) Defendants' offer was not made in good faith, and (2) the statute does not apply where the Plaintiffs have sought non-monetary relief, as Plaintiffs have clearly done here.

**A.     Defendants' Offer Was Not Made In Good Faith**

As a threshold matter, an offer of judgment must be made in good faith in order to for the offeror to be entitled to any fees and costs. *Gurney v. State Farm Mut. Auto.*, 889 So. 2d 97 (Fla. Dist. Ct. App. 2004). "The question to be considered by the court in determining if an offer of judgment was made in good faith is whether the offer or proposal bears a reasonable relationship to the amount of damages suffered and was a realistic assessment of liability." *Id*. at 99.

Here, Defendants offered a grand total of $1.00 to settle claims, essentially a nominal if not insulting bad faith offer from a group that has been found to be not just anti-Semitic, but also

in effect a terrorist group which supports other terrorists such as Hamas. ECF No. 55-1. It is clear that this offer was not made in good faith, and it was simply an attempt to collect a windfall from what Defendants perceived was—and was ultimately correct on—a favorable judge. This was in no way "a reasonable relationship to the amount of damages suffered and…a realistic assessment of liability." *Id*.

This case involved Defendants' intentional interference and other misconduct in having Ms. Loomer banned from Twitter. Ms. Loomer had approximately 265,000 followers on Twitter at the time. ECF No. 1-2 at 13 (Am. Comp. ¶ 61). With this number of followers, Plaintiffs clearly were able to derive significant income from Twitter. As pled in the Amended Complaint, as a result of the Twitter ban, Ms. Loomer's monthly income was decreased by approximately 75%. ECF No. 1-2 at 34 (Am. Comp. ¶ 188). This is only further evidenced by Defendants' own admissions in their Notice of Removal, ECF No. 1, where they argue that the amount in controversy exceeds the minimum threshold for diversity of citizenship jurisdiction. "Common sense dictates that claims for loss of 90% of ones' income, punitive damages, attorneys' fees, and injunctive relief, when combined, exceed $75,000." ECF No. 1 at 7. Defendants cannot have it both ways. They cannot credulously assert that Plaintiffs' damages exceeded $75,000 in an attempt to seek a favorable venue and then claiming that an offer of $1.00 to settle all claims was made in good faith. This simply does not add up.

Furthermore, Defendants cannot credibly assert that their offer was a "realistic assessment of liability" where the "offer" was made on October 2, 2019 – a mere month and a half after the matter had been removed, and before any discovery had taken place. The timing of the "offer" shows that it was nothing more than a "hail-Mary" in not fraudulent attempt to collect a windfall, which the District Court erroneously allowed to occur.

3

Thus, Defendants' "offer" was not made in good faith, and as such, they are entitled to zero (0) fees under Florida's offer of judgment statute.

### B. Defendants' Offer of Judgment Does Not Qualify For An Award Because Plaintiffs Sought Non-Monetary Relief

It is indisputable that the offer of judgment statute only applies to "any civil action for damages." "Courts have consistently interpreted this phrase as being applicable to a claim in a civil action in which a party seeks **only** money damages." *Starboard Cruise Servs., Inc. v. DePrince*, 259 So. 3d 295, 298 (Fla. Dist. Ct. App. 2018) (emphasis added). "If the plaintiff requests injunctive relief and monetary damages and the defendant serves a general offer of judgment that seeks release of all claims, the defendant cannot recover its attorney's fees under section 768.79." *Highland Holdings, Inc. v. Mid-Continent Cas. Co.*, 725 F. App'x 906 (11th Cir. 2018).

> The district court did not err by denying the motion of Mid-Continent to recover its attorney's fees under section 768.79. Mid-Continent made a general offer of judgment to settle "all claims" in the amended complaint, and that pleading sought both equitable relief and a monetary judgment. The complaint by Highland Holdings and Adams for a declaratory judgment about "insurance coverage for [its] underlying tort action" did not constitute "a civil action for damages within the meaning of" section 768.79. *See Nat'l Indem. Co. of the S. v. Consol. Ins. Servs.*, 778 So.2d 404, 408 (Fla. Dist. Ct. App. 2001). Because Highland Holdings and Adams sought "both monetary and nonmonetary relief, and [Mid-Continent] ma[de] a general offer of settlement, section 768.79 is not applicable." *Diamond Aircraft*, 107 So.3d at 373. *Id*.

