**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

FILED BY _____ D.C.

JUL 29 2024

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

ILLOOMINATE MEDIA, INC ET AL

               Plaintiffs

        v.

                             Case Number:   9:19-cv-81179

CAIR FLORIDA, INC., et al

               Defendants.

**PLAINTIFF LAURA LOOMER'S RESPONSE IN OPPOSITION TO MOTION TO COMPEL COMPLIANCE WITH ECF NO. 105-1/106 AND/OR FOR CONTEMPT AND MOTION FOR EXTENSION OF TIME FOR CORPORATE PLAINTIFF ILLOOMINATE MEDIA, INC TO FILE A RESPONSE**

Plaintiff Laura Loomer hereby submits the following in response to Defendants CAIR Florida, Inc. and CAIR Foundation's Motion to Compel Compliance With ECF No. 105-1/106 and/or for Contempt. ECF No. 107 ("Motion to Compel").

The Defendants' Motion to Compel stems from the fact that Plaintiffs have objected to counsel for Defendants' communicating with and attempting to "settle" a case that they are not involved in—the separate ongoing legal malpractice case that Plaintiffs have filed against their former counsel in this case. *Loomer v. Coleman et al*, 50-2023-CA-010810-XXXX-MB (15th Jud. Cir. Fla.) (the "Malpractice Case"). Notably, the Defendants here are not parties to, nor do they have any involvement in the Malpractice Case, yet they have attempted to "settle" away Plaintiffs' substantive rights with a Defendant in the Malpractice Case, Defendant Craig Young. This is highly unethical, illegal behavior that should be referred to The Florida Bar. The Defendants did this in secret, without any notice to the Plaintiffs until after a purported "settlement" had been reached with Mr. Young.

Defendants attempt to argue that the language of the settlement agreement between the

1

parties in this case grants them authority to act in this unprecedented, illegal, and unethical fashion, but a review of the language at issue shows that this is simply untrue:

> **Veto Power and Settlement Authority**. CAIR shall have final sign off power on; veto power over, and substantive control of Plaintiffs' authority to settle *Coleman*, including through any offer of judgment. Plaintiffs may not settle *Coleman* without CAIR's written consent, and failure to obtain such consent is a substantive breach of this Settlement.

Nowhere in this provision are Defendants' granted authorization to secretly settle away Plaintiffs' substantive rights with the Defendants in the Malpractice Case. The plain language of this provision shows that Defendants have veto power and final say over whether to accept a settlement that has been worked out between Plaintiffs and the Defendants in the Malpractice Case. The practical effect of this provision – which is what both parties bargained for - is that both Plaintiffs and Defendants in this case must agree to any settlement in the Malpractice Case. It does not give the Defendants the right to accept a settlement in the Malpractice Case affecting Plaintiffs' rights that Plaintiffs would never have accepted.

Accordingly, Defendants CAIR Foundation and CAIR Florida - unindicted co-conspirators in a criminal prosecution of the Holy Land Foundation in Dallas, Texas for allegedly funneling millions of dollars to the terrorist organization Hamas – Motion to Compel must be denied as they have far exceeded any authority provided through the Settlement Agreement. This unethical and illegal conduct cannot be allowed to occur and counsel for Defendants must be referred to The Florida Bar for their actions here.

Lastly, Plaintiffs respectfully request a two-week extension of time, until and including August 12, 2024 for Plaintiff Illoominate Media, Inc. to file a response to Defendants' Motion to Compel, as Ms. Loomer is unable to represent a corporate party *pro se*. This extension of time will allow Ms. Loomer to retain counsel and prepare a response, as Plaintiffs' current counsel in

unable to practice in this Court at this time.

