# EXHIBIT 1

1

IN THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, FLORIDA
CIVIL DIVISION
Case No: 50-2023-CA-010810-XXXX-MB


LAURA LOOMER, et al.,

                    Plaintiffs,


v.

RONALD COLEMAN, et al.,

                    Defendants.
_____/


VIDEOTAPED VIDEOCONFERENCE DEPOSITION
OF
RONALD COLEMAN


Taken on behalf of the Plaintiff via videotaped
videoconference

DATE TAKEN:  Thursday, August 22, 2024
TIME: 10:00 a.m. - 12:52 p.m.


Held remotely via videotaped videoconference


Examination of the witness taken before:
Jamie D. Mackrell, Court Reporter
Daughters Reporting, Inc.
101 Northeast 3rd Avenue
Suite 1500
Fort Lauderdale, Florida 33301

```
 1    APPEARANCES VIA VIDEOTAPED VIDEOCONFERENCE:

 2    ON BEHALF OF THE PLAINTIFF:

 3    KLAYMAN LAW GROUP, P.A.
      LARRY KLAYMAN, ESQUIRE
 4    7050 West Palmetto Park Road
      #15-287
 5    Boca Raton, Florida 33433
      561-558-5336
 6    leklayman@gmail.com

 7

 8    ON BEHALF OF DEFENDANTS RONALD COLEMAN
      AND MANDELBAUM BARRETT P.C.:
 9
      COLE, SCOTT & KISSANE, P.A.
10    BLAKE S. SANDO, ESQUIRE
      SEBASTIAN G. AGUIRRE, ESQUIRE
11    9150 South Dadeland Boulevard, Suite 1400
      P.O. Box 569015
12    Miami, Florida 33256
      305-350-5365
13    blake.sando@csklegal.com
      sebastian.aguirre@csklegal.com
14

15    ON BEHALF OF DEFENDANT DHILLON LAW GROUP, INC;

16    SHENDELL & POLLOCK, P.L.
      BRETT R. BLOCH, ESQUIRE
17    2700 North Military Trail
      Suite 150
18    Boca Raton, Florida 33431-1809
      561 241-2323
19    brett@shendellpollock.com

20    ON BEHALF OF DEFENDANT CRAIG WILLIAM YOUNG:

21    CWY Legal & Consulting, LLC
      CRAIG WILLIAM YOUNG, ESQUIRE
22    2500 Quantum Lakes Drive
      Suite 100
23    Boynton Beach, Florida 33426-8308
      561-568-1000
24    craig@cwylegal.com

25
```

```
 1    CONTINUED APPEARANCES:

 2

 3    ALSO PRESENT:

 4    Arthur Grossman, Esquire

 5    Matthew Sarelson, Esquire

 6    Joshua Lida, Esquire

 7    Laura Loomer

 8    Asher Anderson

 9    Jeff Abrams, videographer

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                          INDEX

 2

 3   Testimony of RONALD COLEMAN

 4                                                    Page

 5   Direct Examination by Mr. Klayman          8

 6   Cross-Examination by Mr. Bloch             108

 7

 8

 9   Certificate of Oath                             110
     Certificate of Reporter                         111
10   Errata Sheet                                    112
     Read and Sign letter                            113
11

12

13                   CERTIFIED QUESTIONS

14                 PAGE                LINE

15                 40                  3

16                 85                  23

17                 90                  17

18                 93                  3

19                 99                  4

20                 104                 14

21                       - - - -

22

23

24

25
```

5

```
 1                       EXHIBITS

 2    Plaintiff's

 3    EXHIBIT    DESCRIPTION                                  PAGE

 4    1          Notice of Deposition                         9

 5    2          Amended Verified Complaint                   10

 6    3          Email correspondence                         13

 7    4          "The Daily Beast" article                    13

 8    5          Loomer-Coleman Representation Agreement      20

 9    6          CAIR Joint Offer of Judgment                 24

10    7          "Wall Street Journal" article                41

11    8          Responses to First Request for Production    75

12    9          Responses to Second Request for Production   91

13    10         Motion for Summary Judgment                  98

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              Videotaped videoconference deposition of RONALD
 2      COLEMAN taken remotely before Jamie D. Mackrell, Court
 3      Reporter and Notary Public in and for the State of Florida
 4      at Large, in the above cause.
 5              THE VIDEOGRAPHER:  We are now on the record.
 6      This begins Video 1 of the deposition of Ronald
 7      Coleman in the matter of the Laura Loomer and
 8      Iloominate Media LLC, Plaintiffs versus Ronald
 9      Coleman, Dhillon Law Group Inc., Mandelbaum Barret
10      PC, and Craig William Young, Defendants, in the
11      Fifteenth Judicial Circuit in and for Palm Beach
12      County.  Case Number 50-2023-CA-010810-XXXX-MB.
13              Today's date is August 22, 2024.  The time is
14      10:00 a.m.  This deposition is being taken via Zoom
15      at the request of counsel for the claimant, Larry
16      Klayman, Esquire.  The videographer is Jeff Abrams,
17      and the court reporter is Jamie Mackrell on behalf of
18      Daughters Reporting.
19              Will counsel and all parties present state their
20      appearances and whom they represent?
21              MR. KLAYMAN:  Larry Klayman on behalf of Laura
22      Loomer, who is present for the deposition, and
23      Iloominate Media, Plaintiffs.
24              MR. SANDO:  Good morning.  Blake Sando and
25      Sebastian Aguirre on behalf of Mr. Coleman, our
```

```
 1      witness today, as well as the Mandelbaum firm, and
 2      with us is Arthur Grossman on behalf of the law firm.
 3           MR. YOUNG:  Good morning.  Craig Young,
 4      Defendant pro se.
 5           MR. GROSSMAN:  Good morning.  Arthur Grossman
 6      from Mandelbaum Barrett.
 7           THE VIDEOGRAPHER:  Will the court reporter
 8      please swear in the witness?
 9           MR. BLOCH:  I need to say my appearance.  Good
10      morning.  Brett Bloch on behalf of the Dhillon Law
11      Group.
12           THE VIDEOGRAPHER:  I apologize, Mr. Bloch.
13           MR. BLOCH:  Not a problem.
14           MR. KLAYMAN:  There is also a video picture of a
15      Joshua Lida.  Who are you with?
16           MR. BLOCH:  He is my associate.
17           MR. KLAYMAN:  You are Mr. Grossman, okay, for
18      the record.  We've got a transcript here as well.
19           THE COURT REPORTER:  Mr. Coleman, can you show
20      me your identification so I can swear you in?
21           THE WITNESS:  Can you read it?
22           THE COURT REPORTER:  A little bit closer.  I'm
23      sorry.  Thank you.  Just raise your right hand when
24      you're ready.
25           Do you swear or affirm the testimony you're
```

1  about to give will be the truth, the whole truth, and

2  nothing but the truth?

3    THE WITNESS:  I so affirm.

4    THE COURT REPORTER:  Thank you.

5 Thereupon --

6    RONALD COLEMAN,

7 having been first duly sworn or affirmed, was examined and

8 testified as follows:

9    DIRECT EXAMINATION

10 BY MR. KLAYMAN:

11  Q. Please state your name, please.

12  A. Ronald Coleman.

13  Q. And when were you born?

14  A. March 11, 1963.

15  Q. Where were you born?

16  A. Queens, New York.

17  Q. Where are you currently licensed to practice law?

18  A. New Jersey and New York.

19  Q. Have you ever been subject to any Bar complaints

20 in either of those jurisdictions?

21  A. Yes.

22  Q. When did that happen?

23  A. There was a complaint filed against me in a

24 matter about ten years ago.

25  Q. What was the nature of that matter?

```
1        A.    It was a billing dispute.

2        Q.    What Bar handled that disciplinary matter?

3        A.    It was dismissed by the complainant -- New York.

4   That was in New York.  I'm sorry.  That was in New Jersey.

5        Q.    Have any other ethics complaints been filed

6   against you in your career?

7        A.    No.

8        Q.    I will show you what I will ask the court

9   reporter to mark as the notice of taking deposition that

10  required your presence here today.  Put that up as Exhibit

11  1.

12       (Exhibit No. 1 was marked for identification.)

13  BY MR. KLAYMAN:

14       Q.    Do you see that?

15       A.    Yes.

16       Q.    You are here pursuant to this notice of

17  deposition, correct?

18       A.    Yes.

19       Q.    And you are a defendant in this lawsuit?

20       A.    Yes.

21       Q.    Before this deposition today, did you discuss the

22  deposition with anyone?  Any of your counsel or anyone

23  else?

24       A.    Yes.

25       Q.    Who did you discuss it with?
```

1       A.    With my counsel, and with Mrs. Coleman.

2       Q.    And your counsel is who?

3       A.    Mr. Sando, Mr. Bloch, their associates.  Also my

4    former partner and friend, Arthur, who is on the call,

5    Grossman.

6       Q.    How long were these discussions in total?

7       A.    About two hours.

8       Q.    And when did they occur?

9       A.    Yesterday.

10      Q.    There came a point in time, did there not, when

11   an opinion issued by the 11th Circuit, which is relevant to

12   this case.  I will ask -- it's attached to the verified

13   amended complaint, which I will make Exhibit 2.

14      (Exhibit No. 2 was marked for identification.)

15   BY MR. KLAYMAN:

16      Q.    I ask you to turn -- and Mr. Anderson, my

17   assistant, can put that up on the screen -- to the opinion

18   of the United States Court of Appeals for the 11th Circuit,

19   and it was dated September 30, 2022.  You're aware of that

20   opinion?

21      A.    Yes.

22      Q.    Shortly after that opinion issued -- and I will

23   ask Mr. Anderson to put this up on the screen.  It's the

24   Dhillon Law Firm's Bates number 000067.  I sent you an

25   email, did I not, asking, and I will quote "please advise

1    by cob this Wednesday" -- that email is dated October 10,

2    2022 -- "if carrier will pay the attorneys' fees and costs

3    before Laura considers further action.  Thank you, Larry

4    Klayman."

5            Do you remember that email?

6        A.   I do.

7        Q.   And you responded on -- excuse me.  Let me back

8    up.  I contacted you on October 3, 2022 asking you "thank

9    you for notifying the carrier, and please advise the name

10   and contact information for the carrier.  Larry Klayman."

11           Do you remember that email?

12       A.   Yes.

13           MR. SANDO:  Object to form.

14   BY MR. KLAYMAN:

15       Q.   And you responded on October 3rd, "rejected

16   appeal arguments are not errors, whether your appeal, mine,

17   or otherwise.  In any event, we are not going to resolve

18   this by email.  Our carrier is being notified."

19           You wrote that email, right?

20           MR. SANDO:  Object to form.

21       A.   Yes.

22   BY MR. KLAYMAN:

23       Q.   Now, I had contacted you -- did you respond?  I

24   didn't catch it, Mr. Coleman.

25       A.   I did respond.

1       Q.   And what is your response?

2       A.   Yes.

3       Q.   In fact, you never contacted the carrier at that

4   time, did you?

5            MR. SANDO:  Object to form.

6       A.   I did.

7   BY MR. KLAYMAN:

8       Q.   You can respond.

9       A.   I did -- you're incorrect.  I did contact the

10  carrier.

11      Q.   Do you have any written evidence of doing that?

12           MR. SANDO:  Object to form.

13      A.   I don't recall.

14  BY MR. KLAYMAN:

15      Q.   Did you speak with anyone at the carrier?

16           MR. SANDO:  Object to form.

17      A.   I don't recall.

18  BY MR. KLAYMAN:

19      Q.   What's the name of the carrier?

20           MR. SANDO:  Object to form.

21      A.   I do not know.

22  BY MR. KLAYMAN:

23      Q.   You don't know the name of the malpractice

24  carrier or liability carrier that insures you?

25           MR. SANDO:  Object to form and move to strike

13

1       any reference to insurance.

2       A.   No.

3   BY MR. KLAYMAN:

4       Q.   So the bottom line here is that Ms. Loomer tried

5   to settle this matter before bringing suit, correct?

6       A.   I do not know.

7       Q.   You don't take my request to contact the carrier

8   as a way to try to settle the suit?

9            MR. SANDO:   Object to form.

10      A.   No.

11  BY MR. KLAYMAN:

12      Q.   Now, I turn your attention to --

13           MR. SANDO:   Mr. Klayman, is that email number 3?

14       Is that Exhibit 3?

15           MR. KLAYMAN:   Exhibit 3.   Thank you.

16       (Exhibit No. 3 was marked for identification.)

17  BY MR. KLAYMAN:

18      Q.   Turn your attention to an article in the

19  Huffington Post -- excuse me, The Daily Beast, and I will

20  ask Mr. Anderson to put it up on the screen.   The title is

21  "Laura Loomer Sics Current Lawyer on Former Lawyer."

22           Have you seen that article before?

23           MR. KLAYMAN:   I will make that Exhibit 4.

24       (Exhibit No. 4 was marked for identification.)

25      A.   Yes.

```
 1   BY MR. KLAYMAN:

 2        Q.   In fact, you generated this article, did you not?

 3             MR. SANDO:  Form.

 4        A.   No.

 5   BY MR. KLAYMAN:

 6        Q.   You contacted The Daily Beast, correct?

 7        A.   No.

 8        Q.   Now, this is an article that's written with

 9   regard to a dispute between Ms. Loomer and you over payment

10   of legal fees that were ordered by the court with regard to

11   the lawsuit that you brought on her behalf and Iloominate

12   Media's behalf, correct?

13        A.   I would say the article speaks for itself.

14        Q.   It deals with that issue, correct?

15        A.   Apparently it does.

16        Q.   So rather than trying to settle this case, you

17   decided you were going to make a comment to The Daily

18   Beast, as set forth in this article, correct?

19             MR. SANDO:  Object to form.

20        A.   No.

21   BY MR. KLAYMAN:

22        Q.   Well, let's go to the last page of this article,

23   which is dated -- all right.  We'll get to the date.

24             We'll go to the last page of this article.  It

25   quotes you as saying "Coleman said he blames Klayman, not
```

1   Loomer, for the filing."  Talking about the filing, that

2   was the filing that I made on Ms. Loomer's behalf in the

3   US District Court for the Southern District of Florida,

4   correct?

5           MR. SANDO:  Object to form.

6       A.   I don't recall.

7   BY MR. KLAYMAN:

8       Q.   And you do remember a filing that was made in the

9   Southern District of Florida, correct?

10      A.   Could you be more specific?

11      Q.   The filing talked about our seeking to have you

12  pay the attorneys' fees that were ordered to be paid to the

13  CAIR defendants, correct?

14      A.   I remember that there was such a filing.

15      Q.   And the comment that you made is, with regard to

16  me, and that date of that article is May 4, 2023, "I think

17  he's using (this case) as a vehicle to stay relevant and

18  give the appearance of someone who is still entrusted with

19  legal work as part of the conservative movement, Coleman

20  said."

21          Do you think that I'm totally irrelevant as a

22  lawyer and conservative public interest advocate,

23  particularly on behalf of Ms. Loomer?

24          MR. SANDO:  Object to form.

25      A.   Yes.

```
1    BY MR. KLAYMAN:

2         Q.   What's the basis of your claim that I'm

3    irrelevant?

4              MR. SANDO:   Form.

5         A.   I'm not aware of anyone who considers you to be

6    a go-to lawyer in the conservative movement.

7    BY MR. KLAYMAN:

8         Q.   You are aware that I'm the founder of Judicial

9    Watch, are you not?

10             MR. SANDO:   Form.

11        A.   I am.

12   BY MR. KLAYMAN:

13        Q.   You are aware that I ran for the US Senate in

14   Florida in 2003, correct?

15             MR. SANDO:   Form.

16        A.   No.

17   BY MR. KLAYMAN:

18        Q.   You are aware that I currently run a nonprofit by

19   the name of Freedom Watch, correct?

20        A.   No.

21        Q.   You are aware that I enjoined the National

22   Security Agency from mass surveillance while at Freedom

23   Watch as the chairman and general counsel, correct?

24        A.   No.

25        Q.   So you felt the need to, rather than settle this
```

1    case with Ms. Loomer, you would rather have disparaged her

2    lawyer, Larry Klayman, with The Daily Beast?

3            MR. SANDO:   Object to form.   Misstates the

4        evidence -- the testimony I should say.

5    BY MR. KLAYMAN:

6        Q.   You can respond.

7        A.   No.

8        Q.   What was the necessity of even commenting about

9    me in this article in The Daily Beast?

10           MR. SANDO:   Object to form.

11       A.   I don't understand the question.

12   BY MR. KLAYMAN:

13       Q.   Why did you even make a comment with regard to

14   Ms. Loomer's lawyer?

15       A.   I was asked.

16       Q.   Who asked you?

17       A.   I don't remember the name of the reporter.

18       Q.   Then you added "but I certainly hope it doesn't

19   reach the point where she authorizes him to file what would

20   most certainly be a meritless claim against me or anyone I

21   work with."  You made that statement, correct?

22       A.   I did.

23       Q.   You fashion yourself as an important lawyer in

24   the conservative movement, correct?

25       A.   I don't know.  I'd like to think that I get my

1   -- I get the opportunity to do some meaningful work.

2       Q.   Do you feel a necessity to put somebody else

3   down?  Like me?

4            MR. SANDO:  Object to form.

5       A.   No.

6   BY MR. KLAYMAN:

7       Q.   Is that how you increase your reputation, by

8   putting another lawyer down who's trying to represent a

9   client and settle a case?

10           MR. SANDO:  Object to form.

11      A.   No.

12  BY MR. KLAYMAN:

13      Q.   The 11th Circuit opinion doesn't say that

14  Ms. Loomer would have a meritless case against you for

15  malpractice, does it?

16           MR. SANDO:  Object to form.

17      A.   I do not know.

18  BY MR. KLAYMAN:

19      Q.   You never read it?

20      A.   I have read it.

21      Q.   In fact, it enumerates a number of errors which

22  it claims you made -- the court claims you made.

23           MR. SANDO:  Object to form.  Is that a question

24      or a statement?

25  BY MR. KLAYMAN:

```
 1       Q.   Yes?

 2       A.   I don't understand what the question is.

 3       Q.   You are aware that the opinion of the 11th

 4   Circuit enumerates a number of legal errors that you made

 5   in representing Ms. Loomer and Iloominate Media?

 6            MR. SANDO:  Object to form.

 7   BY MR. KLAYMAN:

 8       Q.   Respond.

 9       A.   I don't hear a question.

10   BY MR. KLAYMAN:

11       Q.   Yes.  You are aware that the 11th Circuit opinion

12   of September 30, 2022, which came down before I contacted

13   you to try settle this matter in carrier, enumerates a

14   number of legal errors that you made in the representation

15   of Ms. Loomer and Iloominate Media, correct?

16            MR. SANDO:  Object to form.

17       A.   No.

18   BY MR. KLAYMAN:

19       Q.   So it basically said that you did everything

20   right; is that what you are saying?

21            MR. SANDO:  Form.

22       A.   No.

23   BY MR. KLAYMAN:

24       Q.   How do you interpret this ruling by the 11th

25   Circuit?  What did they say about your representation?
```

1          MR. SANDO:  Object to form.

2      A.   I believe -- my recollection is that the ruling

3  was on the merits of the appeal, not on a claim regarding

4  my representation.

5  BY MR. KLAYMAN:

6      Q.   It dealt with errors that you made at the lower

7  court level, did it not?

8          MR. SANDO:  Object to form.

9      A.   No.

10          MR. KLAYMAN:  I'm going to ask the court

11      reporter to mark as -- is it Exhibit 5?

12          MR. ANDERSON:  Yes.

13          MR. KLAYMAN:  -- the legal representation

14      agreement of the February 7, 2019 between Mandelbaum

15      Salsburg law firm, and you as its counsel, and

16      Ms. Loomer and Iloominate Media, and I will ask that

17      Mr. Anderson put that up on the screen.

18      (Exhibit No. 5 was marked for identification.)

19  BY MR. KLAYMAN:

20      Q.   Is that the legal representation agreement that

21  you entered into with Ms. Loomer?

22      A.   It appears to be.

23      Q.   In paragraph 1 it says "you understand that I'm

24  not admitted to practice in the state of Florida and that

25  we will consult and associate with internal or external

1    Florida counsel as appropriate."

2         That's a correct statement, is it not, that you

3    are not licensed to practice in Florida?

4         A.   Yes.

5         Q.   How many cases, if any, have you had in Florida

6    during your career?

7         A.   Between five and ten.

8         Q.   When was the last one you had before you

9    represented Ms. Loomer and Iloominate Media?

10        A.   I don't remember the caption.  It was a

11   trademark infringement trial in the Southern District of

12   New York -- I mean in the Southern District of Florida for

13   my client Gel, G-E-L, Ingredients.

14        Q.   What was the nature of any other lawsuits that

15   you claim to have handled in Florida?

16        A.   I'm sorry.  What do you mean that I claim to

17   have handled?

18        Q.   You said that you've had maybe ten cases in

19   Florida during your career.

20        A.   Right, but --

21        Q.   Or were they just legal matters, they weren't

22   litigation?  Please try to explain what your representation

23   in Florida was, as you claim.

24        A.   I represented a company called Consumer --

25   Consumer Research I think it was in litigation brought by

1    a company called Boca Labs in the Southern District of

2    Florida.  I think they're actually two -- there were a

3    couple of companion cases there.  It has been a while.

4    Those both went to summary judgment in my client's favor.

5         Q.   What were the claims that were raised in that

6    case?

7         A.   My client operated a consumer review website,

8    and a company that sold a diet supplement, which was

9    subsequently prohibited by the Food and Drug

10   Administration, sued my client for publishing truthful

11   reviews by former customers of Boca Labs.

12        Q.   Any other lawsuits that you've handled in

13   Florida?

14        A.   There are, but I do have some trouble

15   remembering them now.

16        Q.   In fact, you do not have significant experience

17   in representing clients in Florida, correct?

18             MR. SANDO:  Object to form.

19        A.   No.

20   BY MR. KLAYMAN:

21        Q.   I turn to paragraph 7 of the representation

22   agreement wherein you state "we will communicate with you

23   throughout the course of our representation so that you're

24   aware of how we are progressing, and will certainly seek

25   its input in decisions which may have impact on both the

1    cost of the matter and the outcome.  Given the number of

2    unknowns, however, we cannot warrant, predict, or guarantee

3    any particular result or the final outcome of this matter."

4              So you actually had an agreement with Ms. Loomer

5    to communicate with her regularly and to keep her up to

6    date and to explain to her what was going to be in the

7    lawsuit that you were going to bring on her behalf,

8    correct?

9        A.   Yes.

10       Q.   And, in fact, you did not regularly communicate

11   with her, did you?

12       A.   I did.

13       Q.   In fact, on many occasions when she tried to talk

14   to you, you told her "I got to go because I'm a

15   conservative Jew and I've got to be to Sabbath," or worship

16   or something to that effect. You basically just brushed her

17   off, correct?

18             MR. SANDO:  Object to form.

19       A.   No.

20             MR. KLAYMAN:  I will ask that the court reporter

21        mark as -- is it Exhibit 7?

22             MR. SANDO:  6.

23             MR. KLAYMAN:  I'm not good with numbers.  The

24        CAIR Foundation, Inc. and CAIR Florida Inc's Joint

25        Offer of Judgment.

```
1        (Exhibit No. 6 was marked for identification.)

2    BY MR. KLAYMAN:

3        Q.   Do you see that?  You can look through each of

4    the pages if you'd' like.

5        A.   I have seen it.

6        Q.   You never sent her that offer of judgment, did

7    you?  Ms. Loomer?

8        A.   I don't recall.

9        Q.   It's pretty important to send an offer of

10   judgment to a client, is it not, based on your experience?

11       A.   Yes.

12       Q.   So how is it that you don't recall?

13       A.   Because I recall discussing it with her by

14   phone, but I don't recall emailing it to her, and in

15   reviewing the documents produced in this case, I did not

16   find that email -- I did not find an email sending it to

17   her.

18       Q.   In fact, this offer of judgment specifically

19   states that if it's not accepted, that Ms. Loomer and

20   Iloominate Media could be liable for attorneys' fees and

21   costs, correct?

22       A.   Yes.

23       Q.   And you never discussed that with her, did you?

24       A.   I did.

25       Q.   But you have no proof of that in writing, do you?
```

25

```
1        A.    That is correct.

2        Q.    You consider yourself to be a thorough lawyer, do

3   you not?

4        A.    I do.

5        Q.    And you consider yourself to be ethical, do you

6   not?

7        A.    I do.

8        Q.    In the ordinary course of your practice, is it

9   not the case that you would send a client a document as

10  important as this and have a record of having done so?

11             MR. SANDO:  Object to form.

12       A.    Yes.

13  BY MR. KLAYMAN:

14       Q.    Now I'll turn your attention back to the amended

15  complaint, the verified amended complaint.  You've seen

16  this before, have you not?

17       A.    Yes.

18             MR. SANDO:  This is Exhibit 2?

19             MR. KLAYMAN:  Correct.

20  BY MR. KLAYMAN:

21       Q.    Let's turn to paragraph 11, wherein it states "in

22  and around January of 2019, Defendant Coleman, who was

23  working at the time at Mandelbaum, invited Ms. Loomer to

24  his office in New York City and induced and convinced her

25  to file lawsuit against the Council on American Islamic
```

```
 1    Relations and Twitter."

 2              That's an accurate statement, is it not?

 3        A.   No.

 4        Q.   Why is it not accurate?

 5        A.   I did not induce or convince Ms. Loomer.

 6        Q.   But you invited her to your office, did you not?

 7        A.   Yes.

 8        Q.   And you had a meeting where you discussed the

 9    lawsuit ultimately you would bring on her behalf and

10    Iloominate Media, correct?

11        A.   I did.

12        Q.   And you told her it would be a very strong case,

13    correct?

14        A.   I don't think so.

15        Q.   You told her it would be a weak case?

16        A.   I certainly did not.

17        Q.   What did you tell her?

18        A.   I don't remember the exact words that I used in

19    this January of 2019.

20        Q.   Do you remember any words that you used?

21        A.   Not really.

22        Q.   Paragraph 13, "Defendant Coleman did not apprise

23    Ms. Loomer of the risks of the litigation, namely that she

24    could be subject to a court order and that she could pay

25    the other side's attorneys' fees and costs if the suit was
```

1    not successful, and Defendant Coleman also did not provide

2    an honest or accurate and competent assessment of the

3    merits of the case against CAIR and Twitter."