Here, Plaintiffs clearly sought non-monetary relief in the Amended Complaint. In the prayer for relief section, Plaintiffs sought (1) "rescission or reformation of those provisions of the Twitter Terms of Service which, as a matter of equity, might otherwise prevent or limit this Court's ability to provide just and complete remedies for defendants' unlawful conduct", and (2) "preliminary and permanent injunctions to prevent defendants from continuing their unlawful conduct." ECF No. 1-2 at 41.

4

Magistrate Reinhart acknowledges this cold, hard case law, but still strains to find a way to apply the offer of judgment statute. He does this but erroneously finding that Plaintiffs' claims for non-monetary relief were only a "passing reference," and that non-monetary relief was not the "true relief" sought by Plaintiffs. Magistrate Reinhart himself wrote that the "true relief" sought is monetary damages when a party only pursues damages throughout litigation and does not pursue its equitable claim." It was disingenuous and improper, at best, for him to make this finding when this matter was disposed of at the notion to dismiss stage. What other opportunity did Plaintiffs have to pursue their non-monetary claims other than including them in their Complaint? It would have been one thing if this case proceeded into discovery, and perhaps summary judgment, and Plaintiffs had actually had an opportunity to even somewhat litigate the case. This did not occur here. All Plaintiffs had a chance to do was plead, and they clearly pled non-monetary relief. Thus, Magistrate Reinhart had absolutely no basis to make the clearly flawed finding that Plaintiffs' "true relief" was solely monetary, as he could not possibly predict how the litigation would have proceeded if Plaintiffs were given a chance to do so.

Accordingly, since Plaintiffs' Amended Complaint clearly sought non-monetary relief, the offer of judgment statute is inapplicable and Defendants are entitled to zero (0) fees.

## II. ALTERNATIVELY, THE COURT MUST ORDER AN EVIDENTIARY HEARING AND DISCOVERY

As set forth above, if the unlikely event that Magistrate Reinhart's finding that the offer of judgment statute is applicable is not reversed, the Court must still order a full evidentiary hearing and discovery with regard to attorney's fees and costs.

As set forth in Plaintiff's opposition to Motion for Fees and Costs, ECF No. 64, the Defendants' calculation of fees and basis of fees incurred does not comply with Florida law and is not reasonable. *See* ECF No. 55, incorporated herein by reference. This is because (1)

Defendants failed to make the affirmative showing as to what portion of their claimed fees was expended on the claim(s) that authorized fees, (2) the use of an unqualified "expert" in Ramon A. Abadin, and (3) the failure of the "expert" to actually provide specific detailed evidence from which the court can determine the reasonable hourly rate, rendering his testimony inadequate as a matter of law.

Despite this, Magistrate Reinhart still granted nearly every single dollar the Defendants sought, without even providing Plaintiffs with an evidentiary hearing or discovery into the patently fraudulent amount of claimed fees and costs. Under the context of determining an award of attorneys' fees, the U.S. District Court for the Southern District of Florida held, "[h]owever, the Eleventh Circuit has stated that evidentiary hearings should be held where a hearing has been requested, where there are disputes of fact, and where the written record is not sufficiently clear so as to allow the trial court to resolve the disputes of fact." *Clark Realty Builders v. V the Falls*, 2007 U.S. Dist. LEXIS 116946, at *9 (S.D. Fla. June 13, 2007). At a minimum, there are disputes of fact—as Plaintiffs have argued that the amount of fees claimed by Defendants is hyper-inflated, fraudulent, and in bad faith. Thus, Plaintiffs are entitled to an evidentiary hearing. *See also Norman v. Hous. Auth. of Montgomery*, 836 F.2d 1292, 1303 (11th Cir. 1988).

Indeed, these claimed inflated fees clearly create a strong presumption of dishonesty and if not fraud, which Courts, including Florida state courts have held warrant dismissal of an action in the entirety. In *Tesco Corp. v. Weatherford Int'l, Inc.*, 2014 U.S. Dist. LEXIS 118427 (S.D. Tex. Aug. 25, 2014), the counsel for Tesco made a material misrepresentation to the Court regarding a contested issue in a patent case. The Court found that it was proper to completely dismiss the case:

> Further, the Court is deeply concerned about Tesco's attitude towards its misrepresentations to the Court. Counsel owes the Court a duty of complete

6

candor at all times, regardless of whether the jury is in the courtroom, or opposing counsel rejects other sanctions. Moreover, any sanctions opposing counsel rejected have nothing to do with Tesco's misrepresentations to the Court. As the trial transcript makes abundantly clear, the Court offered a mistrial as a way to cure any prejudice to Defendants from the new evidence. Post-trial disclosures show that the Defendants were denied access to critical information they needed in deciding whether to accept a mistrial." *Id*. at 17-18