Dated: July 29, 2024                                      Respectfully Submitted,


                                                          */s/ Laura Loomer*
                                                          Laura Loomer
                                                          2046 Treasure Coast Plaza
                                                          Suite A #138
                                                          Vero Beach, FL 32960

                                                          *Pro Se*


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 29th day of July, 2024, the foregoing was served on

counsel  for Defendants via U.S. mail at:

J. Remy Green
1639 Centre St., Ste. 216, Ridgewood NY 11385


                                                          */s/ Laura Loomer*

# **EXHIBIT A**



**U.S. Department of Justice**
**Office of the Inspector General**
**Evaluation and Inspections Division**

**Executive Summary**

**Review of FBI
Interactions with the
Council on American-
Islamic Relations**

**September 2013**

**I-2013-007R**

**REDACTED – FOR PUBLIC RELEASE**

## EXECUTIVE SUMMARY*

In March 2012, after receiving a congressional request, the Office of the Inspector General (OIG) initiated a review to examine the clarity of the Federal Bureau of Investigation's (FBI) policy and guidance for its non-investigative interactions with the Council on American-Islamic Relations (CAIR) and FBI field office compliance with the policy and guidance. In evaluating field office compliance, we focused on five specific interactions between the FBI and CAIR that took place from 2010 through 2012 at three FBI field offices: New Haven, Connecticut; Chicago, Illinois; and Philadelphia, Pennsylvania. We found significant issues with the way the FBI implemented and managed its CAIR policy and guidance. The OIG is issuing a full report today on FBI interactions with CAIR to Congress and the Department of Justice that is classified at the Secret level. This unclassified summary of the report summarizes the findings, conclusions, and recommendations of the report.

**Background**

In 2008, the FBI developed a policy on its interactions with CAIR based in part on evidence presented during the 2007 trial of the Holy Land Foundation for Relief and Development.[1] The evidence at trial linked CAIR leaders to Hamas, a specially designated terrorist organization, and CAIR was named as an unindicted co-conspirator in the case. The policy was intended to significantly restrict the FBI's non-investigative interactions with CAIR and to prevent CAIR from publicly exploiting such contacts with the FBI.

The FBI's ███████████████████████████ communicated the policy to FBI field offices through a series of electronic communications (EC) during a 4-month period from August through December 2008. During this time, ███ sent three ECs and the FBI's ████████████████ sent two other ECs to FBI field offices providing background, guidance, and policy language on when, how, and why future specific non-investigative interactions with CAIR would be restricted.[2] The ECs mandated coordination with the ████████████ for all non-investigative interactions with CAIR and directed FBI field offices to specific points of contact at ██████████████████████ for guidance

---

* The FBI identified within the full version of this report classified and other information that if released publicly could compromise national security interests and the FBI's operations. To create this unclassified public Executive Summary, the Office of the Inspector General redacted (blacked out) portions of the Executive Summary.

[1] *United States* v. *Holy Land Foundation et al.* (Cr. No. 3:04-240-P, N.D. Tex).

[2] The strategy addressed only non-investigative community outreach interactions and was not intended to affect field offices' interactions with CAIR representatives with regard to civil rights complaints or criminal investigations.

regarding the implementation of the policy.  Additionally, in late November 2008, ███ held a mandatory meeting for all Special Agents-in-Charge (SAC) and Assistant Directors-in-Charge of FBI field offices to ensure compliance with the policy.

The ECs containing the policy acknowledged that it represented a significant deviation from past FBI policy and that it affected longstanding relationships in the field.  When we asked the former FBI Assistant Director for ███, who was the Deputy Assistant Director for ███ at the time, why the FBI issued multiple ECs over a 4-month period regarding the policy, he said that some of the field offices were reluctant to go along with the policy initially.[3]  For example, on October 27, 2008, the Los Angeles SAC sent an e-mail to his staff stating that the field office's "position is that we will decide how our relationship is operated and maintained with CAIR barring some additional instruction from FBI Headquarters."  The SAC further stated:  "Please instruct your folks at this time that they are not to abide by the [October 24, 2008, EC from the ████████████████, but that their direction in regards to CAIR will come from the LA Field Office front office."  We learned from interviews with the ████████████████ that several other SACs also were reluctant to follow the policy.  The former Assistant Director of ███ also said that field office managers believed the strategy was being run by the ████████████████ rather than ███ and "they did not like answering to the ████████████."  The former Assistant Director of ███ further stated that the ECs were meant to demonstrate that this was a national issue, rather than an issue that affected only a ████████████████.