4         That's an accurate statement, is it not?

5    A.   No, it is not.

6    Q.   During that meeting, that initial meeting in

7    January 2019, you did not discuss the issue of whether if

8    she lost she would have to pay attorneys' fees, correct?

9         MR. SANDO:  Object to form.

10   A.   That is not correct.

11   BY MR. KLAYMAN:

12   Q.   Why is it not correct?

13   A.   It's a statement of fact which is contrary to

14   the truth.

15   Q.   Okay.  Well, what did you tell her at that

16   meeting?

17   A.   That there was a risk range of possibilities,

18   including that the case could be dismissed, that there's

19   always the possibility of sanctions.  In my opinion, there

20   was no risk in this case -- no appreciable risk of a grant

21   of attorneys' fees.

22   Q.   You actually really wanted to bring a case

23   against the CAIR defendants and Twitter, correct?

24   A.   No.

25   Q.   And the reason that you wanted to do that is

1   because you consider yourself to be a major figure in

2   social media, correct?

3        A.   I already answered "no," so I don't understand

4   your second question.

5        Q.   Well, this helps your reputation in the

6   conservative community, does it not, to bring a case

7   against CAIR, a group that was an unindicted coconspirator

8   in a case in Dallas, Texas, a criminal case, with regard to

9   the Islamic Associates of North America?  It helps your

10  representation, does it not, to have brought this case?

11            MR. SANDO:  Object to form.

12       A.   It may or may not have.

13  BY MR. KLAYMAN:

14       Q.   And this allows you to attract more clients to

15  you and your firm, correct?

16       A.   It may or may not have.

17       Q.   And as a conservative Jew, you obviously have

18  great concerns about CAIR, correct?

19       A.   I do.

20       Q.   And what is your problem with CAIR?

21            MR. SANDO:  Form.

22       A.   CAIR is an antisemitic organization that is

23  actively involved -- especially at that time, was actively

24  involved in censoring conservative and pro-Israel figures

25  from social media.

1    BY MR. KLAYMAN:

2        Q.   You were aware that CAIR was linked to helping to

3    finance Hamas at the time that you met with Ms. Loomer,

4    correct?

5        A.   Yes.

6        Q.   So this case would have been great for you in

7    terms of bringing in new clients, and building your

8    reputation, and getting you out on social media?

9        A.   I would not necessarily have any way of knowing

10   that.

11       Q.   You've bragged about your social media presence,

12   have you not --

13           MR. SANDO:   Object to form.

14   BY MR. KLAYMAN:

15       Q.   -- and elsewhere?

16       A.   "Bragged" strikes me as a subjective opinion.

17       Q.   What social media did you generally participate

18   in at this time when you met -- at the time that you met

19   with Ms. Loomer?

20       A.   Mostly Twitter.

21       Q.   And what else?

22       A.   I had an account on Facebook.  Didn't make much

23   use of it.

24       Q.   How many followers did you have on Twitter at the

25   time that you met with Ms. Loomer, approximately?

```
 1        A.    I don't remember.

 2        Q.    Tens of thousands?

 3        A.    Probably.

 4        Q.    Over a hundred thousand?

 5        A.    I don't think so.

 6        Q.    Give me a rough estimate.

 7        A.    I don't remember.

 8        Q.    Do you know how many followers you have today?

 9        A.    I do, yes.

10        Q.    How many?

11        A.    250,000 -- 250.7 thousand.

12        Q.    So at the time that you met with Ms. Loomer in

13  2019, you had about the same amount, correct?

14        A.    No.

15        Q.    What has caused you to acquire more followers

16  over these years -- over the last five years?

17        A.    I do not know.

18        Q.    What do you generally write about on Twitter?

19        A.    Politics and law.

20        Q.    Have you ever been sued by a client before, other

21  than Ms. Loomer and Iloominate Media?

22        A.    I was sued by the client in that billing dispute

23  that I mentioned to you.  That was the only other time.

24        Q.    And maybe I asked you this question and you

25  responded.  What court was that in?
```

```
 1        A.   New Jersey Superior Court.

 2        Q.   In which city of New Jersey?

 3        A.   It was Essex County.

 4        Q.   When was that suit filed against you?  The year?

 5        A.   I think maybe 2018.  I'm not really sure.

 6        Q.   Do you still have the file pertaining to that

 7   lawsuit?

 8        A.   No.

 9        Q.   Who has it?

10        A.   My former law firm.

11        Q.   Mandelbaum?

12        A.   No.

13        Q.   Which one was that?

14        A.   Goetz, G-O-E-T-Z -- Goetz Fitzpatrick.

15        Q.   You left the Mandelbaum law firm to work for the

16   Dhillon law firm to become -- you're a partner in the

17   Dhillon law firm?

18        A.   I am not.

19        Q.   What is your status there?

20        A.   I am Of Counsel.

21        Q.   You were asked to leave the Mandelbaum law firm

22   as a result of your representation of Ms. Loomer and

23   Iloominate Media, correct?

24             MR. SANDO:  Object to form.

25        A.   That was never how it was explained to me.
```

1    BY MR. KLAYMAN:

2       Q.   What reasons did Mandelbaum want you to leave

3    their firm?  What was explained to you?

4       A.   That I had filed too many controversial

5    lawsuits.  And after we had agreed to have them vetted

6    more carefully, in their view, one lawsuit that I had

7    filed that they believed should have been vetted, and

8    which I thought should -- did not need to be vetted, was

9    filed, and they no longer wanted to bear the risk of my

10   being involved in controversial cases, given that I wasn't

11   complying with what they considered to be, you know, the

12   management framework that they put in place.

13      Q.   What was their vetting policy?

14      A.   That they -- if there was a case that I had

15   reason to believe would be politically sensitive, that I

16   would discuss it with appropriate management -- a firm

17   management representative.

18      Q.   At the time that you met with Ms. Loomer and

19   entered into a legal representation agreement, did you

20   consult with the appropriate management at Mandelbaum about

21   that case?

22      A.   Well, when I met with Ms. Loomer, that policy

23   wasn't in place.  It was a -- I had discretion to take on

24   any case that passed conflict checks, and as long as I

25   provided the necessary information in the case opening

1    memorandum.

2         Q.   Did you prepare a case opening memorandum with

3    Mandelbaum with regard to Ms. Loomer and Iloominate?

4         A.   Yes.

5         Q.   Who reviewed it, if anyone, at Mandelbaum?

6         A.   I do not remember.

7         Q.   Do you have that documentation in your files?

8         A.   No.

9         Q.   Does the Dhillon law firm?

10        A.   No.

11        Q.   Does Mandelbaum have it?

12        A.   I do not know.

13        Q.   Have you asked to get it in order to be able to

14   -- with regard to your defense in this case?

15        A.   No.

16        Q.   And you can't remember anybody you talked to at

17   Mandelbaum about bringing the lawsuit for Ms. Loomer and

18   Iloominate Media?

19        A.   I remember discussing it with Steve Teppler, who

20   was our -- admitted in Florida and asking whether he would

21   be interested in working on it with me because I would

22   need someone in Florida.

23        Q.   So Steve Teppler was actually a lawyer with

24   Mandelbaum that was licensed in Florida at the time that

25   you accepted representation?

1      A.   Yes.

2      Q.   Did he agree to work on the Loomer-Iloominate

3  case with you?

4      A.   He did.

5      Q.   When you left the Mandelbaum firm and Mr. Craig

6  Young was retained, did you first make an effort to have

7  Mr. Teppler represent Ms. Loomer when you changed firms?

8      A.   No.

9      Q.   Why is that?

10      A.   I didn't think he would have any interest in

11  that -- I didn't think Mandelbaum had any interest in

12  maintaining that representation.

13      Q.   Because, in fact, the Loomer case was the reason

14  why Mandelbaum wanted you to leave, correct?

15           MR. SANDO:  Object to form.

16      A.   I do not know why the decision was made to ask

17  me to leave.  I only know what I was told, and they did

18  not tell me that.

19  BY MR. KLAYMAN:

20      Q.   There were writings that explained why they

21  wanted you to leave, correct, the Mandelbaum office?

22           MR. SANDO:  Object to form.

23      A.   I don't know.

24  BY MR. KLAYMAN:

25      Q.   You're not saying they don't exist, you just

1  don't know at this time?

2          MR. SANDO:  Form.

3      A.  I said I don't know.

4  BY MR. KLAYMAN:

5      Q.  So you don't recall seeing anything in writing

6  from Mandelbaum saying that you must leave the firm?

7      A.  No.

8      Q.  And who is it that advised you that you should

9  leave the firm at Mandelbaum?

10     A.  It was Mr. Grossman and the co-chairman of the

11  litigation department, whose name escapes me at the

12  moment.

13     Q.  At the time that you left the Mandelbaum firm,

14  Mandelbaum was aware that you could very well be sued for

15  malpractice for representing Ms. Loomer and Iloominate

16  Media, correct?

17         MR. SANDO:  Object to form.

18     A.  No.

19  BY MR. KLAYMAN:

20     Q.  So the Mandelbaum firm by asking you to leave was

21  trying to cut its losses potentially, correct?

22         MR. SANDO:  Object to form.

23     A.  I have no idea.

24  BY MR. KLAYMAN:

25     Q.  Who was the insurer of the Mandelbaum law firm,

1   liability insurer?

2          MR. SANDO:   Object to form.

3      A.   I do not know.

4   BY MR. KLAYMAN:

5      Q.   How long were you with the Mandelbaum law firm?

6      A.   About four years.

7      Q.   And you were a partner, correct?

8      A.   Oh, no.  I'm sorry.  It wasn't four years.  I

9   joined Mandelbaum -- it was two years.  Yes, I was -- I

10  was a partner.

11     Q.   Now, in the ordinary course of becoming a

12  partner, you would have learned who the insurance carrier

13  was for liability insurance, correct?

14         MR. SANDO:   Object to form.

15     A.   No.

16  BY MR. KLAYMAN:

17     Q.   That would have been provided to you by the

18  partnership committee, or whatever committee would be

19  engaged in having you come on as a partner, correct?

20         MR. SANDO:   Object to form.  Move to strike any

21         reference to insurance.  You may answer.

22     A.   No.

23  BY MR. KLAYMAN:

24     Q.   So as far as you're concerned, you didn't think

25  that Mandelbaum had any insurance that would cover you for

1   potential liability claims?

2          MR. SANDO:  Same objection.  Move to strike.

3      You may answer it.

4      A.    That is incorrect.

5   BY MR. KLAYMAN:

6      Q.    You never asked anyone at Mandelbaum "who is our

7   insurance carrier" and if you're insured?

8          MR. SANDO:  Same objection.  Move to strike.

9      A.    No.

10  BY MR. KLAYMAN:

11     Q.    Paragraph 14 of the amended complaint, Exhibit 2,

12  "it is now evident to Plaintiffs that Defendant Coleman was

13  simply looking for any vehicle to bring a lawsuit against

14  CAIR and Twitter, regardless of the merits, in order to

15  boost his own notoriety, fame, and social media presence

16  after Ms. Loomer crowd funded over $90,000 to pay for a

17  lawsuit when she was banned on all social media."

18         That's a correct statement, is it not?

19     A.    No.

20     Q.    You're saying that Ms. Loomer didn't crowd fund

21  over $90,000 to pay for the lawsuit that you would bring?

22     A.    I did not say that at all.

23     Q.    You are aware that that's how she paid the

24  initial retainer and helped finance the lawsuit that you

25  brought on her behalf, correct?

```
1        A.    No.

2        Q.    You're not aware of her crowd funding to raise

3   money to pay you?

4        A.    I am aware.

5        Q.    And she did, right?  Correct?

6        A.    Yes.

7        Q.    Did you give her an estimate of how much you

8   thought the lawsuit you would bring for her and Iloominate

9   Media would cost to litigate to a conclusion?

10       A.    Yes.

11       Q.    What was that estimate?

12       A.    I do not remember.

13       Q.    Several hundred thousand dollars?

14       A.    I do not remember.

15       Q.    So you advised her to enter into litigation

16  without telling her what ultimately you would bill her for,

17  as well as her company Iloominate Media?

18            MR. SANDO:  Object to form, and misstates the

19       testimony.

20  BY MR. KLAYMAN:

21       Q.    Correct?

22       A.    No.

23       Q.    Is it your practice not to tell the client that's

24  paying fees how much the litigation is estimated to cost?

25  Is that your regular practice?
```

1     A.   No.

2     Q.   Now, in the case you were going up against an

3  organization which was accused to have ties to terrorism,

4  correct?

5     A.   Yes.

6     Q.   And you understood that this case could become

7  very contentious as a result, correct?

8     A.   Yes.

9     Q.   You understood that CAIR was alleged to have

10  financed terrorist groups that killed Jews and others,

11  correct?

12     A.   Yes.

13     Q.   So would it not have been prudent to tell her

14  what you thought this litigation would cost, given the fact

15  that you're going up against such an adverse foe?

16        MR. SANDO:  Object to form, and misstates the

17     testimony.

18     A.   Yes.

19  BY MR. KLAYMAN:

20     Q.   Now, does this refresh your recollection as to

21  what you told her, if anything, that this case could likely

22  cost?

23     A.   Yes.

24     Q.   Okay.  How much?

25     A.   It refreshes my recollection that I did discuss

```
 1    the range of possibilities with her, but I don't remember

 2    what estimate I gave her.

 3         Q.   Well, based on your independent expertise, how

 4    much do you think this case would have cost to litigate to

 5    a conclusion if it hadn't been dismissed?

 6         A.   Are you asking me to speculate?

 7         Q.   I'm asking you based on your experience.

 8              MR. SANDO:  Object to form.

 9    BY MR. KLAYMAN:

10         Q.   It's not speculation.

11         A.   I decline to speculate.

12         Q.   Well, you're declining to answer question?

13         A.   Yeah.

14              MR. KLAYMAN:  Okay.  Certify it.

15              MR. SANDO:  Form.  Misstates his testimony.

16              MR. KLAYMAN:  There was no testimony.

17              MR. SANDO:  He said he doesn't know and declined

18         to answer.

19              MR. KLAYMAN:  Yeah.  That's really credible, Mr.

20         Sando.

21              MR. SANDO:  Well, he can't make a guess,

22         Mr. Klayman.  He's a fact witness.

23    BY MR. KLAYMAN:

24         Q.   Now, at the time that this complaint was to be

25    filed, it was contemplated that Twitter would be a
```

1    defendant, correct?

2        A.    Yes.

3        Q.    And I will turn your attention to an article

4    written by Kirsten Grind, K-I-R-S-T-E-N.  Grind, G-R-I-N-D,

5    and John D. McKinnon with the title "Facebook, Twitter Turn

6    to Right-Leaning Groups to Help Referee Political Speech."

7    Subtitled "Advisers on touchy issues include Tony Perkins'

8    Family Research Council, Grover Norquist's Americans for

9    Tax Reform and, on the left, the Southern Poverty Law

10   Center."

11           MR. KLAYMAN:  We'll make that -- what is the

12       next exhibit, Mr. Anderson?  Is that 8?

13           MR. ANDERSON:  7.

14           MR. KLAYMAN:  We'll mark that 7.

15           If you could please keep a list of the exhibits,

16       Mr. Anderson.  If you'd put that up on screen, if we

17       can scroll through this.

18       (Exhibit No. 7 was marked for identification.)

19   BY MR. KLAYMAN:

20       Q.    Mr. Coleman, you have seen this article before,

21   correct?

22       A.    I am not sure.

23       Q.    Take your time to look at it.

24           MR. KLAYMAN:  Mr. Anderson, scroll the pages so

25       Mr. Coleman can review it so he can refresh his

```
1          recollection.

2              MR. SANDO:  Art, would you mind muting your

3          microphone if there's background noise?  Thank you.

4     BY MR. KLAYMAN:

5          Q.   Turn your particular attention to Pages 7, 8 and

6     9 in the article dated January 8, 2019.  Having shown it to

7     you, this refreshes your recollection, does it not, of this

8     article?

9          A.   Yes.

10         Q.   Ms. Loomer brought this article to your attention

11    when you first met, correct?

12         A.   Yes.

13         Q.   And turning to Page 7 it states therein

14    "conservative Jewish activist Laura Loomer says she didn't

15    know until recently that outside groups and individuals had

16    privately lobbied Twitter executives to remove her from the

17    site in late November."

18             "In an email to Ms. Loomer, Twitter said she had

19    violated hateful conduct policy for a tweet calling Ilhan

20    Omar," I-L-H-A-N, Omar, O-M-A-R "the Muslim congresswoman

21    from Minnesota, anti-Jewish and supportive of Shariah law.

22    In an interview, Ms. Loomer says she was referring to a

23    2012 tweet from Ms. Omar in which the congresswoman

24    wrote," quote "may Allah awaken the people and help them

25    see the evil doings of Israel" unquote.
```

1          "Among the groups that had complained to Twitter

2     was the Council on American-Islamic Relations, an advocacy

3     organization.  The council doesn't often step in to

4     advocate against other users, says Executive Director

5     Zahra Billoo," Z-A-H-R-A.  Last name B-I-L-L-O-O, "but did

6     so in the case of Ms. Loomer based on her previous

7     comments about Muslims."

8          "In 2017, Ms. Loomer tweeted after a terror

9     attack in New York City," quote "Leave it to Muslims to

10    ruin Everything. People can't even enjoy Halloween without

11    those savages f-king everything up for everyone".

12         "Other organizations, including the civil-rights

13    organization, Muslim Advocates, voiced similar

14    complaints."

15         "Twitter's email to Ms. Loomer didn't mention

16    the behind-the-scenes discussions.  After her suspension,

17    she handcuffed herself to Twitter's New York headquarters

18    in protest.  Police cut her free from the handcuffs after

19    two hours."

20         "Twitter's Mr. Borrman," B-O-R-R-M-A-N, "says

21    Ms. Loomer's suspension," quote, "was the result of

22    multiple, repeated violations of the same rules, it was

23    not about any one tweet," unquote.  "He added that many

24    organizations and individuals contacted Twitter about her

25    account over the years.  Ms. Loomer says she didn't post

1  anything hateful, or anything in violation of Twitter's

2  terms of service."

3      "Twitter's hateful conduct policy says that

4  users," quote, "may not promote violence against or

5  directly attack or threaten other people," unquote, "based

6  on race, ethnicity, or gender, nor may users incite harm

7  toward others."

8      "Ms. Billoo of the Council on American-Islamic

9  Relations welcomes tech companies' openness to feedback.

10  In 2016, her own Facebook account was suspended after she

11  posted a photo of a hate letter sent to a San Jose,

12  California mosque.  Ms. Billoo says she asked dozens of

13  contacts to email everyone that she knew at Facebook,

14  until someone internally took up the issue and her account

15  was resolved."  Quote, "you need to throw the kitchen sink

16  at it, she says," quote, "it's a little like politics,"

17  unquote.

18      "Write to Kirsten Grind at kirsten.grind@wsj.com

19  and John D. McKinnon at John.mckinnon@wsj.com."

20      Now, Ms. Loomer raised this article with you,

21  correct, when you met initially?

22      A.  Yes.

23      Q.  And she advised you to get an affidavit from

24  Kirsten Grind, correct, with regard to what she wrote in

25  this article, correct?

```
1        A.   I don't recall.

2        Q.   In fact, she instructed you to do that after a

3   legal representation agreement was signed, correct?

4             MR. SANDO:  Object to form.

5        A.   I don't recall.

6   BY MR. KLAYMAN:

7        Q.   Now, based on the information provided in

8   article, Twitter became a primary defendant in the lawsuit

9   that you had ultimately filed for Ms. Loomer and Iloominate

10  Media, correct?

11       A.   I don't know what you mean by "primary

12  defendant."

13       Q.   Well, it was important to include them in the

14  complaint.

15            MR. SANDO:  Form.

16       A.   They were a defendant.

17  BY MR. KLAYMAN:

18       Q.   And they were -- based on this article, in which

19  you knew at the time that you filed the complaint,

20  including Twitter as a defendant, Twitter was an important

21  defendant to put in the complaint because Twitter

22  interfered with Ms. Loomer's social media account with

23  Twitter, correct?

24            MR. SANDO:  Object to form.

25       A.   No.
```

```
 1    BY MR. KLAYMAN:

 2         Q.   CAIR rather interfered, correct?  Correct?

 3         A.   It was -- well, ultimately our conclusion was

 4    that it was worth including Twitter as a defendant.

 5         Q.   In fact, you never served Twitter with the

 6    complaint, did you?

 7         A.   No.

 8         Q.   You are saying you did serve Twitter?

 9         A.   No, I didn't -- we did not serve Twitter.  I was

10    contacted by Twitter after news of the complaint became

11    public, and service was not an issue.

12         Q.   So are you saying that Twitter accepted service?

13         A.   I don't recall whether they accepted the

14    service.  They may have, but the gravamen of the

15    conversation was that they wanted me to know that we could

16    expect a motion based on their venue selection provision

17    in the user agreement, and we decided to dismiss Twitter

18    from the Florida lawsuit without prejudice.

19         Q.   And you never discussed that with Ms. Loomer, did

20    you, dismissing them without prejudice?

21         A.   Yes, I did.

22         Q.   You don't have anything in writing to that

23    effect, do you?

24         A.   I don't know.

25         Q.   It's a pretty important issue in this lawsuit for
```

1    malpractice, is it not?

2         MR. SANDO:  Object to form.

3      A.   No.

4    BY MR. KLAYMAN:

5      Q.   In fact, both the lower courts and the 11th

6    Circuit held that you failed to serve Twitter, correct?

7         MR. SANDO:  Form.

8    BY MR. KLAYMAN:

9      Q.   That's in the court orders.

10        MR. SANDO:  Form.

11     A.   No.

12   BY MR. KLAYMAN:

13     Q.   And it's in the court orders as well that you

14   fraudulently joined CAIR Florida.  That was a finding by

15   Magistrate Judge Bruce Reinhart, which was adopted by Judge

16   Ruiz, correct?  R-U-I-Z.

17        MR. SANDO:  Object to form.

18     A.   There was a finding of fraudulent joinder, yes,

19   there was.

20   BY MR. KLAYMAN:

21     Q.   Did you ever have communications with CAIR over

22   whether or not they had interfered with Ms. Loomer's social

23   media Twitter account?

24     A.   No.

25     Q.   And you received no information that what

1   Ms. Kirsten wrote about in her article, and Mr. McKinnon,

2   that I just referenced, Exhibit 7, was simply a prank by

3   CAIR?  You had no information that it was a prank, did you?

4        A.   At what time?

5        Q.   Anytime.

6             MR. SANDO:   Form.

7        A.   Eventually papers were submitted in the motion

8   in opposition -- on the remand motion.  I'm sorry.  In

9   opposition to remand, claiming that there had been a prank

10  played.

11  BY MR. KLAYMAN:

12       Q.   But you had no independent verification of that

13  other than what CAIR said, correct?

14            MR. SANDO:   Form.

15       A.   Verification that there had in fact been a

16  prank?

17  BY MR. KLAYMAN:

18       Q.   Correct.

19       A.   That is correct.

20       Q.   And, in fact, the individual that could have

21  confirmed that it wasn't a prank, two of them, was Kirsten

22  Grind and John McKinnon of the Wall Street Journal,

23  correct?

24       A.   No.

25       Q.   Well, they said that this in fact had occurred,

1     that CAIR had intervened with Twitter with regard to

2     Ms. Loomer and Iloominate Media, correct?  That's what they

3     wrote about, correct?

4          A.    That's what they wrote about, but that's not

5     necessarily what they would have been competent to testify

6     about.

7          Q.    And you never made any effort to contact them,

8     did you?  Ms. Grind or Mr. McKinnon?

9          A.    Incorrect.

10         Q.    Did you speak with either of them ever?

11         A.    Yes.

12         Q.    When did you speak with them?

13         A.    I don't remember.

14         Q.    And what did Ms. Grind tell you?

15         A.    I don't remember.

16         Q.    What did Mr. McKinnon tell you?

17         A.    I did not speak to him.

18         Q.    Now, you're aware that one of the ways that

19    people can escape from liability, at least try to, is to

20    say they don't remember, correct?