Just as with witnesses testifying truthfully under oath, the proper administration of justice depends upon counsel being completely forthright with the Court. As the court recognized in *Hull*, not every lawyer who lies to a court will be caught, so when such deliberate and advantage-seeking untruthful conduct is uncovered, the penalty must be severe enough to act as a deterrent. Awarding attorney's fees — even if they were to be paid by Tesco's counsel alone — is insufficient. [*20] Such serious misrepresentations cannot be excused as simply the cost of doing business. Attorney's fees also may be appropriate, but such an affront to this Court, to the other parties, and to judicial integrity can only be answered with dismissal." *Id*. at 19-20

Florida courts have followed this reasoning:

The requisite fraud on the court occurs where "it can be demonstrated, clearly and convincingly, that a party has sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by improperly influencing the trier of fact or unfairly hampering the presentation of the opposing party's claim or defense." *Jacob v. Henderson*, 840 So. 2d 1167, 1169 (Fla. Dist. Ct. App. 2003).

A "fraud on the court" occurs where it can be demonstrated, clearly and convincingly, that a party has sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by improperly influencing the trier or unfairly hampering the presentation of the opposing party's claim or defense.....We find the caselaw fully consonant with the view that a federal district judge can order dismissal or default where a litigant has stooped to the level of fraud on the court." *Aoude v. Mobil Oil Corp*., 892 F.2d 1115, 1118-19 (1st Cir. 1989).

Where Courts have held that dismissal of an entire action is proper where a counsel commits a fraud on the Court, at a minimum, Defendants' motion for fees should be summarily dismissed.

Thus, the Court must order a full evidentiary hearing with discovery, in the unlikely event the Magistrate Reinhart's order is not wholly reversed. Clearly, Defendants are entitled to zero

7

fees and costs since Florida's offer of judgment statute does not apply.

## CONCLUSION

For the foregoing reasons, Magistrate Reinhart's order should be reversed and Defendants be awarded zero fees and costs due to the inapplicability of Florida's offer of judgment statute. Alternatively, in the unlikely event that the attorneys fee award is not reversed, the Court must order a full evidentiary hearing with discovery in the interests of due process, standard litigation procedure in Florida, and fundamental norms of justice, on the issue of fees and costs.

Of importance in this regard, is that Defendant has been found by the U.S. Department of Justice to further Islamic terrorism by supporting the terrorist group Hamas, an entity which has vowed to destroy not just the state of Israel by driving Jews, like Ms. Loomer, into the sea, but also to exterminate Jews in general ala the German Nazi regime of Adolph Hitler.

In short, to bankrupt Ms. Loomer but reward the co-conspirator CAIR with a huge award of attorneys fees would work more than a manifest injustice pursuant to applicable law, as set forth herein, but also fly in the face of any standard of fairness and human decency.

Dated: November 10, 2021                                     Respectfully Submitted,

                                                             /s/ Larry Klayman
                                                             Larry Klayman, Esq.
                                                             7050 W. Palmetto Park Rd
                                                             Boca Raton, FL, 33433
                                                             Telephone: (561)558-5336
                                                             Email:leklayman@gmail.com

                                                             *Counsel for Plaintiffs*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 10th day of November, 2021  a true copy of the foregoing was filed via ECF and served to all counsel of record though the Court's ECF system.

/s/ *Larry Klayman*

# EXHIBIT A



**U.S. Department of Justice**
Office of the Inspector General
Evaluation and Inspections Division

# Executive Summary

# Review of FBI Interactions with the Council on American-Islamic Relations

## September 2013

I-2013-007R

**REDACTED – FOR PUBLIC RELEASE**

# EXECUTIVE SUMMARY*

In March 2012, after receiving a congressional request, the Office of the Inspector General (OIG) initiated a review to examine the clarity of the Federal Bureau of Investigation's (FBI) policy and guidance for its non-investigative interactions with the Council on American-Islamic Relations (CAIR) and FBI field office compliance with the policy and guidance. In evaluating field office compliance, we focused on five specific interactions between the FBI and CAIR that took place from 2010 through 2012 at three FBI field offices: New Haven, Connecticut; Chicago, Illinois; and Philadelphia, Pennsylvania. We found significant issues with the way the FBI implemented and managed its CAIR policy and guidance. The OIG is issuing a full report today on FBI interactions with CAIR to Congress and the Department of Justice that is classified at the Secret level. This unclassified summary of the report summarizes the findings, conclusions, and recommendations of the report.