Based on our review of five incidents in three field offices, we found that ███ did not manage or provide the oversight needed to ensure proper implementation and compliance with its policy.  Instead, a different headquarters entity, the Office of Public Affairs (OPA), provided policy interpretation and advice to FBI field offices on potential interactions with local CAIR chapters, without consulting ███.[4]  We found that OPA's guidance was not always in line with, or supported by, the binding language contained in the policy.  We also found instances in which FBI field offices did not communicate with the points of contact identified in the policy.  And we found that ███ and OPA still appear to have coordination issues before providing guidance to FBI field offices.

---

[3] He served as Assistant Director of the FBI's ████████████████ from January to December 2010.

[4] OPA issued "Public Affairs Guidance" in April 2009, July 2009, January 2010, March 2010, and March 2011 to FBI field offices to provide questions and answers (Q & A's) and talking points for media inquiries and interviews on Muslim outreach that each contained a portion on FBI-CAIR relations.

**Five Field Office Incidents**

Chicago Field Office – On July 27, 2010, the SAC of the Chicago Field Office gave a presentation at the request of the American Islamic College. The SAC was not aware until 30 minutes prior to the event that a local CAIR official was scheduled to make the introductory remarks. Shortly after the event, CAIR-Chicago posted a description of the event on its website with a photograph of the SAC talking to the class. While this appearance with a CAIR official did not adhere to the policy language or its intent, the OIG recognizes that the SAC was notified at the last minute and made a judgment call. Had the SAC learned earlier the identity of the person who was scheduled to introduce him, we believe that the policy would have required coordination with the ███████████████ before proceeding with the event.

New Haven Field Office – On October 29, 2010, the FBI New Haven Field Office co-coordinated a diversity training workshop with a local Muslim organization. Two of the six trainers selected for this "cultural sensitivity" training were local CAIR officials. The New Haven Field Office sought guidance from OPA, ██████████████████████ about how it could participate in the event and still comply with policy. The ████████████████ informed the New Haven Field Office that the training would be against policy. However, OPA provided different guidance to the New Haven Field Office that training could occur as long as it was conducted offsite, and New Haven did not abide by the opinion of the ████████████████ and instead followed the OPA guidance. The result was an FBI interaction with CAIR that was inconsistent with the FBI's policy.

Chicago Field Office – On December 2, 2010, the Chicago Field Office hosted a quarterly Department of Homeland Security (DHS) Community Engagement Roundtable at its field office that many Chicago area government and community officials attended. DHS invited a local CAIR official to attend the meeting at the Chicago FBI Field Office, although the CAIR official ultimately did not attend. The Chicago Field Office SAC told the OIG that if DHS invited a CAIR official to the Roundtable, he would not deny them entry at the door. The SAC also stated that if CAIR officials came to the Chicago Field Office, he was not required to report it to FBI Headquarters, just as he was not required to report a meeting with CAIR on a civil rights matter.[5] He stated such notification would be impractical given the realities the field office encountered. He said that he viewed the various ECs from FBI Headquarters regarding interactions with CAIR as "guidance" and not policy and that he therefore was not required to contact or coordinate with Headquarters. We do not believe that the ECs could have been viewed as anything other than

---

[5] The field office did send an EC reporting the Roundtable event to the Director's Office at FBI Headquarters after the event occurred, but it did not mention that a CAIR representative had been invited to attend.

mandatory, particularly in light of the SAC's attendance at ████ policy meeting in November 2008 on this same subject. While the CAIR representative ultimately did not attend the Roundtable, the failure to follow the ECs in this instance could have led to an interaction that would have been inconsistent with the FBI's policy.

Philadelphia Field Office – On December 11, 2010, the Philadelphia Field Office held a Community Relations Executive Seminar Training (CREST) event. CREST is an FBI community outreach program created by OPA as a subprogram of the FBI's Citizen's Academy. The policy specifically instructed FBI field offices that CAIR could not participate in the FBI Citizen's Academy. Nevertheless, based on guidance it received from OPA, the Philadelphia Field Office allowed a local CAIR official to attend as an invited guest. A few days later, CAIR-Philadelphia posted an article on its website describing its participation in the training program, with a link to the FBI's website. The FBI Philadelphia Field Office did not coordinate with the ████████ as required in the policy, and OPA did not consult with ████████ ████████. As a result, OPA provided guidance that resulted in an interaction with CAIR that was inconsistent with the FBI's policy.