21              MR. SANDO:  Object to form.  Argumentative.

22         A.    Yes.

23    BY MR. KLAYMAN:

24         Q.    In fact, in the course of this deposition over

25    the last hour you've remembered very little, correct?

```
1            MR. SANDO:  Object to form.  Misstates his
2        testimony.  Argumentative.
3        A.   Incorrect.
4   BY MR. KLAYMAN:
5        Q.   In fact, Mr. Coleman, you're simply lying, aren't
6   you?
7            MR. SANDO:  Same objection.  Argumentative.
8        Watch it, Larry.  Form.
9        A.   Incorrect.
10  BY MR. KLAYMAN:
11       Q.   Something as important as this, you would
12  necessarily remember, would you not?
13           MR. SANDO:  Form.
14       A.   As important as what?
15  BY MR. KLAYMAN:
16       Q.   Well, in this particular instance, with regard to
17  what the Wall Street Journal had written about CAIR's
18  interference with Ms. Loomer and her company Iloominate
19  Media?
20       A.   I don't understand the question.
21       Q.   The article is important because it implicates
22  CAIR in interfering and competing unfairly in an unfair
23  trade practice with Ms. Loomer and Iloominate Media,
24  correct?
25           MR. SANDO:  Form.
```

```
 1      A.    The article was important, yes.
 2   BY MR. KLAYMAN:
 3      Q.    And consequently, it was important to have
 4   Twitter as a defendant, because you had proof as to why
 5   Twitter should be a defendant.
 6      A.    I don't think it was as important as having CAIR
 7   as a defendant.
 8      Q.    During the course of your representation of
 9   Ms. Loomer or Iloominate Media, did you seek to take any
10   discovery of Twitter?
11           MR. SANDO:  Form.
12      A.    The case was dismissed before discovery began.
13   BY MR. KLAYMAN:
14      Q.    But you never sought to take discovery?
15           MR. SANDO:  Form.
16      A.    The case was dismissed before discovery began.
17   BY MR. KLAYMAN:
18      Q.    Did you ask the court to allow you to take
19   discovery?
20      A.    No.
21      Q.    Did you ask the court to allow you to take
22   discovery before you had to respond to the defendant's
23   motion to dismiss?
24      A.    No.
25      Q.    And I take it you never tried to contact or get
```

1      an affidavit from Ms. Kirsten Grin or John McKinnon to be

2      able to use in responding to the motion to dismiss of the

3      defendants, correct?

4           A.   Affidavits are not used in motions to dismiss.

5           Q.   Well, that's your legal conclusion.  I just asked

6      you the question straight up.  You never sought to get an

7      affidavit from Ms. Grind or Mr. McKinnon to use to defend

8      the motion to dismiss, yes or no?

9           A.   I did not.

10          Q.   Now, I didn't quite understand your response

11     before.  Why did you say -- what was your reasoning for not

12     proceeding against Twitter and getting them served?

13          A.   Twitter was prepared to make a motion to

14     transfer venue to, I think, the Northern District or

15     Central District of California based on their user

16     agreement with Ms. Loomer, and I did not want the case

17     transferred to California.  I thought it was more

18     important to proceed against CAIR in this case and to deal

19     with Twitter in a separate case if the result of this

20     case, including discovery that might be obtained, would

21     support a future claim against Twitter.

22          Q.   Now, the reason you didn't want to transfer it to

23     the Central District of California is because you didn't

24     have counsel there that could represent her in conjunction

25     with your own representation, correct?

1          MR. SANDO:  Object to form.

2     A.   No.

3  BY MR. KLAYMAN:

4     Q.   Correct?

5     A.   No.

6     Q.   Did the Mandelbaum law firm have counsel on its

7  staff licensed in California?

8     A.   No.

9     Q.   The fact that it would be transferred to

10 California would not preclude bringing the suit against

11 Twitter, would it?

12    A.   No.

13    Q.   Now, with regard to your representation of Ms.

14 Loomer and Iloominate Media, you never took any steps, such

15 as filing a preliminary -- motion for preliminary

16 injunction, or any motion for equitable relief on her

17 behalf, or on Iloominate Media's behalf, correct?

18    A.   Correct.

19    Q.   You were aware, given your expertise, that to

20 combat any claim for attorneys' fees and failing to accept

21 an offer of judgment, you'd have to make a showing that

22 your clients pursued injunctive and equitable relief,

23 correct?

24         MR. SANDO:  Object to form.

25    A.   No.

 1   BY MR. KLAYMAN:

 2        Q.   You didn't know that?

 3        A.   That's not my testimony.

 4        Q.   So you did know that?

 5        A.   Pursuing injunctive relief does not require

 6   making a motion for a preliminary injunction.

 7        Q.   Or doing anything else?  I mean, you took no

 8   affirmative step to obtain equitable relief for Ms. Loomer

 9   and Iloominate Media during your representation of them,

10   correct?

11        A.   Incorrect.

12        Q.   Okay.  What efforts did you make to get equitable

13   relief on their behalf, other than just a passing reference

14   in the amended complaint?

15        A.   Well, I don't consider a demand for injunctive

16   relief to be a passing reference.  Everything that I put

17   into a complaint I take full responsibility for.  So when

18   I sought in the addendum clause injunctive relief against

19   all defendants, I consider that to be a significant act

20   from a legal practice point of view.

21        Q.   But both the lower court and the appellate court,

22   the 11th Circuit, found that it was not, correct, that did

23   you not pursue equitable relief sufficient to absolve

24   Ms. Loomer and Iloominate Media from having to pay

25   attorneys' fees?  That's been their findings, correct?

```
 1              MR. SANDO:  Object to form.

 2         A.   Yes, that was their finding.

 3    BY MR. KLAYMAN:

 4         Q.   So you're saying that those courts are wrong?

 5         A.   Sure.

 6         Q.   But that is the law in terms of the case that you

 7    brought for Ms. Loomer and Iloominate Media, correct, that

 8    is currently the law?

 9         A.   That is currently the ruling with respect to

10    this case, yes.

11         Q.   Now, there came a point in time, did there not,

12    when you abandoned Ms. Loomer and Iloominate Media as their

13    counsel?

14              MR. SANDO:  Object to form.

15    BY MR. KLAYMAN:

16         Q.   Correct?

17         A.   No.

18         Q.   There came a point in time when you refused to

19    represent them further, correct?

20         A.   Yes.

21         Q.   And why was that?

22         A.   I found that it was almost impossible for me to

23    work with Laura at that point.

24         Q.   Did you put that in writing to her?

25         A.   I don't think so.
```

1      Q.   In fact, the reason that you didn't continue on

2   is because you didn't think you were going to make money

3   out of this, given all the screw-ups that occurred prior?

4            MR. SANDO:   Object to form.

5   BY MR. KLAYMAN:

6      Q.   Correct?

7      A.   No.

8            MR. SANDO:   Form.

9   BY MR. KLAYMAN:

10     Q.   In other words, it would no longer be a

11   money-making venture, correct?

12     A.   No.

13     Q.   And it wasn't doing anything good to your

14   representation either, was it, in terms of the perception

15   that you did not represent her diligently and competently,

16   correct?

17           MR. SANDO:   Form.

18     A.   I don't understand what you are asking.

19   BY MR. KLAYMAN:

20     Q.   Well, you bailed out because you were no longer

21   wanting to associate yourself with Ms. Loomer or Iloominate

22   Media because, in fact, your reputation was being harmed,

23   given the way you handled the case.

24           MR. SANDO:   Form.

25     A.   No.

1    BY MR. KLAYMAN:

2        Q.    If you had continued to represent her, you could

3    have made the argument that you sufficiently pled equitable

4    relief, and that was all that needed to be done, correct?

5        A.    I did make that argument.

6        Q.    Which was not accepted by the courts, correct?

7        A.    That is correct.

8        Q.    Turn to Page 27 of the Ms. Loomer's verified

9    amended complaint.  "During the entire period of

10   representation, Defendants Coleman and Mandelbaum never

11   once followed up on, litigated, or took any action

12   whatsoever to obtain the injunctive and equitable relief

13   that Plaintiffs desired."

14           That's a correct statement, correct?

15       A.    No.

16       Q.    Why is that not correct?

17       A.    We filed a lawsuit seeking equitable relief.

18   Everything we did in connection with that lawsuit,

19   including defending the motion to dismiss, the venue --

20   the remand motion, the appeal, all were in pursuit of the

21   relief demanded in the complaint, which included the

22   equitable relief.

23       Q.    But that's the extent of your seeking equitable

24   relief on behalf of Ms. Loomer and Iloominate Media?

25       A.    That is pursuing equitable relief, yes.

1      Q.   And that's the extent of your actions on her

2   behalf with regard to equitable relief, correct?

3      A.   What do you mean by "that is the extent"?

4      Q.   That's all you did was to plead it.

5      A.   All one can do when filing a lawsuit is plead.

6   And then if it's dismissed, there's nothing else you can

7   do.

8      Q.   Turn to paragraph 33 of the complaint, where it

9   says "despite this reminder, Defendants Coleman and Dhillon

10   failed to provide any objection pursuant to Southern

11   District of Florida rule 7.3(a)".

12        That's an accurate statement, is it not?

13      A.   Yes.  Well, actually, ultimately we did.

14   Ultimately we did, because in fact the court did reduce

15   the amount due by 20 percent.

16      Q.   Your sole argument, was it not, that attorneys'

17   fees were not due and owing, you never actually item by

18   item opposed the request for attorneys' fees by the CAIR

19   defendants, correct?

20      A.   We made the tactical decision that it would be

21   more useful and more effectual to make the point that

22   under the offer of judgment statute there should not be

23   any fees owing at all.

24      Q.   You are aware that lawyers generally plead in the

25   alternative, if one argument does not stick with the court,

```
 1    another one may; you are aware of that, based on your

 2    experience?

 3        A.   Yes.

 4        Q.   Yet, you chose not to do that here, correct?

 5        A.   Correct.

 6        Q.   You never advised Ms. Loomer that that was your

 7    tactic here, did you?

 8        A.   I don't remember doing so.

 9        Q.   In fact, when the attorneys' fees award issued at

10    the lower court, you did not immediately advise her of

11    that, did you?

12        A.   I don't remember.

13        Q.   In fact, she learned of it only because it was in

14    the media at the time.

15             MR. SANDO:  Object to form.

16    BY MR. KLAYMAN:

17        Q.   Correct?

18        A.   I don't know.

19        Q.   Turn to paragraph 35 where it states, "even

20    worse, Defendants Coleman and Dhillon failed to even file

21    any response to CAIR and CAIR Florida's joint motion for

22    attorneys' fees, forcing Magistrate Bruce Reinhart

23    (Magistrate Reinhart), to whom this issue had been referred

24    by Judge Ruiz, to issue an order to show cause on May 18,

25    2021 as to why CAIR and CAIR Florida's motion should not be
```

1  granted."

2          That's an accurate statement, is it not?

3          MR. SANDO:  Object to form.

4      A.    The procedural facts recited in that statement

5  are correct.

6  BY MR. KLAYMAN:

7      Q.    Then it states "Defendants Coleman and Dhillon

8  also failed to timely respond to the OSC," that's order to

9  show cause.

10         That's also an accurate statement, is it not?

11         MR. SANDO:  Form.

12     A.    Failed to respond -- we did not respond.  We

13  were not aware of it.

14  BY MR. KLAYMAN:

15     Q.    You were not aware that the court had issued an

16  order to show cause?

17     A.    Correct.

18     Q.    What's your reason for that?  You were on the

19  electronic service filing system, were you not?

20     A.    Only under my previous firm's email.

21     Q.    So you never took the time to update the

22  electronic service requirements of the Southern District of

23  California?

24     A.    You mean Florida?

25     Q.    Well, when you changed firms, you did not advise

1   the Southern District of Florida that you had another

2   contact at your new law firm?

3        A.   There have -- the case was actually in the 11th

4   Circuit at the time, so the Southern District of Florida

5   filings were entirely quiescent.

6        Q.   What do you mean by "quiescent"?

7        A.   Nothing was going on there.  Nothing was being

8   filed.  We weren't filing.  The court didn't have

9   jurisdiction.

10        Q.   Wouldn't it have been an ordinary standard of

11   care to advise the lower court that you had a new contact

12   information for electronic filings?

13            MR. SANDO:  Form.

14        A.   I thought that the changes I had made to my

15   PACER account had accounted for that.

16   BY MR. KLAYMAN:

17        Q.   So you were negligent in not providing that

18   information to the Southern District of Florida, correct?

19            MR. SANDO:  Form.

20        A.   No.

21   BY MR. KLAYMAN:

22        Q.   You intentionally did not provide it?

23            MR. SANDO:  Form.

24   BY MR. KLAYMAN:

25        Q.   You can answer.

1      A.   I did not provide it, because I was under the

2  impression that changing my PACER log-in information had

3  effectuated the change.

4      Q.   Continuing in paragraph 35 "only on June 1, 2021

5  did Magistrate Reinhart receive an email from Defendant

6  Coleman with the specious, if not wholly manufactured,

7  story that he had not been receiving any notifications, and

8  Magistrate Reinhart ultimately granted additional time."

9           That's an accurate statement, isn't it?

10     A.   No.

11     Q.   Paragraph 36, "on or around June 24, 2021,

12  Defendants Coleman and Dhillon contracted with Defendant

13  Young on behalf of Ms. Loomer and Iloominate Media LLC to

14  serve as local counsel pursuant to the US District Court

15  for the Southern District of Florida's pro hac vice rules.

16  Defendant Young agreed to review filings and attend

17  hearings as second chair in exchange for $5,000, which was

18  paid by Defendants."

19           That's an accurate statement, is it not?

20     A.   No.

21     Q.   What's inaccurate about it?

22     A.   Neither I nor the Dhillon law firm contracted

23  with Mr. Young.

24     Q.   But Mr. Young was serving as your so-called local

25  counsel, correct, at Dhillon?

1      A.   What do you mean "so-called?"

2      Q.   Well, was he local counsel that you were relying

3   upon with regard to proceedings in this case?

4      A.   Yes.

5      Q.   Were you the one who found Craig Young to

6   represent Ms. Loomer and Iloominate Media?

7      A.   I was the one who found him and recommended that

8   she speak to him and that we use him.

9      Q.   How did you find him?

10      A.   I asked a colleague who I knew practiced in

11   Florida for a recommendation.

12      Q.   Now, in bringing Mr. Young into the case as local

13   counsel, it was his duty and responsibility to review the

14   file, the entire file, correct?

15           MR. SANDO:   Object to form.

16      A.   I'm not really cognizant of the full extent of

17   his duty, whether it required the entire file.

18   Considering the procedural situation that was involved at

19   the time, I'd think that there are things in the file that

20   would have nothing to do with his responsibilities.

21   BY MR. KLAYMAN:

22      Q.   And what are they?

23      A.   The issue of whether or not to dismiss Twitter,

24   the remand motion, the fraudulent joinder issue, these

25   things are all adjudicated.  The 11th Circuit had ruled,

1   and we had now to deal with a fairly narrow issue.

2       Q.   He was local counsel at the time that you and he

3   decided not to oppose the attorneys' fees and costs under

4   Southern District of Florida rule 7.3(a) line by line,

5   correct?

6       A.   That is correct.

7       Q.   And he made that issue -- he made that

8   determination along with you?

9       A.   We both made a conclusion -- yeah, we discussed

10  it, and came up with a strategy based on our judgment as

11  to what would be a good tactical approach to dealing with

12  the motion.

13      Q.   And like you, he never raised this with

14  Ms. Loomer?  Neither of you told her what you were doing in

15  terms of your strategy in this regard?

16      A.   That's correct.

17      Q.   Are you aware that Mr. Young has attempted to

18  settle his claim in this lawsuit directly with CAIR?

19      A.   Yes.

20      Q.   How did you learn of that?

21      A.   Through my counsel.

22      Q.   That's nothing that you would have done, correct?

23           MR. SANDO:   Object to form.

24      A.   I would not have attempted to settle Mr. Young's

25  claim, no.

```
1    BY MR. KLAYMAN:

2         Q.   No.  I'm talking about your claim.  Is it

3    appropriate for you to go to CAIR, a nonparty, to enter

4    into a settlement agreement in the case that you're here on

5    today?  Is that appropriate?

6              MR. SANDO:  Object to form.

7         A.   I have no opinion as to the propriety of it.

8    BY MR. KLAYMAN:

9         Q.   Have you attempted to do that?

10        A.   No.

11        Q.   And the reason you haven't done it is because

12   CAIR is not a party to this lawsuit, correct?

13             MR. SANDO:  Object to form.

14   BY MR. KLAYMAN:

15        Q.   The one we're here for today.

16        A.   That is not correct.

17        Q.   And, in fact, based upon your experience, it

18   wouldn't be ethical for you to do that, would it?

19             MR. SANDO:  Object to form.

20        A.   I have no experience with situations such as

21   this one.

22   BY MR. KLAYMAN:

23        Q.   In fact, if you were to do that, you could not

24   only subject yourself to ethical ramifications, but also

25   your counsel, Mr. Sando, if you were to do that?
```

```
 1              MR. SANDO:  Form.

 2   BY MR. KLAYMAN:

 3       Q.   Correct?

 4       A.   I have no idea.

 5       Q.   Have you seen the proposed settlement agreement

 6   that Mr. Young sought to enter into with CAIR?

 7       A.   No.

 8       Q.   So you are not aware that he put in that

 9   settlement that he wants Ms. Loomer and Iloominate Media to

10   sign off on that they cannot file an ethics complaint

11   against him with the Florida Bar?

12              MR. SANDO:  Object to form.

13       A.   I have not seen that agreement.

14   BY MR. KLAYMAN:

15       Q.   You've taken courses on legal ethics with regard

16   to New York and New Jersey, have you not?

17       A.   Yes.

18       Q.   And you're familiar with their rules of

19   professional responsibility?

20       A.   Yes.

21       Q.   And you are aware that under the rules of

22   professional responsibility in those jurisdictions that you

23   cannot agree with a client to not file an ethics complaint

24   against you, that that's strictly prohibited?

25       A.   Yes, I am aware of that.
```

```
 1        Q.   Are you aware that Mr. Young admits to having

 2   negotiated this proposed settlement without advising

 3   Ms. Loomer or Iloominate Media?

 4            MR. SANDO:  Object to form.

 5        A.   No.

 6   BY MR. KLAYMAN:

 7        Q.   You wouldn't do that, would you?

 8            MR. SANDO:  Form.

 9        A.   I would never do something that I knew to be

10   unethical in the jurisdictions where I practice.

11   BY MR. KLAYMAN:

12        Q.   Well, you were practicing in Florida, were you

13   not, for Ms. Loomer and Iloominate Media, correct?

14        A.   I was.

15        Q.   And you wouldn't do that in a Florida

16   jurisdiction either, would you?

17        A.   I would not.

18        Q.   Turning to paragraph 37, "Defendant Young upon

19   entering an appearance in the CAIR suit should have

20   reviewed the case and provided Plaintiffs with an accurate

21   and competent assessment of the merits of the CAIR suit."

22            That's an accurate statement, is it not?

23        A.   No.

24        Q.   In fact, that would be the ordinary practice of a

25   lawyer when he enters into a case, to review the entire
```

```
1    file, correct?

2             MR. SANDO:   Object to form.

3    BY MR. KLAYMAN:

4        Q.   You can respond.

5        A.   Not necessarily.

6        Q.   You wouldn't do that, would you?  I mean, if

7    you're entering a case, Mr. Coleman, you would want to know

8    what came before your entry to decide whether you wanted to

9    enter into it, correct?

10            MR. SANDO:   Form.

11   BY MR. KLAYMAN:

12       Q.   Correct?

13       A.   Yes.

14       Q.   Because you could potentially be liable for

15   malpractice committed by another lawyer before you entered

16   the case.

17            MR. SANDO:   Form.

18   BY MR. KLAYMAN:

19       Q.   Correct?

20       A.   I can't imagine why someone would make such a

21   claim against me if I came into the case late, but I

22   suppose there are people who are vicious enough to do

23   that.

24       Q.   Paragraph 38, "Defendants Coleman, Dhillon, and

25   Young together ultimately prepared and filed on July 21,
```

1    2021 Plaintiff's opposition to joint motion for attorneys'

2    fees and additional costs, which was clearly," quote,

3    "mailed in" unquote.  "Despite CAIR and CAIR Florida having

4    filed an extremely detailed joint motion for attorneys'

5    fees and costs, which was supported by numerous

6    declarations, Defendants Coleman, Dhillon, and Young threw

7    together a cursory and slip shod response of only eight

8    pages making only general and extremely broad arguments.

9    The final straw was that Defendants Coleman, Dhillon, and

10   Young still chose not to comply with Southern District of

11   Florida rule 7.3(a), which required them to describe with

12   reasonable particularity each time entry or nontaxable

13   expense to which it objects both as to issues of

14   entitlement and as to amount and shall provide supporting

15   legal authority."

16           That's an accurate statement in that paragraph,

17   correct?

18           MR. SANDO:  Form.

19       A.  No.

20   BY MR. KLAYMAN:

21       Q.  Why is it not accurate?

22       A.  It was not clearly mailed in.  It was not

23   cursory --

24       Q.  Let's stop there with the "cursory" and the

25   "mailed in."  The reason that you only generally challenged

```
 1    the attorneys' fees and costs is because you had already

 2    been untimely in filing a response and wanted to get

 3    something in quickly, correct, and didn't want to take the

 4    time or effort to challenge the claimed attorneys' fees of

 5    CAIR line by line, correct?

 6              MR. SANDO:  Form.

 7    BY MR. KLAYMAN:

 8        Q.    Correct?

 9        A.    No.

10        Q.    It would have taken great effort to challenge the

11    attorneys' fees and costs claimed by CAIR line by line,

12    correct?

13              MR. SANDO:  Form.

14        A.    No.

15    BY MR. KLAYMAN:

16        Q.    In fact, they were claiming almost $150,000 of

17    attorney's fees; that was a lot to go through, correct?

18              MR. SANDO:  Form.

19        A.    "A lot" is a subjective term.

20    BY MR. KLAYMAN:

21        Q.    Okay.  That's a substantial sum in your opinion,

22    correct?

23              MR. SANDO:  Form.

24        A.    The sum doesn't -- I don't understand your

25    question.
```

1    BY MR. KLAYMAN:

2        Q.   My question is that they had submitted affidavits

3    which were extremely detailed which set forth their claim

4    for attorneys' fees of about $150,000, and it would have

5    required effort to go through each of those line item

6    entries of the work that CAIR's attorneys had done to

7    respond pursuant to Florida rule 7.3(a), item by item,

8    correct?

9            MR. SANDO:  Form.

10           MR. BLOCH:  Join.

11       A.   As the complaint states in paragraph 38, the

12   motion by CAIR and CAIR Florida was extremely detailed and

13   was supported by numerous declarations.  Viewing it, my

14   conclusion was that it would be difficult to find a

15   principal basis for objecting to this well-developed and

16   authenticated record of charges under the circumstances in

17   a situation where there had been unusual motion practice

18   implicating unusual and, in some cases, complex litigation

19   issues, in a court that had already demonstrated a decided

20   lack of sympathy for my client on issues where I felt far

21   more strongly I could support my arguments.

22   BY MR. KLAYMAN:

23       Q.   Did you seek to retain an expert to rebut the

24   claims of CAIR with regard to each of their entries for

25   attorneys' fees and costs?

```
 1            MR. SANDO:  Form.

 2       A.   No.

 3  BY MR. KLAYMAN:

 4       Q.   In the ordinary course of your practice over many

 5  years, that would be something that you would do in the

 6  ordinary course, correct?

 7            MR. SANDO:  Form.

 8       A.   No.

 9  BY MR. KLAYMAN:

10       Q.   And you yourself had the expertise to be able to

11  assess whether the attorneys' fees that were claimed by

12  CAIR were correct or whether they were inflated, correct?

13            MR. BLOCH:  Form.

14       A.   I had the experience.

15  BY MR. KLAYMAN:

16       Q.   So you yourself could have countered their

17  attorneys' fees by submitting your own affidavit by saying

18  "this line item, they're charging too much," et cetera,

19  correct?

20            MR. SANDO:  Form.

21            MR. BLOCH:  Join.

22       A.   If I had observed time entries that struck me as

23  clearly amenable to that kind of objection, I would not

24  have hesitated to do so.

25  BY MR. KLAYMAN:
```

```
 1      Q.   So you considered CAIR's fees to be totally

 2   legit?

 3           MR. BLOCH:  Form.

 4           MR. SANDO:  Form.

 5      A.   I consider them to have been so well-documented

 6   and thorough that I did not really have a good faith basis

 7   for objecting to any particular item of expense or time

 8   delay.

 9   BY MR. KLAYMAN:

10      Q.   Of course the real reason you didn't want to

11   object line by line, and Mr. Young didn't as well, is that

12   would have taken a lot of time, correct?

13           MR. SANDO:  Object to form.

14           MR. BLOCH:  Form.

15      A.   No.

16   BY MR. KLAYMAN:

17      Q.   Well, you are aware that the Magistrate Judge

18   Reinhart himself cut the fees back 20 percent, correct?

19      A.   I am.

20      Q.   So apparently you are aware that he didn't agree

21   with you that they were well pled, correct?

22           MR. SANDO:  Object to form.  Misstates his

23       testimony.

24      A.   The Magistrate has the discretion to act as he

25   sees fit.  I did not see a principal basis on which I
```

 1   could object to these charges.

 2   BY MR. KLAYMAN:

 3       Q.   In fact, you're aware from having participated in

 4   the case as lead counsel, that the amount of work claimed

 5   by CAIR was inflated?

 6           MR. SANDO:   Form.

 7       A.   I am not.

 8   BY MR. KLAYMAN:

 9       Q.   You're aware that regrettably, based on your

10   years of practice, that lawyers frequently ask for more

11   than they deserve in fee matters thinking that the court

12   will cut them back?

13           MR. SANDO:   Form.

14       A.   I am aware that some lawyers do this.

15   BY MR. KLAYMAN:

16       Q.   As a general rule, you're aware that the legal

17   profession is not a paradigm of honesty, is it?

18       A.   I think lawyers are more honest than nonlawyers,

19   as a general rule.

20       Q.   How long have you been practicing?

21       A.   Thirty-five years.

22       Q.   How old are you now?

23       A.   Sixty-one.

24       Q.   Where did you graduate from law school?

25       A.   Northwestern University School of Law.

1       Q.   Paragraph 45 where it says, "indeed, Ms. Loomer

2   is in possession of communications between herself and

3   Defendant Coleman where Defendant Coleman admits that the

4   law firm made egregious errors in representing the

5   Plaintiffs."  Do you have that correspondence?

6       A.   I don't believe I do.

7       Q.   Who has it?

8       A.   I believe, according to paragraph 45, Ms. Loomer

9   has it.