**Background**

In 2008, the FBI developed a policy on its interactions with CAIR based in part on evidence presented during the 2007 trial of the Holy Land Foundation for Relief and Development.[1] The evidence at trial linked CAIR leaders to Hamas, a specially designated terrorist organization, and CAIR was named as an unindicted co-conspirator in the case. The policy was intended to significantly restrict the FBI's non-investigative interactions with CAIR and to prevent CAIR from publicly exploiting such contacts with the FBI.

The FBI's ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ communicated the policy to FBI field offices through a series of electronic communications (EC) during a 4-month period from August through December 2008. During this time, ▉▉▉ sent three ECs and the FBI's ▉▉▉▉▉▉▉▉▉▉▉▉▉ sent two other ECs to FBI field offices providing background, guidance, and policy language on when, how, and why future specific non-investigative interactions with CAIR would be restricted.[2] The ECs mandated coordination with the ▉▉▉▉▉▉▉▉▉▉▉▉▉ for all non-investigative interactions with CAIR and directed FBI field offices to specific points of contact at ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ for guidance



---

\* The FBI identified within the full version of this report classified and other information that if released publicly could compromise national security interests and the FBI's operations. To create this unclassified public Executive Summary, the Office of the Inspector General redacted (blacked out) portions of the Executive Summary.

[1] *United States* v. *Holy Land Foundation et al.* (Cr. No. 3:04-240-P, N.D. Tex).

[2] The strategy addressed only non-investigative community outreach interactions and was not intended to affect field offices' interactions with CAIR representatives with regard to civil rights complaints or criminal investigations.

regarding the implementation of the policy. Additionally, in late November 2008, ▇ held a mandatory meeting for all Special Agents-in-Charge (SAC) and Assistant Directors-in-Charge of FBI field offices to ensure compliance with the policy.

The ECs containing the policy acknowledged that it represented a significant deviation from past FBI policy and that it affected longstanding relationships in the field. When we asked the former FBI Assistant Director for ▇, who was the Deputy Assistant Director for ▇ at the time, why the FBI issued multiple ECs over a 4-month period regarding the policy, he said that some of the field offices were reluctant to go along with the policy initially.[3] For example, on October 27, 2008, the Los Angeles SAC sent an e-mail to his staff stating that the field office's "position is that we will decide how our relationship is operated and maintained with CAIR barring some additional instruction from FBI Headquarters." The SAC further stated: "Please instruct your folks at this time that they are not to abide by the [October 24, 2008, EC from the ▇, but that their direction in regards to CAIR will come from the LA Field Office front office." We learned from interviews with the ▇ that several other SACs also were reluctant to follow the policy. The former Assistant Director of ▇ also said that field office managers believed the strategy was being run by the ▇ rather than ▇ and "they did not like answering to the ▇." The former Assistant Director of ▇ further stated that the ECs were meant to demonstrate that this was a national issue, rather than an issue that affected only a ▇.

Based on our review of five incidents in three field offices, we found that ▇ did not manage or provide the oversight needed to ensure proper implementation and compliance with its policy. Instead, a different headquarters entity, the Office of Public Affairs (OPA), provided policy interpretation and advice to FBI field offices on potential interactions with local CAIR chapters, without consulting ▇.[4] We found that OPA's guidance was not always in line with, or supported by, the binding language contained in the policy. We also found instances in which FBI field offices did not communicate with the points of contact identified in the policy. And we found that ▇ and OPA still appear to have coordination issues before providing guidance to FBI field offices.

---

[3] He served as Assistant Director of the FBI's ▇ from January to December 2010.

[4] OPA issued "Public Affairs Guidance" in April 2009, July 2009, January 2010, March 2010, and March 2011 to FBI field offices to provide questions and answers (Q & A's) and talking points for media inquiries and interviews on Muslim outreach that each contained a portion on FBI-CAIR relations.

**Five Field Office Incidents**

Chicago Field Office – On July 27, 2010, the SAC of the Chicago Field Office gave a presentation at the request of the American Islamic College. The SAC was not aware until 30 minutes prior to the event that a local CAIR official was scheduled to make the introductory remarks. Shortly after the event, CAIR-Chicago posted a description of the event on its website with a photograph of the SAC talking to the class. While this appearance with a CAIR official did not adhere to the policy language or its intent, the OIG recognizes that the SAC was notified at the last minute and made a judgment call. Had the SAC learned earlier the identity of the person who was scheduled to introduce him, we believe that the policy would have required coordination with the ██████████████ before proceeding with the event.