Philadelphia Field Office – Between August 2011 and June 2012, Philadelphia Field Office Special Agents attended the Pennsylvania Human Relations Commission Interagency Task Force on Community Activities and Relations meetings on a monthly basis. CAIR personnel have also attended these meetings. During our review, we learned that the Philadelphia Field Office attended these task force meetings for approximately 7 years for liaison purposes related to its civil rights program. The meetings were sponsored by a state government agency and not by the FBI or CAIR; they were held in non-FBI office space; the FBI did not have a role in organizing the program; and the event was not otherwise structured in a way that would give the public appearance of a liaison relationship between CAIR and the FBI. Therefore, we found that the policy did not preclude FBI attendance at these meetings.

**Conclusion**

In 2008, the FBI developed a policy intended to restrict FBI field offices' non-investigative interactions with CAIR. However, in three of the five incidents we reviewed, we concluded that the policy was not followed. Despite recognizing the importance of the policy by issuing multiple ECs and holding a mandatory meeting with field office leadership to ensure compliance, we found that the FBI did not conduct effective oversight to ensure compliance with the policy. Additionally, FBI field offices at times contacted OPA instead of the required points of contact under the policy, and OPA did not consistently coordinate with ████████████████ when that happened. We found that OPA, which has a different mission and focus than other divisions,

provided guidance regarding interactions with CAIR that we found was inconsistent with the policy. This resulted in public interactions with CAIR that we found to be inconsistent with the goal of the FBI's policy.

## Recommendations

    To help the FBI improve its implementation of the policy, the OIG has made two recommendations in this report. They are:

1. Ensure effective implementation of FBI policy relating to interactions with CAIR, including the coordination mandated by the policy and enforcement and oversight of compliance with the policy.

2. Provide comprehensive education on the objectives and requirements of the current CAIR policy to Headquarters and field office personnel who are likely to be involved with the application of the policy.



---

Use **Priority Mail Express** packaging or stickers.  Securely affix label to mail piece. Do not tape over barcode.  Service guarantees begin with the acceptance processing of this item when brought to a USPS retail location, or when the item returns to the Post Office after being collected during delivery/collection or from a Priority Mail Express Collection box. This Online Record must be presented to Postal personnel if applying for a service related refund. Refunds for unused postage paid labels can be requested online 30 days from the print date.

**UNITED STATES POSTAL SERVICE®**  **PRIORITY MAIL EXPRESS™**  *Click-N-Ship® Label Record*   DO NOT MAIL

| PO ZIP Code | ☐ 1-Day | 6:00 PM | Flat Rate |
| 32960 | ☒ 2-Day | | ☒ |
| Weight | Address to PO Box | | Postage |
| lbs          ozs | ☐ | | $30.45 |
| No Delivery | Contents Value | COD Fee | Ins. Fee |
| ☐ Saturday  ☒ Sunday/ Holiday | | | $0.00 |
| | | | Total Postage & Fees |
| | | | $30.45 |

**9470 1036 9930 0075 8555 55**

Signature Service:

Ship Date:    07/26/2024
Scheduled Delivery Date:    07/29/2024

---

**LABEL INFORMATION**

FROM:
LAURA LOOMER
STE A
2046 TREASURE COAST PLZ
VERO BEACH FL 32960-0931

TO:
HON. RODOLFO RUIZ II
WILKIE D. FERGUSON, JR. UNITED STATES
COURTHOUSE
COURTROOM 11-2
400 N MIAMI AVE
MIAMI FL 33128-1801

Label Feb 2014                    FOR PICKUP OR TRACKING GO TO USPS.COM                    usps.com

**USPS Employee: For service failure refunds, follow standard refund procedures.**