10      Q.   Is that correspondence in the possession of

11  Dhillon law firm?

12      A.   No.

13           MR. KLAYMAN:  I would ask that court reporter

14      mark -- what is it?  Is it exhibit 8 or 9?

15           MR. ANDERSON:  This is 8.

16           MR. KLAYMAN:  Exhibit 8.  Defendant Coleman's

17      response to Plaintiff's first request for production

18      of documents.

19      (Exhibit No. 8 was marked for identification.)

20  BY MR. KLAYMAN:

21      Q.   If you could put that up on screen.

22           Do you remember responding to this, Mr. Coleman,

23  or having your lawyer do it?

24      A.   Yes.

25      Q.   You consulted with your lawyer in making the

1    response to this request for production of documents, the

2    first request?

3         A.   I do -- or I did.

4         Q.   What your lawyer wrote is what you directed him

5    to write?

6              MR. SANDO:  Object to form.  Do not answer that

7         question.  That's privileged.

8    BY MR. KLAYMAN:

9         Q.   You didn't produce any documents as to Ms. Loomer

10   or Iloominate Media in response to the first request for

11   production of documents?

12             MR. SANDO:  Object to form.

13        A.   My counsel was responsible for production of

14   documents.

15   BY MR. KLAYMAN:

16        Q.   Let's just turn to number four, as just one

17   example, wherein it is requested the "documents which will

18   be used or cited to show that each the Defendants did not

19   commit legal malpractice, violate his or her fiduciary

20   duties to Plaintiffs and/or did not act in a fraudulent

21   fashion towards them."  The response -- your response:

22   "Objection.  Defendant Ronald Coleman states that this

23   request is vague and ambiguous."

24             What is vague and ambiguous about that request?

25             MR. SANDO:  Objection.  Object to form.

1    BY MR. KLAYMAN:

2         Q.   You can respond.

3         A.   My lawyers recommended certain objections be

4    interposed in response to discovery, and I deferred to

5    them.

6         Q.   And those recommendations were for purposes of

7    delay and obstruction?

8              MR. SANDO:  Object to form.  Mr. Coleman, don't

9         speak about recommendations.  There is a privilege

10        there, which you have a right to insert there.  I

11        instruct you not to answer.

12   BY MR. KLAYMAN:

13        Q.   Let me finish this.  "Defendant Ronald Coleman

14   states this request is vague and ambiguous, overbroad and

15   unduly burdensome, protected by the work product privilege,

16   and not reasonably calculated to lead to admissible

17   evidence."  You stand by that?

18             MR. SANDO:  Object to form.

19        A.   Yes.

20   BY MR. KLAYMAN:

21        Q.   Sir, you are aware that you could be subject to

22   sanctions personally for making that response, correct?

23             MR. SANDO:  Object to form.  Mr. Klayman, don't

24        try to bully my client.  You never even filed a

25        motion to compel on this.  Form.

```
1          MR. KLAYMAN:  I'm asking him a question, and

2     it's not bullying.  I'm talking very softly.

3          MR. SANDO:  You are bullying because there's

4     absolutely zero basis, considering you never

5     litigated the --

6          MR. KLAYMAN:  You are concerned, Mr. Sando,

7     because it touches on your representation.

8          MR. SANDO:  It's filed by me, so if you want to

9     know why we filed what we filed, then litigate it in

10    court.

11         MR. KLAYMAN:  This is going to come up at trial,

12    so I'm entitled to ask about it.

13         MR. SANDO:  That's not a trial issue,

14    Mr. Klayman.  If you could read the response, he is

15    very clear that the law firms have the files and they

16    produce the records.

17         MR. KLAYMAN:  You got a guy here, no disrespect

18    towards Mr. Coleman, who can't remember much of

19    anything.

20         MR. SANDO:  Object to form.

21         MR. KLAYMAN:  Then he's asked what documents he

22    is relying upon to defend himself of the legal

23    malpractice claims in a complaint verified by

24    Ms. Loomer, on behalf of herself and Iloominate

25    Media, which is --
```

```
 1          MR. SANDO:  No.  He is not being asked what he

 2     relied upon.  That is a request for documents.  That

 3     is a production of documents.  That is not

 4     Mr. Coleman's testimony.  Form.

 5          MR. KLAYMAN:  That's correct.  That's correct.

 6     So I'm asking him --

 7          MR. SANDO:  You're asking him if he's relying

 8     upon that.  He responded to that, Mr. Klayman.

 9          MR. KLAYMAN:  I'm asking why he considers that

10     request to be vague and ambiguous, overbroad and

11     unduly burdensome, protected by work product

12     privilege, and not reasonably calculated to lead --

13          MR. SANDO:  I'm going to instruct you not to

14     answer on the basis of attorney-client privilege and

15     the work product privilege, and it invades the

16     providence of this defendant to defend himself.

17          MR. KLAYMAN:  I'm not asking him for anything

18     that you discussed with him.  I'm asking him he

19     stands behind that.  He's the one responsible --

20          MR. SANDO:  Let me say something.  To the extent

21     that he can answer that question without relying on

22     the advice of his lawyer, then he can answer it.

23          MR. KLAYMAN:  Yeah.  Let him do that.

24          MR. SANDO:  Do you understand, Mr. Coleman?  To

25     the extent that you can answer Mr. Klayman's question
```

```
 1        without relying on the advice and consultation of

 2        your lawyers, you are welcome to do so.  If you

 3        can't, then I instruct you not to answer.

 4        A.    I cannot answer that question without relying on

 5   privileged communications with my counsel.

 6   BY MR. KLAYMAN:

 7        Q.    It goes on to state "notwithstanding the

 8   foregoing objection, Mr. Coleman does not have personal

 9   possession of any file relative to the underlying

10   litigation styled, Laura Loomer and Iloominate Media LLC

11   versus CAIR Foundation Inc, et al., 9:19cv81179 (Southern

12   District of Florida).  The underlying file documents remain

13   in the possession of the law firms, and Mr. Coleman would

14   defer to the codefendant law firms for their respective

15   litigation files, as they are kept in their regular course

16   of business, and which may contain responsive documents to

17   this request ."

18        Are you saying that in particular with regard to

19   Dhillon law firm of which you are Of Counsel, that the

20   documents I requested on behalf of Ms. Loomer and

21   Iloominate Media are not in your custody, possession, and

22   control?

23        MR. SANDO:  Object to form.

24        A.    No.

25   BY MR. KLAYMAN:
```

81

```
1        Q.   You don't have the ability to request those

2   documents from Dhillon?

3             MR. SANDO:  Object to form.  As this request was

4        directed to Mr. Coleman individually, not the law

5        firms.

6             MR. KLAYMAN:  That's fine.  I'm clear what it's

7        directed to.

8   BY MR. KLAYMAN:

9        Q.   But you are a lawyer with the Dhillon law firm,

10   correct?

11       A.   What the answer says is I do not have personal

12   possession, that the documents are in the possession of

13   the law firms.

14       Q.   Well, not all the documents are in possession of

15   law firms, are they, such as emails and texts to and from

16   Ms. Loomer?

17            MR. SANDO:  Form.

18       A.   I'm not aware of any that would not be.

19   BY MR. KLAYMAN:

20       Q.   You never did a search to see whether there were

21   documents that were not in the possession of these law

22   firms, did you, that were responsive to this request to

23   produce?  You never did a search, did you?

24       A.   I did.

25            MR. SANDO:  Object to form.
```

```
1        A.   I did.

2   BY MR. KLAYMAN:

3        Q.   Correct?

4        A.   Incorrect.  I've answered it three times.

5        Q.   No, you haven't answered it at all, Mr. Coleman.

6   I'm asking for your response.

7             THE WITNESS:  Will the reporter please read back

8        my response?

9   BY MR. KLAYMAN:

10       Q.   You're simply hiding behind your counsel.

11            MR. SANDO:  Object to form.  Mr. Klayman, don't

12       badger or belittle my client.  Form.

13            THE WITNESS:  He can't belittle me.

14  BY MR. KLAYMAN:

15       Q.   Why can't I belittle you?

16            MR. SANDO:  Form.

17       A.   Because my size is not in any way a function of

18  your comments, statements, reflections, or views.

19  BY MR. KLAYMAN:

20       Q.   I'm not worthy of asking you questions; is that

21  the reason?

22       A.   That is also true.

23       Q.   Well, you made that clear to The Daily Beast,

24  which remains potentially actionable, Mr. Coleman.

25            MR. SANDO:  Object to form.  Is that a question
```

```
 1        or a statement?

 2                MR. KLAYMAN:  That's a statement.

 3                MR. SANDO:  Okay.  Let's focus on questions.

 4   BY MR. KLAYMAN:

 5        Q.   You never searched your cellphone, or your

 6   computer yourself, for emails and/or text messages to and

 7   from Ms. Loomer with regard to the allegations that you had

 8   committed legal malpractice and violated your fiduciary

 9   duties to the Plaintiffs and acted in a fraudulent fashion

10   towards them?  You never --

11                MR. SANDO:  Object to form.

12   BY MR. KLAYMAN:

13        Q.   You never made such a search, did you?

14                MR. SANDO:  Object to form.

15        A.   I did search my devices for anything that would

16   not have been already available in the law firm records.

17   BY MR. KLAYMAN:

18        Q.   What devices did you search --

19                MR. SANDO:  Form.

20   BY MR. KLAYMAN:

21        Q.   -- specifically?

22        A.   My computer and my cellphone.

23        Q.   What kind of computer do you have?

24        A.   A PC.

25        Q.   And what's the make of it?  What is the model and
```

84

```
 1    what company?

 2        A.   I don't know.

 3        Q.   You don't know whether you have an Apple, or you

 4    don't whether you have a --

 5        A.   No.  It is a -- an Intel PC.  I change machines

 6    approximately every two years.  I, frankly, couldn't tell

 7    you right now.  I probably got a Dell -- a Dell computer

 8    at home.

 9        Q.   When you claim to change machines, you transfer

10    over what's on the prior machine, correct?

11        A.   Yes.

12        Q.   So you have everything still in your possession

13    of your communications with Ms. Loomer with regard to your

14    representation of her and Iloominate Media, correct?

15            MR. SANDO:  Object to form.

16        A.   Everything I have is in the possession of the

17    law firm.

18    BY MR. KLAYMAN:

19        Q.   Including your computers?

20        A.   No.

21        Q.   Including your cell phones?

22        A.   No.

23        Q.   So my question is when you changed the computer,

24    and we'll get to the cellphone, you would have transferred

25    over to the new computer that which you had on the old
```

```
1    computer, correct?

2         A.   Yes, but all my firm information, all the firm

3    documents, all firm business was always retained in the

4    possession of the law firms.  I was meticulous.  I would

5    even copy and paste WhatsApp conversations and text

6    conversations into the document management systems of the

7    law firms because that's where they belong.

8         Q.   From your computer?

9         A.   Yes, and from my cellphone.

10        Q.   So you're saying that Dhillon has all that stuff?

11        A.   Yes.

12        Q.   Did you ask Dhillon to be able to conduct the

13   search yourself?

14             MR. BLOCH:  Form.

15        A.   No.

16   BY MR. KLAYMAN:

17        Q.   Who, if anyone, conducted the search in response

18   to the requests to produce, and I'll get to number two,

19   that were sent to you to respond to in this case?

20        A.   I did.

21        Q.   So you went into Dhillon's files?

22        A.   Yes.

23        Q.   Is there a record of your having requested access

24   to those files with Dhillon?

25             MR. SANDO:  Object to form.  Don't answer that
```

```
 1        question.  That would be work product and

 2        attorney-client privilege.

 3            MR. KLAYMAN:  It's not attorney-client

 4        privilege.  The fact that he --

 5            MR. SANDO:  What he did --

 6            MR. KLAYMAN:  No.

 7            MR. SANDO:  -- and who he spoke with -- let me

 8        make the objection, because you're challenging it.

 9            Who he spoke with at Dhillon, which is a named

10        defendant to this lawsuit of which he works for, in

11        response to discovery is privileged.

12            MR. KLAYMAN:  No, it's not.  I mean, that is not

13        dealing with the substance of any communication, and

14        you know --

15            MR. SANDO:  It would be his work product.

16            MR. KLAYMAN:  -- even in a privilege log, you

17        have to state the date, individuals that are

18        involved, and the general nature.

19            MR. SANDO:  You're asking him this question now

20        for the first time, and I'm instructing him that he

21        has a work product and an attorney-client privilege,

22        and I would instruct Mr. Coleman not to answer on

23        those bases.

24            MR. KLAYMAN:  Certify it.

25    BY MR. KLAYMAN:
```

1      Q.   So you can't verify with anything in writing that

2   you ever actually did a search in response to the requests

3   to produce that were served upon you?

4           MR. SANDO:  Object to form.

5      A.   I'm unfamiliar with the entire concept.  I'm a

6   lawyer at the Dhillon Law Group.  I have access to the

7   files that I maintain in connection with my work, and I

8   searched those files in order -- and turned them over to

9   outside counsel for production.

10  BY MR. KLAYMAN:

11     Q.   Who, if anyone, from Dhillon participated in any

12  search in response to requests to produce served upon you

13  by Ms. Loomer and Iloominate Media?  Who from Dhillon

14  conducted any search, if anyone?

15     A.   Ronald Coleman.

16     Q.   You're the only one?

17     A.   Yes.

18     Q.   There was no administrative individual that

19  assisted you in the search?

20     A.   Correct.

21     Q.   So if you're the only one that did a search, then

22  how would Dhillon know what to produce in response to the

23  requests to produce that were served upon them?

24          MR. SANDO:  Object to form.

25          MR. BLOCH:  Join.

```
 1        A.   I don't understand the question.

 2   BY MR. KLAYMAN:

 3        Q.   Well, Dhillon has been sued here, correct?

 4   Correct?

 5        A.   Oh.  Yeah.  Very good.

 6        Q.   And Dhillon's concerned with the fact that

 7   they're a defendant in this case, correct?

 8        A.   I can't speak --

 9             MR. BLOCH:  Object to form.

10        A.   I can't speak for the firm.

11   BY MR. KLAYMAN:

12        Q.   Who at the firm have you talked to about this

13   lawsuit -- at Dhillon?

14             MR. SANDO:  You can give the name, but not the

15        content of what you discussed.  Form.

16             MR. BLOCH:  Join.

17        A.   Harmeet Dhillon, Matthew Sarelson.

18   BY MR. KLAYMAN:

19        Q.   What was the general subject matter of your

20   discussion?

21             MR. SANDO:  I instruct you not to answer.

22        Attorney-client, work product privilege.

23             MR. BLOCH:  Join.

24             MR. KLAYMAN:  General subject matter is not

25        covered.
```

```
 1          MR. SANDO:  Yeah, it is, Larry.  You don't get
 2     to decide.  I made a good faith basis for asserting a
 3     privilege, attorney-client, work product privilege.
 4     I instruct you not to answer.
 5          MR. BLOCH:  Join.
 6          MR. KLAYMAN:  Certify it.
 7          That would ordinarily be required in a privilege
 8     log, for instance.
 9          MR. SANDO:  In response to an interrogatory.
10     BY MR. KLAYMAN:
11        Q.   In terms of --
12          MR. KLAYMAN:  No.  When you produce documents,
13     you know that, Mr. Sando, that if you don't produce
14     documents you're claiming a privilege on, you have to
15     produce a privilege log.
16          MR. SANDO:  Mr. Klayman, he did not assert a
17     privilege in his response, Ron Coleman's response, to
18     the RFP that you just marked.
19          MR. KLAYMAN:  No.  It was a total stonewall,
20     correct?
21          MR. SANDO:  It was an objection that you never
22     bothered to pursue.
23          MR. KLAYMAN:  Well, not yet.
24          MR. SANDO:  Well, you got a lot going on.  Form.
25     BY MR. KLAYMAN:
```

```
 1        Q.   So this is the point that I'm trying to make:
 2   You're the only one that knows what was produced and what
 3   was not produced by Dhillon.
 4             MR. SANDO:  Object to form.
 5   BY MR. KLAYMAN:
 6        Q.   Correct?
 7        A.   I turned over the entirety of the files to
 8   outside counsel.  So there is no issue of what was or what
 9   was not produced.  Everything -- everything that was or
10   was not produced, that decision was made at the level of
11   outside counsel.
12        Q.   Did outside counsel consult with you before it
13   made production, or he made production?
14        A.   Yes.
15             MR. SANDO:  Object to form.
16   BY MR. KLAYMAN:
17        Q.   Did you go through each document that was being
18   produced with him?
19             MR. SANDO:  Object to form.  I instruct you not
20        to answer on the basis of work product and
21        attorney-client privilege.
22             MR. KLAYMAN:  That's not privileged.
23             MR. SANDO:  What documents we discussed --
24             MR. KLAYMAN:  But that --
25             MR. SANDO:  Let me finish the objection.  What
```

```
 1         documents we discussed or not discussed in response
 2         to a discovery request with our own clients is
 3         privileged.
 4              MR. KLAYMAN:  I'm not asking for content.
 5              MR. SANDO:  You just did.  You asked --
 6              MR. KLAYMAN:  No.  I'm asking did you go over
 7         each document that was produced.
 8              MR. SANDO:  That's content.  That's content.
 9         That's privilege.  That's privileged.  That's
10         content, and I instruct you not to answer.
11              MR. KLAYMAN:  Certify it.
12    BY MR. KLAYMAN:
13         Q.   I'll turn your attention to --
14              MR. KLAYMAN:  What's the next exhibit number,
15         Mr. Anderson?
16              MR. ANDERSON:  9.
17              MR. KLAYMAN:  9?  Defendant Ron Coleman's
18         responses and objections to Plaintiff's second
19         request for production document.
20         (Exhibit No. 9 was marked for identification.)
21    BY MR. KLAYMAN:
22         Q.   You remember receiving this, do you not?
23              MR. KLAYMAN:  And you can scroll through it so
24         he can look through it, Mr. Anderson.
25         A.   I don't need to scroll it in such slow motion.
```

```
 1    I remember -- I remember seeing it, yes.

 2    BY MR. KLAYMAN:

 3        Q.   Number one says "any and all documents which

 4    refer or relate in any way to communications with The Daily

 5    Beast, or any other media publication concerning Laura

 6    Loomer and/or Larry Klayman."  Your objection is "Defendant

 7    states this request is irrelevant, vague and ambiguous,

 8    overbroad, and not reasonably calculated to lead to

 9    admissible evidence."

10            Now, with regard to that Daily Beast story,

11    which we went over at the beginning of this deposition,

12    you are claiming that Ms. Loomer and I are making false

13    claims that you committed malpractice, correct?

14            MR. SANDO:  Object to form.

15        A.   I would say meritless claims.

16    BY MR. KLAYMAN:

17        Q.   Okay.  Meritless claims.  And you're saying the

18    only reason that I'm doing that is because I want to make

19    myself relevant again in the conservative legal community.

20    That's what you told The Daily Beast, right?

21            MR. SANDO:  Object to form.

22        A.   That is what I told The Daily Beast.

23    BY MR. KLAYMAN:

24        Q.   Correct.  That is relevant, because it deals with

25    the issue of whether you committed malpractice, correct?
```

```
 1              MR. SANDO:  Form.  Argumentative.
 2     BY MR. KLAYMAN:
 3          Q.   Correct?
 4          A.   No.
 5              MR. KLAYMAN:  Certify it.
 6              MR. SANDO:  Certify what?
 7              MR. KLAYMAN:  The response.  It's nonresponsive.
 8              MR. SANDO:  You don't certify that, Mr. Klayman.
 9          Form.
10              MR. KLAYMAN:  I'll do what I want.  It will be
11          certified.
12     BY MR. KLAYMAN:
13          Q.   Number two, "any and all documents which refer or
14     relate to communications with the US District Court for the
15     Southern District of Florida, the Florida Bar, or any other
16     Bar authority with regard to Larry Klayman."
17              You, in fact, sent communications to the
18     Southern District of Florida and the Florida Bar with
19     regard to me and my participation as counsel for Laura
20     Loomer and Iloominate Media, correct?
21              MR. SANDO:  Object to form.
22          A.   Correct.
23     BY MR. KLAYMAN:
24          Q.   And you have those communications, do you not?
25              MR. SANDO:  Form.
```

```
 1        A.   I am not sure.

 2   BY MR. KLAYMAN:

 3        Q.   Do you have any communications from those courts

 4   and the Florida Bar from that court in the Florida Bar?

 5        A.   I believe so.

 6        Q.   Okay.  Well, I'm requesting that you produce

 7   them.  I'm going to give you another opportunity to do it

 8   before I have to go to the court.  Are you going to do

 9   that?

10        MR. SANDO:  There is an objection which stands

11        absent a court order.  Form.

12   BY MR. KLAYMAN:

13        Q.   The reason you did that is that you were trying

14   to interfere with my representation of Ms. Loomer and

15   Iloominate Media?

16        MR. SANDO:  Object to form.

17   BY MR. KLAYMAN:

18        Q.   Correct?

19        A.   No.

20        Q.   No, you just did it out of -- because you're a

21   person who has great concern with regard to me?  You're

22   fixated on me?  Is that why you did it?

23        MR. SANDO:  Form.  Come on, Larry.

24        Argumentative.

25   BY MR. KLAYMAN:
```

```
 1        Q.   Is that why you did it?

 2             MR. SANDO:  Form.

 3   BY MR. KLAYMAN:

 4        Q.   Is this something you do with lawyers you do

 5   business with or have contact with, you just send in Bar

 6   complaints to courts and Bars?

 7             MR. SANDO:  Object to form.

 8        A.   Not all.

 9   BY MR. KLAYMAN:

10        Q.   Not all.  So you viewed me as a threat, is that

11   correct?  That's why you did it?

12             MR. SANDO:  Object to form.

13        A.   No.

14             MR. SANDO:  Which malpractice case are we

15        talking about here, Larry?  Because I'm confused with

16        this line of questioning.  I don't know if there's

17        another one that -- form.

18   BY MR. KLAYMAN:

19        Q.   In fact, that was something you did vindictively

20   because I had raised the possibility in a court pleading of

21   your being held accountable for alleged malpractice,

22   correct?

23             MR. SANDO:  Form.

24        A.   No.

25   BY MR. KLAYMAN:
```

1      Q.   So you thought you'd try to throw a monkey wrench

2   into my representation of Ms. Loomer before the Southern

3   District of Florida, where this case resided in front of

4   Judge Ruiz and Magistrate Judge Reinhart, correct?

5           MR. SANDO:   Form.

6      A.   No.

7   BY MR. KLAYMAN:

8      Q.   What do you mean by "no"?

9      A.   You asked me a yes or no question.  I answered

10   "no".

11      Q.   Okay.  So you just gratuitously sent this stuff

12   to the Southern District of Florida and the Florida Bar?

13           MR. SANDO:   Object to form.

14      A.   No.

15   BY MR. KLAYMAN:

16      Q.   Are you aware of laws that say trying to tamper

17   with counsel of a litigant can constitute a crime?

18      A.   I don't understand what the word "tamper" means.

19      Q.   Obstruct -- obstruct representation of the lawyer

20   who's representing the client in due course.

21      A.   Generally speaking, yes.

22      Q.   Turn to request three:  "Any and all documents

23   which refer or relate to any and all legal malpractice, any

24   negligent allegations leveled against you by any person or

25   entity in your legal practice."

1        Are all of these documents in the custody,

2  possession, and control of the Dhillon law firm?

3    A.  Yes.

4    Q.  Even dealing with legal malpractice claims

5  against you before you became Of Counsel to that firm?

6    A.  No.

7    Q.  So you have them, right?

8    A.  No.

9    Q.  Where are they?

10    A.  They do not exist.

11    Q.  Why don't they exist?

12    A.  I have never been accused of legal malpractice

13  before.

14    Q.  Well, you just told me earlier that you got sued

15  for financial -- alleged financial irregularities in your

16  representation, correct?

17        THE WITNESS:  Have you muted my counsel's

18     microphone, Mr. Klayman?

19        MR. KLAYMAN:  No.  Maybe he went to the

20     bathroom.  I don't know.

21        THE WITNESS:  Mr. Sando, can you please respond?

22        MR. ANDERSON:  He just messaged in the chat.

23        MR. LIDA:  He's advised he's muted.  Stop the

24     depo.

25        MR. KLAYMAN:  We don't have the ability to mute

```
 1        anybody else.
 2            MR. LIDA:  Mr. Sando is unable to participate,
 3        so we kind of need to take a break.
 4            MR. KLAYMAN:  All right.  We can take a break
 5        now anyway.  Let's take a 15-minute break.  We'll
 6        resume at 9:25 -- 9:26.
 7            THE VIDEOGRAPHER:  The time is 12:06 p.m.  We
 8        are off the record.
 9        (A recess was taken from 12:06 p.m. until 12:25 p.m.)
10            THE VIDEOGRAPHER:  The time is 12:25 p.m.  Back
11        on the record.
12            MR. KLAYMAN:  I will ask the next exhibit be
13        made Exhibit 10.  It's Defendants Ronald Coleman and
14        Mandelbaum Barrett PC's motion for final judgment.
15        Can you put that up on the screen, Mr. Anderson?
16        (Exhibit No. 10 was marked for identification.)
17            MR. KLAYMAN:  Mr. Coleman, are you there?
18            THE WITNESS:  Yes.
19            MR. KLAYMAN:  Mr. Sando there?
20            MR. SANDO:  Yes.
21            MR. KLAYMAN:  Okay.  Good.  We're all here.
22        BY MR. KLAYMAN:
23            Q.   Have you seen this motion for summary judgment
24        that was filed recently?
25            A.   Yes.
```

1      Q.   You wrote the first draft?

2           MR. SANDO:  I'm sorry.  What's the question?

3   BY MR. KLAYMAN:

4      Q.   Yeah.  Mr. Coleman, you wrote the first draft of

5   this, didn't you?