New Haven Field Office – On October 29, 2010, the FBI New Haven Field Office co-coordinated a diversity training workshop with a local Muslim organization. Two of the six trainers selected for this "cultural sensitivity" training were local CAIR officials. The New Haven Field Office sought guidance from OPA, ██████████████████████ about how it could participate in the event and still comply with policy. The ████████████████ informed the New Haven Field Office that the training would be against policy. However, OPA provided different guidance to the New Haven Field Office that training could occur as long as it was conducted offsite, and New Haven did not abide by the opinion of the ██████████████ and instead followed the OPA guidance. The result was an FBI interaction with CAIR that was inconsistent with the FBI's policy.

Chicago Field Office – On December 2, 2010, the Chicago Field Office hosted a quarterly Department of Homeland Security (DHS) Community Engagement Roundtable at its field office that many Chicago area government and community officials attended. DHS invited a local CAIR official to attend the meeting at the Chicago FBI Field Office, although the CAIR official ultimately did not attend. The Chicago Field Office SAC told the OIG that if DHS invited a CAIR official to the Roundtable, he would not deny them entry at the door. The SAC also stated that if CAIR officials came to the Chicago Field Office, he was not required to report it to FBI Headquarters, just as he was not required to report a meeting with CAIR on a civil rights matter.[5] He stated such notification would be impractical given the realities the field office encountered. He said that he viewed the various ECs from FBI Headquarters regarding interactions with CAIR as "guidance" and not policy and that he therefore was not required to contact or coordinate with Headquarters. We do not believe that the ECs could have been viewed as anything other than

---

[5] The field office did send an EC reporting the Roundtable event to the Director's Office at FBI Headquarters after the event occurred, but it did not mention that a CAIR representative had been invited to attend.

mandatory, particularly in light of the SAC's attendance at ▆▆▆ policy meeting in November 2008 on this same subject. While the CAIR representative ultimately did not attend the Roundtable, the failure to follow the ECs in this instance could have led to an interaction that would have been inconsistent with the FBI's policy.

Philadelphia Field Office – On December 11, 2010, the Philadelphia Field Office held a Community Relations Executive Seminar Training (CREST) event. CREST is an FBI community outreach program created by OPA as a subprogram of the FBI's Citizen's Academy. The policy specifically instructed FBI field offices that CAIR could not participate in the FBI Citizen's Academy. Nevertheless, based on guidance it received from OPA, the Philadelphia Field Office allowed a local CAIR official to attend as an invited guest. A few days later, CAIR-Philadelphia posted an article on its website describing its participation in the training program, with a link to the FBI's website. The FBI Philadelphia Field Office did not coordinate with the ▆▆▆ as required in the policy, and OPA did not consult with ▆▆▆ ▆▆▆. As a result, OPA provided guidance that resulted in an interaction with CAIR that was inconsistent with the FBI's policy.

Philadelphia Field Office – Between August 2011 and June 2012, Philadelphia Field Office Special Agents attended the Pennsylvania Human Relations Commission Interagency Task Force on Community Activities and Relations meetings on a monthly basis. CAIR personnel have also attended these meetings. During our review, we learned that the Philadelphia Field Office attended these task force meetings for approximately 7 years for liaison purposes related to its civil rights program. The meetings were sponsored by a state government agency and not by the FBI or CAIR; they were held in non-FBI office space; the FBI did not have a role in organizing the program; and the event was not otherwise structured in a way that would give the public appearance of a liaison relationship between CAIR and the FBI. Therefore, we found that the policy did not preclude FBI attendance at these meetings.

**Conclusion**

In 2008, the FBI developed a policy intended to restrict FBI field offices' non-investigative interactions with CAIR. However, in three of the five incidents we reviewed, we concluded that the policy was not followed. Despite recognizing the importance of the policy by issuing multiple ECs and holding a mandatory meeting with field office leadership to ensure compliance, we found that the FBI did not conduct effective oversight to ensure compliance with the policy. Additionally, FBI field offices at times contacted OPA instead of the required points of contact under the policy, and OPA did not consistently coordinate with ▆▆▆ when that happened. We found that OPA, which has a different mission and focus than other divisions,

provided guidance regarding interactions with CAIR that we found was inconsistent with the policy. This resulted in public interactions with CAIR that we found to be inconsistent with the goal of the FBI's policy.

**Recommendations**

To help the FBI improve its implementation of the policy, the OIG has made two recommendations in this report. They are:

1. Ensure effective implementation of FBI policy relating to interactions with CAIR, including the coordination mandated by the policy and enforcement and oversight of compliance with the policy.

2. Provide comprehensive education on the objectives and requirements of the current CAIR policy to Headquarters and field office personnel who are likely to be involved with the application of the policy.