6           MR. SANDO:  Object to form.  Don't answer.

7           Privileged.  Work product privilege.  Attorney-client

8           privilege.

9           MR. KLAYMAN:  That's not privileged.

10          MR. SANDO:  Yes, it is.  Work product of who

11          prepared a motion in an ongoing case?  Absolutely.

12          MR. KLAYMAN:  Oh, really?  Okay.  Certify that.

13          I'm learning all kind of new things.  Thank you, Mr.

14          Sando.

15          MR. SANDO:  Yeah, you are.

16          MR. KLAYMAN:  I don't think so.  I don't think

17          so.

18          MR. SANDO:  What relevance is it who drafted a

19          motion for summary judgment, Mr. Klayman?

20          MR. KLAYMAN:  That's my decision to ask the

21          question.

22          MR. SANDO:  Yeah.  Exactly.  None.

23   BY MR. KLAYMAN:

24     Q.   I'm asking you, Mr. Coleman, did you draft this?

25          MR. SANDO:  Object to form.  Instruct you not to

```
 1        answer.  Work product.  Attorney-client.
 2  BY MR. KLAYMAN:
 3        Q.    Did review this motion for summary judgment
 4  before it was filed?
 5        A.    Yes.
 6        Q.    Did you suggest changes to the draft of it before
 7  it was filed?
 8             MR. SANDO:  Object to form.  Work product.
 9        Attorney-client.  Do not answer.
10  BY MR. KLAYMAN:
11        Q.    Have you ever read the deposition of Laura Loomer
12  in this case?
13        A.    No.
14        Q.    You're aware -- were you advised that before --
15  strike that.
16             You were advised that she testified that she
17  would never have accepted the offer of judgment of CAIR if
18  she had known the ramifications of what could be caused
19  with regard to attorneys' fees, et cetera.
20             MR. SANDO:  Object to form.
21        A.    I am aware.
22  BY MR. KLAYMAN:
23        Q.    You're also aware that Ms. Loomer and Iloominate
24  Media's claims for malpractice, or shall we say the counts
25  in the amended complaint, concern more than just whether or
```

```
 1    not an offer of judgment should have been accepted as put

 2    forth by CAIR, correct?

 3              MR. SANDO:  Object to form.

 4        A.   I am aware.

 5    BY MR. KLAYMAN:

 6        Q.   So to the extent that there's any validity to the

 7    motion for final summary judgment, it should have been

 8    styled, correct, "partial summary judgment," correct?

 9              MR. SANDO:  Object to form.

10        A.   I have no opinion on that.  I rely on my outside

11    counsel for how to designate motions and how to format

12    them.

13    BY MR. KLAYMAN:

14        Q.   You are aware that you were sued for legal

15    malpractice, professional negligence, gross professional

16    negligence --

17        A.   I'm aware of the claims in the --

18        Q.   -- fraudulent inducement, and breach of fiduciary

19    duty, correct, and breach of contract?

20        A.   Yes.

21        Q.   And you're aware that the unjust enrichment count

22    is no longer in this case?

23        A.   I am.

24        Q.   Do you yourself have a listing of the legal fees

25    that were charged to Ms. Loomer and Iloominate Media?
```

```
 1      A.   No.

 2      Q.   Mandelbaum law firm has that, and Dhillon?

 3           MR. SANDO:  Object to form.

 4      A.   I would assume so.

 5  BY MR. KLAYMAN:

 6      Q.   Did you itemize the fees that were charged to

 7  Laura Loomer and Iloominate Media during your

 8  representation of them?

 9           MR. SANDO:  Object to form.

10      A.   I don't understand what "itemize fees" means.

11  The bills reflect itemized time charges, yes.

12  BY MR. KLAYMAN:

13      Q.   Okay.  Is there any other record that was kept by

14  you, or the Mandelbaum law firm, or Dhillon as to the work

15  you performed on behalf of Iloominate Media and Ms. Loomer?

16           MR. SANDO:  Form.

17      A.   The record of our communications implies time

18  spent, but it's not a time record as such.

19  BY MR. KLAYMAN:

20      Q.   Did you keep notes of your communications with

21  Ms. Loomer?

22      A.   No.

23      Q.   Do you have an iPad?

24      A.   No.

25      Q.   Do you have any kind of device where you would
```

```
 1    record notes of what you've done on a particular case?

 2         A.   Yes.

 3         Q.   What's that?

 4         A.   I have computers with Outlook -- I mean, there

 5    are virtually every sort of mobile phone and computer has

 6    software on it that enables you to keep notes.

 7         Q.   Do you have notes with regard to your

 8    representation of Ms. Loomer and Iloominate Media --

 9              MR. SANDO:   Object to form.

10    BY MR. KLAYMAN:

11         Q.   -- on that device?

12         A.   On no device.

13         Q.   Maybe I misunderstood.  I want to know if there

14    is any recordation, other than your billing statements, of

15    the work you performed for her and Iloominate Media?

16         A.   No.

17         Q.   While you were with Mandelbaum, what associates

18    worked on the case for Ms. Loomer and Iloominate Media with

19    you or other lawyers and paralegals?  Who was involved in

20    representing Ms. Loomer and Iloominate Media?

21         A.   Mr. Teppler, and another partner named Lauren

22    Topelsohn, and I would not be able to tell you the names

23    of any of the support staff.

24         Q.   Do you intend to call any of them as witnesses at

25    trial?
```

```
 1          MR. SANDO:  Object to form.  Work product.  You

 2      may answer, Ron, if you know.

 3      A.   I am not the person who decides on witnesses to

 4  be called at trial.

 5  BY MR. KLAYMAN:

 6      Q.   Have you spoken with either of these persons with

 7  regard to this case?

 8      A.   No.

 9      Q.   Do you intend to call an expert witness at trial?

10          MR. SANDO:  Object to form.

11      A.   I leave that up to the judgment of the lawyers

12  representing me, and the law firm.

13  BY MR. KLAYMAN:

14      Q.   Have you identified an expert witness in this

15  case?

16          MR. SANDO:  Object to form.  Work product.  Do

17      not answer.

18          MR. KLAYMAN:  I'm talking about in pleadings.

19          MR. SANDO:  In pleadings?

20          MR. KLAYMAN:  Yeah.

21          MR. SANDO:  You're asking if he's consulted with

22      an expert in defense of the case?  Object to form.

23      Work product.  Attorney-client.  Do not answer.

24          MR. KLAYMAN:  Certify it.

25  BY MR. KLAYMAN:
```

1      Q.   When you moved from Mandelbaum law firm to

2  Dhillon law firm, you didn't have a separate representation

3  agreement prepared for Dhillon law firm with Ms. Loomer or

4  Iloominate Media, did you?

5      A.   Correct.

6      Q.   Is there anything in writing between you and the

7  Dhillon law firm that sets forth your representation of

8  Ms. Loomer and Iloominate Media?

9      A.   The firm was aware of all my ongoing cases, and

10  that was provided to them in writing.

11     Q.   And the firm advised you to prepare a legal

12  representation agreement for them to have with Ms. Loomer

13  and Iloominate Media?

14          MR. BLOCH:   Form.

15     A.   No.

16  BY MR. KLAYMAN:

17     Q.   Is there anything in writing which sets forth for

18  the Dhillon law firm what your terms of representation were

19  with Ms. Loomer and Iloominate Media when you were at

20  Mandelbaum?

21     A.   I believe the entire file was transferred over

22  from the Mandelbaum firm to Dhillon.  So the retainer

23  agreement would have been included in that file.

24     Q.   Is the Dhillon law firm going to claim that they

25  don't have any agreement with Loomer and Iloominate Media?

```
1            MR. SANDO:  Object to form.

2            MR. BLOCH:  Form -- join.

3       A.  Can you repeat the question?

4  BY MR. KLAYMAN:

5       Q.  Is the Dhillon law firm going to make the claim

6  that they don't have a legal representation agreement with

7  Loomer and Iloominate Media?

8            MR. SANDO:  Same objection.

9       A.  I don't know.

10  BY MR. KLAYMAN:

11       Q.  Are they taking the position that you're the one

12  who's on the hook here?

13            MR. SANDO:  Object to form.  Same objection.

14  BY MR. KLAYMAN:

15       Q.  You can respond.

16       A.  Yeah, I don't really understand the question.

17  We've never had such a discussion.

18       Q.  Well, if there's no legal representation

19  agreement that Dhillon signed with Ms. Loomer and

20  Iloominate Media, are they saying "it's all on you,

21  Mr. Coleman"?

22            MR. BLOCH:  Form.

23            MR. SANDO:  Form.

24       A.  No.

25            MR. KLAYMAN:  Let's take a break.  I want to
```

```
1          consult with Ms. Loomer.  We may be close to

2          finishing here.  Let's take a 15-minute break.

3              THE VIDEOGRAPHER:  Thank you.  Time is 12:38

4          p.m.  We are off the record.

5          (A recess was taken from 12:38 p.m. until 12:50 p.m.)

6              THE VIDEOGRAPHER:  The time is 12:50 p.m.  We

7          are back on the record.

8   BY MR. KLAYMAN:

9      Q.   Mr. Coleman, you previously testified that you

10  were aware at the time you filed suit for Ms. Loomer and

11  Iloominate Media that CAIR did have alleged ties to

12  terrorist organizations, including Hamas, correct?

13     A.   Yes.

14     Q.   Consequently, the fact that Ms. Loomer had to pay

15  attorneys' fees to CAIR is something which was more than

16  emotionally difficult for her based on your opinion,

17  correct?

18             MR. SANDO:  Object to form.

19     A.   I can speculate -- I would deduce that that is

20  the case, yes.

21             MR. KLAYMAN:  I have no further questions.  At

22         this time I'm going to leave the deposition open

23         pending my seeking the documents which weren't

24         produced and some other matters where I had to

25         certify questions.  But as far as right now, we'll
```

108

```
 1        adjourn the deposition.
 2            MR. SANDO:  No.  We're not agreeing to adjourn.
 3        The deposition of Mr. Coleman is over.  There's no
 4        pending --
 5            MR. BLOCH:  Actually --
 6            MR. SANDO:  Mr. Bloch, sorry?  What?
 7            MR. BLOCH:  Blake, I'd like to just ask one
 8        question of Mr. Coleman.
 9            MR. SANDO:  Okay.
10                    CROSS-EXAMINATION
11   BY MR. BLOCH:
12      Q.   Mr. Coleman, this Brett Bloch.  I just have one
13   question for you.
14            Do you recall the date that you joined the
15   Dhillon Law Group?
16      A.   I think it was August 1, 2020.
17            MR. BLOCH:  Thank you very much.  Nothing
18        further.
19            MR. SANDO:  Okay.  So the witness will read.  We
20        are not agreeing to reproduce him.  There are no
21        motions to compel documents pending.  And if it's
22        ordered by Mr. Klayman, then I will take a copy for
23        myself.
24            MR. KLAYMAN:  And we'll let the Court decide
25        whether the deposition will go forward at this point.
```

```
1        So this concludes the deposition for right now, and

2        thank you for your attention everyone.

3            THE VIDEOGRAPHER:  Everyone ready to go off the

4        record?

5            MR. KLAYMAN:  Yes.

6            MR. SANDO:  Yes.

7            THE VIDEOGRAPHER:  The time is 12:52 p.m.  We

8        are off the record.

9    (Videotaped videoconference concluded at 12:52 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    CERTIFICATE OF OATH

 2

 3        THE STATE OF FLORIDA

 4        COUNTY OF BROWARD

 5

 6

 7            I, the undersigned authority, certify that the

 8    witness, RONALD COLEMAN, appeared before me via videotaped

 9    videoconference on the 22nd of August, 2024.

10

11     Signed this 22nd of August, 2024.

12

13

14

15        _____

16        JAMIE D. MACKRELL, CSR
          Notary Public - State of Florida
17        Commission No. HH173501
          Expires:  September 8, 2025
18

19

20

21

22

23

24

25
```

```
1                    REPORTER'S CERTIFICATE

2

3          I, Jamie D. Mackrell, Shorthand Reporter and

4     Notary Public in and for the State of Florida at Large, do

5     hereby certify that the foregoing transcript, Pages 1 to

6     and including 109, is a true and correct transcription of

7     my stenographic notes of the statement given by RONALD

8     COLEMAN via videotaped videoconference, on the 22nd of

9     August, 2024, commencing at 10:00 a.m.

10         I FURTHER CERTIFY that I am neither attorney nor

11    counsel for, nor related to or employed by, any of the

12    parties to the action in which this statement is taken;

13    and further that I am not a relative or employee of any

14    attorney or counsel employed by the parties hereto, or

15    financially interested in the action.

16                      Dated this 27th of August, 2024.

17                      _____

18                      JAMIE D. MACKRELL, CSR
                        Notary Public - State of Florida
19                      Commission No. HH173501
                        Expires:  September 8, 2025
20

21

22

23

24

25
```

1                    ERRATA SHEET

2   In RE: LAURA LOOMER, et al. vs RONALD COLEMAN, et al.
    CASE NO.: 50-2023-CA-010810-XXXX-MB
3   DEPONENT: RONALD COLEMAN

4

5   Page No:_____   Line No.: ____ Change to:_____

6   Reason for change:_____

7

8   Page No:_____   Line No.: ____ Change to:_____

9   Reason for change:_____

10

11  Page No.:____   Line No.: ____ Change to:_____

12  Reason for change:_____

13

14  Page No.:____   Line No.: ____ Change to:_____

15  Reason for change:_____

16

17  Page No.:____   Line No.: ____ Change to:_____

18  Reason for change:_____

19

20  Page No.:____   Line No.: ____ Change to:_____

21  Reason for change:_____

22  Under the penalties of perjury, I declare that I have read
    the foregoing document and that the facts stated are true.

23

24  _____

25  date                              Name

```
 1   AUGUST 26, 2024
     blake.sando@csklegal.com
 2
        IN RE:              Deposition of Ronald Coleman
 3           Taken on: August 22, 2024
             Laura Loomer, et al. vs Ronald Coleman, et al.
 4
     Dear Mr. Sando,
 5
             This letter is to advise you that the deposition
 6   taken in the above-referenced case has been
     transcribed.  Please have the deponent execute the
 7   Errata Sheet, which can be found at the back of the
     transcript, when reading your copy, and have it
 8   returned to us for distribution to all parties.
             The original of this transcript has been
 9   forwarded to the ordering party and your errata, once
     received, will be forwarded to all ordering parties
10   for inclusion in the transcript.
             If the deponent does not read and sign the
11   deposition within 30 days, the original, which has
     already been forwarded to the ordering attorney, may
12   be filed with the Clerk of the Court.
             If the deponent wishes to now waive signature,
13   please have the deponent sign his/her name in the
     blank at the bottom of this letter and return to the
14   address listed below.

15   Sincerely,

16           Jamie Mackrell
     Jamie Mackrell, Court Reporter
17   Daughters Reporting Inc.
     101 Northeast 3rd Avenue
18   Suite 1500
     Fort Lauderdale, Florida 33301
19   daughtersreporting@gmail.com

20

21   I do hereby waive my signature

22   _____

     Ronald Coleman
23

24   cc:  leklayman@gmail.com

25
```

**A**

**a.m** 1:16 6:14
111:9
**abandoned**
55:12
**ability** 81:1
97:25
**able** 33:13 52:2
72:10 85:12
103:22
**above-referen...**
113:6
**Abrams** 3:9 6:16
**absent** 94:11
**absolutely** 78:4
99:11
**absolve** 54:23
**accept** 53:20
**accepted** 24:19
33:25 46:12,13
57:6 100:17
101:1
**access** 85:23
87:6
**account** 29:22
43:25 44:10,14
45:22 47:23
61:15
**accountable**
95:21
**accounted** 61:15
**accurate** 26:2,4
27:2,4 58:12
60:2,10 62:9
62:19 67:20,22
69:16,21
**accused** 39:3
97:12
**acquire** 30:15
**act** 54:19 73:24
76:20
**acted** 83:9
**action** 11:3
57:11 111:12
111:15
**actionable** 82:24

**actions** 58:1
**actively** 28:23
28:23
**activist** 42:14
**added** 17:18
43:23
**addendum**
54:18
**additional** 62:8
69:2
**address** 113:14
**adjourn** 108:1,2
**adjudicated**
63:25
**Administration**
22:10
**administrative**
87:18
**admissible** 77:16
92:9
**admits** 67:1 75:3
**admitted** 20:24
33:20
**adopted** 47:15
**adverse** 39:15
**advice** 79:22
80:1
**advise** 10:25
11:9 59:10
60:25 61:11
113:5
**advised** 35:8
38:15 44:23
59:6 97:23
100:14,16
105:11
**Advisers** 41:7
**advising** 67:2
**advocacy** 43:2
**advocate** 15:22
43:4
**Advocates** 43:13
**affidavit** 44:23
52:1,7 72:17
**affidavits** 52:4
71:2
**affirm** 7:25 8:3

**affirmative** 54:8
**affirmed** 8:7
**Agency** 16:22
**ago** 8:24
**agree** 34:2 66:23
73:20
**agreed** 32:5
62:16
**agreeing** 108:2
108:20
**agreement** 5:8
20:14,20 22:22
23:4 32:19
45:3 46:17
52:16 65:4
66:5,13 105:3
105:12,23,25
106:6,19
**Aguirre** 2:10
6:25
**al** 1:4,8 80:11
112:2,2 113:3
113:3
**Allah** 42:24
**allegations** 83:7
96:24
**alleged** 39:9
95:21 97:15
107:11
**allow** 51:18,21
**allows** 28:14
**alternative**
58:25
**ambiguous**
76:23,24 77:14
79:10 92:7
**amenable** 72:23
**amended** 5:5
10:13 25:14,15
37:11 54:14
57:9 100:25
**America** 28:9
**American** 25:25
**American-Isla...**
43:2 44:8
**Americans** 41:8
**amount** 30:13

58:15 69:14
74:4
**and/or** 76:20
83:6 92:6
**Anderson** 3:8
10:16,23 13:20
20:12,17 41:12
41:13,16,24
75:15 91:15,16
91:24 97:22
98:15
**answer** 36:21
37:3 40:12,18
61:25 76:6
77:11 79:14,21
79:22,25 80:3
80:4 81:11
85:25 86:22
88:21 89:4
90:20 91:10
99:6 100:1,9
104:2,17,23
**answered** 28:3
82:4,5 96:9
**anti-Jewish**
42:21
**antisemitic**
28:22
**anybody** 33:16
98:1
**Anytime** 48:5
**anyway** 98:5
**apologize** 7:12
**apparently**
14:15 73:20
**appeal** 11:16,16
20:3 57:20
**Appeals** 10:18
**appearance** 7:9
15:18 67:19
**appearances** 2:1
3:1 6:20
**appeared** 110:8
**appears** 20:22
**appellate** 54:21
**Apple** 84:3
**appreciable**

27:20
**apprise** 26:22
**approach** 64:11
**appropriate**
21:1 32:16,20
65:3,5
**approximately**
29:25 84:6
**argument** 57:3,5
58:16,25
**Argumentative**
49:21 50:2,7
93:1 94:24
**arguments**
11:16 69:8
71:21
**Art** 42:2
**Arthur** 3:4 7:2,5
10:4
**article** 5:7,10
13:18,22 14:2
14:8,13,18,22
14:24 15:16
17:9 41:3,20
42:6,8,10
44:20,25 45:8
45:18 48:1
50:21 51:1
**Asher** 3:8
**asked** 17:15,16
30:24 31:21
33:13 37:6
44:12 52:5
63:10 78:21
79:1 91:5 96:9
**asking** 10:25
11:8 33:20
35:20 40:6,7
56:18 78:1
79:6,7,9,17,18
82:6,20 86:19
91:4,6 99:24
104:21
**assert** 89:16
**asserting** 89:2
**assess** 72:11
**assessment** 27:2

67:21
**assistant** 10:17
**assisted** 87:19
**associate** 7:16
20:25 56:21
**associates** 10:3
28:9 103:17
**assume** 102:4
**attached** 10:12
**attack** 43:9 44:5
**attempted** 64:17
64:24 65:9
**attend** 62:16
**attention** 13:12
13:18 25:14
41:3 42:5,10
91:13 109:2
**attorney** 111:10
111:14 113:11
**attorney's** 70:17
**attorney-client**
79:14 86:2,3
86:21 88:22
89:3 90:21
99:7 100:1,9
104:23
**attorneys** 71:6
**attorneys'** 11:2
15:12 24:20
26:25 27:8,21
53:20 54:25
58:16,18 59:9
59:22 64:3
69:1,4 70:1,4
70:11 71:4,25
72:11,17
100:19 107:15
**attract** 28:14
**August** 1:16
6:13 108:16
110:9,11 111:9
111:16 113:1,3
**authenticated**
71:16
**authority** 69:15
93:16 110:7
**authorizes** 17:19

**available** 83:16
**Avenue** 1:22
113:17
**awaken** 42:24
**award** 59:9
**aware** 10:19
16:5,8,13,18
16:21 19:3,11
22:24 29:2
35:14 37:23
38:2,4 49:18
53:19 58:24
59:1 60:13,15
64:17 66:8,21
66:25 67:1
73:17,20 74:3
74:9,14,16
77:21 81:18
96:16 100:14
100:21,23
101:4,14,17,21
105:9 107:10

_____
**B**
_____

**B-I-L-L-O-O**
43:5
**B-O-R-R-M-...**
43:20
**back** 11:7 25:14
73:18 74:12
82:7 98:10
107:7 113:7
**background**
42:3
**badger** 82:12
**bailed** 56:20
**banned** 37:17
**Bar** 8:19 9:2
66:11 93:15,16
93:18 94:4,4
95:5 96:12
**Barret** 6:9
**Barrett** 2:8 7:6
98:14
**Bars** 95:6
**based** 24:10
40:3,7 43:6

44:5 45:7,18
46:16 52:15
59:1 64:10
65:17 74:9
107:16
**bases** 86:23
**basically** 19:19
23:16
**basis** 16:2 71:15
73:6,25 78:4
79:14 89:2
90:20
**Bates** 10:24
**bathroom** 97:20
**Beach** 1:1 2:23
6:11
**bear** 32:9
**Beast** 5:7 13:19
14:6,18 17:2,9
82:23 92:5,10
92:20,22
**becoming** 36:11
**began** 51:12,16
**beginning** 92:11
**begins** 6:6
**behalf** 1:14 2:2,8
2:15,20 6:17
6:21,25 7:2,10
14:11,12 15:2
15:23 23:7
26:9 37:25
53:17,17 54:13
57:24 58:2
62:13 78:24
80:20 102:15
**behind-the-sc...**
43:16
**believe** 20:2
32:15 75:6,8
94:5 105:21
**believed** 32:7
**belittle** 82:12,13
82:15
**belong** 85:7
**bill** 38:16
**billing** 9:1 30:22
103:14

**Billoo** 43:5 44:8
44:12
**bills** 102:11
**bit** 7:22
**Blake** 2:10 6:24
108:7
**blake.sando@...**
2:13 113:1
**blames** 14:25
**blank** 113:13
**Bloch** 2:16 4:6
7:9,10,12,13
7:16 10:3
71:10 72:13,21
73:3,14 85:14
87:25 88:9,16
88:23 89:5
105:14 106:2
106:22 108:5,6
108:7,11,12,17
**Boca** 2:5,18 22:1
22:11
**boost** 37:15
**born** 8:13,15
**Borrman** 43:20
**bothered** 89:22
**bottom** 13:4
113:13
**Boulevard** 2:11
**Box** 2:11
**Boynton** 2:23
**bragged** 29:11
29:16
**breach** 101:18
101:19
**break** 98:3,4,5
106:25 107:2
**Brett** 2:16 7:10
108:12
**brett@shende...**
2:19
**bring** 23:7 26:9
27:22 28:6
37:13,21 38:8
**bringing** 13:5
29:7 33:17
53:10 63:12

**broad** 69:8
**brought** 14:11
21:25 28:10
37:25 42:10
55:7
**BROWARD**
110:4
**Bruce** 47:15
59:22
**brushed** 23:16
**building** 29:7
**bully** 77:24
**bullying** 78:2,3
**burdensome**
77:15 79:11
**business** 80:16
85:3 95:5

_____
**C**
_____

**CAIR** 5:9 15:13
23:24,24 27:3
27:23 28:7,18
28:20,22 29:2
37:14 39:9
46:2 47:14,21
48:3,13 49:1
50:22 51:6
52:18 58:18
59:21,21,25,25
64:18 65:3,12
66:6 67:19,21
69:3,3 70:5,11
71:12,12,24
72:12 74:5
80:11 100:17
101:2 107:11
107:15
**CAIR's** 50:17
71:6 73:1
**calculated** 77:16
79:12 92:8
**California** 44:12
52:15,17,23
53:7,10 60:23
**call** 10:4 103:24
104:9
**called** 21:24

22:1 104:4
**calling** 42:19
**caption** 21:10
**care** 61:11
**career** 9:6 21:6
21:19
**carefully** 32:6
**carrier** 11:2,9,10
11:18 12:3,10
12:15,19,24,24
13:7 19:13
36:12 37:7
**case** 1:2 6:12
10:12 14:16
15:17 17:1
18:9,14 22:6
24:15 25:9
26:12,15 27:3
27:18,20,22
28:6,8,8,10
29:6 32:14,21
32:24,25 33:2
33:14 34:3,13
39:2,6,21 40:4
43:6 51:12,16
52:16,18,19,20
55:6,10 56:23
61:3 63:3,12
65:4 67:20,25
68:7,16,21
74:4 85:19
88:7 95:14
96:3 99:11
100:12 101:22
103:1,18 104:7
104:15,22
107:20 112:2
113:6
**cases** 21:5,18
22:3 32:10
71:18 105:9
**catch** 11:24
**cause** 6:4 59:24
60:9,16
**caused** 30:15
100:18
**cc** 113:24

**cell** 84:21
**cellphone** 83:5
83:22 84:24
85:9
**censoring** 28:24
**Center** 41:10
**Central** 52:15
52:23
**certain** 77:3
**certainly** 17:18
17:20 22:24
26:16
**Certificate** 4:9,9
110:1 111:1
**certified** 4:13
93:11
**certify** 40:14
86:24 89:6
91:11 93:5,6,8
99:12 104:24
107:25 110:7
111:5,10
**cetera** 72:18
100:19
**chair** 62:17
**chairman** 16:23
**challenge** 70:4
70:10
**challenged**
69:25
**challenging** 86:8
**change** 62:3
84:5,9 112:5,6
112:8,9,11,12
112:14,15,17
112:18,20,21
**changed** 34:7
60:25 84:23
**changes** 61:14
100:6
**changing** 62:2
**charged** 101:25
102:6
**charges** 71:16
74:1 102:11
**charging** 72:18
**chat** 97:22

**checks** 32:24
**chose** 59:4 69:10
**Circuit** 1:1 6:11
10:11,18 18:13
19:4,11,25
47:6 54:22
61:4 63:25
**circumstances**
71:16
**cited** 76:18
**city** 25:24 31:2
43:9
**CIVIL** 1:2
**civil-rights**
43:12
**claim** 16:2 17:20
20:3 21:15,16
21:23 52:21
53:20 64:18,25
65:2 68:21
71:3 84:9
105:24 106:5
**claimant** 6:15
**claimed** 70:4,11
72:11 74:4
**claiming** 48:9
70:16 89:14
92:12
**claims** 18:22,22
22:5 37:1
71:24 78:23
92:13,15,17
97:4 100:24
101:17
**clause** 54:18
**clear** 78:15 81:6
82:23
**clearly** 69:2,22
72:23
**Clerk** 113:12
**client** 18:9 21:13
22:7,10 24:10
25:9 30:20,22
38:23 66:23
71:20 77:24
82:12 96:20
**client's** 22:4

**clients** 22:17
28:14 29:7
53:22 91:2
**close** 107:1
**closer** 7:22
**co-chairman**
35:10
**cob** 11:1
**coconspirator**
28:7
**codefendant**
80:14
**cognizant** 63:16
**COLE** 2:9
**Coleman** 1:8,12
2:8 4:3 6:2,7,9
6:25 7:19 8:6
8:12 10:1
11:24 14:25
15:19 25:22
26:22 27:1
37:12 41:20,25
50:5 57:10
58:9 59:20
60:7 62:6,12
68:7,24 69:6,9
75:3,3,22
76:22 77:8,13
78:18 79:24
80:8,13 81:4
82:5,24 86:22
87:15 98:13,17
99:4,24 106:21
107:9 108:3,8
108:12 110:8
111:8 112:2,3
113:2,3,22
**Coleman's** 75:16
79:4 89:17
91:17
**colleague** 63:10
**combat** 53:20
**come** 36:19
78:11 94:23
**commencing**
111:9
**comment** 14:17

15:15 17:13
**commenting**
17:8
**comments** 43:7
82:18
**Commission**
110:17 111:19
**commit** 76:19
**committed**
68:15 83:8
92:13,25
**committee** 36:18
36:18
**communicate**
22:22 23:5,10
**communication**
86:13
**communicatio...**
47:21 75:2
80:5 84:13
92:4 93:14,17
93:24 94:3
102:17,20
**community** 28:6
92:19
**companies'** 44:9
**companion** 22:3
**company** 21:24
22:1,8 38:17
50:18 84:1
**compel** 77:25
108:21
**competent** 27:2
49:5 67:21
**competently**
56:15
**competing** 50:22
**complainant** 9:3
**complained** 43:1
**complaint** 5:5
8:23 10:13
25:15,15 37:11
40:24 45:14,19
45:21 46:6,10
54:14,17 57:9
57:21 58:8
66:10,23 71:11

78:23 100:25
**complaints** 8:19
9:5 43:14 95:6
**complex** 71:18
**comply** 69:10
**complying** 32:11
**computer** 83:6
83:22,23 84:7
84:23,23 85:1
85:8 103:5
**computers** 84:19
103:4
**concept** 87:5
**concern** 94:21
100:25
**concerned** 36:24
78:6 88:6
**concerning** 92:5
**concerns** 28:18
**concluded** 109:9
**concludes** 109:1
**conclusion** 38:9
40:5 46:3 52:5
64:9 71:14
**conduct** 42:19
44:3 85:12
**conducted** 85:17
87:14
**confirmed** 48:21
**conflict** 32:24
**confused** 95:15
**congresswoman**
42:20,23
**conjunction**
52:24
**connection**
57:18 87:7
**consequently**
51:3 107:14
**conservative**
15:19,22 16:6
17:24 23:15
28:6,17,24
42:14 92:19
**consider** 25:2,5
28:1 54:15,19
73:5

**considered**
32:11 73:1
**considering**
63:18 78:4
**considers** 11:3
16:5 79:9
**constitute** 96:17
**consult** 20:25
32:20 90:12
107:1
**consultation**
80:1
**consulted** 75:25
104:21
**Consulting** 2:1
**consumer** 21:24
21:25 22:7
**contact** 11:10
12:9 13:7 49:7
51:25 61:2,11
95:5
**contacted** 11:8
11:23 12:3
14:6 19:12
43:24 46:10
**contacts** 44:13
**contain** 80:16
**contemplated**
40:25
**content** 88:15
91:4,8,8,10
**contentious** 39:7
**continue** 56:1
**continued** 3:1
57:2
**Continuing** 62:4
**contract** 101:19
**contracted**
62:12,22
**contrary** 27:13
**control** 80:22
97:2
**controversial**
32:4,10
**conversation**
46:15
**conversations**

85:5,6
**convince** 26:5
**convinced** 25:24
**copy** 85:5
108:22 113:7
**correct** 9:17
13:5 14:6,12
14:14,18 15:4
15:9,13 16:14
16:19,23 17:21
17:24 19:15
21:2 22:17
23:8,17 24:21
25:1,19 26:10
26:13 27:8,10
27:12,23 28:2
28:15,18 29:4
30:13 31:23
34:14,21 35:16
35:21 36:7,13
36:19 37:18,25
38:5,21 39:4,7
39:11 41:1,21
42:11 44:21,24
44:25 45:3,10
45:23 46:2,2
47:6,16 48:13
48:18,19,23
49:2,3,20,25
50:24 52:3,25
53:4,17,18,23
54:10,22,25
55:7,16,19
56:6,11,16
57:4,6,7,14,14
57:16 58:2,19
59:4,5,17 60:5
60:17 61:18
62:25 63:14
64:5,6,16,22
65:12,16 66:3
67:13 68:1,9
68:12,19 69:17
70:3,5,8,12,17
70:22 71:8
72:6,12,12,19
73:12,18,21

77:22 79:5,5
81:10 82:3
84:10,14 85:1
87:20 88:3,4,7
89:20 90:6
92:13,24,25
93:3,20,22
94:18 95:11,22
96:4 97:16
101:2,8,8,19
105:5 107:12
107:17 111:6
**correspondence**
5:6 75:5,10
**cost** 23:1 38:9,24
39:14,22 40:4
**costs** 11:2 24:21
26:25 64:3
69:2,5 70:1,11
71:25
**council** 25:25
41:8 43:2,3
44:8
**counsel** 6:15,19
9:22 10:1,2
16:23 20:15
21:1 31:20
52:24 53:6
55:13 62:14,25
63:2,13 64:2
64:21 65:25
74:4 76:13
80:5,19 82:10
87:9 90:8,11
90:12 93:19
96:17 97:5
101:11 111:11
111:14
**counsel's** 97:17
**count** 101:21
**countered** 72:16
**counts** 100:24
**County** 1:1 6:12
31:3 110:4
**couple** 22:1
**course** 22:23
25:8 36:11

49:24 51:8
72:4,6 73:10
80:15 96:20
**courses** 66:15
**court** 1:21 6:2
6:17 7:7,19,22
8:4 9:8 10:18
14:10 15:3
18:22 20:7,10
23:20 26:24
30:25 31:1
47:9,13 51:18
51:21 54:21,21
58:14,25 59:10
60:15 61:8,11
62:14 71:19
74:11 75:13
78:10 93:14
94:4,8,11
95:20 108:24
113:12,16
**courts** 47:5 55:4
57:6 94:3 95:6
**cover** 36:25
**covered** 88:25
**Craig** 2:20,21
6:10 7:3 34:5
63:5
**craig@cwyleg...**
2:24
**credible** 40:19
**crime** 96:17
**criminal** 28:8
**Cross-Examin...**
4:6 108:10
**crowd** 37:16,20
38:2
**CSR** 110:16
111:18
**Current** 13:21
**currently** 8:17
16:18 55:8,9
**cursory** 69:7,23
69:24
**custody** 80:21
97:1
**customers** 22:11

**cut** 35:21 43:18
73:18 74:12
**CWY** 2:21

**D**

**D** 1:21 6:2 41:5
44:19 110:16
111:3,18
**Dadeland** 2:11
**Daily** 5:7 13:19
14:6,17 17:2,9
82:23 92:4,10
92:20,23
**Dallas** 28:8
**date** 1:16 6:13
14:23 15:16
23:6 86:17
108:14 112:25
**dated** 10:19 11:1
14:23 42:6
111:16
**Daughters** 1:22
6:18 113:17
**daughtersrep...**
113:19
**days** 113:11
**deal** 52:18 64:1
**dealing** 64:11
86:13 97:4
**deals** 14:14
92:24
**dealt** 20:6
**Dear** 113:4
**decide** 68:8 89:2
108:24
**decided** 14:17
46:17 64:3
71:19
**decides** 104:3
**decision** 34:16
58:20 90:10
99:20
**decisions** 22:25
**declarations**
69:6 71:13
**declare** 112:22
**decline** 40:11

**declined** 40:17
**declining** 40:12
**deduce** 107:19
**defend** 52:7
78:22 79:16
**defendant** 2:15
2:20 7:4 9:19
25:22 26:22
27:1 37:12
41:1 45:8,12
45:16,20,21
46:4 51:4,5,7
62:5,12,16
67:18 75:3,3
75:16 76:22
77:13 79:16
86:10 88:7
91:17 92:6
**defendant's**
51:22
**defendants** 1:9
2:8 6:10 15:13
27:23 52:3
54:19 57:10
58:9,19 59:20
60:7 62:12,18
68:24 69:6,9
76:18 98:13
**defending** 57:19
**defense** 33:14
104:22
**defer** 80:14
**deferred** 77:4
**delay** 73:8 77:7
**Dell** 84:7,7
**demand** 54:15
**demanded** 57:21
**demonstrated**
71:19
**department**
35:11
**depo** 97:24
**deponent** 112:3
113:6,10,12,13
**deposition** 1:11
5:4 6:1,6,14,22
9:9,17,21,22

49:24 92:11
100:11 107:22
108:1,3,25
109:1 113:2,5
113:11
**describe** 69:11
**DESCRIPTION**
5:3
**deserve** 74:11
**designate**
101:11
**desired** 57:13
**despite** 58:9
69:3
**detailed** 69:4
71:3,12
**determination**
64:8
**device** 102:25
103:11,12
**devices** 83:15,18
**Dhillon** 2:15 6:9
7:10 10:24
31:16,17 33:9
58:9 59:20
60:7 62:12,22
62:25 68:24
69:6,9 75:11
80:19 81:2,9
85:10,12,24
86:9 87:6,11
87:13,22 88:3
88:13,17 90:3
97:2 102:2,14
105:2,3,7,18
105:22,24
106:5,19
108:15
**Dhillon's** 85:21
88:6
**diet** 22:8
**difficult** 71:14
107:16
**diligently** 56:15
**Direct** 4:5 8:9
**directed** 76:4
81:4,7

**directly** 44:5
64:18
**Director** 43:4
**disciplinary** 9:2
**discovery** 51:10
51:12,14,16,19
51:22 52:20
77:4 86:11
91:2
**discretion** 32:23
73:24
**discuss** 9:21,25
27:7 32:16
39:25
**discussed** 24:23
26:8 46:19
64:9 79:18
88:15 90:23
91:1,1
**discussing** 24:13
33:19
**discussion** 88:20
106:17
**discussions** 10:6
43:16
**dismiss** 46:17
51:23 52:2,4,8
57:19 63:23
**dismissed** 9:3
27:18 40:5
51:12,16 58:6
**dismissing** 46:20
**disparaged** 17:1
**dispute** 9:1 14:9
30:22
**disrespect** 78:17
**distribution**
113:8
**District** 15:3,3,9
21:11,12 22:1
52:14,15,23
58:11 60:22
61:1,4,18
62:14,15 64:4
69:10 80:12
93:14,15,18
96:3,12

**DIVISION** 1:2
**document** 25:9
85:6 90:17
91:7,19 112:22
**documentation**
33:7
**documents**
24:15 75:18
76:1,9,11,14
76:17 78:21
79:2,3 80:12
80:16,20 81:2
81:12,14,21
85:3 89:12,14
90:23 91:1
92:3 93:13
96:22 97:1
107:23 108:21
**doing** 12:11 54:7
56:13 59:8
64:14 92:18
**doings** 42:25
**dollars** 38:13
**dozens** 44:12
**draft** 99:1,4,24
100:6
**drafted** 99:18
**Drive** 2:22
**Drug** 22:9
**due** 58:15,17
96:20
**duly** 8:7
**duties** 76:20
83:9
**duty** 63:13,17
101:19

**E**

**earlier** 97:14
**effect** 23:16
46:23
**effectual** 58:21
**effectuated** 62:3
**effort** 34:6 49:7
70:4,10 71:5
**efforts** 54:12
**egregious** 75:4

**eight** 69:7
**either** 8:20
49:10 56:14
67:16 104:6
**electronic** 60:19
60:22 61:12
**email** 5:6 10:25
11:1,5,11,18
11:19 13:13
24:16,16 42:18
43:15 44:13
60:20 62:5
**emailing** 24:14
**emails** 81:15
83:6
**emotionally**
107:16
**employed**
111:11,14
**employee** 111:13
**enables** 103:6
**engaged** 36:19
**enjoined** 16:21
**enjoy** 43:10
**enrichment**
101:21
**enter** 38:15 65:3
66:6 68:9
**entered** 20:21
32:19 68:15
**entering** 67:19
68:7
**enters** 67:25
**entire** 57:9
63:14,17 67:25
87:5 105:21
**entirely** 61:5
**entirety** 90:7
**entitled** 78:12
**entitlement**
69:14
**entity** 96:25
**entries** 71:6,24
72:22
**entrusted** 15:18
**entry** 68:8 69:12
**enumerates**

18:21 19:4,13
**equitable** 53:16
53:22 54:8,12
54:23 57:3,12
57:17,22,23,25
58:2
**errata** 4:10
112:1 113:7,9
**errors** 11:16
18:21 19:4,14
20:6 75:4
**escape** 49:19
**escapes** 35:11
**especially** 28:23
**Esquire** 2:3,10
2:10,16,21 3:4
3:5,6 6:16
**Essex** 31:3
**estimate** 30:6
38:7,11 40:2
**estimated** 38:24
**et** 1:4,8 72:18
80:11 100:19
112:2,2 113:3
113:3
**ethical** 25:5
65:18,24
**ethics** 9:5 66:10
66:15,23
**ethnicity** 44:6
**event** 11:17
**Eventually** 48:7
**evidence** 12:11
17:4 77:17
92:9
**evident** 37:12
**evil** 42:25
**exact** 26:18
**Exactly** 99:22
**Examination**
1:21 4:5 8:9
**examined** 8:7
**example** 76:17
**exchange** 62:17
**excuse** 11:7
13:19
**execute** 113:6

**Executive** 43:4
**executives** 42:16
**exhibit** 5:3 9:10
9:12 10:13,14
13:14,15,16,23
13:24 20:11,18
23:21 24:1
25:18 37:11
41:12,18 48:2
75:14,16,19
91:14,20 98:12
98:13,16
**exhibits** 5:1
41:15
**exist** 34:25 97:10
97:11
**expect** 46:16
**expense** 69:13
73:7
**experience**
22:16 24:10
40:7 59:2
65:17,20 72:14
**expert** 71:23
104:9,14,22
**expertise** 40:3
53:19 72:10
**Expires** 110:17
111:19
**explain** 21:22
23:6
**explained** 31:25
32:3 34:20
**extent** 57:23
58:1,3 63:16
79:20,25 101:6
**external** 20:25
**extremely** 69:4,8
71:3,12

—————
**F**
—————
**f-king** 43:11
**Facebook** 29:22
41:5 44:10,13
**fact** 12:3 14:2
18:21 22:16
23:10,13 24:18

27:13 34:13
39:14 40:22
45:2 46:5 47:5
48:15,20,25
49:24 50:5
53:9 56:1,22
58:14 59:9,13
65:17,23 67:24
70:16 74:3
86:4 88:6
93:17 95:19
107:14
**facts** 60:4
112:22
**failed** 47:6 58:10
59:20 60:8,12
**failing** 53:20
**fairly** 64:1
**faith** 73:6 89:2
**false** 92:12
**fame** 37:15
**familiar** 66:18
**Family** 41:8
**far** 36:24 71:20
107:25
**fashion** 17:23
76:21 83:9
**favor** 22:4
**February** 20:14
**fee** 74:11
**feedback** 44:9
**feel** 18:2
**fees** 11:2 14:10
15:12 24:20
26:25 27:8,21
38:24 53:20
54:25 58:17,18
58:23 59:9,22
64:3 69:2,5
70:1,4,11,17
71:4,25 72:11
72:17 73:1,18
100:19 101:24
102:6,10
107:15
**felt** 16:25 71:20
**fiduciary** 76:19

83:8 101:18
**Fifteenth** 1:1
6:11
**figure** 28:1
**figures** 28:24
**file** 17:19 25:25
31:6 59:20
63:14,14,17,19
66:10,23 68:1
80:9,12 105:21
105:23
**filed** 8:23 9:5
31:4 32:4,7,9
40:25 45:9,19
57:17 61:8
68:25 69:4
77:24 78:8,9,9
98:24 100:4,7
107:10 113:12
**files** 33:7 78:15
80:15 85:21,24
87:7,8 90:7
**filing** 15:1,1,2,8
15:11,14 53:15
58:5 60:19
61:8 70:2
**filings** 61:5,12
62:16
**final** 23:3 69:9
98:14 101:7
**finance** 29:3
37:24
**financed** 39:10
**financial** 97:15
97:15
**financially**
111:15
**find** 24:16,16
63:9 71:14
**finding** 47:14,18
55:2
**findings** 54:25
**fine** 81:6
**finish** 77:13
90:25
**finishing** 107:2
**firm** 7:1,2 20:15

28:15 31:10,15
31:16,17,21
32:3,16 33:9
34:5 35:6,9,13
35:20,25 36:5
53:6 61:2
62:22 75:4,11
80:19 81:9
83:16 84:17
85:2,2,3 88:10
88:12 97:2,5
102:2,14
104:12 105:1,2
105:3,7,9,11
105:18,22,24
106:5
**firm's** 10:24
60:20
**firms** 34:7 60:25
78:15 80:13,14
81:5,13,15,22
85:4,7
**first** 5:11 8:7
34:6 42:11
75:17 76:2,10
86:20 99:1,4
**fit** 73:25
**Fitzpatrick**
31:14
**five** 21:7 30:16
**fixated** 94:22
**Florida** 1:1,23
2:5,12,18,23
6:3 15:3,9
16:14 20:24
21:1,3,5,12,15
21:19,23 22:2
22:13,17 23:24
33:20,22,24
46:18 47:14
58:11 60:24
61:1,4,18
63:11 64:4
66:11 67:12,15
69:3,11 71:7
71:12 80:12
93:15,15,18,18

94:4,4 96:3,12
96:12 110:3,16
111:4,18
113:18
**Florida's** 59:21
59:25 62:15
**focus** 83:3
**foe** 39:15
**followed** 57:11
**followers** 29:24
30:8,15
**follows** 8:8
**Food** 22:9
**forcing** 59:22
**foregoing** 80:8
111:5 112:22
**form** 11:13,20
12:5,12,16,20
12:25 13:9
14:3,19 15:5
15:24 16:4,10
16:15 17:3,10
18:4,10,16,23
19:6,16,21
20:1,8 22:18
23:18 25:11
27:9 28:11,21
29:13 31:24
34:15,22 35:2
35:17,22 36:2
36:14,20 38:18
39:16 40:8,15
45:4,15,24
47:2,7,10,17
48:6,14 49:21
50:1,8,13,25
51:11,15 53:1
53:24 55:1,14
56:4,8,17,24
59:15 60:3,11
61:13,19,23
63:15 64:23
65:6,13,19
66:1,12 67:4,8
68:2,10,17
69:18 70:6,13
70:18,23 71:9

72:1,7,13,20
73:3,4,13,14
73:22 74:6,13
76:6,12,25
77:8,18,23,25
78:20 79:4
80:23 81:3,17
81:25 82:11,12
82:16,25 83:11
83:14,19 84:15
85:14,25 87:4
87:24 88:9,15
89:24 90:4,15
90:19 92:14,21
93:1,9,21,25
94:11,16,23
95:2,7,12,17
95:23 96:5,13
99:6,25 100:8
100:20 101:3,9
102:3,9,16
103:9 104:1,10
104:16,22
105:14 106:1,2
106:13,22,23
107:18
**format** 101:11
**former** 10:4
13:21 22:11
31:10
**Fort** 1:23 113:18
**forth** 14:18 71:3
101:2 105:7,17
**forward** 108:25
**forwarded** 113:9
113:9,11
**found** 54:22
55:22 63:5,7
113:7
**Foundation**
23:24 80:11
**founder** 16:8
**four** 36:6,8
76:16
**framework**
32:12
**frankly** 84:6

**fraudulent**
47:18 63:24
76:20 83:9
101:18
**fraudulently**
47:14
**free** 43:18
**Freedom** 16:19
16:22
**frequently** 74:10
**friend** 10:4
**front** 96:3
**full** 54:17 63:16
**function** 82:17
**fund** 37:20
**funded** 37:16
**funding** 38:2
**further** 11:3
55:19 107:21
108:18 111:10
111:13
**future** 52:21

## G

**G** 2:10
**G-E-L** 21:13
**G-O-E-T-Z**
31:14
**G-R-I-N-D** 41:4
**Gel** 21:13
**gender** 44:6
**general** 16:23
69:8 74:16,19
86:18 88:19,24
**generally** 29:17
30:18 58:24
69:25 96:21
**generated** 14:2
**getting** 29:8
52:12
**give** 8:1 15:18
30:6 38:7
88:14 94:7
**given** 23:1 32:10
39:14 53:19
56:3,23 111:7
**go** 14:22,24

23:14 65:3
70:17 71:5
90:17 91:6
94:8 108:25
109:3
**go-to** 16:6
**goes** 80:7
**Goetz** 31:14,14
**going** 11:17
14:17 20:10
23:6,7 39:2,15
56:2 61:7
78:11 79:13
89:24 94:7,8
105:24 106:5
107:22
**good** 6:24 7:3,5
7:9 23:23
56:13 64:11
73:6 88:5 89:2
98:21
**graduate** 74:24
**grant** 27:20
**granted** 60:1
62:8
**gratuitously**
96:11
**gravamen** 46:14
**great** 28:18 29:6
70:10 94:21
**Grin** 52:1
**Grind** 41:4,4
44:18,24 48:22
49:8,14 52:7
**gross** 101:15
**Grossman** 3:4
7:2,5,5,17 10:5
35:10
**group** 2:3,15 6:9
7:11 28:7 87:6
108:15
**groups** 39:10
41:6 42:15
43:1
**Grover** 41:8
**guarantee** 23:2
**guess** 40:21

guy 78:17

**H**

hac 62:15
Halloween 43:10
Hamas 29:3
107:12
hand 7:23
handcuffed
43:17
handcuffs 43:18
handled 9:2
21:15,17 22:12
56:23
happen 8:22
harm 44:6
harmed 56:22
Harmeet 88:17
hate 44:11
hateful 42:19
44:1,3
headquarters
43:17
hear 19:9
hearings 62:17
held 1:18 47:6
95:21
help 41:6 42:24
helped 37:24
helping 29:2
helps 28:5,9
hereto 111:14
hesitated 72:24
HH173501
110:17 111:19
hiding 82:10
his/her 113:13
home 84:8
honest 27:2
74:18
honesty 74:17
hook 106:12
hope 17:18
hour 49:25
hours 10:7 43:19
Huffington
13:19

hundred 30:4
38:13

**I**

I-L-H-A-N
42:20
idea 35:23 66:4
identification
7:20 9:12
10:14 13:16,24
20:18 24:1
41:18 75:19
91:20 98:16
identified
104:14
Ilhan 42:19
Iloominate 6:8
6:23 14:11
19:5,15 20:16
21:9 24:20
26:10 30:21
31:23 33:3,18
35:15 38:8,17
45:9 49:2
50:18,23 51:9
53:14,17 54:9
54:24 55:7,12
56:21 57:24
62:13 63:6
66:9 67:3,13
76:10 78:24
80:10,21 84:14
87:13 93:20
94:15 100:23
101:25 102:7
102:15 103:8
103:15,18,20
105:4,8,13,19
105:25 106:7
106:20 107:11
imagine 68:20
immediately
59:10
impact 22:25
implicates 50:21
implicating
71:18

implies 102:17
important 17:23
24:9 25:10
45:13,20 46:25
50:11,14,21
51:1,3,6 52:18
impossible 55:22
impression 62:2
inaccurate
62:21
Inc's 23:24
incite 44:6
include 41:7
45:13
included 57:21
105:23
including 27:18
43:12 45:20
46:4 52:20
57:19 84:19,21
107:12 111:6
inclusion 113:10
incorrect 12:9
37:4 49:9 50:3
50:9 54:11
82:4
increase 18:7
independent
40:3 48:12
INDEX 4:1
individual 48:20
87:18
individually
81:4
individuals
42:15 43:24
86:17
induce 26:5
induced 25:24
inducement
101:18
inflated 72:12
74:5
information
11:10 32:15
45:7 47:25
48:3 61:12,18

62:2 85:2
infringement
21:11
Ingredients
21:13
initial 27:6
37:24
initially 44:21
injunction 53:16
54:6
injunctive 53:22
54:5,15,18
57:12
input 22:25
insert 77:10
instance 50:16
89:8
instruct 77:11
79:13 80:3
86:22 88:21
89:4 90:19
91:10 99:25
instructed 45:2
instructing
86:20
insurance 13:1
36:12,13,21,25
37:7
insured 37:7
insurer 35:25
36:1
insures 12:24
Intel 84:5
intend 103:24
104:9
intentionally
61:22
interest 15:22
34:10,11
interested 33:21
111:15
interfere 94:14
interfered 45:22
46:2 47:22
interference
50:18
interfering

50:22
internal 20:25
internally 44:14
interposed 77:4
interpret 19:24
interrogatory
89:9
intervened 49:1
interview 42:22
invades 79:15
invited 25:23
26:6
involved 28:23
28:24 32:10
63:18 86:18
103:19
iPad 102:23
irregularities
97:15
irrelevant 15:21
16:3 92:7
Islamic 25:25
28:9
Israel 42:25
issue 14:14 27:7
44:14 46:11,25
59:23,24 63:23
63:24 64:1,7
78:13 90:8
92:25
issued 10:11,22
59:9 60:15
issues 41:7 69:13
71:19,20
item 58:17,18
71:5,7,7 72:18
73:7
itemize 102:6,10
itemized 102:11

**J**

Jamie 1:21 6:2
6:17 110:16
111:3,18
113:16
January 25:22
26:19 27:7

42:6
**Jeff** 3:9 6:16
**Jersey** 8:18 9:4
  31:1,2 66:16
**Jew** 23:15 28:17
**Jewish** 42:14
**Jews** 39:10
**John** 41:5 44:19
  48:22 52:1
**John.mckinno...**
  44:19
**join** 71:10 72:21
  87:25 88:16,23
  89:5 106:2
**joinder** 47:18
  63:24
**joined** 36:9
  47:14 108:14
**joint** 5:9 23:24
  59:21 69:1,4
**Jose** 44:11
**Joshua** 3:6 7:15
**Journal** 5:10
  48:22 50:17
**Judge** 47:15,15
  59:24 73:17
  96:4,4
**judgment** 5:9,13
  22:4 23:25
  24:6,10,18
  53:21 58:22
  64:10 98:14,23
  99:19 100:3,17
  101:1,7,8
  104:11
**Judicial** 1:1 6:11
  16:8
**July** 68:25
**June** 62:4,11
**jurisdiction** 61:9
  67:16
**jurisdictions**
  8:20 66:22
  67:10

  **K**
**K-I-R-S-T-E-N**

41:4
**keep** 23:5 41:15
  102:20 103:6
**kept** 80:15
  102:13
**killed** 39:10
**kind** 72:23
  83:23 98:3
  99:13 102:25
**Kirsten** 41:4
  44:18,24 48:1
  48:21 52:1
**kirsten.grind...**
  44:18
**KISSANE** 2:9
**kitchen** 104:5
**Klayman** 2:3,3
  4:5 6:16,21,21
  7:14,17 8:10
  9:13 10:15
  11:4,10,14,22
  12:7,14,18,22
  13:3,11,13,15
  13:17,23 14:1
  14:5,21,25
  15:7 16:1,7,12
  16:17 17:2,5
  17:12 18:6,12
  18:18,25 19:7
  19:10,18,23
  20:5,10,13,19
  22:20 23:20,23
  24:2 25:13,19
  25:20 27:11
  28:13 29:1,14
  32:1 34:19,24
  35:4,19,24
  36:4,16,23
  37:5,10 38:20
  39:19 40:9,14
  40:16,19,22,23
  41:11,14,19,24
  42:4 45:6,17
  46:1 47:4,8,12
  47:20 48:11,17
  49:23 50:4,10
  50:15 51:2,13

51:17 53:3
  54:1 55:3,15
  56:5,9,19 57:1
  59:16 60:6,14
  61:16,21,24
  63:21 65:1,8
  65:14,22 66:2
  66:14 67:6,11
  68:3,11,18
  69:20 70:7,15
  70:20 71:1,22
  72:3,9,15,25
  73:9,16 74:2,8
  74:15 75:13,16
  75:20 76:8,15
  77:1,12,20,23
  78:1,6,11,14
  78:17,21 79:5
  79:8,9,17,23
  80:6,25 81:6,8
  81:19 82:2,9
  82:11,14,19
  83:2,4,12,17
  83:20 84:18
  85:16 86:3,6
  86:12,16,24,25
  87:10 88:2,11
  88:18,24 89:6
  89:10,12,16,19
  89:23,25 90:5
  90:16,22,24
  91:4,6,11,12
  91:14,17,21,23
  92:2,6,16,23
  93:2,5,7,8,10
  93:12,16,23
  94:2,12,17,25
  95:3,9,18,25
  96:7,15 97:18
  97:19,25 98:4
  98:12,17,19,21
  98:22 99:3,9
  99:12,16,19,20
  99:23 100:2,10
  100:22 101:5
  101:13 102:5
  102:12,19

103:10 104:5
  104:13,18,20
  104:24,25
  105:16 106:4
  106:10,14,25
  107:8,21
  108:22,24
  109:5
**Klayman's**
  79:25
**knew** 44:13
  45:19 63:10
  67:9
**know** 12:21,23
  13:6 17:25
  18:17 30:8,17
  32:11 33:12
  34:16,17,23
  35:1,3 36:3
  40:17 42:15
  45:11 46:15,24
  54:2,4 59:18
  68:7 78:9 84:2
  84:3 86:14
  87:22 89:13
  95:16 97:20
  103:13 104:2
  106:9
**knowing** 29:9
**known** 100:18
**knows** 90:2

  **L**
**Labs** 22:1,11
**lack** 71:20
**Lakes** 2:22
**Large** 6:4 111:4
**Larry** 2:3 6:15
  6:21 11:3,10
  17:2 50:8 89:1
  92:6 93:16
  94:23 95:15
**late** 42:17 68:21
**Lauderdale** 1:23
  113:18
**Laura** 1:4 3:7
  6:7,21 11:3

13:21 42:14
  55:23 80:10
  92:5 93:19
  100:11 102:7
  112:2 113:3
**Lauren** 103:21
**law** 2:3,15 6:9
  7:2,10 8:17
  10:24 20:15
  30:19 31:10,15
  31:16,17,21
  33:9 35:25
  36:5 41:9
  42:21 53:6
  55:6,8 61:2
  62:22 74:24,25
  75:4,11 78:15
  80:13,14,19
  81:4,9,13,15
  81:21 83:16
  84:17 85:4,7
  87:6 97:2
  102:2,14
  104:12 105:1,2
  105:3,7,18,24
  106:5 108:15
**laws** 96:16
**lawsuit** 9:19
  14:11 23:7
  25:25 26:9
  31:7 32:6
  33:17 37:13,17
  37:21,24 38:8
  45:8 46:18,25
  57:17,18 58:5
  64:18 65:12
  86:10 88:13
**lawsuits** 21:14
  22:12 32:5
**lawyer** 13:21,21
  15:22 16:6
  17:2,14,23
  18:8 25:2
  33:23 67:25
  68:15 75:23,25
  76:4 79:22
  81:9 87:6

96:19
**lawyers** 58:24
74:10,14,18
77:3 80:2 95:4
103:19 104:11
**lead** 74:4 77:16
79:12 92:8
**learn** 64:20
**learned** 36:12
59:13
**learning** 99:13
**leave** 31:21 32:2
34:14,17,21
35:6,9,20 43:9
104:11 107:22
**left** 31:14 34:5
35:13 41:9
**legal** 2:21 14:10
15:19 19:4,14
20:13,20 21:21
32:19 45:3
52:5 54:20
66:15 69:15
74:16 76:19
78:22 83:8
92:19 96:23,25
97:4,12 101:14
101:24 105:11
106:6,18
**legit** 73:2
**leklayman@g...**
2:6 113:24
**let's** 14:22 25:21
69:24 76:16
83:3 98:5
106:25 107:2
**letter** 4:10 44:11
113:5,13
**level** 20:7 90:10
**leveled** 96:24
**liability** 12:24
36:1,13 37:1
49:19
**liable** 24:20
68:14
**licensed** 8:17
21:3 33:24

53:7
**Lida** 3:6 7:15
97:23 98:2
**line** 4:14 13:4
64:4,4 70:5,5
70:11,11 71:5
72:18 73:11,11
95:16 112:5,8
112:11,14,17
112:20
**linked** 29:2
**list** 41:15
**listed** 113:14
**listing** 101:24
**litigant** 96:17
**litigate** 38:9
40:4 78:9
**litigated** 57:11
78:5
**litigation** 21:22
21:25 26:23
35:11 38:15,24
39:14 71:18
80:10,15
**little** 7:22 44:16
49:25
**LLC** 2:21 6:8
62:13 80:10
**lobbied** 42:16
**local** 62:14,24
63:2,12 64:2
**log** 86:16 89:8
89:15
**log-in** 62:2
**long** 10:6 32:24
36:5 74:20
**longer** 32:9
56:10,20
101:22
**look** 24:3 41:23
91:24
**looking** 37:13
**Loomer** 1:4 3:7
6:7,22 13:4,21
14:9 15:1,23
17:1 18:14
19:5,15 20:16

20:21 21:9
23:4 24:7,19
25:23 26:5,23
29:3,19,25
30:12,21 31:22
32:18,22 33:3
33:17 34:7,13
35:15 37:16,20
42:10,14,18,22
43:6,8,15,25
44:20 45:9
46:19 49:2
50:18,23 51:9
52:16 53:14
54:8,24 55:7
55:12 56:21
57:24 59:6
62:13 63:6
64:14 66:9
67:3,13 75:1,8
76:9 78:24
80:10,20 81:16
83:7 84:13
87:13 92:6,12
93:20 94:14
96:2 100:11,23
101:25 102:7
102:15,21
103:8,18,20
105:3,8,12,19
105:25 106:7
106:19 107:1
107:10,14
112:2 113:3
**Loomer's** 15:2
17:14 43:21
45:22 47:22
57:8
**Loomer-Cole...**
5:8
**Loomer-Iloom...**
34:2
**losses** 35:21
**lost** 27:8
**lot** 70:17,19
73:12 89:24
**lower** 20:6 47:5

54:21 59:10
61:11
**lying** 50:5

**M**

**machine** 84:10
**machines** 84:5,9
**Mackrell** 1:21
6:2,17 110:16
111:3,18
113:16
**Magistrate**
47:15 59:22,23
62:5,8 73:17
73:24 96:4
**mailed** 69:3,22
69:25
**maintain** 87:7
**maintaining**
34:12
**major** 28:1
**making** 54:6
69:8 75:25
77:22 92:12
**malpractice**
12:23 18:15
35:15 47:1
68:15 76:19
78:23 83:8
92:13,25 95:14
95:21 96:23
97:4,12 100:24
101:15
**management**
32:12,16,17,20
85:6
**Mandelbaum**
2:8 6:9 7:1,6
20:14 25:23
31:11,15,21
32:2,20 33:3,5
33:11,17,24
34:5,11,14,21
35:6,9,13,14
35:20,25 36:5
36:9,25 37:6
53:6 57:10

98:14 102:2,14
103:17 105:1
105:20,22
**manufactured**
62:6
**March** 8:14
**mark** 9:9 20:11
23:21 41:14
75:14
**marked** 9:12
10:14 13:16,24
20:18 24:1
41:18 75:19
89:18 91:20
98:16
**mass** 16:22
**matter** 6:7 8:24
8:25 9:2 13:5
19:13 23:1,3
88:19,24
**matters** 21:21
74:11 107:24
**Matthew** 3:5
88:17
**McKinnon** 41:5
44:19 48:1,22
49:8,16 52:1,7
**mean** 21:12,16
45:11 54:7
58:3 60:24
61:6 63:1 68:6
86:12 96:8
103:4
**meaningful** 18:1
**means** 96:18
102:10
**media** 6:8,23
19:5,15 20:16
21:9 24:20
26:10 28:2,25
29:8,11,17
30:21 31:23
33:18 35:16
37:15,17 38:9
38:17 45:10,22
47:23 49:2
50:19,23 51:9

53:14 54:9,24
55:7,12 56:22
57:24 59:14
62:13 63:6
66:9 67:3,13
76:10 78:25
80:10,21 84:14
87:13 92:5
93:20 94:15
101:25 102:7
102:15 103:8
103:15,18,20
105:4,8,13,19
105:25 106:7
106:20 107:11
**Media's** 14:12
53:17 100:24
**meeting** 26:8
27:6,6,16
**memorandum**
33:1,2
**mention** 43:15
**mentioned**
30:23
**meritless** 17:20
18:14 92:15,17
**merits** 20:3 27:3
37:14 67:21
**messaged** 97:22
**messages** 83:6
**met** 29:3,18,18
29:25 30:12
32:18,22 42:11
44:21
**meticulous** 85:4
**Miami** 2:12
**microphone**
42:3 97:18
**Military** 2:17
**mind** 42:2
**mine** 11:16
**Minnesota**
42:21
**misstates** 17:3
38:18 39:16
40:15 50:1
73:22

**misunderstood**
103:13
**mobile** 103:5
**model** 83:25
**moment** 35:12
**money** 38:3 56:2
**money-making**
56:11
**monkey** 96:1
**morning** 6:24
7:3,5,10
**mosque** 44:12
**motion** 5:13
46:16 48:7,8
51:23 52:2,8
52:13 53:15,16
54:6 57:19,20
59:21,25 63:24
64:12 69:1,4
71:12,17 77:25
91:25 98:14,23
99:11,19 100:3
101:7
**motions** 52:4
101:11 108:21
**move** 12:25
36:20 37:2,8
**moved** 105:1
**movement** 15:19
16:6 17:24
**multiple** 43:22
**Muslim** 42:20
43:13
**Muslims** 43:7,9
**mute** 97:25
**muted** 97:17,23
**muting** 42:2

_____ N _____

**name** 8:11 11:9
12:19,23 16:19
17:17 35:11
43:5 88:14
112:25 113:13
**named** 86:9
103:21
**names** 103:22

**narrow** 64:1
**National** 16:21
**nature** 8:25
21:14 86:18
**necessarily** 29:9
49:5 50:12
68:5
**necessary** 32:25
**necessity** 17:8
18:2
**need** 7:9 16:25
32:8 33:22
44:15 91:25
98:3
**needed** 57:4
**negligence**
101:15,16
**negligent** 61:17
96:24
**negotiated** 67:2
**neither** 62:22
64:14 111:10
**never** 12:3 18:19
24:6,23 31:25
37:6 46:5,19
49:7 51:14,25
52:6 53:14
57:10 58:17
59:6 60:21
64:13 67:9
77:24 78:4
81:20,23 83:5
83:10,13 89:21
97:12 100:17
106:17
**new** 8:16,18,18
9:3,4,4 21:12
25:24 29:7
31:1,2 43:9,17
61:2,11 66:16
66:16 84:25
99:13
**news** 46:10
**noise** 42:3
**nonlawyers**
74:18
**nonparty** 65:3

**nonprofit** 16:18
**nonresponsive**
93:7
**nontaxable**
69:12
**Norquist's** 41:8
**North** 2:17 28:9
**Northeast** 1:22
113:17
**Northern** 52:14
**Northwestern**
74:25
**Notary** 6:3
110:16 111:4
111:18
**notes** 102:20
103:1,6,7
111:7
**notice** 5:4 9:9,16
**notifications**
62:7
**notified** 11:18
**notifying** 11:9
**notoriety** 37:15
**notwithstandi...**
80:7
**November** 42:17
**number** 6:12
10:24 13:13
18:21 19:4,14
23:1 76:16
85:18 91:14
92:3 93:13
**numbers** 23:23
**numerous** 69:5
71:13

_____ O _____

**O-M-A-R** 42:20
**Oath** 4:9 110:1
**object** 11:13,20
12:5,12,16,20
12:25 13:9
14:19 15:5,24
17:3,10 18:4
18:10,16,23
19:6,16 20:1,8

22:18 23:18
25:11 27:9
28:11 29:13
31:24 34:15,22
35:17,22 36:2
36:14,20 38:18
39:16 40:8
45:4,24 47:2
47:17 49:21
50:1 53:1,24
55:1,14 56:4
59:15 60:3
63:15 64:23
65:6,13,19
66:12 67:4
68:2 73:11,13
73:22 74:1
76:6,12,25
77:8,18,23
78:20 80:23
81:3,25 82:11
82:25 83:11,14
84:15 85:25
87:4,24 88:9
90:4,15,19
92:14,21 93:21
94:16 95:7,12
96:13 99:6,25
100:8,20 101:3
101:9 102:3,9
103:9 104:1,10
104:16,22
106:1,13
107:18
**objecting** 71:15
73:7
**objection** 37:2,8
50:7 58:10
72:23 76:22,25
80:8 86:8
89:21 90:25
92:6 94:10
106:8,13
**objections** 77:3
91:18
**objects** 69:13
**observed** 72:22

obstruct 96:19
  96:19
obstruction 77:7
obtain 54:8
  57:12
obtained 52:20
obviously 28:17
occasions 23:13
occur 10:8
occurred 48:25
  56:3
October 11:1,8
  11:15
offer 5:9 23:25
  24:6,9,18
  53:21 58:22
  100:17 101:1
office 25:24 26:6
  34:21
Oh 36:8 88:5
  99:12
okay 7:17 27:15
  39:24 40:14
  54:12 70:21
  83:3 92:17
  94:6 96:11
  98:21 99:12
  102:13 108:9
  108:19
old 74:22 84:25
Omar 42:20,20
  42:23
once 57:11
  113:9
ongoing 99:11
  105:9
open 107:22
opening 32:25
  33:2
openness 44:9
operated 22:7
opinion 10:11
  10:17,20,22
  18:13 19:3,11
  27:19 29:16
  65:7 70:21
  101:10 107:16

opportunity
  18:1 94:7
oppose 64:3
opposed 58:18
opposition 48:8
  48:9 69:1
order 26:24
  33:13 37:14
  59:24 60:8,16
  87:8 94:11
ordered 14:10
  15:12 108:22
ordering 113:9,9
  113:11
orders 47:9,13
ordinarily 89:7
ordinary 25:8
  36:11 61:10
  67:24 72:4,6
organization
  28:22 39:3
  43:3,13
organizations
  43:12,24
  107:12
original 113:8
  113:11
OSC 60:8
outcome 23:1,3
Outlook 103:4
outside 42:15
  87:9 90:8,11
  90:12 101:10
overbroad 77:14
  79:10 92:8
owing 58:17,23

_____

P

P.A 2:3,9
P.C 2:8
P.L 2:16
p.m 1:16 98:7,9
  98:9,10 107:4
  107:5,5,6
  109:7,9
P.O 2:11
PACER 61:15

62:2
page 4:4,14 5:3
  14:22,24 42:13
  57:8 112:5,8
  112:11,14,17
  112:20
pages 24:4 41:24
  42:5 69:8
  111:5
paid 15:12 37:23
  62:18
Palm 1:1 6:11
Palmetto 2:4
papers 48:7
paradigm 74:17
paragraph
  20:23 22:21
  25:21 26:22
  37:11 58:8
  59:19 62:4,11
  67:18 68:24
  69:16 71:11
  75:1,8
paralegals
  103:19
Park 2:4
part 15:19
partial 101:8
participate
  29:17 98:2
participated
  74:3 87:11
participation
  93:19
particular 23:3
  42:5 50:16
  73:7 80:18
  103:1
particularity
  69:12
particularly
  15:23
parties 6:19
  111:12,14
  113:8,9
partner 10:4
  31:16 36:7,10

36:12,19
  103:21
partnership
  36:18
party 65:12
  113:9
passed 32:24
passing 54:13,16
paste 85:5
pay 11:2 15:12
  26:24 27:8
  37:16,21 38:3
  54:24 107:14
paying 38:24
payment 14:9
PC 6:10 83:24
  84:5
PC's 98:14
penalties 112:22
pending 107:23
  108:4,21
people 42:24
  43:10 44:5
  49:19 68:22
percent 58:15
  73:18
perception
  56:14
performed
  102:15 103:15
period 57:9
perjury 112:22
Perkins' 41:7
person 94:21
  96:24 104:3
personal 80:8
  81:11
personally 77:22
persons 104:6
pertaining 31:6
phone 24:14
  103:5
phones 84:21
photo 44:11
picture 7:14
place 32:12,23
Plaintiff 1:14

2:2
Plaintiff's 5:2
  69:1 75:17
  91:18
Plaintiffs 1:5 6:8
  6:23 37:12
  57:13 67:20
  75:5 76:20
  83:9
played 48:10
plead 58:4,5,24
pleading 95:20
pleadings
  104:18,19
please 7:8 8:11
  8:11 10:25
  11:9 21:22
  41:15 82:7
  97:21 113:6,13
pled 57:3 73:21
point 10:10
  17:19 54:20
  55:11,18,23
  58:21 90:1
  108:25
Police 43:18
policy 32:13,22
  42:19 44:3
Political 41:6
politically 32:15
politics 30:19
  44:16
POLLOCK
  2:16
position 106:11
possession 75:2
  75:10 80:9,13
  80:21 81:12,12
  81:14,21 84:12
  84:16 85:4
  97:2
possibilities
  27:17 40:1
possibility 27:19
  95:20
post 13:19 43:25
posted 44:11

potential 37:1
potentially
  35:21 68:14
  82:24
Poverty 41:9
practice 8:17
  20:24 21:3
  25:8 38:23,25
  50:23 54:20
  67:10,24 71:17
  72:4 74:10
  96:25
practiced 63:10
practicing 67:12
  74:20
prank 48:2,3,9
  48:16,21
preclude 53:10
predict 23:2
prejudice 46:18
  46:20
preliminary
  53:15,15 54:6
prepare 33:2
  105:11
prepared 52:13
  68:25 99:11
  105:3
presence 9:10
  29:11 37:15
present 3:3 6:19
  6:22
pretty 24:9
  46:25
previous 43:6
  60:20
previously 107:9
primary 45:8,11
principal 71:15
  73:25
prior 56:3 84:10
privately 42:16
privilege 77:9,15
  79:12,14,15
  86:2,4,16,21
  88:22 89:3,3,7
  89:14,15,17

90:21 91:9
  99:7,8
privileged 76:7
  80:5 86:11
  90:22 91:3,9
  99:7,9
pro 7:4 62:15
pro-Israel 28:24
probably 30:3
  84:7
problem 7:13
  28:20
procedural 60:4
  63:18
proceed 52:18
proceeding
  52:12
proceedings
  63:3
produce 76:9
  78:16 81:23
  85:18 87:3,12
  87:22,23 89:12
  89:13,15 94:6
produced 24:15
  90:2,3,9,10,18
  91:7 107:24
product 77:15
  79:11,15 86:1
  86:15,21 88:22
  89:3 90:20
  99:7,10 100:1
  100:8 104:1,16
  104:23
production 5:11
  5:12 75:17
  76:1,11,13
  79:3 87:9
  90:13,13 91:19
profession 74:17
professional
  66:19,22
  101:15,15
progressing
  22:24
prohibited 22:9
  66:24

promote 44:4
proof 24:25 51:4
proposed 66:5
  67:2
propriety 65:7
protected 77:15
  79:11
protest 43:18
provide 27:1
  58:10 61:22
  62:1 69:14
provided 32:25
  36:17 45:7
  67:20 105:10
providence
  79:16
providing 61:17
provision 46:16
prudent 39:13
public 6:3 15:22
  46:11 110:16
  111:4,18
publication 92:5
publishing
  22:10
purposes 77:6
pursuant 9:16
  58:10 62:14
  71:7
pursue 54:23
  89:22
pursued 53:22
pursuing 54:5
  57:25
pursuit 57:20
put 9:10 10:17
  10:23 13:20
  18:2 20:17
  32:12 41:16
  45:21 54:16
  55:24 66:8
  75:21 98:15
  101:1
putting 18:8

_____
Q
_____
Quantum 2:22

Queens 8:16
question 17:11
  18:23 19:2,9
  28:4 30:24
  40:12 50:20
  52:6 70:25
  71:2 76:7 78:1
  79:21,25 80:4
  82:25 84:23
  86:1,19 88:1
  96:9 99:2,21
  106:3,16 108:8
  108:13
questioning
  95:16
questions 4:13
  82:20 83:3
  107:21,25
quickly 70:3
quiescent 61:5,6
quite 52:10
quote 10:25
  42:24 43:9,21
  44:4,15,16
  69:2
quotes 14:25

_____
R
_____
R 2:16
R-U-I-Z 47:16
race 44:6
raise 7:23 38:2
raised 22:5
  44:20 64:13
  95:20
ramifications
  65:24 100:18
ran 16:13
range 27:17 40:1
Raton 2:5,18
reach 17:19
read 4:10 7:21
  18:19,20 78:14
  82:7 100:11
  108:19 112:22
  113:10
reading 113:7

ready 7:24 109:3
real 73:10
really 26:21
  27:22 31:5
  40:19 63:16
  73:6 99:12
  106:16
reason 27:25
  32:15 34:13
  52:22 56:1
  60:18 65:11
  69:25 73:10
  82:21 92:18
  94:13 112:6,9
  112:12,15,18
  112:21
reasonable
  69:12
reasonably
  77:16 79:12
  92:8
reasoning 52:11
reasons 32:2
rebut 71:23
recall 12:13,17
  15:6 24:8,12
  24:13,14 35:5
  45:1,5 46:13
  108:14
receive 62:5
received 47:25
  113:9
receiving 62:7
  91:22
recess 98:9
  107:5
recited 60:4
recollection 20:2
  39:20,25 42:1
  42:7
recommendati...
  63:11
recommendati...
  77:6,9
recommended
  63:7 77:3
record 6:5 7:18

25:10 71:16
85:23 98:8,11
102:13,17,18
103:1 107:4,7
109:4,8
**recordation**
103:14
**records** 78:16
83:16
**reduce** 58:14
**refer** 92:4 93:13
96:23
**Referee** 41:6
**reference** 13:1
36:21 54:13,16
**referenced** 48:2
**referred** 59:23
**referring** 42:22
**reflect** 102:11
**reflections** 82:18
**Reform** 41:9
**refresh** 39:20
41:25
**refreshes** 39:25
42:7
**refused** 55:18
**regard** 14:9,10
15:15 17:13
28:8 33:3,14
44:24 49:1
50:16 53:13
58:2 63:3
64:15 66:15
71:24 80:18
83:7 84:13
92:10 93:16,19
94:21 100:19
103:7 104:7
**regarding** 20:3
**regardless** 37:14
**regrettably** 74:9
**regular** 38:25
80:15
**regularly** 23:5
23:10
**Reinhart** 47:15
59:22,23 62:5

62:8 73:18
96:4
**rejected** 11:15
**relate** 92:4 93:14
96:23
**related** 111:11
**Relations** 26:1
43:2 44:9
**relative** 80:9
111:13
**relevance** 99:18
**relevant** 10:11
15:17 92:19,24
**relied** 79:2
**relief** 53:16,22
54:5,8,13,16
54:18,23 57:4
57:12,17,21,22
57:24,25 58:2
**rely** 101:10
**relying** 63:2
78:22 79:7,21
80:1,4
**remain** 80:12
**remains** 82:24
**remand** 48:8,9
57:20 63:24
**remember** 11:5
11:11 15:8,14
17:17 21:10
26:18,20 30:1
30:7 33:6,16
33:19 38:12,14
40:1 49:13,15
49:20 50:12
59:8,12 75:22
78:18 91:22
92:1,1
**remembered**
49:25
**remembering**
22:15
**reminder** 58:9
**remotely** 1:18
6:2
**remove** 42:16
**repeat** 106:3

**repeated** 43:22
**reporter** 1:21
4:9 6:3,17 7:7
7:19,22 8:4 9:9
17:17 20:11
23:20 75:13
82:7 111:3
113:16
**REPORTER'S**
111:1
**Reporting** 1:22
6:18 113:17
**represent** 6:20
18:8 34:7
52:24 55:19
56:15 57:2
63:6
**representation**
5:8 19:14,25
20:4,13,20
21:22 22:21,23
28:10 31:22
32:19 33:25
34:12 45:3
51:8 52:25
53:13 54:9
56:14 57:10
78:7 84:14
94:14 96:2,19
97:16 102:8
103:8 105:2,7
105:12,18
106:6,18
**representative**
32:17
**represented**
21:9,24
**representing**
19:5 22:17
35:15 75:4
96:20 103:20
104:12
**reproduce**
108:20
**reputation** 18:7
28:5 29:8
56:22

**request** 5:11,12
6:15 13:7
58:18 75:17
76:1,2,10,23
76:24 77:14
79:2,10 80:17
81:1,3,22 91:2
91:19 92:7
96:22
**requested** 76:17
80:20 85:23
**requesting** 94:6
**requests** 85:18
87:2,12,23
**require** 54:5
**required** 9:10
63:17 69:11
71:5 89:7
**requirements**
60:22
**Research** 21:25
41:8
**resided** 96:3
**resolve** 11:17
**resolved** 44:15
**respect** 55:9
**respective** 80:14
**respond** 11:23
11:25 12:8
17:6 19:8
51:22 60:8,12
60:12 68:4
71:7 77:2
85:19 97:21
106:15
**responded** 11:7
11:15 30:25
79:8
**responding** 52:2
75:22
**response** 12:1
52:10 59:21
69:7 70:2
75:17 76:1,10
76:21,21 77:4
77:22 78:14
82:6,8 85:17

86:11 87:2,12
87:22 89:9,17
89:17 91:1
93:7
**responses** 5:11
5:12 91:18
**responsibilities**
63:20
**responsibility**
54:17 63:13
66:19,22
**responsible**
76:13 79:19
**responsive** 80:16
81:22
**result** 23:3 31:22
39:7 43:21
52:19
**resume** 98:6
**retain** 71:23
**retained** 34:6
85:3
**retainer** 37:24
105:22
**return** 113:13
**returned** 113:8
**review** 22:7
41:25 62:16
63:13 67:25
100:3
**reviewed** 33:5
67:20
**reviewing** 24:15
**reviews** 22:11
**RFP** 89:18
**right** 7:23 11:19
14:23 19:20
21:20 38:5
77:10 84:7
92:20 97:7
98:4 107:25
109:1
**Right-Leaning**
41:6
**risk** 27:17,20,20
32:9
**risks** 26:23

**Road** 2:4
**Ron** 89:17 91:17
104:2
**Ronald** 1:8,12
2:8 4:3 6:1,6,8
8:6,12 76:22
77:13 87:15
98:13 110:8
111:7 112:2,3
113:2,3,22
**rough** 30:6
**ruin** 43:10
**Ruiz** 47:16
59:24 96:4
**rule** 58:11 64:4
69:11 71:7
74:16,19
**ruled** 63:25
**rules** 43:22
62:15 66:18,21
**ruling** 19:24
20:2 55:9
**run** 16:18

**S**

**S** 2:10
**Sabbath** 23:15
**Salsburg** 20:15
**San** 44:11
**sanctions** 27:19
77:22
**Sando** 2:10 6:24
6:24 10:3
11:13,20 12:5
12:12,16,20,25
13:9,13 14:3
14:19 15:5,24
16:4,10,15
17:3,10 18:4
18:10,16,23
19:6,16,21
20:1,8 22:18
23:18,22 25:11
25:18 27:9
28:11,21 29:13
31:24 34:15,22
35:2,17,22

36:2,14,20
37:2,8 38:18
39:16 40:8,15
40:17,20,21
42:2 45:4,15
45:24 47:2,7
47:10,17 48:6
48:14 49:21
50:1,7,13,25
51:11,15 53:1
53:24 55:1,14
56:4,8,17,24
59:15 60:3,11
61:13,19,23
63:15 64:23
65:6,13,19,25
66:1,12 67:4,8
68:2,10,17
69:18 70:6,13
70:18,23 71:9
72:1,7,20 73:4
73:13,22 74:6
74:13 76:6,12
76:25 77:8,18
77:23 78:3,6,8
78:13,20 79:1
79:7,13,20,24
80:23 81:3,17
81:25 82:11,16
82:25 83:3,11
83:14,19 84:15
85:25 86:5,7
86:15,19 87:4
87:24 88:14,21
89:1,9,13,16
89:21,24 90:4
90:15,19,23,25
91:5,8 92:14
92:21 93:1,6,8
93:21,25 94:10
94:16,23 95:2
95:7,12,14,23
96:5,13 97:21
98:2,19,20
99:2,6,10,14
99:15,18,22,25
100:8,20 101:3

101:9 102:3,9
102:16 103:9
104:1,10,16,19
104:21 106:1,8
106:13,23
107:18 108:2,6
108:9,19 109:6
113:4
**Sarelson** 3:5
88:17
**savages** 43:11
**saying** 14:25
19:20 34:25
35:6 37:20
46:8,12 55:4
72:17 80:18
85:10 92:17
106:20
**says** 20:23 42:14
42:22 43:4,20
43:25 44:3,12
44:16 58:9
75:1 81:11
92:3
**school** 74:24,25
**SCOTT** 2:9
**screen** 10:17,23
13:20 20:17
41:16 75:21
98:15
**screw-ups** 56:3
**scroll** 41:17,24
91:23,25
**se** 7:4
**search** 81:20,23
83:13,15,18
85:13,17 87:2
87:12,14,19,21
**searched** 83:5
87:8
**Sebastian** 2:10
6:25
**sebastian.agui...**
2:13
**second** 5:12 28:4
62:17 91:18
**Security** 16:22

**see** 9:14 24:3
42:25 73:25
81:20
**seeing** 35:5 92:1
**seek** 22:24 51:9
71:23
**seeking** 15:11
57:17,23
107:23
**seen** 13:22 24:5
25:15 41:20
66:5,13 98:23
**sees** 73:25
**selection** 46:16
**Senate** 16:13
**send** 24:9 25:9
95:5
**sending** 24:16
**sensitive** 32:15
**sent** 10:24 24:6
44:11 85:19
93:17 96:11
**separate** 52:19
105:2
**September**
10:19 19:12
110:17 111:19
**serve** 46:8,9
47:6 62:14
**served** 46:5
52:12 87:3,12
87:23
**service** 44:2
46:11,12,14
60:19,22
**serving** 62:24
**set** 14:18 71:3
**sets** 105:7,17
**settle** 13:5,8
14:16 16:25
18:9 19:13
64:18,24
**settlement** 65:4
66:5,9 67:2
**Shariah** 42:21
**Sheet** 4:10 112:1
113:7

**SHENDELL**
2:16
**shod** 69:7
**Shorthand**
111:3
**Shortly** 10:22
**show** 7:19 9:8
59:24 60:9,16
76:18
**showing** 53:21
**shown** 42:6
**Sics** 13:21
**side's** 26:25
**sign** 4:10 66:10
113:10,13
**signature**
113:12,21
**signed** 45:3
106:19 110:11
**significant** 22:16
54:19
**similar** 43:13
**simply** 37:13
48:2 50:5
82:10
**Sincerely** 113:15
**sink** 44:15
**Sir** 77:21
**site** 42:17
**situation** 63:18
71:17
**situations** 65:20
**Sixty-one** 74:23
**size** 82:17
**slip** 69:7
**slow** 91:25
**so-called** 62:24
63:1
**social** 28:2,25
29:8,11,17
37:15,17 45:22
47:22
**softly** 78:2
**software** 103:6
**sold** 22:8
**sole** 58:16
**somebody** 18:2

sorry 7:23 9:4
21:16 36:8
48:8 99:2
108:6
sort 103:5
sought 51:14
52:6 54:18
66:6
South 2:11
Southern 15:3,9
21:11,12 22:1
41:9 58:10
60:22 61:1,4
61:18 62:15
64:4 69:10
80:11 93:15,18
96:2,12
speak 12:15
49:10,12,17
63:8 77:9 88:8
88:10
speaking 96:21
speaks 14:13
specific 15:10
specifically
24:18 83:21
specious 62:6
speculate 40:6
40:11 107:19
speculation
40:10
Speech 41:6
spent 102:18
spoke 86:7,9
spoken 104:6
staff 53:7 103:23
stand 77:17
standard 61:10
stands 79:19
94:10
state 6:3,19 8:11
20:24 22:22
80:7 86:17
110:3,16 111:4
111:18
stated 112:22
statement 17:21

18:24 21:2
26:2 27:4,13
37:18 57:14
58:12 60:2,4
60:10 62:9,19
67:22 69:16
83:1,2 111:7
111:12
statements
82:18 103:14
states 10:18
24:19 25:21
42:13 59:19
60:7 71:11
76:22 77:14
92:7
status 31:19
statute 58:22
stay 15:17
stenographic
111:7
step 43:3 54:8
steps 53:14
Steve 33:19,23
stick 58:25
stonewall 89:19
stop 69:24 97:23
story 62:7 92:10
straight 52:6
strategy 64:10
64:15
straw 69:9
Street 5:10
48:22 50:17
strictly 66:24
strike 12:25
36:20 37:2,8
100:15
strikes 29:16
strong 26:12
strongly 71:21
struck 72:22
stuff 85:10 96:11
styled 80:10
101:8
subject 8:19
26:24 65:24

77:21 88:19,24
subjective 29:16
70:19
submitted 48:7
71:2
submitting
72:17
subsequently
22:9
substance 86:13
substantial
70:21
Subtitled 41:7
successful 27:1
sued 22:10
30:20,22 35:14
88:3 97:14
101:14
sufficient 54:23
sufficiently 57:3
suggest 100:6
suit 13:5,8 26:25
31:4 53:10
67:19,21
107:10
Suite 1:23 2:11
2:17,22 113:18
sum 70:21,24
summary 5:13
22:4 98:23
99:19 100:3
101:7,8
Superior 31:1
supplement 22:8
support 52:21
71:21 103:23
supported 69:5
71:13
supporting
69:14
supportive
42:21
suppose 68:22
sure 31:5 41:22
55:5 94:1
surveillance
16:22

suspended 44:10
suspension
43:16,21
swear 7:8,20,25
sworn 8:7
sympathy 71:20
system 60:19
systems 85:6

———————
T
tactic 59:7
tactical 58:20
64:11
take 13:7 32:23
41:23 51:9,14
51:18,21,25
54:17 70:3
98:3,4,5
106:25 107:2
108:22
taken 1:14,16,21
6:2,14 66:15
70:10 73:12
98:9 107:5
111:12 113:3,6
talk 23:13
talked 15:11
33:16 88:12
talking 15:1
65:2 78:2
95:15 104:18
tamper 96:16,18
Tax 41:9
tech 44:9
tell 26:17 27:15
34:18 38:23
39:13 49:14,16
84:6 103:22
telling 38:16
ten 8:24 21:7,18
Tens 30:2
Teppler 33:19
33:23 34:7
103:21
term 70:19
terms 29:7 44:2
55:6 56:14

64:15 89:11
105:18
terror 43:8
terrorism 39:3
terrorist 39:10
107:12
testified 8:8
100:16 107:9
testify 49:5
testimony 4:3
7:25 17:4
38:19 39:17
40:15,16 50:2
54:3 73:23
79:4
Texas 28:8
text 83:6 85:5
texts 81:15
thank 7:23 8:4
11:3,8 13:15
42:3 99:13
107:3 108:17
109:2
things 63:19,25
99:13
think 15:16,21
17:25 21:25
22:2 26:14
30:5 31:5
34:10,11 36:24
40:4 51:6
52:14 55:25
56:2 63:19
74:18 99:16,16
108:16
thinking 74:11
Thirty-five
74:21
thorough 25:2
73:6
thought 32:8
38:8 39:14
52:17 61:14
96:1
thousand 30:4
30:11 38:13
thousands 30:2

**threat** 95:10
**threaten** 44:5
**three** 82:4 96:22
**threw** 69:6
**throw** 44:15
  96:1
**Thursday** 1:16
**ties** 39:3 107:11
**time** 1:16 6:13
  10:10 12:4
  25:23 28:23
  29:3,18,18,25
  30:12,23 32:18
  33:24 35:1,13
  40:24 41:23
  45:19 48:4
  55:11,18 59:14
  60:21 61:4
  62:8 63:19
  64:2 69:12
  70:4 72:22
  73:7,12 86:20
  98:7,10 102:11
  102:17,18
  107:3,6,10,22
  109:7
**timely** 60:8
**times** 82:4
**title** 13:20 41:5
**today** 7:1 9:10
  9:21 30:8 65:5
  65:15
**Today's** 6:13
**told** 23:14 26:12
  26:15 34:17
  39:21 64:14
  92:20,22 97:14
**Tony** 41:7
**Topelsohn**
  103:22
**total** 10:6 89:19
**totally** 15:21
  73:1
**touches** 78:7
**touchy** 41:7
**trade** 50:23
**trademark**

  21:11
**Trail** 2:17
**transcribed**
  113:6
**transcript** 7:18
  111:5 113:7,8
  113:10
**transcription**
  111:6
**transfer** 52:14
  52:22 84:9
**transferred**
  52:17 53:9
  84:24 105:21
**trial** 21:11 78:11
  78:13 103:25
  104:4,9
**tried** 13:4 23:13
  51:25
**trouble** 22:14
**true** 82:22 111:6
  112:22
**truth** 8:1,1,2
  27:14
**truthful** 22:10
**try** 13:8 19:13
  21:22 49:19
  77:24 96:1
**trying** 14:16
  18:8 35:21
  90:1 94:13
  96:16
**turn** 10:16 13:12
  13:18 22:21
  25:14,21 41:3
  41:5 42:5 57:8
  58:8 59:19
  76:16 91:13
  96:22
**turned** 87:8 90:7
**turning** 42:13
  67:18
**tweet** 42:19,23
  43:23
**tweeted** 43:8
**Twitter** 26:1
  27:3,23 29:20

  29:24 30:18
  37:14 40:25
  41:5 42:16,18
  43:1,24 45:8
  45:20,20,21,23
  46:4,5,8,9,10
  46:12,17 47:6
  47:23 49:1
  51:4,5,10
  52:12,13,19,21
  53:11 63:23
**Twitter's** 43:15
  43:17,20 44:1
  44:3
**two** 10:7 22:2
  36:9 43:19
  48:21 84:6
  85:18 93:13

---
  **U**

**ultimately** 26:9
  38:16 45:9
  46:3 58:13,14
  62:8 68:25
**unable** 98:2
**underlying** 80:9
  80:12
**undersigned**
  110:7
**understand**
  17:11 19:2
  20:23 28:3
  50:20 52:10
  56:18 70:24
  79:24 88:1
  96:18 102:10
  106:16
**understood** 39:6
  39:9
**unduly** 77:15
  79:11
**unethical** 67:10
**unfair** 50:22
**unfairly** 50:22
**unfamiliar** 87:5
**unindicted** 28:7
**United** 10:18

**University** 74:25
**unjust** 101:21
**unknowns** 23:2
**unquote** 42:25
  43:23 44:5,17
  69:3
**untimely** 70:2
**unusual** 71:17
  71:18
**update** 60:21
**use** 29:23 52:2,7
  63:8
**useful** 58:21
**user** 46:17 52:15
**users** 43:4 44:4
  44:6

---
  **V**

**v** 1:7
**vague** 76:23,24
  77:14 79:10
  92:7
**validity** 101:6
**vehicle** 15:17
  37:13
**venture** 56:11
**venue** 46:16
  52:14 57:19
**verification**
  48:12,15
**verified** 5:5
  10:12 25:15
  57:8 78:23
**verify** 87:1
**versus** 6:8 80:11
**vetted** 32:5,7,8
**vetting** 32:13
**vice** 62:15
**vicious** 68:22
**video** 6:6 7:14
**videoconference**
  1:11,14,18 2:1
  6:1 109:9
  110:9 111:8
**videographer**
  3:9 6:5,16 7:7
  7:12 98:7,10

  107:3,6 109:3
  109:7
**videotaped** 1:11
  1:14,18 2:1 6:1
  109:9 110:8
  111:8
**view** 32:6 54:20
**viewed** 95:10
**Viewing** 71:13
**views** 82:18
**vindictively**
  95:19
**violate** 76:19
**violated** 42:19
  83:8
**violation** 44:1
**violations** 43:22
**violence** 44:4
**virtually** 103:5
**voiced** 43:13
**vs** 112:2 113:3

---
  **W**

**waive** 113:12,21
**Wall** 5:10 48:22
  50:17
**want** 32:2 52:16
  52:22 68:7
  70:3 73:10
  78:8 92:18
  93:10 103:13
  106:25
**wanted** 27:22,25
  32:9 34:14,21
  46:15 68:8
  70:2
**wanting** 56:21
**wants** 66:9
**warrant** 23:2
**wasn't** 32:10,23
  36:8 48:21
  56:13
**Watch** 16:9,19
  16:23 50:8
**way** 13:8 29:9
  56:23 82:17
  92:4

ways 49:18
we'll 14:23,24
  41:11,14 84:24
  98:5 107:25
  108:24
we're 65:15
  98:21 108:2
We've 7:18
  106:17
weak 26:15
website 22:7
Wednesday 11:1
welcome 80:2
welcomes 44:9
well-developed
  71:15
well-documen...
  73:5
went 22:4 85:21
  92:11 97:19
weren't 21:21
  61:8 107:23
West 2:4
WhatsApp 85:5
whatsoever
  57:12
wholly 62:6
William 2:20,21
  6:10
wishes 113:12
witness 1:21 7:1
  7:8,21 8:3
  40:22 82:7,13
  97:17,21 98:18
  104:9,14
  108:19 110:8
witnesses 103:24
  104:3
word 96:18
words 26:18,20
  56:10
work 15:19
  17:21 18:1
  31:15 34:2
  55:23 71:6
  74:4 77:15
  79:11,15 86:1

86:15,21 87:7
88:22 89:3
90:20 99:7,10
100:1,8 102:14
103:15 104:1
104:16,23
worked 103:18
working 25:23
  33:21
works 86:10
worse 59:20
worship 23:15
worth 46:4
worthy 82:20
wouldn't 61:10
  65:18 67:7,15
  68:6
wrench 96:1
write 30:18
  44:18 76:5
writing 24:25
  35:5 46:22
  55:24 87:1
  105:6,10,17
writings 34:20
written 12:11
  14:8 41:4
  50:17
wrong 55:4
wrote 11:19
  42:24 44:24
  48:1 49:3,4
  76:4 99:1,4

_____

**X**

_____

**Y**

yeah 40:13,19
  64:9 79:23
  88:5 89:1 99:4
  99:15,22
  104:20 106:16
year 31:4
years 8:24 30:16
  30:16 36:6,8,9
  43:25 72:5
  74:10,21 84:6

**Yesterday** 10:9
**York** 8:16,18
  9:3,4 21:12
  25:24 43:9,17
  66:16
you'd' 24:4
Young 2:20,21
  6:10 7:3,3 34:6
  62:13,16,23,24
  63:5,12 64:17
  66:6 67:1,18
  68:25 69:6,10
  73:11
**Young's** 64:24

_____

**Z**

**Z-A-H-R-A** 43:5
**Zahra** 43:5
zero 78:4
Zoom 6:14

_____

**0**

**000067** 10:24

_____

**1**

1 5:4 6:6 9:11,12
  20:23 62:4
  108:16 111:5
10 5:5,13 11:1
  98:13,16
10:00 1:16 6:14
  111:9
100 2:22
101 1:22 113:17
104 4:20
108 4:6
109 111:6
11 8:14 25:21
110 4:9
111 4:9
112 4:10
ff.3 4:10
11th 10:11,18
  18:13 19:3,11
  19:24 47:5
  54:22 61:3
  63:25

**12:06** 98:7,9
**12:25** 98:9,10
**12:38** 107:3,5
**12:50** 107:5,6
**12:52** 1:16 109:7
  109:9
13 5:6,7 26:22
14 4:20 37:11
1400 2:11
15-287 2:4
**15-minute** 98:5
  107:2
150 2:17
150,000 70:16
  71:4
1500 1:23
  113:18
17 4:17
18 59:24
1963 8:14

_____

**2**

2 5:5 10:13,14
  25:18 37:11
20 5:8 58:15
  73:18
2003 16:14
2012 42:23
2016 44:10
2017 43:8
2018 31:5
2019 20:14
  25:22 26:19
  27:7 30:13
  42:6
2020 108:16
2021 59:25 62:4
  62:11 69:1
2022 10:19 11:2
  11:8 19:12
2023 15:16
2024 1:16 6:13
  110:9,11 111:9
  111:16 113:1,3
2025 110:17
  111:19
21 68:25

22 1:16 6:13
  113:3
22nd 110:9,11
  111:8
23 4:16
24 5:9 62:11
241-2323 2:18
250,000 30:11
250.7 30:11
2500 2:22
26 113:1
27 57:8
2700 2:17
27th 111:16

_____

**3**

3 4:15,18 5:6
  11:8 13:13,14
  13:15,16
30 10:19 19:12
  113:11
305-350-5365
  2:12
33 58:8
33256 2:12
33301 1:23
  113:18
33426-8308 2:23
33431-1809 2:18
33433 2:5
35 59:19 62:4
36 62:11
37 67:18
38 68:24 71:11
3rd 1:22 11:15
  113:17

_____

**4**

4 4:19 5:7 13:23
  13:24 15:16
40 4:15
41 5:10
45 75:1,8

_____

**5**

5 5:8 20:11,18
:5,000 62:17

_____

**50-2023-CA-0...**
  1:2 6:12 112:2
**561** 2:18
**561-558-5336**
  2:5
**561-568-1000**
  2:23
**569015** 2:11

─────── **6** ───────

**6** 5:9 23:22 24:1

─────── **7** ───────

**7** 5:10 20:14
  22:21 23:21
  41:13,14,18
  42:5,13 48:2
**7.3(a)** 58:11
  64:4 69:11
  71:7
**7050** 2:4
**75** 5:11

─────── **8** ───────

**8** 4:5 5:11 41:12
  42:5,6 75:14
  75:15,16,19
  110:17 111:19
**85** 4:16

─────── **9** ───────

**9** 5:4,12 42:6
  75:14 91:16,17
  91:20
**9:19cv81179**
  80:11
**9:25** 98:6
**9:26** 98:6
**90** 4:17
**90,000** 37:16,21
**91** 5:12
**9150** 2:11
**93** 4:18
**98** 5:13
**99** 4:19