IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA



FILED BY _____ D.C.

OCT - 2 2024

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

ILLOOMINATE MEDIA, INC ET AL

Plaintiffs

v.

CAIR FLORIDA, INC., et al

Defendants.

Case Number:   9:19-cv-81179

## PLAINTIFFS' MOTION FOR EXTENSION OF TIME

Plaintiff Laura Loomer ("Ms. Loomer") hereby respectfully requests an additional ten (1) days for Plaintiffs to respond to the September 10, 2024 order of Magistrate Bruce Reinhart directing Plaintiffs to "execute documentation to finalize the Young Settlement Agreement on or before October 11, 2024."

Plaintiffs have filed the attached "Emergency Motion to Declare Unenforceable and Enjoin Order of Magistrate Bruce Reinhart", Exhibit 1, in *Loomer v. Coleman et al*, 50-2023-CA-010810-XXXX-MB (15th Jud. Cir. Fla.)(the "Malpractice Case") to seek a ruling that Magistrate Reinhart's September 10, 2024 Order is not applicable in the Malpractice Case. This is the only remaining avenue of relief available to Plaintiffs to address the illegal and unethical secret agreement between Defendants and Craig Young, particularly since Plaintiffs are financially strapped as a result of this case and thus are hesitant to pay the $605 dollar appeal fee.

Dated: October 1, 2024

Respectfully Submitted,

*/s/ Laura Loomer*
Laura Loomer
P.O. Box 651444
Vero Beach, FL 32965

*Pro Se*

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that on this 1st day of October the foregoing was served on counsel

for Defendants via Federal Express at:

J. Remy Green
1639 Centre St., Ste. 216, Ridgewood NY 11385

*/s/ Laura Loomer*

# EXHIBIT 1

Filing # 207775621 E-Filed 09/26/2024 10:24:49 PM

## IN THE FIFTEENTH JUDICIAL CIRCUIT
## IN AND FOR PALM BEACH COUNTY, FLORIDA

LAURA LOOMER, ET AL

Plaintiffs

v.                                    **Case No: 50-2023-CA-010810-XXXX-MB**

RONALD COLEMAN, et. al

Defendants.

## PLAINTIFFS' EMERGENCY MOTION TO DECLARE UNENFORCEABLE AND ENJOIN ORDER OF MAGISTRATE BRUCE REINHART AND MOTION TO COMPEL

Plaintiffs Laura Loomer and Illoominate Media, LLC ("Plaintiffs") hereby move this Court, on an emergency basis, for an order enjoining the September 10, 2024 Order on Defendants' Motion to Compel Compliance [ECF No. 107] ("Reinhart Order") of Magistrate Bruce Reinhart ("Magistrate Reinhart"), Exhibit A, of the U.S. District Court for the Southern District of Florida (the "Federal Court") because Magistrate Judge Bruce Reinhart lacks authority to dictate and decide how this Court administers to its cases.

**A.      STATEMENT OF RELEVANT FACTS**

**1.      Background Facts**

On or about July 8, 2024, Plaintiffs discovered that Defendant Craig Young ("Defendant Young") had purportedly entered into a settlement agreement in secret with CAIR Florida, Inc. CAIR Foundation (collectively "CAIR")[1] to settle away his liability in this instant case for legal malpractice despite CAIR not even being parties to this ongoing litigation. CAIR were

---

[1] CAIR was an unindicted co-conspirators in a criminal prosecution of the Holy Land Foundation in Dallas, Texas for allegedly funneling millions of dollars to the terrorist organization Hamas. Exhibit C.

1

previously the Defendants in the litigation which gave rise to this instant malpractice case styled *Illoominate Media, Inc. et al v. CAIR Florida, Inc. et al,* 9:19-cv-81179 (S.D. Fl.) (the "CAIR Case") and the Defendants in this instant malpractice case, including Defendant Young, represented Plaintiffs in the CAIR Case and their malpractice resulted in a large monetary judgment against Plaintiffs in favor of CAIR, as well as other severe damage to the Plaintiffs.

Upon discovering that Defendant Young and CAIR had illegally and unethically agreed to settle Defendant Young's liability to Plaintiffs in this instant malpractice case, Plaintiffs and their counsel strongly objected, leading to CAIR filing a Motion to Compel in the CAIR Case, which was assigned to Magistrate Judge Bruce Reinhart. Unfortunately for Plaintiffs, Magistrate Judge Reinhart has had a strong personal animus towards Plaintiff Laura Loomer ("Ms. Loomer"), likely as a result of her association with Donald Trump. Magistrate Judge Reinhart is known to be hostile toward President Trump, and it is no coincidence that he was sought out and effectively hand-picked by Special Counsel Jack Smith to sign the search warrant which ordered the raid on President Trump's Mar-a-Lago residence in 2022, which was later effectively found to have been illegal by the Honorable Aileen Canon in her July 15, 2024 Order Granting Motion to Dismiss Superseding Indictment Based on Appointments Clause Violation. *United States of America v. Trump,* 9:23-cr-80101-AMC (S.D. Fl.) ECF No. 672. Thus, it is regrettably unsurprising that on September 10, 2024, Magistrate Judge Reinhart issued the Reinhart Order granting CAIR's motion to compel, despite having no factual or legal basis to do so.

Further, Defendant Young has refused to produce documents pertaining to this illegal and unethical agreement and refused to answer questions about it at his deposition as well, as shown in the attached transcript. Exhibit D.

    **2.**    **Facts Pertaining to Emergency Relief**

As set forth in Magistrate Reinhart's Order, <u>Exhibit A</u>, he has threatened Plaintiffs with contempt if she does not "execute documentation to finalize the Young Settlement Agreement on or before October 11, 2024." Reinhart Order at 5. Specifically, Magistrate Reinhart ordered:

> The Plaintiffs are further cautioned that failure to comply with this order will constitute conduct potentially subject to additional contempt sanctions. I take Defendants' Motion for contempt and attorneys' fees under advisement. <u>Exhibit A</u> at 6.

Thus, emergency consideration of this motion, which would moot out the Reinhart Order, is required to avoid Plaintiffs being effectively "strongarmed" by Magistrate Reinhart, CAIR and Defendant Young into consenting to the illegal and unethical agreement.

The exigent nature of the relief sought necessitated Plaintiffs noticing up the UMC hearing for this motion October 2, 2024, as it was the only available that would give the Court ample time to render a ruling prior to the October 10, 2024 deadline imposed by Magistrate Reinhart. However, despite Plaintiffs attempting to have the Court hear the motion first on it's calendar on October 2,2024, to accommodate Defendant Young, as Defendant Young claimed to have a dentist appointment on that date, resulting in the cancellation of the hearing, Plaintiffs are now required to move on an emergency basis to have this motion heard and respectfully request that it be specially set prior to October 10, 2024, which was the only other date on this Court's website which was available for a UMC hearing, necessitating the now cancelled October 2, 2024 notice of hearing.

## B.    LEGAL ARGUMENT

The sole basis for Defendant Young and CAIR's false assertion that they are entitled to settle away Defendant Young's liability to Plaintiffs in this instant malpractice case stems from one provision of the settlement agreement between Plaintiffs and CAIR in the CAIR Case. This provision states:

> **Veto Power and Settlement Authority**. CAIR shall have final sign off power on; veto power over, and substantive control of Plaintiffs' authority to settle *Coleman*, including through any offer of judgment. Plaintiffs may not settle *Coleman* without CAIR's written consent, and failure to obtain such consent is a substantive breach of this Settlement. <u>Exhibit B</u>.

On the other hand, there are numerous compelling reasons why such an illegal, unethical agreement between Defendant Young and CAIR cannot be enforced in this Court, or anywhere else.

*First*, nowhere in this "Veto Power and Settlement Authority" provision is CAIR granted authorization to secretly settle away Plaintiffs' substantive rights with the Defendants in this instant malpractice case before this Court. The plain language of this provision shows that CAIR have veto power and final say only over whether to accept a settlement that has been worked out between Plaintiffs and the Defendants in this instant malpractice case. The practical effect of this provision – which is what both parties bargained for - is that **both Plaintiffs and CAIR must agree to any settlement**. It does not give the CAIR the right to secretly negotiate and accept a settlement in this instant malpractice affecting Plaintiffs' rights that Plaintiffs would never have accepted.

*Second*, pursuant to subsection 3(c) of the Settlement Agreement, <u>Exhibit B</u>, "the amount due out of any recovery – whether by settlement, judgment, or otherwise – **shall be the Full Amount Due....**" Here, CAIR have violated the terms of the Settlement Agreement by attempting to settle away Defendant Young's liability for a mere $5000.00, which is far short of the Total Amount Due. Thus, the illegal and unethical settlement agreement is void on this basis as well.

*Third*, Magistrate Judge Reinhart simply has no authority or jurisdiction to dictate and decide how this Court administers to its cases or to order it to accept the unethical an illegal

settlement agreement entered into between Defendant Young and CAIR. A federal court cannot reach into a state court and dictate and decide how the state court acts. By way of analogy, this Court can look to the Anti-Injunction Act, 28 U.S.C. § 2283, which "forbids federal courts from issuing injunctions to stay proceedings in state courts unless one of three enumerated exceptions applies." More specifically, a court of the United States may not grant an injunction to stay proceedings in a state court unless (1) expressly authorized by an act of Congress, (2) an injunction is necessary to aid the federal court's jurisdiction, or (3) an injunction is necessary to protect or effectuate the federal court's judgments. *Id*. Furthermore, it is well settled that any doubts must be construed in favor of allowing a state court matter to proceed:

> These statutory exceptions are not to be enlarged by "loose statutory construction." *Id*. at 287; *see Amalgamated Clothing Workers v. Richman Bros.*, 348 U.S. 511, 514, 75 S. Ct. 452, 99 L. Ed. 600, 71 Ohio Law Abs. 177 (1955) ("[T]he prohibition [of § 2283] is not to be whittled away by judicial improvisation."). Animating the Anti-Injunction Act is Congress' focus on the delicate balance between federal and state courts' respective spheres of authority. *See Toucey v. N.Y. Life Ins. Co.*, 314 U.S. 118, 135, 62 S. Ct. 139, 86 L. Ed. 100 (1941) ("The Act . . . expresses the desire of Congress to avoid friction between the federal government and the states resulting from the intrusion of federal authority into the orderly functioning of a state's judicial process."). Courts therefore recognize that "any doubts are to be resolved in favor of allowing the state court action to proceed." *Tex. Employers' Ins. Ass'n v. Jackson*, 862 F.2d 491, 499 (5th Cir. 1988) (en banc). *Naegele v. Albers*, 843 F. Supp. 2d 123, 128 (D.D.C. 2012).

Here, Magistrate Judge Reinhart's Order is, in effect and practice, interferes with and is tantamount to injunction against Defendant Young's participating in this instant malpractice case. Thus, under the Anti-Injunction Act, this Court is not subject to such an order from Magistrate Reinhart.

## C.    CONCLUSION

ACCORDINGLY, based on the foregoing, the Federal Court and Magistrate Judge Reinhart have no authority or jurisdiction to allow Defendant Young to attempt to settle away his

liability to Plaintiffs in this case to CAIR, which is not even a party to this action. This is forbidden by both the Anti-Injunction Act and the express terms of the settlement agreement between Plaintiffs and CAIR. Thus, the Court must issue an order declaring invalid and of no force and effect and enjoin the enforcement of the purported settlement agreement between Defendant Young and CAIR, and compelling Defendant Young to produce responsive documents and to answer questions under oath, or order such other relief as it may deem just and proper to prevent this manifest injustice, as well as to respect and preserve the authority of this Court to administer to its own cases.

DATED on September 26, 2024                          Respectfully Submitted,

                                                    /s/ Larry Klayman
                                                    Larry Klayman, Esq.
                                                    Klayman Law Group P.A.
                                                    7050 W. Palmetto Park Rd
                                                    Boca Raton, FL, 33433
                                                    561-558-5336
                                                    leklayman@gmail.com

                                                    *Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I, Larry Klayman, hereby certify that on this day, September 26, 2024 a copy of the foregoing was filed via this Court's e-filing system and served upon all parties and/or counsel of record through Notices of Electronic Filing and via email.

                                                    */s/ Larry Klayman*
                                                    Larry Klayman

# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.:  19-cv-81179-RUIZ/REINHART

ILLOOMINATE MEDIA, INC., et al.,

                    Plaintiffs,

vs.

CAIR FLORIDA, INC., et al.,

                    Defendants.

_____/

## ORDER ON DEFENDANTS' MOTION TO COMPEL COMPLIANCE [ECF NO. 107]

Plaintiffs Laura Loomer and Illoominate Media, Inc., and Defendants, CAIR Florida, Inc., CAIR Foundation, collectively ("Defendants") settled this case in July 2023. ECF Nos. 105. Section 3 of their Settlement Agreement discusses malpractice claims against Ms. Loomer and Illoominate's prior attorneys. Those claims are identified as "*Coleman.*" ECF No. 105 ¶3. (emphasis in original). According to the Settlement Agreement,

> CAIR shall have final sign off power on; veto power over; and substantive control of Plaintiff's authority to settle *Coleman* including through any offer of judgment.  Plaintiffs may not settle *Coleman* without CAIR's written consent and failure to obtain such consent is a substantive breach of this Settlement.

*Id.* ¶3a. This Court retained jurisdiction to enforce the Agreement. ECF No. 106. Section 5 of the Settlement Agreement calls for contempt for failure to comply unless

compliance is impossible. ECF No. 105 ¶5a. Section 5 also awards CAIR to its "reasonable costs and attorneys' fees for any motion to enforce..." *Id.* ¶5b.

Defendants now move to compel compliance with the settlement agreement, specifically the *Coleman* provision. ECF No. 107. Defendants say they reached an agreement with one of the *Coleman* Defendants, Craig Young ("Young Settlement Agreement") and reached out to Ms. Loomer and Illoominate to "execute the relevant portions of the agreement." *Id.* at pp 2. Ms. Loomer and Illoominate refused. *Id.* Defendants argue Ms. Loomer and Illoominate's refusal is against the already agreed upon term that gives CAIR "substantive control of [Ms. Loomer and Illoominate]'s authority to settle *Coleman*." *Id.*

Ms. Loomer responds that she was not made aware of Young Settlement Agreement and that Defendants did not have authority to attempt to settle *Coleman* without Ms. Loomer's knowledge. ECF No. 109.

On July 27, 2024, through Ms. Loomer and without conferral, Illoominate moved for two-week extension of time to hire counsel and respond. ECF No. 110. I granted the request and gave Illoominate until August 16, 2024, at 5 p.m. Eastern Time, to hire counsel and file its response. ECF No. 115. I cautioned Illoominate that failure to comply may result in this "Court Granting the Motion to Compel Compliance and or for contempt against Illoominate Media, Inc." *Id.* On August 16, 2024, through Ms. Loomer and without conferral, Illoominate moved for a second extension of time. ECF Nos. 116, I denied the request for failure to show good cause. ECF Nos. 117. On August 21, 2024, in a nearly identical motion on behalf of

2

Illoominate, Ms. Loomer filed a third motion for extension of time. ECF No. 118. I denied that motion for the same reasons and ordered the Defendants to file their reply. In all three motions for extensions of time, Ms. Loomer makes additional arguments in response to the Motion to Compel. Those arguments are not properly before me will not be considered.

The time for responses has since expired. I have reviewed the Motion to Compel, the Response, the Reply, and the Settlement Agreement. ECF Nos. 107, 109, 121. For the reasons stated below, Defendants' Motion to Compel Compliance is **GRANTED IN PART.** Defendants' request for contempt and attorneys' fees is taken under advisement.

## I.    DISCUSSION

When a court incorporates a settlement agreement into a final judgment or approves a settlement agreement by order and retains jurisdiction to enforce its terms, the court has the jurisdiction to enforce the terms of the settlement agreement even if the terms are outside the scope of the remedy sought in the original pleadings. *Paulucci v. Gen. Dynamics Corp.,* 842 So. 2d 797 (Fla. 2003). "However, the extent of the court's continuing jurisdiction to enforce the terms of the settlement agreement is circumscribed by the terms of that agreement." *Id.* at 803.

At the request of the parties, this Court retained jurisdiction to enforce the terms of the Settlement Agreement. The relevant terms I am bound by in their Settlement Agreement are that Defendants have "sign off power on; veto power over; and substantive control of Plaintiff's authority to settle *Coleman."* ECF No. 105.

3

Mr. Young is one of the *Coleman* Defendants. Defendants reached a settlement with Mr. Young and both Ms. Loomer and Illoominate refused to sign off on it. Mr. Young has since filed a Notice striking paragraph two of his settlement agreement with Defendants. ECF No. 120. In his certificate of conferral, he says the Defendants do not object. *Id.* In light of the proposed modification to the Young Settlement Agreement, I granted Ms. Loomer additional time to file a notice of intent to object. ECF No. 124. Ms. Loomer has since filed her Notice of Intent to Object to the modified Young Settlement Agreement. ECF No. 127. So, I will construe the initial Motion to Compel Compliance (ECF No. 107) to be about the modified settlement agreement in Mr. Young's Notice. ECF No. 120-1.

Ms. Loomer does not dispute that she refused to sign the Young Settlement Agreement or that the terms of *her own* Settlement Agreement call for contempt for failure to comply. The Agreement says,

> a. **Compliance and Contempt.** For avoidance of doubt, an intentional violation of this Settlement shall constitute contempt of Court, except that Plaintiffs may raise a defense that compliance is "factually impossible" to any contempt proceeding. *See generally, Yimbly, Inc. v. Fedak,* 2017 U.S. Dist. LEXIS 96700, at *9-10 (S.D.N.Y. June 22, 2017) ("a party may defend against a contempt by showing that compliance is factually impossible, but that party bears the burden of producing in raising the defense") (cleaned up); *Ramgoolie v. Ramgoolie,* 2020 U.S. Dist. LEXIS 33145, at *7 (S.D.N.Y. Feb. 25, 2020) (similar).
> b. **Costs and Fees.** CAIR shall be entitled to its reasonable costs and attorneys' fees for any motion to enforce, which shall include any other work required []
> c. **Equity and Contempt Jurisdiction.** Plaintiffs stipulate and waive any objections to the Court's Jurisdiction over enforcement of this Settlement, including the Court's contempt and equity jurisdiction.

4

ECF No. 105 ¶5a–c.

So, according to the Settlement Agreement, the next question is whether Ms. Loomer has shown her compliance "would have been impossible." She has not. She says the settlement agreement between Mr. Young and the Defendants is "unethical and illegal" because Defendants are attempting to "settle away [her] rights…in secret…" ECF No. 109. But she contracted her "sign off power, veto power over, and substantive control of [her] to settle *Coleman*" away when she entered into the Settlement Agreement with Defendants. ECF No. 105 (emphasis in original).

## II.    CONCLUSION

The Motion to Compel Compliance is GRANTED as to Ms. Loomer and GRANTED by default as to Illoominate. Plaintiff in her individual capacity and as Illoominate's corporate representative is hereby ORDERED to execute documentation to finalize the Young Settlement Agreement on or before October 11, 2024.

5

The Plaintiffs are further cautioned that failure to comply with this order will constitute conduct potentially subject to additional contempt sanctions. I take Defendants' Motion for contempt and attorneys' fees under advisement.

**DONE and ORDERED** in Chambers at West Palm Beach, Palm Beach County, in the Southern District of Florida, this 10th day of September 2024.

BRUCE E. REINHART
UNITED STATES MAGISTRATE JUDGE

6

# EXHIBIT B

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**PALM BEACH COUNTY DIVISION**

| | |
|---|---|
| ILLOOMINATE MEDIA, INC., a Florida Corporation, and LAURA LOOMER, a Florida individual | Case No. 19-CV-81179 |
| Plaintiffs, | Judge Rodolfo A. Ruiz<br>U.S. District Judge |
| v. | Judge Bruce E. Reinhart<br>U.S. Magistrate Judge |
| CAIR FOUNDATION, a District of Columbia corporation, et. al. | |
| Defendants. | |

## NOTICE OF FILING STIPULATION AND PROPOSED ORDER

Defendants, CAIR Florida, Inc. and CAIR Foundation (collectively, "CAIR" or "CAIR Defendants"), by and through undersigned counsel, and pursuant to this Court's orders dated May 3, 2013 (ECF 90) and July 26, 2023 (ECF 102), submit this Notice of Filing Stipulation and Proposed Order.

On May 3, 2023, this Court granted CAIR's motion to compel compliance (ECF 87) from Plaintiffs, Illoominate Media, Inc. and Laura Loomer (collectively, "Plaintiffs), with this Court's Order for final judgment issued February 13, 2023 (ECF 84).

On May 15, 2023, Plaintiffs filed their notice of compliance with ECF 90 (ECF 91) which the CAIR Defendants later objected to on May 19, 2023, (ECF 92) followed later by Plaintiffs' response to CAIRs' objection on May 19, 2023 (ECF 93).

Since then, CAIR has sought a total of three extensions of time (ECF 97, ECF 99, and ECF 101) to collectively extend the deadline to August 9, 2023 (ECF 102) for CAIR to file its reply in support of its original objection to Plaintiffs' Notice of Compliance (ECF 92).

CAIR now hereby files this Notice of Filing of an executed Stipulation and Proposed Order between the CAIR Defendants and Plaintiffs. A copy of the same is attached hereto as **Exhibit A**. Defendants request that this Court enter said attached Stipulation and Proposed Order.

<u>**LOCAL RULE 7.1(A)(3) CERTIFICATION**</u>

Pursuant to Local Rule 7.1(A)(3), undersigned counsel for Defendants certifies that their office has conferred with Plaintiffs via email and that Plaintiffs have indicated that they consent to the relief requested in accordance with the Stipulation.

Dated: August 9, 2023

Respectfully submitted,

BY: */s/ Darren Spielman*
Darren Spielman
THE CONCEPT LAW GROUP, P.A.
6400 North Andrews Avenue
Suite 500
Fort Lauderdale, FL 33309
(754) 300-1500
dspielman@conceptlaw.com

Remy Green (*admitted pro hac vice*)
COHEN&GREEN P.L.L.C
1639 Centre St.
Suite 216
Ridgewood, NY 11385
(929) 888-9480

CAIR LEGAL DEFENSE FUND

LEFA F. MASRI (DC: 1000019)
JUSTIN SADOWSKY (DC: 977642)
453 New Jersey Ave, SE
Washington, DC 20003
Phone: (202) 742-6420
ldf@cair.com

*Counsel for CAIR-Florida, Inc.*

Case 9:19-cv-81179-RAR   Document 103   Entered on FLSD Docket 08/09/2023   Page 4 of 4

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on August 9, 2023, I have filed the foregoing document with the Clerk of Court using the CM/ECF system. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified in the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

*/s/ Darren Spielman*
Darren Spielman

### SERVICE LIST:

Larry Klayman, Esq.
KLAYMAN LAW GROUP, P.A.
7050 W. Palmetto Park Rd
Boca Raton, FL, 33433
Telephone: (561)558-5336
Email:leklayman@gmail.com
Ron Coleman
Dhillon Law Group, Inc.
347-996-4840
RColeman@dhillonlaw.com
646-358-8082
256 5th Ave., 4th Floor
New York, NY 10001

Craig W. Young, Esq.
CWY Legal & Consulting, LLC
2500 Quantum Lakes Dr., Suite 100,
Boynton Beach, FL 33426
Tel: (561) 568-1000
Email: Craig@cwylegal.com

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
————————————————————————X

Illoominate Media, LLC,[1] et al.,

                    Plaintiffs,

          - against -                                    Case No. 9:19-cv-81179

CAIR Florida, Inc., et al.                    **STIPULATION AND**
                                              **[PROPOSED] ORDER**
                                              **OF SETTLEMENT**
                    Defendants.
————————————————————————X

        WHEREAS, Plaintiffs Illoominate Media, LLC and Laura Loomer ("Illoominate" and "Loomer" respectively; together, "Plaintiffs") filed this suit against Defendants CAIR Florida, Inc., CAIR Foundation, Twitter, Inc., and John Does 1-5 (CAIR Florida and CAIR Foundation together, "CAIR");

        WHEREAS, Plaintiff voluntarily dismissed Twitter without service, and never identified or served John Does 1-5 (see ECF No. 1 at 1);

        WHEREAS, CAIR removed this case to the Southern District of Florida;

        WHEREAS, CAIR has since obtained a final judgment in the amount of $124,423.37, plus interest, against Plaintiffs (ECF No. 84; the "Judgment");

        WHEREAS, CAIR has incurred the following costs and attorneys' fees in enforcing the Judgment, totaling $20,508.50.00 (the "Enforcement Costs"), as follows:
- Attorneys' fees of $16,452.50:
  - Remy Green (@$500/hr, for 23.8 hours), $11,900.00;
  - Justin Sadowsky (@555/hr, for 3.5 hours), $1,942.50;
  - Darren Spielman (@$300/hr, for 9.7), $2,610.00;
- Costs of:
  - $3,150.00, from BitCoin expert fees;
  - $906.00 as taxed (ECF No. 47).

        WHEREAS, with attorneys' fees, and costs, the full sum due as of the date of signing is $144,931.87.00, plus interest at the statutory rate of 5.52% per annum, from August 4, 2021 (ECF No. 66), until the date of payment (with interest, this is the "Full Amount Due");

———————————————
[1] Misnamed in the initial filing as "Illoominate Media, Inc."

WHEREAS, Plaintiffs and CAIR (each a "Party"; together, the "Parties") wish now to settle the remaining disputes as to payment of that judgment, on the terms and conditions below:

WHEREAS, Plaintiffs have filed a suit against their prior counsel, styled *Loomer et al v. Coleman et al.*, in the Circuit Court of the Fifteenth Judicial Circuit in and for Palm Beach County, Florida ("*Coleman*");

WHEREAS, each Party in this matter has been represented by counsel, has had time to review the terms of this Stipulation and Order of Settlement, and agrees both Parties have received good and valuable consideration hereunder;

**NOW THEREFORE,** the parties agree as follows:

1. **Payment.** Plaintiffs shall make a total payment of $73,500.00, as follows:

   a. **Initial Payment.** Prior to the filing of this Stipulation and Proposed Order of Settlement ("Settlement"), Plaintiffs shall make a payment of $12,000.00 (the "Initial Payment"), by way of paper check sent to ___453 New Jersey Ave SE___ . within 5 ___Washington, DC 20003___ business days of receiving fully executed copy of this Settlement. Neither Party may file a copy of this Settlement until the Initial Payment is made, and this Settlement shall not be effective, even if filed, until the Initial Payment has been made. Failure to make the Initial Payment shall be a substantive breach of this Settlement.

   b. **Payment Over Time.** Plaintiffs shall, in monthly installments of $1,200 (or, in the case of the final payment, the remaining amount due), pay a total of $61,500.00. Those payments shall be due on the 5th of the month each month, starting with the first 5th of a month that is at least 20 days after the Initial Payment set out above.

   c. **Notice and Cure.** If Plaintiffs miss a payment under ¶ 1(b), Defendants may send a notice that the payment was missed, by email, to Plaintiffs' counsel at klaymanlaw@gmail.com. Once that email has been sent, Plaintiffs shall cure the missed payment within 5 business days. If the missed payment is not cured within those 5 business days, that missed payment is a substantive breach of this Settlement.

2. **Non-Disparagement.**

a. **Disparagement Bar.**   Plaintiffs shall never make any comments, of any kind, about CAIR in the future. Violation of this provision shall be a substantive breach of this Settlement.

b. **Waiver.**   To the extent this clause has any issues with enforceability, Plaintiffs waive all objections thereto that are waivable.

c. **Voluntary Steps to Avoid Enforceability Objections.** Plaintiffs commit that they shall take any and all voluntary steps that are necessary to avoid creating any issues with enforceability of this agreement.   This provision shall be enforceable through specific performance and in equity, subject to CAIR identifying such steps.  Failure to take such voluntary steps, once they are identified, shall be a substantive breach of this Settlement.

d. **Exceptions for Responses.**  Plaintiffs may publicly respond to any specific statement by Defendants or their authorized agents that discuss Plaintiffs by name.  Plaintiffs may not use the exception for such responses to begin making general comments about Defendants outside of responding to the specific statement.

3.    *Coleman* **Resolution.**  Plaintiffs shall, upon any recovery in *Coleman*, become immediately liable for the Full Amount Due (with credit for all payments Plaintiff has made under ¶ 1 to that date) as follows:

a. **Information.**  Plaintiffs shall keep CAIR, by and through CAIR's undersigned counsel, up to date and informed about any settlement discussions, proceedings, and the like in *Coleman*; and Plaintiffs shall give CAIR reasonable notice before any settlement.  Failure to provide such reasonable updates shall be a substantive breach of this Settlement.

b. **Veto Power and Settlement Authority.**  CAIR shall have final sign off power on; veto power over; and substantive control of Plaintiffs' authority to settle *Coleman*, including through any offer of judgment.  Plaintiffs may not settle *Coleman* without CAIR's written consent, and failure to obtain such consent is a substantive breach of this Settlement.

CAIR shall not exercise its rights under this paragraph to veto any settlement where the monetary component of the settlement provides CAIR with the Total Amount Due as of the date of such settlement.

3

c. **Amount and Priority.** As set out above, the amount due out of any recovery — whether by settlement, judgment, or otherwise — shall be the Full Amount Due (less credit for any payments under ¶ 1 above), and CAIR shall be entitled to be paid in full before any funds are used for any other purpose whatsoever.

d. **Escrow.** Any recovery, whether by settlement, judgment, or otherwise, in *Coleman* shall be paid into an escrow account established for this purpose by Plaintiffs' counsel (or otherwise, upon agreement), and shall not be paid to Plaintiffs, or to any other person with a direct interest in the funds. If for any reason, Plaintiffs, or their agents, assigns, employees, or other persons within their control receive the funds, Plaintiffs shall immediately place the funds into escrow. A failure to abide by this condition is a substantive breach of this settlement. CAIR shall be entitled to take the Full Amount Due (less credit for any payments under ¶ 1 above) from escrow without further notice to Plaintiffs, and the Full Amount Due shall be considered the property of CAIR at all times.

4.   **Retention of Jurisdiction to Enforce.** The Court retains jurisdiction to enforce the confidential non-disparagement term of this Settlement.

The Parties recognize the Court has discretion to reject this term, and should the Court do so, this Settlement shall be held in abeyance while the Parties discuss in good faith whether another enforcement mechanism is effective to achieve the aims of this Settlement. The availability of a robust enforcement term and mechanism are both necessary parts of the consideration the Parties have agreed to exchange, and therefore the Settlement would be ineffective without some enforcement mechanism.

5.   **Enforcement.** Enforcement of this Settlement may be by contempt, and any substantive breach hereof shall be contempt of court.

a. **Compliance and Contempt.** For the avoidance of doubt, an intentional violation of this Settlement shall constitute contempt of Court, except that Plaintiffs may raise a defense that compliance is "factually impossible" to any contempt proceeding. *See generally, Yimby, Inc. v. Fedak*, 2017 U.S. Dist. LEXIS 96700, at *9-10 (S.D.N.Y. June 22, 2017) ("a party may defend against a contempt by showing that compliance is factually impossible, but that party bears the burden of

4

production in raising the defense") (cleaned up); *Ramgoolie v. Ramgoolie,* 2020 U.S. Dist. LEXIS 33145, at \*7 (S.D.N.Y. Feb. 25, 2020) (similar).

**b. Costs and Fees.** CAIR shall be entitled to its reasonable costs and attorneys' fees for any motion to enforce, which shall include any other work required (for example, without limitation, sending notices under ¶ 1(c)) in advance of such a motion.

**c. Equity and Contempt Jurisdiction.** Plaintiffs stipulate to and waive any objections to the Court's jurisdiction over enforcement of this Settlement, including the Court's contempt and equity jurisdiction.

**6. Signatures and Counterparts.** This Settlement may be executed in any number of counterparts, each of which shall be deemed an original and all of which together shall be deemed one and the same instrument. Electronic signatures shall be the same as any other signature.

**[SIGNATURES ON FOLLOWING PAGE]**

Dated: *7/14/2023*, 2023

Laura Loomer
**Laura Loomer**

Duly sworn to before me on
the *14* day of *July*, 2023

*Mark S Healy*
Notary Public

*14 July, 2023*

Notary Public State of Florida
Mark S Healy
My Commission  HH 283343
Expires  7/4/2026

**ILLOOMINATE MEDIA, LLC**

*Laura Loomer*, CEO
By:

Duly sworn to before me on
the *14* day of *July*, 2023

*Mark S Healy*
Notary Public

*14 July, 2023*

Notary Public State of Florida
Mark S Healy
My Commission  HH 283343
Expires  7/4/2026

**CAIR FLORIDA, INO.**

Duly sworn to before me on
the *24th* day of *July*, 2023

Notary Public

JOSHUA MATTHEW BABOOLA
Notary Public - State of Florida
Commission # HH 204248
My Comm. Expires Dec 5, 202
Bonded through National Notary Ass

**CAIR FOUNDATION**

Duly sworn to before me on
the *20th* day of *July*, 2023

Notary Public

LENA F. MASRI
NOTARY PUBLIC - MICHIGAN
OAKLAND COUNTY
ACTING IN THE COUNTY OF OAKLAND
MY COMMISSION EXPIRES 11/22/2024

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 19-CV-81179-RAR

**ILLOOMINATE MEDIA, INC. AND
LAURA LOOMER,**

     Plaintiffs,

v.

**CAIR FOUNDATION, et al.,**

     Defendants.

_____/

## ORDER GRANTING DEFENDANTS'
## MOTION FOR ENTRY OF STIPULATION

**THIS CAUSE** comes before the Court on Defendants' Motion to Enter Stipulated Settlement Order, [ECF No. 105] ("Motion"), filed on August 30, 2023, as well as the parties' Settlement Agreement, [ECF No. 105-1], filed as an exhibit to the Motion. The Motion requests the Court enter the parties' Stipulated Settlement. Mot. at 1. Accordingly, the Court having carefully reviewed the Motion, the Settlement Agreement, the record, and being otherwise fully advised, it is hereby

**ORDERED AND ADJUDGED** as follows:

1.    The Motion, [ECF No. 105], is **GRANTED**.

2.    The Settlement Agreement, [ECF No. 105-1], is **APPROVED**.

3.    The parties are hereby authorized to execute all settlement documents.

**DONE AND ORDERED** in Miami, Florida, this 5th day of September, 2023.

**RODOLFO A. RUIZ II
UNITED STATES DISTRICT JUDGE**

# EXHIBIT C



**U.S. Department of Justice**
**Office of the Inspector General**
**Evaluation and Inspections Division**

# Executive Summary

# Review of FBI
# Interactions with the
# Council on American-
# Islamic Relations

## September 2013

## I-2013-007R

## REDACTED – FOR PUBLIC RELEASE

## EXECUTIVE SUMMARY*

In March 2012, after receiving a congressional request, the Office of the Inspector General (OIG) initiated a review to examine the clarity of the Federal Bureau of Investigation's (FBI) policy and guidance for its non-investigative interactions with the Council on American-Islamic Relations (CAIR) and FBI field office compliance with the policy and guidance. In evaluating field office compliance, we focused on five specific interactions between the FBI and CAIR that took place from 2010 through 2012 at three FBI field offices: New Haven, Connecticut; Chicago, Illinois; and Philadelphia, Pennsylvania. We found significant issues with the way the FBI implemented and managed its CAIR policy and guidance. The OIG is issuing a full report today on FBI interactions with CAIR to Congress and the Department of Justice that is classified at the Secret level. This unclassified summary of the report summarizes the findings, conclusions, and recommendations of the report.

**Background**

In 2008, the FBI developed a policy on its interactions with CAIR based in part on evidence presented during the 2007 trial of the Holy Land Foundation for Relief and Development.[1] The evidence at trial linked CAIR leaders to Hamas, a specially designated terrorist organization, and CAIR was named as an unindicted co-conspirator in the case. The policy was intended to significantly restrict the FBI's non-investigative interactions with CAIR and to prevent CAIR from publicly exploiting such contacts with the FBI.

The FBI's ███████████████████████ communicated the policy to FBI field offices through a series of electronic communications (EC) during a 4-month period from August through December 2008. During this time, ███ sent three ECs and the FBI's ███████████████████ sent two other ECs to FBI field offices providing background, guidance, and policy language on when, how, and why future specific non-investigative interactions with CAIR would be restricted.[2] The ECs mandated coordination with the ███████████████ for all non-investigative interactions with CAIR and directed FBI field offices to specific points of contact at ███████████████████████████ for guidance

---

* The FBI identified within the full version of this report classified and other information that if released publicly could compromise national security interests and the FBI's operations. To create this unclassified public Executive Summary, the Office of the Inspector General redacted (blacked out) portions of the Executive Summary.

[1] *United States v. Holy Land Foundation et al.* (Cr. No. 3:04-240-P, N.D. Tex).

[2] The strategy addressed only non-investigative community outreach interactions and was not intended to affect field offices' interactions with CAIR representatives with regard to civil rights complaints or criminal investigations.

regarding the implementation of the policy. Additionally, in late November 2008, ▆ held a mandatory meeting for all Special Agents-in-Charge (SAC) and Assistant Directors-in-Charge of FBI field offices to ensure compliance with the policy.

The ECs containing the policy acknowledged that it represented a significant deviation from past FBI policy and that it affected longstanding relationships in the field. When we asked the former FBI Assistant Director for ▆, who was the Deputy Assistant Director for ▆ at the time, why the FBI issued multiple ECs over a 4-month period regarding the policy, he said that some of the field offices were reluctant to go along with the policy initially.[3]  For example, on October 27, 2008, the Los Angeles SAC sent an e-mail to his staff stating that the field office's "position is that we will decide how our relationship is operated and maintained with CAIR barring some additional instruction from FBI Headquarters." The SAC further stated: "Please instruct your folks at this time that they are not to abide by the [October 24, 2008, EC from the ▆▆▆▆▆▆▆], but that their direction in regards to CAIR will come from the LA Field Office front office." We learned from interviews with the ▆▆▆▆▆ that several other SACs also were reluctant to follow the policy. The former Assistant Director of ▆ also said that field office managers believed the strategy was being run by the ▆▆▆▆▆ rather than ▆ and "they did not like answering to the ▆▆▆▆▆." The former Assistant Director of ▆ further stated that the ECs were meant to demonstrate that this was a national issue, rather than an issue that affected only a ▆▆▆▆▆▆▆.

Based on our review of five incidents in three field offices, we found that ▆ did not manage or provide the oversight needed to ensure proper implementation and compliance with its policy. Instead, a different headquarters entity, the Office of Public Affairs (OPA), provided policy interpretation and advice to FBI field offices on potential interactions with local CAIR chapters, without consulting ▆.[4]  We found that OPA's guidance was not always in line with, or supported by, the binding language contained in the policy. We also found instances in which FBI field offices did not communicate with the points of contact identified in the policy. And we found that ▆ and OPA still appear to have coordination issues before providing guidance to FBI field offices.

---

[3] He served as Assistant Director of the FBI's ▆▆▆▆▆ from January to December 2010.

[4] OPA issued "Public Affairs Guidance" in April 2009, July 2009, January 2010, March 2010, and March 2011 to FBI field offices to provide questions and answers (Q & A's) and talking points for media inquiries and interviews on Muslim outreach that each contained a portion on FBI-CAIR relations.

## Five Field Office Incidents

Chicago Field Office – On July 27, 2010, the SAC of the Chicago Field Office gave a presentation at the request of the American Islamic College. The SAC was not aware until 30 minutes prior to the event that a local CAIR official was scheduled to make the introductory remarks. Shortly after the event, CAIR-Chicago posted a description of the event on its website with a photograph of the SAC talking to the class. While this appearance with a CAIR official did not adhere to the policy language or its intent, the OIG recognizes that the SAC was notified at the last minute and made a judgment call. Had the SAC learned earlier the identity of the person who was scheduled to introduce him, we believe that the policy would have required coordination with the ████████████ before proceeding with the event.

New Haven Field Office – On October 29, 2010, the FBI New Haven Field Office co-coordinated a diversity training workshop with a local Muslim organization. Two of the six trainers selected for this "cultural sensitivity" training were local CAIR officials. The New Haven Field Office sought guidance from OPA, ███████████████████ about how it could participate in the event and still comply with policy. The ██████████████████ informed the New Haven Field Office that the training would be against policy. However, OPA provided different guidance to the New Haven Field Office that training could occur as long as it was conducted offsite, and New Haven did not abide by the opinion of the ██████████████ and instead followed the OPA guidance. The result was an FBI interaction with CAIR that was inconsistent with the FBI's policy.

Chicago Field Office – On December 2, 2010, the Chicago Field Office hosted a quarterly Department of Homeland Security (DHS) Community Engagement Roundtable at its field office that many Chicago area government and community officials attended. DHS invited a local CAIR official to attend the meeting at the Chicago FBI Field Office, although the CAIR official ultimately did not attend. The Chicago Field Office SAC told the OIG that if DHS invited a CAIR official to the Roundtable, he would not deny them entry at the door. The SAC also stated that if CAIR officials came to the Chicago Field Office, he was not required to report it to FBI Headquarters, just as he was not required to report a meeting with CAIR on a civil rights matter.[5] He stated such notification would be impractical given the realities the field office encountered. He said that he viewed the various ECs from FBI Headquarters regarding interactions with CAIR as "guidance" and not policy and that he therefore was not required to contact or coordinate with Headquarters. We do not believe that the ECs could have been viewed as anything other than

---

[5] The field office did send an EC reporting the Roundtable event to the Director's Office at FBI Headquarters after the event occurred, but it did not mention that a CAIR representative had been invited to attend.

mandatory, particularly in light of the SAC's attendance at ███ policy meeting in November 2008 on this same subject. While the CAIR representative ultimately did not attend the Roundtable, the failure to follow the ECs in this instance could have led to an interaction that would have been inconsistent with the FBI's policy.

Philadelphia Field Office – On December 11, 2010, the Philadelphia Field Office held a Community Relations Executive Seminar Training (CREST) event. CREST is an FBI community outreach program created by OPA as a subprogram of the FBI's Citizen's Academy. The policy specifically instructed FBI field offices that CAIR could not participate in the FBI Citizen's Academy. Nevertheless, based on guidance it received from OPA, the Philadelphia Field Office allowed a local CAIR official to attend as an invited guest. A few days later, CAIR-Philadelphia posted an article on its website describing its participation in the training program, with a link to the FBI's website. The FBI Philadelphia Field Office did not coordinate with the ████████████████ as required in the policy, and OPA did not consult with ████████████████ ████████. As a result, OPA provided guidance that resulted in an interaction with CAIR that was inconsistent with the FBI's policy.

Philadelphia Field Office – Between August 2011 and June 2012, Philadelphia Field Office Special Agents attended the Pennsylvania Human Relations Commission Interagency Task Force on Community Activities and Relations meetings on a monthly basis. CAIR personnel have also attended these meetings. During our review, we learned that the Philadelphia Field Office attended these task force meetings for approximately 7 years for liaison purposes related to its civil rights program. The meetings were sponsored by a state government agency and not by the FBI or CAIR; they were held in non-FBI office space; the FBI did not have a role in organizing the program; and the event was not otherwise structured in a way that would give the public appearance of a liaison relationship between CAIR and the FBI. Therefore, we found that the policy did not preclude FBI attendance at these meetings.

## Conclusion

In 2008, the FBI developed a policy intended to restrict FBI field offices' non-investigative interactions with CAIR. However, in three of the five incidents we reviewed, we concluded that the policy was not followed. Despite recognizing the importance of the policy by issuing multiple ECs and holding a mandatory meeting with field office leadership to ensure compliance, we found that the FBI did not conduct effective oversight to ensure compliance with the policy. Additionally, FBI field offices at times contacted OPA instead of the required points of contact under the policy, and OPA did not consistently coordinate with ████████████████████████ when that happened. We found that OPA, which has a different mission and focus than other divisions,

provided guidance regarding interactions with CAIR that we found was inconsistent with the policy. This resulted in public interactions with CAIR that we found to be inconsistent with the goal of the FBI's policy.

## Recommendations

To help the FBI improve its implementation of the policy, the OIG has made two recommendations in this report. They are:

1. Ensure effective implementation of FBI policy relating to interactions with CAIR, including the coordination mandated by the policy and enforcement and oversight of compliance with the policy.

2. Provide comprehensive education on the objectives and requirements of the current CAIR policy to Headquarters and field office personnel who are likely to be involved with the application of the policy.

# EXHIBIT D

1

IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, FLORIDA

CASE NO.:  50-2023-CA-010810-XXXX-MB


LAURA LOOMER, et al.,

     Plaintiffs,

vs.

RONALD COLEMAN, et al.,

     Defendants.
_____/



VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF

CRAIG YOUNG


Taken on Behalf of the Plaintiffs via Videoconference


DATE TAKEN:     Wednesday, August 21, 2024
TIME:          10:01 a.m. to 11:10 a.m.


Held remotely via videoconference



Examination of the witness taken before:
Gail Hmielewski, Court Stenographer

Daughters Reporting, Inc.
101 Northeast 3rd Avenue
Suite 1500
Fort Lauderdale, Florida  33301

```
 1   APPEARANCES VIA VIDEOCONFERENCE:
 2   Appearing for the Plaintiffs:
 3        LARRY E. KLAYMAN, ESQUIRE
          KLAYMAN LAW GROUP, P.A.
 4        7050 West Palmetto Park Road
          Boca Raton, Florida  33433
 5        561-558-5336
          leklayman@gmail.com
 6
     Appearing for Defendants Ronald Coleman and
 7   Mandelbaum Barrett P.C.:
 8        BLAKE S. SANDO, ESQUIRE
          SEBASTIAN A. AGUIRRE, ESQUIRE
 9        COLE, SCOTT & KISSANE, P.A.
          9150 S. Dadeland Blvd., Suite 1400
10        Miami, Florida 33256
          305-350-5365  Phone
11        305-373-2294  Fax
          blake.sando@csklegal.com
12        sebastian.aguirre@csklegal.com
13   Appearing for Defendant Dhillon Law Group Inc.:
14        BRETT R. BLOCH, ESQUIRE
          SHENDELL & POLLOCK, P.L.
15        2700 N. Military Trail, Suite 150
          Boca Raton, Florida  33431
16        561-241-2323  Phone
          561-241-2330  Fax
17        brett@shendellpollack.com
18   Appearing for Defendant/Deponent Craig William Young:
19        CRAIG W. YOUNG, ESQUIRE, PRO SE
          CWY LEGAL & CONSULTING, LLC
20        2500 Quantum Lakes Drive, Suite 100
          Boynton Beach, Florida  33426
21        561-568-1000
          craig@cwylegal.com
22
     ALSO PRESENT:
23
          Laura Loomer, Plaintiff
24        Cheryl Burstein, Esquire
          Asher Anderson, Legal Assistant
25        Jeff Abrams, Videographer
```

3

```
1                          I N D E X

2                                                    Page

3

4    TESTIMONY OF CRAIG YOUNG

5    Direct Examination by Mr. Klayman:              6

6    Certificate of Oath:                           64

7    Certificate of Reporter:                       65

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

4

1                              E X H I B I T S

2

3                              PLAINTIFFS' EXHIBIT

4
        Number                    Description                Page
5

6       1       Notice of Taking Deposition Duces Tecum      7

7       2       Defendant, Craig William Young's,            7
                Responses and Objections to the
8               Plaintiffs' Third Request for Production
                to the Defendant
9
        3       Notice of Filing Stipulation and             16
10              Proposed Order

11      4       Affidavit of Craig W. Young, Esq.            24

12      5       Legal Retainer Agreement                     35

13      6       Email From Craig Young to Larry Klayman       44
                Dated 8/20/2024
14
        7       Verified Amended Complaint                   46
15

16

17

18

19

20

21

22

23

24

25

1      Videotaped videoconference deposition of CRAIG

2   YOUNG, taken remotely before Gail Hmielewski, Notary

3   Public in and for the State of Florida at large, in the

4   above cause.

5          THE VIDEOGRAPHER:  Good morning, we are now on

6          the record.  This begins video one in the

7          deposition of Craig Young in the matter of Laura

8          Loomer and Illoominate Media LLC v. Ronald Coleman,

9          Dhillon Law Group Inc., Mandelbaum Barrett P.C.,

10          and Craig William Young, Defendants, in the Court

11          of the 15th Judicial Circuit in and for Palm Beach

12          County, Florida, Case No.

13          50-2023-CA-010810-XXXX-MB.

14          Today's date is August 21st, 2024 and the time

15          is 10:01 a.m.  This deposition is being taken via

16          Zoom at the request of counsel for the plaintiff,

17          Larry Klayman, Esquire.  The videographer is Jeff

18          Abrams and the court reporter is Gail Hmielewski on

19          behalf of Daughters Reporting.

20          Will counsel and all parties present state

21          their appearances and whom they represent?

22          MR. KLAYMAN:  Larry Klayman on behalf of Laura

23          Loomer and Illoominate Media, Plaintiffs.

24          MR. YOUNG:  Craig William Young, Defendant,

25          Pro Se.

1          MR. SANDO:  Good morning, Blake Sando and

2     Sebastian Aguirre on behalf of Ron Coleman and the

3     Mandelbaum firm.

4          MR. BLOCH:  Brett Bloch, Shendell & Pollack,

5     on behalf of the Dhillon Law Group.

6          MS. BURSTEIN:  Cheryl Burstein, Mandelbaum

7     Barrett.  I am not representing Mandelbaum Barrett,

8     I'm a party.

9          THE VIDEOGRAPHER:  Thank you.  Will the court

10    reporter please swear in the witness?

11         THE COURT REPORTER:  Yes.  Raise your right

12    hand, please.  Do you solemnly swear or affirm that

13    the testimony you're about to give in this case

14    will be the truth, the whole truth, and nothing but

15    the truth?

16         MR. YOUNG:  I swear.

17         THE COURT REPORTER:  Thank you.  You can lower

18    your hand.

19                    DIRECT EXAMINATION

20  BY MR. KLAYMAN:

21    Q.   Please state your name.

22    A.   Before we start, Mr. Klayman, I just want to

23  make it clear that we agreed to two hours for this

24  deposition and it will end at noon, and my name is Craig

25  Young, C-r-a-i-g Y-o-u-n-g.

7

```
1        Q.   Your statement that it's going to be limited to
2   two hours is not likely to occur, given the fact that
3   you're refusing to produce documents and otherwise comply
4   with other rules and procedures of this court, so when we
5   do move the court, we will ask them to open this
6   deposition to complete it once we receive the required
7   documents.  We can proceed.
8             I'm going to ask the court reporter to mark, and
9   my assistant, Mr. Anderson, will put it up on the screen,
10  a notice of deposition for you to appear here today dated
11  August - to appear on August 21st, 2024.  It was served on
12  or about August 15th.
13            MR. KLAYMAN:  Mr. Anderson, put that up on the
14       screen.
15            (Plaintiffs' Exhibit No. 1 was marked for
16       identification.)
17  BY MR. KLAYMAN:
18       Q.   Have you seen that before, Mr. Young?
19       A.   Yes.
20       Q.   You are here pursuant to this notice of
21  deposition duces tecum?
22       A.   Yes.
23       Q.   And that notice of deposition duces tecum asked
24  you to produce certain documents, did it not?
25       A.   Yes.
```

8

1      Q.   And you have not produced any of those

2   documents?

3      A.   No.  I have a valid objection of relevance.

4      Q.   We'll let the court decide that.  And you

5   previously had been served with a request for production

6   of documents, correct?

7      A.   Correct.

8      Q.   I'll ask that Mr. Anderson put that up on the

9   screen and that that be made your Exhibit No. 2.

10          (Plaintiffs' Exhibit No. 2 was marked for

11          identification.)

12   BY MR. KLAYMAN:

13      Q.   Is that the request for production of documents

14   and your response?  The title of it is Defendant, Craig

15   William Young's, Responses and Objections to the

16   Plaintiff's Third Request for Production to the Defendant.

17      A.   That is just my response, that is not your

18   request.

19      Q.   Well, you state my request in there, correct?

20      A.   Correct.

21      Q.   Any and all documents that refer or relate in

22   any way to an alleged settlement by you - by and between

23   you; CAIR Florida, Inc.; and CAIR Foundation, okay, that

24   is what I requested on behalf of the plaintiffs in terms

25   of your producing documents, correct?

```
1        A.    Correct.

2        Q.    And you responded, and I'm going to read it into

3    the record:

4             "Response:  Objection is made on the grounds

5             of relevance and the availability of less intrusive

6             means.  The settlement communication in question is

7             not pertinent to any of the claims articulated in

8             ... Plaintiff's Amended Complaint.  Furthermore,

9             this communication is confidential and intended

10            solely for the purpose of facilitating a settlement

11            between the parties, rendering it irrelevant to the

12            present action.  Additionally, the Defendant

13            objects on the basis that the Plaintiff has access

14            to less intrusive methods for obtaining the

15            agreement, specifically through CAIR, with which

16            the Plaintiff has an existing contractual

17            relationship as stipulated in their settlement

18            agreement with CAIR."

19            Now, number one, you purport to have

20   negotiated a settlement in this case with the parties,

21   the CAIR parties, correct, K-A-I-R, correct?

22       A.    Correct.

23       Q.    You - CAIR is not a party in this lawsuit, is it

24   not, the one you're here on today, Loomer v. Coleman,

25   et al.?
```

```
1      A.    Is that a question?

2      Q.    Yes.

3      A.    They have a contractual right to your

4  settlement in this matter, but they are not a party.

5      Q.    Correct.  So what is your legal basis for

6  negotiating a settlement with a nonparty?

7      A.    They have a - they have a contract between

8  CAIR and your clients to actually settle this case.

9  They have veto power, they have full authority over any

10 offer of judgment, and they have substantial control

11 over settlement in this malpractice lawsuit.

12     Q.    So you're making your own legal conclusions as

13 to what the settlement agreement between plaintiffs and

14 CAIR entailed, correct?

15     A.    No, that's written down in the actual

16 settlement agreement that Ms. Laura Loomer signed and

17 that you showed at the last motion hearing that we had.

18     Q.    So you're putting yourself in the position of a

19 judge in a court of law in determining what that

20 settlement agreement between plaintiffs and CAIR entails?

21     A.    No.

22     Q.    You negotiated this settlement agreement, this

23 proposed settlement agreement, behind the back of

24 Ms. Loomer and Illoominate Media, did you not?  You did

25 not inform them that you were negotiating a settlement
```

1   that you hope to have enforced with CAIR, correct?

2       A.   CAIR has ultimate settlement authority in this

3   matter via the settlement agreement that your client

4   signed.  As such, I negotiated with the entity that has

5   settlement control in this malpractice action.

6       Q.   The question is you did not inform either

7   Ms. Loomer, Illoominate Media, or me that you were doing

8   that, correct?

9       A.   Correct.  I was not required to.

10      Q.   You previously represented Ms. Loomer, correct?

11      A.   Correct, for about a month-and-a-half.

12      Q.   And Illoominate Media, correct?

13      A.   Correct.

14      Q.   Right.  You were her attorney and Illoominate

15  Media's attorney, correct?

16      A.   I was acting as local counsel for Ron Coleman

17  in the underlying action of this malpractice suit.

18      Q.   But your duties enure to the clients, correct?

19  Your duties and responsibility under the Florida Rules of

20  Professional Conduct relate to the clients, which are

21  Laura Loomer and Illoominate Media, correct?

22      A.   They are no longer my client and they lost

23  that privilege whenever they sued me.

24      Q.   So you owe them no duty at all ethically or

25  legally?

1      A.   There is no ethical rule being broken here and

2  I owe no duty to them.

3      Q.   In fact, in this proposed settlement, and we'll

4  get to it, you actually want me, on behalf of Ms. Loomer

5  and Illoominate Media, to sign off that she cannot file a

6  bar complaint against you, correct?

7      A.   Correct.  That was negotiated at arm's length.

8      Q.   Did you check with the Florida Bar before you

9  put that into this proposed settlement agreement with

10  CAIR?

11      A.   I did not, but it's a contractual agreement

12  and at that point there's no illegality to it.  It is

13  negotiated at arm's length, there's consideration, and

14  she is actually being represented by you, who can review

15  that document.

16      Q.   So you took it upon yourself to decide what the

17  Florida Rules of Professional Responsibility require?

18      A.   No.

19      Q.   You didn't consult with the Florida Rules of

20  Professional Responsibility, did you, before entering into

21  this proposed settlement agreement, did you?

22      A.   No, there's no ethical rule being broken here.

23      Q.   You're going to decide for the Florida Bar to

24  that effect, is that right?

25      A.   You have yet to show any sort of ethical rules

1   that have been broken even though it has been asked of

2   you, so at this point you have nothing to show as far as

3   any ethical issue.  If the Florida Bar has one, they

4   could bring one, but until then there is no issue under

5   the ethical rules.

6       Q.   You're aware that that practice is strictly

7   prohibited in the bars of 50 states in this country?

8       A.   You have yet to show that.

9       Q.   So just to be clear, you never communicated with

10  the Florida Bar, because they'll give advice as to whether

11  this was legal and ethical or not?

12      A.   Correct.

13      Q.   Now I'm going to show you --  Well, let's back

14  up a little bit.  What documents, if any, did you bring to

15  this deposition?

16      A.   None, I --  None.  I had a relevance objection

17  that I filed with the court twice now that you have not

18  responded to.

19      Q.   Since you are claiming that this is irrelevant

20  and has nothing to do with this case, why are you then

21  trying to settle this case with CAIR?

22      A.   Settlement just makes the most sense.  It

23  makes no sense to actually take this out any further

24  than it has to or to delay anything.  I prefer to settle

25  if a settlement could be reached.

1       Q.   So you're saying you're secretly engaging in

2   settlement discussions with CAIR behind the backs of

3   Ms. Loomer, Illoominate Media and me as her counsel, as

4   totally irrelevant to the lawsuit that you're here on

5   today?  Is that what you're saying?

6       A.   Object to form, and also I don't believe --  I

7   believe the documents are irrelevant.  They have no

8   relation to your cause of action in your amended

9   verified complaint.

10      Q.   We had a discussion, did we not, and in addition

11  the request asks for any and all documents that refer or

12  relate in any way to an alleged settlement.  You did have

13  emails that went back and forth to CAIR's counsel, Remy

14  Green, and others that represent CAIR, did you not, with

15  regard to this proposed settlement?

16      A.   Yes.

17      Q.   You have not produced them, correct?

18      A.   No, and I will not absent a court order.

19      Q.   And you're claiming a privilege, that these are

20  privileged communications?

21      A.   I'm claiming that they're not relevant.

22  They're not relevant to your claims of action in your

23  amended verified complaint.

24      Q.   So you're not claiming that they're privileged?

25      A.   No.

1      Q.    I ask that they be produced.  Were there text

2   messages that went to and from CAIR's attorneys?

3      A.    No.

4      Q.    How many emails, approximately, went to and from

5   CAIR's attorneys with regard to the proposed settlement?

6      A.    I couldn't state with specificity.

7      Q.    Roughly speaking.

8      A.    Ten.

9      Q.    More than ten?

10      A.    Ten to twelve, I would say would be a fair

11   estimate.

12      Q.    You have reviewed your files or your computer

13   and determined that there was 12?

14      A.    Well, like I said, I cannot speak with

15   specificity.  I have not reviewed how many emails I

16   have.  I just know that they are not relevant to your -

17   any claims in your amended verified complaint.

18      Q.    Now, you said that you've seen the settlement

19   agreement that was reached between Ms. Loomer, Illoominate

20   Media, and the CAIR defendants, correct?

21      A.    Yes.  You showed it at our last motion for

22   protective order hearing.

23      Q.    What hearing are you referring to?

24      A.    My motion for protective order whenever you

25   actually tried to depose me a couple weeks ago, maybe.

1        Q.    Okay.   Let's turn to the actual settlement

2    agreement that was agreed to between Ms. Loomer,

3    Illoominate Media, and the CAIR defendants, and I'll ask

4    that Mr. Asher Anderson put it up on the screen and turn

5    to Paragraph 3 on Page 3.

6            (Plaintiff's Exhibit No. 3 was marked for

7        identification.)

8    BY MR. KLAYMAN:

9        Q.    I'm going to read it:

10            "Coleman Resolution.  Plaintiffs shall, upon

11        any recovery in Coleman, become immediately liable

12        for the Full Amount Due (with credit for all

13        payments Plaintiff has made under paragraph one to

14        that date) as follows:

15            "a.  Information.  Plaintiffs shall keep CAIR,

16        by and through CAIR's undersigned counsel, up to

17        date and informed about any settlement discussions,

18        proceedings, and the like in Coleman; and

19        Plaintiffs shall give CAIR reasonable notice before

20        any settlement.  Failure to provide (any) such

21        reasonable updates shall be a substantive breach

22        of" the agreement.

23            Now, since neither I nor Ms. Loomer nor

24    Illoominate Media knew what you were doing behind our

25    backs, we were prevented from complying with Section A

1    in keeping CAIR up-to-date, correct?

2         A.   With regards to that specified period,

3    however, when we tried to settle earlier, Mr. Klayman,

4    you did not keep CAIR up-to-date --

5         Q.   Well, we never --

6         A.   -- you therefore breached 3(a).

7         Q.   We never reached a settlement, did we, we never

8    agreed to any settlement?

9         A.   You actually never even brought it over to

10   CAIR to even have them review or to discuss.

11        Q.   That's right, because I rejected it, but I'm not

12   testifying.

13        A.   You're not allowed to reject it.

14        Q.   Ms. Loomer rejected it and so did Illoominate

15   Media, but the point I'm making is that you did this

16   secretly behind the backs of Ms. Loomer and Illoominate

17   Media and prevented them from complying with Section A of

18   Paragraph 3 of the settlement agreement with the CAIR

19   defendants, correct?

20        A.   I believe you were already in breach of

21   Section 3(a) based on our previous settlement

22   discussions, as I did make an offer and you did not

23   bring that to CAIR; but with regards to the latest

24   settlement that I spoke to with CAIR, perhaps you did

25   not breach Section 3(a), but that would be up for a

18

```
 1    court to decide and not for myself.
 2         Q.   Now let's go to Section B:
 3              "Veto Power and Settlement Authority.  CAIR
 4         shall have final sign off power on; veto power
 5         over; and substantive control of Plaintiffs'
 6         authority to settle Coleman, including through any
 7         offer of judgment.  Plaintiffs may not settle
 8         Coleman without CAIR's written consent, and failure
 9         to obtain such consent is a substantive breach of
10         this Settlement."
11              Now, you're a lawyer, correct?
12         A.   Correct.
13         Q.   When were you admitted to the Florida Bar?
14         A.   2016.
15         Q.   Okay, so you've been a lawyer for almost eight
16    years, correct?
17         A.   I've been a lawyer longer.  I was admitted
18    in --
19         Q.   Oh, excuse me.
20         A.   -- in 2013.
21         Q.   Right.  That's why I'm a lawyer, I'm not good at
22    math, okay?  So you've been a lawyer for quite a good
23    period of time.
24         A.   Correct.
25         Q.   Now, this provision, based upon the plain
```

```
 1   language of the provision, gives the CAIR defendants only

 2   a veto power over any settlement.  It does not give them

 3   the power to settle it themselves, the CAIR defendants.

 4        A.   Disagree, Mr. Coleman.  I actually work in

 5   corporate law --

 6        Q.   My name is not Coleman.

 7        A.   Oh, you are correct, Mr. Klayman.  Excuse me -

 8   Coleman, Klayman - I apologize, Mr. Klayman.

 9             You're incorrect, Mr. Klayman.  I handle

10   corporate contracts.  I've reviewed hundreds, if not

11   thousands, of contracts and I've written contracts,

12   redlined, reviewed, and let's see.

13             I'm sorry, Asher, can you stop scrolling,

14   please?  You set a line through there somehow on the

15   screen.  And can you make it a little bit smaller,

16   Mr. Anderson?  Thank you, that's better.  Perfect.

17             So Section 3(b), it gives the CAIR

18   defendants actually three bargained-for - bargained-for

19   powers, as it will.  First is final sign-off power on,

20   meaning final sign off power on any sort of settlement

21   that you may receive; veto power over, veto any

22   settlement that you may receive if it's not good enough

23   to cover their fees, most likely; and then three,

24   substantive control of plaintiffs' authority to settle

25   Coleman, including through any offer of judgment.
```

20

```
 1            This substantive is a big word in contract
 2    law, meaning the majority or almost a hundred percent
 3    control of plaintiffs' authority to settle Coleman.  It
 4    actually gives them the power to reach out and to create
 5    settlements in this malpractice action.  You've signed
 6    away three rights here.  On a bargained-for exchange I
 7    believe you took the monetary award owed to CAIR from
 8    124,000 down to 73,500, so that's your bargained-for
 9    exchange right there.
10        Q.   How can a nonparty, such as the CAIR defendants,
11    decide to settle a separate lawsuit for legal malpractice
12    against you and Ron Coleman and the law firms that are
13    involved in this case?  How can they do that ethically?
14        A.   Through this contract.  It breaks no ethical
15    rules.  You could contract for anything as long as there
16    is not an illegal purpose, and an illegal purpose could
17    be sexual acts, it could be criminal acts such as the
18    death of someone, killing someone, something of that
19    nature.  It must abide by the statute of frauds, and,
20    yeah, and it's written down.
21            So at this point this is an actual contract
22    between Loomer and CAIR and they have substantial
23    authority to settle this matter contractually.  Laura
24    bargained that away.
25        Q.   Are you saying that the use of the phrase veto
```

```
 1   power has no significance in this section?
 2        A.   I'm saying it's actually one point of that
 3   section.  There are three points - final sign-off power
 4   on, veto power over, and substantive control of
 5   plaintiffs' authority to settle Coleman.
 6        Q.   And you decided to interpret this provision
 7   without ever talking to either me as the attorney for the
 8   plaintiffs or Ms. Loomer, correct?
 9        A.   There was no need to.  After reviewing it, it
10   was clear that CAIR had substantive control over the
11   authority to settle this matter, not Laura Loomer.
12        Q.   You're aware that any amount of money that was
13   not subject to your proposed settlement, that Ms. Loomer
14   would still be liable for, as well as Illoominate Media,
15   correct?
16        A.   Yes, she would still owe under this agreement
17   up to 73,500.
18        Q.   So in your view, you have no continuing duty
19   with regard to Ms. Loomer; you can do, in effect, whatever
20   you want.
21        A.   Within the bounds of the rules.  She has lost
22   all that privilege when she actually sued me, including
23   attorney-client privilege.
24        Q.   So once she sues you, you are absolved of any
25   ethical responsibility?
```

```
1        A.   As long as --  If you can point to an ethical
2    rule, then I'm still subject to the Florida Bar rules of
3    ethics, however, there's no ethical rule with regards to
4    this contract.
5        Q.   Okay, so you're making a determination on behalf
6    of the Florida Bar?
7        A.   I'm making a determination on the fact of this
8    contract, not on --
9        Q.   As a matter of prudence and care, would it have
10   not been prudent for you to consult with the Florida Bar
11   before you undertook negotiated settlement behind the
12   backs of the plaintiffs?
13       A.   This is a valid contract, it has nothing to do
14   with the ethics or the Florida rules of ethics.  This is
15   a valid contract and thus gives CAIR substantive control
16   of plaintiffs' authority to settle Coleman, as is shown
17   in 3(b).
18       Q.   Isn't it true that the substantive control deals
19   with the fact --  Or strike that.
20            Isn't it true that any substantive control
21   that's set forth in Paragraph B is exercised through the
22   veto power, which is part of Subpart B of the settlement
23   agreement between Loomer, Illoominate Media, and the CAIR
24   defendants?
25       A.   No, the veto power is separate from
```

23

1   substantive control.  Veto power refers to if Ms. Loomer

2   were to receive a settlement, and if you were to

3   actually communicate with CAIR regarding that settlement

4   and it wasn't good enough to cover, possibly, CAIR's

5   fees - I'm assuming that - then they could actually veto

6   that settlement and tell you not to accept it.

7          That is separate from substantive control of

8   plaintiffs' authority to settle Coleman.  That's shown

9   through the semicolon and the separate "and", allowing

10  for three different bargained-for exchanges.

11      Q.   Your agreement, as proposed with the CAIR

12  defendants, does not cover the fees that were ordered to

13  be owed to the CAIR defendants from Ms. Loomer and

14  Illoominate Media, correct?

15      A.   Not all 73,500, no.

16      Q.   And you don't think that Ms. Loomer has any say,

17  on behalf of herself and Illoominate Media, in approving

18  the very small amount that you propose to pay to the CAIR

19  defendants?

20      A.   No.  CAIR has final sign-off power, veto

21  power, and substantive control.  Any sort of settlement

22  that is either communicated to you or to them must go to

23  them for either the final sign-off to veto or to just

24  have control and to take over the negotiations.

25      Q.   So based upon your own actions, you get to

1    decide how much Loomer will continue to owe, and

2    Illoominate Media, the CAIR defendants?

3         A.   No, I have control over what I can offer as a

4    settlement.

5         Q.   Now, as part of this proposed settlement, you

6    signed an affidavit, did you not?

7         A.   I did.

8              MR. KLAYMAN:  And I'll ask that Mr. Anderson

9         put that up on the screen.

10             (Plaintiffs' Exhibit No. 4 was marked for

11        identification.)

12   BY MR. KLAYMAN:

13        Q.   And turning to Page 3, is that your signature?

14        A.   Correct.

15        Q.   And this affidavit was signed under oath?

16        A.   Yes.

17        Q.   And you will submit that everything in this

18   affidavit is true and correct to the best of your personal

19   knowledge and belief?

20        A.   Yes.

21        Q.   When did you become a lawyer on behalf of

22   Ms. Loomer and Illoominate Media?

23        A.   That would have been June 29th, 2021.

24        Q.   On becoming counsel for Ms. Loomer and

25   Illoominate Media, you were required to review the file,

1   correct, to understand what had gone on up to that point

2   in time?

3       A.   Yes.  I requested the file from Mr. Coleman

4   and I reviewed the file in its entirety.

5       Q.   And you thoroughly reviewed it, correct?

6       A.   Correct.

7       Q.   In reviewing that file, you came to the

8   conclusion that the lawsuit that was filed on behalf of

9   Ms. Loomer and Illoominate Media was non-meritorious,

10  correct?

11      A.   No.

12           MR. SANDO:  Object to form.

13  BY MR. KLAYMAN:

14      Q.   Did you come to the opposite conclusion, that it

15  was meritorious?

16      A.   Object to form, but I believe that.

17           MR. SANDO:  Object to form, too.

18           THE WITNESS:  It seemed meritorious to me, but

19      that - all the decisions back then happened prior

20      to June 29th, so I was not around for those

21      decisions or for that judgment.

22  BY MR. KLAYMAN:

23      Q.   Now, from that point forward that you became

24  counsel, you've had a duty to advise Ms. Loomer as to

25  whether any actions that were taken or not taken were

1    meritorious and justified, correct?

2              MR. SANDO:  Object to form.

3         A.   I'll also object to form.  And, no, I told

4    Ms. Loomer that - where she was in the case, why the

5    case was dismissed, and where we were as far as actually

6    having to respond to the motion for attorney's fees.

7    BY MR. KLAYMAN:

8         Q.   But as co-counsel with Mr. Coleman and his law

9    firms, you had a duty to advise her as to the efficacy and

10   merits of any action that was taken from that point

11   forward, correct?

12             MR. SANDO:  Object to form.

13        A.   Object to form, and from when I came on, yes,

14   I told her that the law was against her, that she was

15   going to have to actually pay something, and that it was

16   really going to be an uphill battle.  However, her

17   stance was the fact that she did not want to pay

18   anything to CAIR, that she saw CAIR as a terrorist

19   organization and paying them would be akin to actually

20   funding terrorism.  Where she came to that conclusion, I

21   don't know.

22   BY MR. KLAYMAN:

23        Q.   Have you ever researched the history of CAIR?

24        A.   No, that was not what I needed to do to

25   actually adequately respond to a motion for attorney's

27

```
 1   fees.  They're a valid Florida entity and that's what I
 2   needed to know.
 3        Q.   So you have no knowledge as to CAIR's history at
 4   all?
 5        A.   No.
 6        Q.   You are aware that CAIR was named as an
 7   unindicted co-conspirator in a criminal case in Dallas,
 8   Texas against the Holy Land Foundation, correct?
 9        A.   I am not aware.
10             MR. SANDO:  Object to form.
11   BY MR. KLAYMAN:
12        Q.   You are aware that CAIR was linked to acting in
13   a capacity of sending financial aid to Hamas, correct?
14             MR. SANDO:  Object to form.
15        A.   Object to form, and, no, I'm not aware.
16   BY MR. KLAYMAN:
17        Q.   You've done no research since?
18             MR. SANDO:  Form.
19        A.   Object to form, and no.  CAIR is a valid
20   Florida entity.
21   BY MR. KLAYMAN:
22        Q.   Well, Ms. Loomer made a rather strong statement.
23   Don't you think you had an obligation to check it out?
24             MR. SANDO:  Form.
25        A.   Object to form, and, no, it had no bearing on
```

28

1    what I had to do with regards to filing an opposition

2    for a motion for attorney's fees.  Any sort of argument

3    regarding CAIR being linked to any sort of terrorist

4    organization or funding terrorism is not a meritorious

5    argument.

6    BY MR. KLAYMAN:

7        Q.   Before you went behind Ms. Loomer's back and

8    tried to negotiate a settlement, it didn't concern you

9    that the monies that you would be agreeing to pay would go

10   to an organization that was named as an unindicted

11   co-conspirator in a terrorism trial in Dallas, Texas for

12   having aided Hamas?

13           MR. SANDO:  Object to form.

14       A.   Object to form, and also, the money would be

15   going to a valid state entity.

16   BY MR. KLAYMAN:

17       Q.   And you have no concern where that money could

18   possibly go after you - it was paid to CAIR?

19       A.   Object to form, and once again, it would be

20   paid to a valid state entity.

21       Q.   You are aware that CAIR, excuse me, that Hamas

22   attacked Israel on October 7th and killed nearly 2,000

23   people, including beheaded - beheading children, raping

24   women and taking hostages and otherwise killing people?

25           MR. SANDO:  Object to form.

```
 1        A.   Object to form.  Yes, I am aware of what's
 2   going on in Gaza somewhat, with Israel.
 3   BY MR. KLAYMAN:
 4        Q.   So it didn't concern you that you were agreeing
 5   to pay money over to CAIR?
 6        A.   Object to form.
 7             MR. SANDO:  Form.
 8             THE WITNESS:  No, I am paying to a valid
 9        Florida state entity.
10   BY MR. KLAYMAN:
11        Q.   And you have no legal obligation to pay any
12   money to CAIR, do you?
13             MR. SANDO:  Form.
14        A.   Object to form.  With regards to the
15   settlement, if we reached a different deal, then it
16   would be a different deal, but we reached the deal that
17   we did and if the contract goes through and is valid,
18   then I would be paying CAIR $5,000, which would go
19   towards Loomer's fees owed to CAIR.
20   BY MR. KLAYMAN:
21        Q.   Quite apart from your being sued for
22   malpractice, you have no financial obligation to pay CAIR
23   anything?
24        A.   Object to form and, no, I'd have, outside of
25   this lawsuit, no reason to pay CAIR anything.
```

```
 1   BY MR. KLAYMAN:
 2        Q.   Turning to your affidavit, Paragraph 8, "I
 3   requested the file from Ron Coleman and I reviewed the
 4   matter," you thoroughly reviewed the case, correct, at
 5   that time?
 6        A.   Yes.
 7        Q.   Paragraph 11, I'm going to read it:
 8             I should note that --  "I should also note
 9        that, as described by the Circuit, it was before I
10        was retained that 'Illoominate's counsel declined
11        to follow local rules of the district court
12        instructing that the recipient of a motion for
13        costs and attorney's fees, within 14 days, 'shall
14        describe with reasonable particularity each time
15        entry or nontaxable expense to which it objects,
16        both as to issues of entitlement and as to amount,
17        and shall provide supporting legal authority.'"
18        Illoominate Media, Inc. v. Cair Florida, Inc.,
19        2022, U.S. App. LEXIS 27435, at 10(11th Cir
20        Sep. 30, 2022), quoting S.D. Fla. R. 7.3(a).  Thus,
21        at that stage, arguments about the amount of fees
22        were waived."
23             That's an accurate statement, is it not?
24        A.   It is.  The rules stated that you have 14 days
25   to actually discuss that.  That did not happen.
```

1    However, there was no order from the court stating that

2    this was waived and we actually believed that, given the

3    instructions from Ms. Loomer as to how she wanted to

4    invalidate the offer of judgment, due to the fact that

5    she did not want to pay CAIR as she viewed them as a

6    terrorist organization, which she repeated multiple

7    times, in my judgment the best argument we could put

8    forward was to invalid the offer of judgment by claiming

9    that there was nonmonetary equitable relief stated in

10   the complaint.

11   BY MR. KLAYMAN:

12       Q.   Having reviewed the file, you became aware that

13   Mr. Coleman and his law firms never took any action to

14   pursue equitable relief in terms of the case?

15            MR. SANDO:  Object to form.

16       A.   Object to form, and that happened prior to my

17   joining.

18   BY MR. KLAYMAN:

19       Q.   But in reviewing the file, you were able to

20   determine that Mr. Coleman and his law firms didn't take

21   any action to further the claims of Ms. Loomer and

22   Illoominate Media for equitable relief?

23            MR. SANDO:  Object to form.

24       A.   Object to form.

25            MR. BLOCH:  And join as to Dhillon.

```
 1    BY MR. KLAYMAN:

 2         Q.    Respond, please.

 3         A.    Yes, also --  Repeat that one more time,

 4    Mr. Klayman.

 5         Q.    In reviewing the file, you were able to

 6    ascertain that Mr. Coleman and his law firm took no action

 7    to further - to litigate the prayer for injunctive relief

 8    in the complaint?

 9              MR. SANDO:  The same objection.

10         A.    Object to form.  Also, while there was no

11    action, there was also no order from the court stating

12    that it could not be done.  In my judgment, it was not a

13    good argument to make with regards to what Ms. Loomer

14    wanted and the arguments that we wanted to make to

15    actually invalid the offer of judgment as a whole.

16    BY MR. KLAYMAN:

17         Q.    Now, as you entered the case, you would have had

18    the ability to pursue the injunctive relief on behalf of

19    Ms. Loomer and Illoominate Media, correct?

20         A.    Object to form, and when I joined it was

21    solely an attorney fees matter.

22         Q.    Now, you also understood the rules as set forth

23    in Paragraph 11.  You did not file a motion, along with

24    Mr. Coleman and his law firm, that specified specific

25    objections to line entries for the claim for attorney's
```

33

1   fees and costs by the CAIR defendants, correct?

2      A.   Object to form.  We didn't --  In my judgment,

3   it was going to go against the main argument that we

4   wanted to make that would invalidate the offer of

5   judgment as a whole, as that was what Ms. Loomer had

6   requested, because she continued to say that CAIR was a

7   terrorist organization.

8      Q.   What does that have to do --  Well, strike that.

9      That has nothing to do with objecting to line

10   items of the attorney's fees requested award, correct?

11      MR. SANDO:  Object to form.

12      A.   Object to form.  In my judgment, that was not

13   an argument that was going to actually help us with what

14   we wanted to do.  Ms. Loomer wanted the fees gone and so

15   in order to do that, the best argument we could make,

16   after consulting and reviewing and doing our research,

17   was to invalidate the offer of a judgment as a whole by

18   claiming that the complaint had set forth a request for

19   nonmonetary and equitable relief.

20   BY MR. KLAYMAN:

21      Q.   In fact, nothing prevented you from making both

22   arguments, correct?  You could have made both.

23      MR. SANDO:  Object to form.

24      A.   Object to form.  It would have weakened our

25   primary argument.

```
 1   BY MR. KLAYMAN:

 2        Q.   How does that weaken your primary argument?

 3             MR. SANDO:   Form.

 4        A.   Object to form.  It would weaken by showing

 5   that there would be some sort of fees owed to CAIR.  The

 6   hard stance and the bigger picture that we took, which

 7   was a clean, clear, simple argument, is that the offer

 8   of a judgment as a whole was invalid due to the

 9   complaint requesting equitable relief.

10   BY MR. KLAYMAN:

11        Q.   Lawyers frequently argue in the alternative, do

12   they not?

13        A.   Object to form, and lawyers can if that's

14   their judgment.

15        Q.   And you never informed Ms. Loomer and

16   Illoominate Media that in fact you were making a decision,

17   along with Mr. Coleman, only to raise one argument,

18   whereas you had two that you could have made.

19        A.   Object to form.  She was aware of every

20   argument that we were making.

21        Q.   Do you have anything in writing to that effect?

22        A.   Object to form.  I believe that was in a phone

23   call between myself and Ms. Loomer and Mr. Coleman.

24        Q.   But you're not sure, you believe that it was?

25        A.   I'm not sure of the timeline, but I believe
```

35

1   there was a call, yes.

2        Q.   I'll show you what I'll ask the court reporter

3   to mark as Exhibit - is it 4?

4             MR. SANDO:   The affidavit is four, I have.

5             MR. KLAYMAN:   The affidavit is four and we'll

6        get back to the affidavit.

7             (Plaintiffs' Exhibit No. 5 was marked for

8        identification.)

9   BY MR. KLAYMAN:

10       Q.   Five, this --  Exhibit 5 is the legal retainer

11  agreement that you signed with Ms. Loomer, correct?

12       A.   Is it going to be shown on the screen?

13       Q.   Yes.

14       A.   That would be it, yes, to act as local counsel

15  to Illoominate Media and Laura Loomer's attorney,

16  Ronald D. Coleman.

17       Q.   Paragraph 2, the second paragraph, "Attorney

18  shall provide those legal services reasonably required to

19  represent Client, and shall take reasonable steps to keep

20  Client informed of progress and to respond to Client's

21  inquiries," that was your duty as set forth in the legal

22  retainer agreement, correct?

23       A.   Yes, and that was fulfilled.

24       Q.   And in furtherance of this legal representation

25  agreement, you were paid due consideration by Ms. Loomer

36

1    and Illoominate Media, correct?

2          A.    Yes, in the amount of $5,000.

3          Q.    Paragraph 14 of your affidavit, going back to

4    Exhibit 4, "My understanding of my role was ... I would

5    essentially be checking materials drafted by Ron for

6    general compliance with local rules and practice," is that

7    an accurate statement?

8          A.    That is an accurate statement, and we also

9    actually consulted with each other frequently to put

10   forth the motion that we did.

11         Q.    Now, Mr. Coleman is not licensed in the State of

12   Florida, correct?

13         A.    Correct.

14         Q.    Based on your knowledge, he doesn't generally

15   practice in Florida, correct?

16         A.    I don't know where he generally practices.  I

17   know for that case he was practicing in Florida, and he

18   is I believe a New Jersey licensed attorney.

19         Q.    And you never asked him about how much

20   experience he had in Florida legal practice in the law,

21   correct?

22         A.    As regards to Florida, no, but I did ask him

23   as to this matter and he said he had plenty of

24   experience.

25         Q.    You had a duty and responsibility, did you not,

37

1    to not just check Ron for general compliance with local

2    rules and practice, but to also affirmatively and

3    independently advise Ms. Loomer as to whether the actions

4    taken were ethically and legally appropriate, correct?

5              MR. SANDO:  Object to form.

6         A.   Object to form.

7              MR. BLOCH:  Join.

8    BY MR. KLAYMAN:

9         Q.   You can respond.

10        A.   Yes.  We did have that discussion, we all were

11   on the same page with what we wanted to do with the

12   motion and how we wanted to proceed.

13        Q.   Your role was not just to rubber stamp what

14   Ron Coleman sent to you, correct?

15        A.   My role was to review and we had a game plan

16   that we set forth and that was actually accomplished and

17   we actually ended up with a 20 percent reduction in

18   attorney's fees.

19        Q.   So you're saying the amount of attorney's fees

20   that Ms. Loomer was ordered to pay was reasonable?  Is

21   that what you're saying?

22             MR. SANDO:  Object to form.

23        A.   Object to form.  The court found them

24   reasonable.

25   BY MR. KLAYMAN:

1      Q.   I asked you, do you believe that they're

2   reasonable?

3           MR. SANDO:   Form.

4      A.   Object to form, and I really can't speculate

5   on that.

6   BY MR. KLAYMAN:

7      Q.   Well, you looked at the motion for attorney's

8   fees, did you not?  You did review it, did you not?

9      A.   Yes, I did.

10      Q.   And you never made any argument on behalf of

11   Ms. Loomer or Illoominate Media that those fees were

12   unreasonable and inflated, did you?

13           MR. SANDO:   Object to form.

14      A.   Object to form.  I believe in Section 2, I'd

15   have to go back and look, but I believe we didn't make a

16   reference to it, however, the main goal was to

17   invalidate the offer of judgment.  We were all on the

18   same page with that.  That is what we put forth.

19           In my judgment that was the best argument we

20   can make to actually obtain what Ms. Loomer wanted,

21   given that she did not want to pay CAIR, given her

22   thought that they were a terrorist organization.

23   BY MR. KLAYMAN:

24      Q.   So neither you nor Mr. Coleman and Coleman's law

25   firm and your law firm ever challenged the $144,931.87

```
 1    plus interest which CAIR was demanding in attorney's fees?

 2              MR. SANDO:  Object to form.

 3        A.    Object to form, and we challenged the --

 4              MR. BLOCH:  Join.

 5        A.    -- offer of judgment as a whole.

 6   BY MR. KLAYMAN:

 7        Q.    You never challenged the amount?

 8        A.    I believe we did the second one.

 9              MR. SANDO:  Object to form.

10   BY MR. KLAYMAN:

11        Q.    That's a lot of money, isn't it?

12        A.    Object to form, and to me, yes.

13        Q.    And that's a lot of money for someone who was

14   offered one dollar in an offer of judgment, correct, in

15   particular?

16              MR. SANDO:  Form.

17        A.    Object to form and she was offered one dollar

18   after it was shown that there was actually - Laura

19   Loomer fell for a prank and that CAIR was actually not

20   involved in any of the allegations that she set forth.

21   She fell for a prank.

22   BY MR. KLAYMAN:

23        Q.    So Mr. Coleman fell for a prank, too, correct?

24              MR. SANDO:  Form.

25        A.    Object to form.  I have no idea if he fell for
```

40

1   the prank or not.

2   BY MR. KLAYMAN:

3       Q.   You filed a lawsuit he fell for the prank, is

4   that what you're saying?

5            MR. SANDO:   Form.

6       A.   Object to form.  I do not know if he fell for

7   a prank.  That was prior to my time and I have no idea

8   what his thought process or what their discussions were

9   as to that.

10  BY MR. KLAYMAN:

11      Q.   But you reviewed the file, as you just

12  testified, the entire file?

13      A.   Object to form.  Yes, I did, but that does not

14  include their thoughts.

15      Q.   And you came to no conclusion as to whether

16  Mr. Coleman filed a frivolous lawsuit, correct?

17           MR. SANDO:   Object to form.

18      A.   Object to form.  That was all done prior to my

19  joining the case, whether it was frivolous or not.  I

20  believe Mr. Coleman would file a meritorious lawsuit.

21  BY MR. KLAYMAN:

22      Q.   Paragraph 22 of your affidavit, "Likewise, it is

23  my view that it is well below the general standard of

24  practice to fail to alert a client of the existence of -

25  to say nothing of the consequences of - an offer of

1   judgment.  I was not involved in that stage, and my view

2   was that I did everything I could to rescue a client from

3   the consequences of that failure."  Do you stand by that

4   statement?

5           MR. SANDO:  Object to form.

6       A.   Object to form.  Yes, that is a true

7   statement.  If that did happen, and that's a big if,

8   then that would fall below the general standard of CAIR.

9   BY MR. KLAYMAN:

10      Q.   Well, you reviewed the file and --

11          MR. SANDO:  Object to form.

12  BY MR. KLAYMAN:

13      Q.   -- you were involved, correct?

14      A.   You'll have to repeat that.

15      Q.   You reviewed the file, correct, and you had

16  conversations with Mr. Coleman, correct?

17      A.   Object to form, and, yes, I reviewed the file

18  and, yes, we did have conversations.

19      Q.   So what you're saying here is that Mr. Coleman

20  did not follow the general standard of care to alert

21  Ms. Loomer and Illoominate Media of the existence of an

22  offer of judgment; that's what you're saying, correct?

23          MR. SANDO:  Object to form.

24      A.   Object to form.  No, I'm not stating that

25  Ron Coleman did that.  I'm stating simply that it would

1  fall below the general standard of care, however, in my

2  initial conversation with Mr. Coleman and Ms. Loomer, I

3  did ask about it.  She said that she rejected it because

4  she was - she believed CAIR was scared about what she

5  could actually produce at discovery and that she was -

6  they were just trying to get rid of her to avoid any

7  sort of embarrassment due to the fact that she believes

8  they were a terrorist organization and she had some sort

9  of smoking gun to suggest as such.

10  BY MR. KLAYMAN:

11      Q.   If that was your view, why did you put

12  Paragraph 22 in this affidavit?

13      A.   Because - object to form - because it would

14  actually fall below the standard of care.

15      Q.   So you were hoping that Ms. Loomer and

16  Illoominate Media would accept your proposed settlement by

17  offering up testimony in the form of this affidavit, sworn

18  testimony, that Mr. Coleman and his law firm had committed

19  malpractice?

20          MR. SANDO:  Object to form.

21      A.   Object to form, and I never said that

22  Mr. Coleman or any of the other defendants committed

23  malpractice.

24  BY MR. KLAYMAN:

25      Q.   So to try to save your own skin, you were

43

1  willing to throw Mr. Coleman and his law firm overboard.

2       A.   Object to form, and, no, I'm not throwing

3  anyone overboard.  It is my general view that not

4  alerting a client would fall below the general standard

5  of care.  However, in my discussion with Ms. Loomer, it

6  was already - it was told to me that she had rejected

7  that offer of judgment.

8       Q.   If in fact what you testified is true, you would

9  not have written Paragraph 22 into your affidavit?

10           MR. SANDO:  Form.

11      A.   Object to form.  It is true and it still would

12  have the same statement because it is still below the

13  general standard of care if that were to happen, but it

14  did not happen.

15  BY MR. KLAYMAN:

16      Q.   So this was a sweetener that you put in the

17  affidavit to try and induce a proposed settlement with

18  CAIR, correct?

19           MR. SANDO:  Form.

20      A.   Object to form.  It is not a sweetener, it is

21  just my general view that not alerting the client would

22  fall below the general standard of care.

23  BY MR. KLAYMAN:

24      Q.   And would be unethical, correct?

25           MR. SANDO:  Object to form.

Daughters Reporting, Inc.
Fort Lauderdale, Florida 954-755-6401

44

```
 1        A.    Object to form.  I'm not sure about the

 2   ethical rule on that, but client communication is

 3   important, so keeping a client informed as to that would

 4   be important.

 5   BY MR. KLAYMAN:

 6        Q.    Do you take CLE courses on professional ethics

 7   to keep your license in Florida?

 8        A.    Object to form, and, yes, as we are required

 9   to do so.

10        Q.    So therefore you know that part of the ethical

11   considerations is to keep a client fully informed?

12        A.    Object to form, and yes.

13        Q.    I'll ask that we attach as Exhibit 6 an email

14   that you sent to me yesterday evening, August 20, 2024.

15   Mr. Anderson could put that up on the screen.

16            (Plaintiffs' Exhibit No. 6 was marked for

17        identification.)

18   BY MR. KLAYMAN:

19        Q.    "Mr. Klayman, you stated you have the document

20   already but want the emails, texts and notes."

21            What I told you was I have your proposed

22   settlement already, correct, not your emails, texts, and

23   notes.

24        A.    That's what's stated in the first sentence.

25   You said you have the settlement document, but you
```

1    wanted the emails, texts, and notes.

2        Q.    Then you state, "I stand by my relevance

3    objection previously filed with the court and there is no

4    privilege so I will not be filing a privilege log.  You

5    can take it up (with) your request on a UMC hearing.  I

6    will not be producing any documents tomorrow."

7             Now, you are claiming, or you claimed previously

8    but you obviously stated otherwise earlier in this

9    deposition, that you felt you had a privilege to discuss

10   settlement confidentially with the CAIR defendants.

11       A.    I did not state that I had a privilege, I

12   state that they had the contractual right.

13       Q.    And so you'll stand by your testimony earlier

14   today that you're not claiming any privilege on your

15   communications with CAIR or a work product doctrine?

16       A.    Objection to form, and, no, there is no

17   privilege.  However, it is not relevant to your cause of

18   action in your amended verified complaint.

19       Q.    And no work product claimed?

20       A.    And no work product, but once again, it is not

21   relevant to any admissible evidence that you may be able

22   to find given your verified amended complaint.

23       Q.    Is it your testimony that as of today you owe no

24   duty of care to Ms. Loomer and Illoominate Media --

25       A.    Object to form.

1       Q.    -- as their prior attorney?

2       A.    She lost that whenever she actually sued me.

3    There is no attorney-client privilege and no longer any

4    duty.

5       Q.    You're saying essentially that once a claim for

6    malpractice is brought against you and your firm, you have

7    no longer any duty of any sort, legal or ethical, towards

8    Ms. Loomer and Illoominate Media?

9       A.    Object to form.  I am bound by the rules of

10   ethics, of which I am following, and there is no other

11   duty to Ms. Loomer due to her filing this malpractice

12   case and actually contracting away her settlement

13   authority.

14      Q.    So you're saying you owe her no duties at all of

15   any sort?

16      A.    Object to form.  No.

17      Q.    That's what you're saying, the answer is yes?

18      A.    Object to form.  Correct, I owe no duty to her

19   anymore.

20      Q.    You are aware that --  Let's turn now to the

21   verified amended complaint, Paragraph 25.  I'll ask that

22   be marked as Exhibit 7 to your deposition.

23            (Plaintiffs' Exhibit No. 7 was marked for

24       identification.)

25   BY MR. KLAYMAN:

47

```
 1        Q.    Paragraph 25:

 2              "Judge Ruiz found that Defendants Coleman and

 3        Mandelbaum had 'fraudulently' joined CAIR Florida

 4        as a party, despite having no basis in law or fact.

 5        It then turned out that Defendants Coleman and

 6        Mandelbaum, as pled herein, did this willfully and

 7        intentionally because they provided zero evidence

 8        to rebut CAIR's ... arguments that it was joined

 9        fraudulently.  Thus, on October 22nd ... Judge Ruiz

10        entered an order denying remand and dismissing all

11        claims against CAIR Florida for lack of

12        jurisdiction."

13              When you came into the case as Ms. Loomer and

14   Illoominate Media's counsel, you were able to see

15   exactly what Paragraph 25 sets forth, that CAIR Florida

16   had been joined fraudulently, correct?

17        A.    That happened prior to my joining.

18        Q.    But you agree that it was joined fraudulently?

19              MR. SANDO:  Object to form.

20        A.    Object to form.  I'd have to go back and look

21   and see exactly what the court said.

22   BY MR. KLAYMAN:

23        Q.    I'm asking you for your own independent

24   judgment, given your having reviewed the entire file when

25   you became counsel.
```

```
 1              MR. SANDO:  Object to form.

 2      A.   Object to form, and, while I did review the

 3  entire file when I became counsel, I do not recall this

 4  specifically.

 5  BY MR. KLAYMAN:

 6      Q.   So you're claiming you didn't do a very thorough

 7  review, is that it?

 8              MR. SANDO:  Form.

 9      A.   Object to form.  At the time I did.  It has

10  now been a couple years since then and I do not recall

11  this specifically.

12  BY MR. KLAYMAN:

13      Q.   Paragraph 27:

14              "During the entire period of representation,

15          Defendants Coleman and Mandelbaum never once

16          followed up on, litigated, or took any action

17          whatsoever to obtain the injunctive and equitable

18          relief that Plaintiffs desired."

19              That's an accurate statement, is it not, based

20  on your review of the file when you became counsel?

21              MR. SANDO:  Object to form.

22      A.   Object to form.  The file shows that Twitter

23  was not served.

24  BY MR. KLAYMAN:

25      Q.   Paragraph 27 deals with whether any action was
```

```
1    taken for injunctive and equitable relief.  You were able

2    to determine when you became counsel that no action was

3    taken by Defendants Coleman and Mandelbaum with regard to

4    pursuing injunctive and equitable relief on behalf of

5    Ms. Loomer and Illoominate Media, correct?

6             MR. SANDO:  Object to form.

7        A.   Object to form.  What the docket showed was

8    that Twitter was not served.

9    BY MR. KLAYMAN:

10       Q.   And that no injunctive relief had been furthered

11   in the case, correct?

12            MR. SANDO:  Form.

13       A.   Object to form.  I believe that would have to

14   be done with Twitter as a party.

15   BY MR. KLAYMAN:

16       Q.   Paragraph 29 of the amended complaint:

17            "Thus, had Defendants Coleman and Mandelbaum

18            actually (1) served Twitter with the CAIR suit, and

19            (2) pursued injunctive and equitable relief that

20            Plaintiffs desired, then Plaintiffs would not have

21            been subjected to having to pay attorneys fees to

22            CAIR and CAIR Florida."

23            That is an accurate statement in Paragraph 29,

24   correct, based upon your review of the file and your

25   experience as an attorney?
```

```
 1              MR. SANDO:  Object to form.

 2        A.   Object to form, and, no, I do not believe so.

 3   I believe it was her rejection of the offer of judgment

 4   that subjected her to having to pay attorney's fees.

 5   Whether Mr. Coleman made a judgment on Twitter and

 6   serving Twitter, that was prior to my joining the case.

 7   BY MR. KLAYMAN:

 8        Q.   Well, you joined the case and you were asked to

 9   analyze what had occurred up to that point in time,

10   correct?

11              MR. SANDO:  Form.

12        A.   Object to form.  I reviewed the case file, I

13   reviewed the docket, and I had spoken with them.  She

14   rejected the offer - settlement offer of judgment and

15   that is what resulted in her having to pay attorney's

16   fees.

17   BY MR. KLAYMAN:

18        Q.   But you just previously testified that if in

19   fact injunctive relief had been furthered in the case,

20   that that was your argument, that attorney's fees were not

21   due?

22              MR. SANDO:  Form, misstates his testimony.

23   BY MR. KLAYMAN:

24        Q.   You can respond.

25        A.   Object to form.  The same objection as
```

1    Mr. Sando, that does misstate my testimony.

2         Q.   Well, you said your primary argument or your

3    only argument was that, on equitable relief, that that

4    nullified having to pay attorney's fees, right?

5              MR. SANDO:   Same objection.

6         A.   Same objection.   What I testified was that it

7    was brought up in the complaint and that is what we used

8    to actually make our argument to get Ms. Loomer out of

9    the fees, as she requested.

10   BY MR. KLAYMAN:

11        Q.   But the argument would be even stronger if in

12   fact any effort had been made to pursue equitable relief

13   by Mr. Coleman and Mandelbaum?

14             MR. SANDO:   Form.

15        A.   Object to form.   That would be up to the

16   court.   It was made - it was mentioned in the complaint

17   and that is what we put forth.

18   BY MR. KLAYMAN:

19        Q.   Based upon your review of the file when you

20   became counsel, you became aware that no effort was made

21   by Coleman or Mandelbaum to pursue equitable relief,

22   correct?

23             MR. SANDO:   Object to form.

24        A.   Object to form.   I don't know about the

25   effort, all I know is that the docket shows Twitter was

```
 1    not served.

 2    BY MR. KLAYMAN:

 3         Q.   Do you see anything in the file to show that

 4    they were pursuing objective relief?

 5              MR. SANDO:   Form.

 6         A.   Object to form.   In the complaint they were

 7    pursuing equitable relief.

 8    BY MR. KLAYMAN:

 9         Q.   And that's it?

10              MR. SANDO:   Form.

11         A.   Object to form.   In the complaint, they were

12    pursuing equitable relief.

13    BY MR. KLAYMAN:

14         Q.   Answer the question, Mr. Young.

15         A.   I did.

16         Q.   When you reviewed the file, did you find any

17    evidence that Coleman and Mandelbaum had actually pursued

18    equitable relief?

19              MR. SANDO:   Object to form.

20         A.   Object to form, already answered.   He put that

21    in the complaint and that was him looking to get

22    equitable relief from Twitter.

23    BY MR. KLAYMAN:

24         Q.   And that was it?

25         A.   Object to form.   That is what happened.
```

1          Q.   Nothing more?

2               MR. SANDO:  Form.

3          A.   Object to form.  Correct.  I have nothing more

4     to add, and that was before my time.

5     BY MR. KLAYMAN:

6          Q.   Paragraph 34, "Despite this reminder, Defendants

7     Coleman and Dhillon failed to provide any objection

8     pursuant to S.D. Fla. R. 7.3(a)," that's an accurate

9     statement, correct?

10              MR. SANDO:  Form.

11         A.   Form.  Which one are you looking at,

12    Mr. Klayman?

13         Q.   Paragraph 33.

14         A.   Thirty-three, excuse me.  Object to form.  I

15    believe this was prior to my joining the case.  I do not

16    know what judgment they made or why they made any

17    judgment.

18         Q.   So based upon your review of the file, you were

19    able to ascertain that that's a correct statement in

20    Paragraph 33, correct?

21         A.   Object to form.  There was no objection.

22         Q.   Paragraph 34:

23              "Had Defendants Coleman and Dhillon complied

24         with S.D. Fla. R. 7.3(a), Plaintiffs would not have

25         been subjected to having to pay attorney's fees to

```
1          CAIR and CAIR Florida, or at a minimum, the amount
2          of fees ordered would have been significantly
3          lower."
4               That is also a true statement in the
5     complaint, correct?
6               MR. SANDO:  Object to form.
7          A.   Object to form, and, no, I did not believe so.
8     In my judgment, we thought that would go against our
9     argument and what Ms. Loomer actually wanted in
10    invalidating the offer of judgment as a whole and would
11    have actually weakened our argument.  I also do not
12    believe that it would have been significantly lower.
13    The court did actually go through the reasoning and we
14    were actually able to successfully obtain a 20 percent
15    reduction in attorney's fees.
16    BY MR. KLAYMAN:
17         Q.   Well, Ms. Loomer and Illoominate Media were
18    ultimately hit with 140,000 plus in attorney's fees.  If
19    you increase that by 20 percent, that's significantly more
20    than even 144,000 plus, correct?
21              MR. SANDO:  Object to form.
22         A.   Object to form, and once again you got the
23    math wrong.  CAIR was looking for 150 - I believe
24    153,000.  We had it reduced by 20 percent, down to
25    124,000.  That 20 percent in any sort of financial
```

1   aspect is significant.

2   BY MR. KLAYMAN:

3       Q.   So it was a good deal that you were able to get

4   for her, huh, a hundred and --

5           MR. SANDO:   Form.

6       A.   Object to form.

7   BY MR. KLAYMAN:

8       Q.   You did a great job, didn't you?

9       A.   Object to form.   We were successful in

10   lowering the amount of attorney's fees by 20 percent.

11   We believe we were successful.

12      Q.   That was the judge that ordered that, not an

13   argument that you made for 20 percent, correct?

14          MR. SANDO:   Object to form.

15      A.   Object to form.   If it wasn't for our argument

16   or me coming in, there would have been no argument, and

17   we were successful in obtaining a 20 percent reduction.

18   BY MR. KLAYMAN:

19      Q.   In fact, neither you nor Coleman nor his law

20   firm ever made that argument to reduce the fees, correct?

21      A.   Object to form.   Once again, we believe that

22   it would actually, in my judgment, not help our case and

23   would not help what Ms. Loomer had requested us to do,

24   which was to invalidate the offer of judgment as a

25   whole.

```
 1        Q.    Paragraph 39:

 2              "Thus, it should come as no surprise that,

 3        after the litany of egregious errors put in front

 4        of the Court by Defendants Coleman, Dhillon, and

 5        Young, on August 4, 2021, including referring to

 6        Illoominate Media as (a) corporation instead of a

 7        limited liability company, Magistrate Reinhart

 8        issued an order granting in part and denying in

 9        part CAIR and CAIR Florida's Joint Motion for

10        Attorneys Fees, and awarded CAIR and CAIR Florida a

11        total of $124,423.37 in fees and costs."

12              That's an accurate statement, correct?

13              MR. SANDO:  Object to form.

14        A.    Object to form.  No.  There were no egregious

15   errors.  In my judgment, we put forth the actual

16   arguments that Ms. Loomer requested of us to actually

17   invalidate the offer of a judgment as a whole.

18   BY MR. KLAYMAN:

19        Q.    So you reviewed the pleading that is referred to

20   in Paragraph 39 before it was filed, correct?

21        A.    Object to form, and, yes, I reviewed our

22   pleading before we filed it.

23        Q.    And you are aware that that pleading was

24   inaccurate in that it described Illoominate Media as a

25   corporation rather than a limited liability company?
```

```
 1              MR. SANDO:  Form.
 2        A.   Object to form.  If there was a typo, then
 3   there was a typo.
 4   BY MR. KLAYMAN:
 5        Q.   Well, that's not a typo, that's a different form
 6   of corporate form, is it not?  A corporation and a limited
 7   liability company are two different entities, correct?
 8              MR. SANDO:  Form.
 9        A.   Object to form.  There is a difference in a
10   corporation versus a limited liability company, however,
11   I don't believe that had anything to do with any sort of
12   decision or any issue whatsoever.
13   BY MR. KLAYMAN:
14        Q.   But you just testified falsely.  That's not a
15   typo, correct?
16              MR. SANDO:  Object to form.
17        A.   Object to form.  It would still be a typo.
18   BY MR. KLAYMAN:
19        Q.   In your opinion, if you just make a mistake, or
20   don't do your job, then it's just a typo?
21              MR. SANDO:  Object to form.
22        A.   Object to form.  A simple mistake like that is
23   not --
24   BY MR. KLAYMAN:
25        Q.   It shows a lack of care, does it not?  It shows
```

58

1    that, no pun intended, it shows a lack of care,

2    professional care, that that error was in there?

3         A.   Object to form.  A simple error, that does not

4    actually affect anything.  There was no lack of care.

5         Q.   Paragraph 37 of the complaint, "Defendant Young,

6    upon entering an appearance in the CAIR Suit, should have

7    reviewed the case and provided Plaintiffs with an accurate

8    and competent assessment of the merits of the CAIR Suit."

9              In fact, that is what you were retained to do,

10   was it not?

11        A.   Object to form.  I was retained to act as

12   local counsel to assist Mr. Coleman in filing the

13   response for a motion for attorney's fees.

14        Q.   But you were also required, as a matter of your

15   agreement with Ms. Loomer and also as a matter of your

16   ethical responsibilities when you came into the case, to

17   give her an accurate and competent assessment of the

18   merits of the CAIR suit, correct?

19        A.   Object to form.  I reviewed the matter and I

20   gave her an opinion as to where we were, why we were

21   doing what we were doing, and what we needed to do.

22        Q.   So you gave her an accurate and competent

23   assessment of the merits of the CAIR suit?

24             MR. SANDO:  Object to form.

25        A.   Object to form.  I reviewed the case in its

1    entirety and I discussed what had happened - the case

2    was dismissed by motion, that there was an offer of

3    judgment that she told me she rejected, and then now we

4    were dealing with the attorney's fees matter.

5    BY MR. KLAYMAN:

6        Q.   Well, you didn't answer my question.  The

7    question is you did give her an accurate and competent

8    assessment of the merits of the CAIR suit when you came

9    into the case, correct?  That was your duty --

10            MR. SANDO:  Object to form.

11   BY MR. KLAYMAN:

12       Q.   -- as counsel.

13       A.   Object to form.  We didn't actually discuss

14   the merits of the CAIR suit.  We looked at it, they had

15   filed it, they were happy with it.  I was not there for

16   the judgment, that predates when I was - when I joined.

17            What I needed to do and I had an ethical duty

18   to do is to actually discuss the case with her, with her

19   attorney, who had been her attorney the entire time,

20   discuss what our plan was and what we had to do with

21   regards to responding to the motion for attorney's fees

22   filed by the CAIR defendants.

23   BY MR. KLAYMAN:

24       Q.   Paragraph 43, "Indeed, had Plaintiffs known

25   that there was no real substantive basis for their

60

```
 1   claims against CAIR, CAIR Florida, and Twitter,

 2   Plaintiffs would never have agreed to initiate this

 3   lawsuit in the first place."

 4             That's an accurate statement, based upon your

 5   review of the file, is it not?

 6        A.   Object to form.  That predates me and I have

 7   no idea what was discussed at the beginning of the

 8   lawsuit.

 9        Q.   The next line, "Had Plaintiff's known that CAIR

10   was open to settling the lawsuit, Plaintiffs also would

11   have been agreeable, but Defendants failed to reply

12   adequately," that's an accurate statement, is it not?

13             MR. SANDO:  Object to form.

14        A.   Object to form.  I do not believe so because

15   she told me that she had rejected the offer of

16   settlement.

17   BY MR. KLAYMAN:

18        Q.   In fact, Ms. Loomer communicated with you

19   exactly what is set forth in Paragraph 43, did she not?

20             MR. SANDO:  Object to form.

21        A.   Object to form.  She told me that she had

22   rejected the offer of judgment, she believed CAIR was

23   scared about what she was actually going to produce via

24   discovery and that they were a terrorist organization.

25   BY MR. KLAYMAN:
```

1        Q.   I'm going to leave this deposition open subject

2   to our motion to compel and for sanctions, and so you're

3   fortunate, okay?  So I'm taking one less hour at this

4   point than I would otherwise need to because I need the

5   documents to complete this deposition, and it may go

6   beyond that.

7        So are you available in the next two weeks for a

8   UMC hearing?

9        A.   File your motion to compel, get on the court's

10   website, see what their schedule looks like, and we'll

11   come to a determination on timing.

12        Q.   You're not going on vacation in the next two

13   weeks?

14        A.   No, I have no plans for a vacation in the next

15   two weeks.

16        MR. KLAYMAN:  All right.  The deposition is,

17        at this point, left open and we'll continue it

18        subject to our motion to compel and for sanctions.

19        Thank you, Mr. Young.

20        MR. SANDO:  Asher, we would request the

21        exhibits to be furnished to all counsel that were

22        marked here today, okay?  One through seven, I

23        believe.

24        MR. KLAYMAN:  That's fine.

25        MR. YOUNG:  And, Gail, I would actually like

1     to make an order of this deposition transcript as

2     well.

3          MR. SANDO:  I didn't order the transcript, I

4     just asked for the exhibits.

5          MR. YOUNG:  I know you did.

6          THE VIDEOGRAPHER:  Is everybody ready to go

7     off the record?

8          MR. KLAYMAN:  We're off the record.

9          MR. BLOCH:  Is anybody ordering?  Is

10    Mr. Klayman ordering the transcript?

11         MR. KLAYMAN:  Yeah, we're going to order it,

12    too.  We'll take a copy off of what Mr. Young just

13    ordered.

14         THE VIDEOGRAPHER:  The time is 11:10 a.m.  We

15    are off the video record.

16         MR. BLOCH:  And this is Brett Bloch.  I'll

17    take a copy --

18         (Recording stopped.)

19         MR. BLOCH:  This is Brett Bloch.  I'll take a

20    copy of the transcript.

21         THE COURT REPORTER:  Mr. Klayman, is it

22    regular delivery?

23         MR. KLAYMAN:  Three days.

24         THE COURT REPORTER:  Mr. Young, do you read or

25    waive?

1            MR. YOUNG:  I'll waive the reading.

2            (The reading of the deposition transcript was

3      waived.)

4            (The deposition adjourned at 11:10 a.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

64

```
 1                    CERTIFICATE OF OATH

 2

 3   THE STATE OF FLORIDA

 4   COUNTY OF ST. LUCIE

 5

 6

 7            I, the undersigned authority, certify that

 8   the witness, CRAIG YOUNG, appeared before me remotely

 9   via videoconference on the 21st day of August, 2024, and

10   was duly sworn.

11

12   Signed this 26th day of August, 2024

13

14

15

16

17

18

19

20            _____
                 Gail Hmielewski, Stenographer
21               Notary Public - State of Florida
                 My Commission No.: HH406786
22               Expires:  June 5, 2027

23

24

25
```

Daughters Reporting, Inc.
Fort Lauderdale, Florida 954-755-6401

65

```
1                    CERTIFICATE OF REPORTER

2    STATE OF FLORIDA

3    COUNTY OF ST. LUCIE

4

5                    I, GAIL HMIELEWSKI, Court Stenographer,

6    HEREBY CERTIFY that I was authorized to and did

7    stenographically remotely report the videoconference of

8    the foregoing deposition of CRAIG YOUNG; that a review

9    of the transcript was not requested; and that the

10   foregoing transcript, Pages 1 through 63, inclusive, is

11   a true and complete record of my stenographic notes.

12                    I FURTHER CERTIFY that I am not a

13   relative, employee, attorney, or counsel of any of the

14   parties, nor am I a relative or employee of any of the

15   parties' attorney or counsel connected with the action,

16   nor am I financially interested in the action.

17                    Dated this 26th day of August, 2024.

18

19

20

21   _____
     GAIL HMIELEWSKI, Court Stenographer

22

23

24

25
```

**A**

a.m 1:17,17 5:15
  62:14 63:4
abide 20:19
ability 32:18
able 31:19 32:5
  45:21 47:14
  49:1 53:19
  54:14 55:3
Abrams 2:25
  5:18
absent 14:18
absolved 21:24
accept 23:6
  42:16
access 9:13
accomplished
  37:16
accurate 30:23
  36:7,8 48:19
  49:23 53:8
  56:12 58:7,17
  58:22 59:7
  60:4,12
act 35:14 58:11
acting 11:16
  27:12
action 9:12 11:5
  11:17 14:8,22
  20:5 26:10
  31:13,21 32:6
  32:11 45:18
  48:16,25 49:2
  65:15,16
actions 23:25
  25:25 37:3
acts 20:17,17
actual 10:15
  16:1 20:21
  56:15
add 53:4
addition 14:10
Additionally
  9:12
adequately
  26:25 60:12

adjourned 63:4
admissible 45:21
admitted 18:13
  18:17
advice 13:10
advise 25:24
  26:9 37:3
affect 58:4
affidavit 4:11
  24:6,15,18
  30:2 35:4,5,6
  36:3 40:22
  42:12,17 43:9
  43:17
affirm 6:12
affirmatively
  37:2
ago 15:25
agree 47:18
agreeable 60:11
agreed 6:23 16:2
  17:8 60:2
agreeing 28:9
  29:4
agreement 4:12
  9:15,18 10:13
  10:16,20,22,23
  11:3 12:9,11
  12:21 15:19
  16:2,22 17:18
  21:16 22:23
  23:11 35:11,22
  35:25 58:15
Aguirre 2:8 6:2
aid 27:13
aided 28:12
akin 26:19
al 1:4,7 9:25
alert 40:24
  41:20
alerting 43:4,21
allegations
  39:20
alleged 8:22
  14:12
allowed 17:13
allowing 23:9

alternative
  34:11
amended 4:14
  9:8 14:8,23
  15:17 45:18,22
  46:21 49:16
amount 16:12
  21:12 23:18
  30:16,21 36:2
  37:19 39:7
  54:1 55:10
analyze 50:9
Anderson 2:24
  7:9,13 8:8 16:4
  19:16 24:8
  44:15
answer 46:17
  52:14 59:6
answered 52:20
anybody 62:9
anymore 46:19
apart 29:21
apologize 19:8
App 30:19
appear 7:10,11
appearance 58:6
appearances 2:1
  5:21
appeared 64:8
Appearing 2:2,6
  2:13,18
appropriate
  37:4
approving 23:17
approximately
  15:4
argue 34:11
argument 28:2,5
  31:7 32:13
  33:3,13,15,25
  34:2,7,17,20
  38:10,19 50:20
  51:2,3,8,11
  54:9,11 55:13
  55:15,16,20
arguments
  30:21 32:14

33:22 47:8
  56:16
arm's 12:7,13
articulated 9:7
ascertain 32:6
  53:19
Asher 2:24 16:4
  19:13 61:20
asked 7:23 13:1
  36:19 38:1
  50:8 62:4
asking 47:23
asks 14:11
aspect 55:1
assessment 58:8
  58:17,23 59:8
assist 58:12
assistant 2:24
  7:9
assuming 23:5
attach 44:13
attacked 28:22
attorney 11:14
  11:15 21:7
  32:21 35:15,17
  36:18 46:1
  49:25 59:19,19
  65:13,15
attorney's 26:6
  26:25 28:2
  30:13 32:25
  33:10 37:18,19
  38:7 39:1 50:4
  50:15,20 51:4
  53:25 54:15,18
  55:10 58:13
  59:4,21
attorney-client
  21:23 46:3
attorneys 15:2,5
  49:21 56:10
August 1:16
  5:14 7:11,11
  7:12 44:14
  56:5 64:9,12
  65:17
authority 10:9

11:2 18:3,6
  19:24 20:3,23
  21:5,11 22:16
  23:8 46:13
  64:7
authority.'
  30:17
authorized 65:6
availability 9:5
available 61:7
Avenue 1:24
avoid 42:6
award 20:7
  33:10
awarded 56:10
aware 13:6
  21:12 27:6,9
  27:12,15 28:21
  29:1 31:12
  34:19 46:20
  51:20 56:23

**B**

B 4:1 18:2 22:21
  22:22
back 10:23
  13:13 14:13
  25:19 28:7
  35:6 36:3
  38:15 47:20
backs 14:2 16:25
  17:16 22:12
bar 12:6,8,23
  13:3,10 18:13
  22:2,6,10
bargained 20:24
bargained-for
  19:18,18 20:6
  20:8 23:10
Barrett 2:7 5:9
  6:7,7
bars 13:7
based 17:21
  18:25 23:25
  36:14 48:19
  49:24 51:19
  53:18 60:4

Page 67

basis 9:13 10:5
47:4 59:25
battle 26:16
Beach 1:1 2:20
5:11
bearing 27:25
becoming 24:24
beginning 60:7
begins 5:6
behalf 1:14 5:19
5:22 6:2,5 8:24
12:4 22:5
23:17 24:21
25:8 32:18
38:10 49:4
beheaded 28:23
beheading 28:23
belief 24:19
believe 14:6,7
17:20 20:7
25:16 34:22,24
34:25 36:18
38:1,14,15
39:8 40:20
49:13 50:2,3
53:15 54:7,12
54:23 55:11,21
57:11 60:14
61:23
believed 31:2
42:4 60:22
believes 42:7
best 24:18 31:7
33:15 38:19
better 19:16
beyond 61:6
big 20:1 41:7
bigger 34:6
bit 13:14 19:15
Blake 2:8 6:1
blake.sando@...
2:11
Bloch 2:14 6:4,4
31:25 37:7
39:4 62:9,16
62:16,19,19
Blvd 2:9

Boca 2:4,15
bound 46:9
bounds 21:21
Boynton 2:20
breach 16:21
17:20,25 18:9
breached 17:6
breaks 20:14
Brett 2:14 6:4
62:16,19
brett@shende...
2:17
bring 13:4,14
17:23
broken 12:1,22
13:1
brought 17:9
46:6 51:7
Burstein 2:24
6:6,6

C
C-r-a-i-g 6:25
Cair 8:23,23
9:15,18,21,23
10:8,14,20
11:1,2 12:10
13:21 14:2,14
15:20 16:3,15
16:19 17:1,4
17:10,18,23,24
18:3 19:1,3,17
20:7,10,22
21:10 22:15,23
23:3,11,13,18
23:20 24:2
26:18,18,23
27:6,12,19
28:3,18,21
29:5,12,18,19
29:22,25 30:18
31:5 33:1,6
34:5 38:21
39:1,19 41:8
42:4 43:18
45:10,15 47:3
47:11,15 49:18

49:22,22 54:1
54:1,23 56:9,9
56:10,10 58:6
58:8,18,23
59:8,14,22
60:1,1,9,22
CAIR's 14:13
15:2,5 16:16
18:8 23:4 27:3
47:8
call 34:23 35:1
capacity 27:13
care 9:9 41:20
42:1,14 43:5
43:13,22 45:24
57:25 58:1,2,4
case 1:2 5:12
6:13 9:20 10:8
13:20,21 20:13
26:4,5 27:7
30:4 31:14
32:17 36:17
40:19 46:12
47:13 49:11
50:6,8,12,19
53:15 55:22
58:7,16,25
59:1,9,18
cause 5:4 14:8
45:17
certain 7:24
Certificate 3:6,7
64:1 65:1
certify 64:7 65:6
65:12
challenged
38:25 39:3,7
check 12:8 27:23
37:1
checking 36:5
Cheryl 2:24 6:6
children 28:23
Cir 30:19
Circuit 1:1,1
5:11 30:9
claim 32:25 46:5
claimed 45:7,19

claiming 13:19
14:19,21,24
31:8 33:18
45:7,14 48:6
claims 9:7 14:22
15:17 31:21
47:11 60:1
CLE 44:6
clean 34:7
clear 6:23 13:9
21:10 34:7
client 11:3,22
35:19,20 40:24
41:2 43:4,21
44:2,3,11
Client's 35:20
clients 10:8
11:18,20
co-conspirator
27:7 28:11
co-counsel 26:8
COLE 2:9
Coleman 1:7 2:6
5:8 6:2 9:24
11:16 16:10,11
16:18 18:6,8
19:4,6,8,25
20:3,12 21:5
22:16 23:8
25:3 26:8 30:3
31:13,20 32:6
32:24 34:17,23
35:16 36:11
37:14 38:24
39:23 40:16,20
41:16,19,25
42:2,18,22
43:1 47:2,5
48:15 49:3,17
50:5 51:13,21
52:17 53:7,23
55:19 56:4
58:12
Coleman's 38:24
come 25:14 56:2
61:11
coming 55:16

Commission
64:22
committed
42:18,22
communicate
23:3
communicated
13:9 23:22
60:18
communication
9:6,9 44:2
communicatio...
14:20 45:15
company 56:7
56:25 57:7,10
compel 61:2,9
61:18
competent 58:8
58:17,22 59:7
complaint 4:14
9:8 12:6 14:9
14:23 15:17
31:10 32:8
33:18 34:9
45:18,22 46:21
49:16 51:7,16
52:6,11,21
54:5 58:5
complete 7:6
61:5 65:11
compliance 36:6
37:1
complied 53:23
comply 7:3
complying 16:25
17:17
computer 15:12
concern 28:8,17
29:4
conclusion 25:8
25:14 26:20
40:15
conclusions
10:12
Conduct 11:20
confidential 9:9
confidentially

45:10
connected 65:15
consent 18:8,9
consequences
  40:25 41:3
consideration
  12:13 35:25
considerations
  44:11
consult 12:19
  22:10
consulted 36:9
consulting 2:19
  33:16
continue 24:1
  61:17
continued 33:6
continuing
  21:18
contract 10:7
  20:1,14,15,21
  22:4,8,13,15
  29:17
contracting
  46:12
contracts 19:10
  19:11,11
contractual 9:16
  10:3 12:11
  45:12
contractually
  20:23
control 10:10
  11:5 18:5
  19:24 20:3
  21:4,10 22:15
  22:18,20 23:1
  23:7,21,24
  24:3
conversation
  42:2
conversations
  41:16,18
copy 62:12,17
  62:20
corporate 19:5
  19:10 57:6

corporation
  56:6,25 57:6
  57:10
correct 8:6,7,19
  8:20,25 9:1,21
  9:21,22 10:5
  10:14 11:1,8,9
  11:10,11,12,13
  11:15,18,21
  12:6,7 13:12
  14:17 15:20
  17:1,19 18:11
  18:12,16,24
  19:7 21:8,15
  23:14 24:14,18
  25:1,5,6,10
  26:1,11 27:8
  27:13 30:4
  32:19 33:1,10
  33:22 35:11,22
  36:1,12,13,15
  36:21 37:4,14
  39:14,23 40:16
  41:13,15,16,22
  43:18,24 44:22
  46:18 47:16
  49:5,11,24
  50:10 51:22
  53:3,9,19,20
  54:5,20 55:13
  55:20 56:12,20
  57:7,15 58:18
  59:9
costs 30:13 33:1
  56:11
counsel 5:16,20
  11:16 14:3,13
  16:16 24:24
  25:24 30:10
  35:14 47:14,25
  48:3,20 49:2
  51:20 58:12
  59:12 61:21
  65:13,15
country 13:7
County 1:1 5:12
  64:4 65:3

couple 15:25
  48:10
courses 44:6
court 1:1,22
  5:10,18 6:9,11
  6:17 7:4,5,8
  8:4 10:19
  13:17 14:18
  18:1 30:11
  31:1 32:11
  35:2 37:23
  45:3 47:21
  51:16 54:13
  56:4 62:21,24
  65:5,21
court's 61:9
cover 19:23 23:4
  23:12
Craig 1:12 2:18
  2:19 3:4 4:7,11
  4:13 5:1,7,10
  5:24 6:24 8:14
  64:8 65:8
craig@cwyleg...
  2:21
create 20:4
credit 16:12
criminal 20:17
  27:7
CWY 2:19

         D
D 3:1 35:16
Dadeland 2:9
Dallas 27:7
  28:11
date 1:16 5:14
  16:14,17
dated 4:13 7:10
  65:17
Daughters 1:23
  5:19
day 64:9,12
  65:17
days 30:13,24
  62:23
deal 29:15,16,16

55:3
dealing 59:4
deals 22:18
  48:25
death 20:18
decide 8:4 12:16
  12:23 18:1
  20:11 24:1
decided 21:6
decision 34:16
  57:12
decisions 25:19
  25:21
declined 30:10
Defendant 2:13
  4:7,8 5:24 8:14
  8:16 9:12 58:5
Defendant/De...
  2:18
defendants 1:8
  2:6 5:10 15:20
  16:3 17:19
  19:1,3,18
  20:10 22:24
  23:12,13,19
  24:2 33:1
  42:22 45:10
  47:2,5 48:15
  49:3,17 53:6
  53:23 56:4
  59:22 60:11
delay 13:24
delivery 62:22
demanding 39:1
denying 47:10
  56:8
depose 15:25
deposition 1:11
  4:6 5:1,7,15
  6:24 7:6,10,21
  7:23 13:15
  45:9 46:22
  61:1,5,16 62:1
  63:2,4 65:8
describe 30:14
described 30:9
  56:24

Description 4:4
desired 48:18
  49:20
despite 47:4
  53:6
determination
  22:5,7 61:11
determine 31:20
  49:2
determined
  15:13
determining
  10:19
Dhillon 2:13 5:9
  6:5 31:25 53:7
  53:23 56:4
difference 57:9
different 23:10
  29:15,16 57:5
  57:7
Direct 3:5 6:19
Disagree 19:4
discovery 42:5
  60:24
discuss 17:10
  30:25 45:9
  59:13,18,20
discussed 59:1
  60:7
discussion 14:10
  37:10 43:5
discussions 14:2
  16:17 17:22
  40:8
dismissed 26:5
  59:2
dismissing 47:10
district 30:11
docket 49:7
  50:13 51:25
doctrine 45:15
document 12:15
  44:19,25
documents 7:3,7
  7:24 8:2,6,13
  8:21,25 13:14
  14:7,11 45:6

61:5
**doing** 11:7 16:24
    33:16 58:21,21
**dollar** 39:14,17
**drafted** 36:5
**Drive** 2:20
**duces** 4:6 7:21
    7:23
**due** 16:12 31:4
    34:8 35:25
    42:7 46:11
    50:21
**duly** 64:10
**duties** 11:18,19
    46:14
**duty** 11:24 12:2
    21:18 25:24
    26:9 35:21
    36:25 45:24
    46:4,7,11,18
    59:9,17

**E**
**E** 2:3 3:1 4:1
**earlier** 17:3 45:8
    45:13
**effect** 12:24
    21:19 34:21
**efficacy** 26:9
**effort** 51:12,20
    51:25
**egregious** 56:3
    56:14
**eight** 18:15
**either** 11:6 21:7
    23:22,23
**email** 4:13 44:13
**emails** 14:13
    15:4,15 44:20
    44:22 45:1
**embarrassment**
    42:7
**employee** 65:13
    65:14
**ended** 37:17
**enforced** 11:1
**engaging** 14:1

**entailed** 10:14
**entails** 10:20
**entered** 32:17
    47:10
**entering** 12:20
    58:6
**entire** 40:12
    47:24 48:3,14
    59:19
**entirety** 25:4
    59:1
**entities** 57:7
**entitlement**
    30:16
**entity** 11:4 27:1
    27:20 28:15,20
    29:9
**entries** 32:25
**entry** 30:15
**enure** 11:18
**equitable** 31:9
    31:14,22 33:19
    34:9 48:17
    49:1,4,19 51:3
    51:12,21 52:7
    52:12,18,22
**error** 58:2,3
**errors** 56:3,15
**Esq** 4:11
**Esquire** 2:3,8,8
    2:14,19,24
    5:17
**essentially** 36:5
    46:5
**estimate** 15:11
**et** 1:4,7 9:25
**ethical** 12:1,22
    12:25 13:3,5
    13:11 20:14
    21:25 22:1,3
    44:2,10 46:7
    58:16 59:17
**ethically** 11:24
    20:13 37:4
**ethics** 22:3,14,14
    44:6 46:10
**evening** 44:14

**everybody** 62:6
**evidence** 45:21
    47:7 52:17
**exactly** 47:15,21
    60:19
**Examination**
    1:22 3:5 6:19
**exchange** 20:6,9
**exchanges** 23:10
**excuse** 18:19
    19:7 28:21
    53:14
**exercised** 22:21
**Exhibit** 4:3 7:15
    8:9,10 16:6
    24:10 35:3,7
    35:10 36:4
    44:13,16 46:22
    46:23
**exhibits** 61:21
    62:4
**existence** 40:24
    41:21
**existing** 9:16
**expense** 30:15
**experience**
    36:20,24 49:25
**Expires** 64:22

**F**
**facilitating** 9:10
**fact** 7:2 12:3
    22:7,19 26:17
    31:4 33:21
    34:16 42:7
    43:8 47:4
    50:19 51:12
    55:19 58:9
    60:18
**fail** 40:24
**failed** 53:7 60:11
**failure** 16:20
    18:8 41:3
**fair** 15:10
**fall** 41:8 42:1,14
    43:4,22
**falsely** 57:14

**far** 13:2 26:5
**Fax** 2:11,16
**fees** 19:23 23:5
    23:12 26:6
    27:1 28:2
    29:19 30:13,21
    32:21 33:1,10
    33:14 34:5
    37:18,19 38:8
    38:11 39:1
    49:21 50:4,16
    50:20 51:4,9
    53:25 54:2,15
    54:18 55:10,20
    56:10,11 58:13
    59:4,21
**fell** 39:19,21,23
    39:25 40:3,6
**felt** 45:9
**FIFTEENTH**
    1:1
**file** 12:5 24:25
    25:3,4,7 30:3
    31:12,19 32:5
    32:23 40:11,12
    40:20 41:10,15
    41:17 47:24
    48:3,20,22
    49:24 50:12
    51:19 52:3,16
    53:18 60:5
    61:9
**filed** 13:17 25:8
    40:3,16 45:3
    56:20,22 59:15
    59:22
**files** 15:12
**filing** 4:9 28:1
    45:4 46:11
    58:12
**final** 18:4 19:19
    19:20 21:3
    23:20,23
**financial** 27:13
    29:22 54:25
**financially** 65:16
**find** 45:22 52:16

**fine** 61:24
**firm** 6:3 32:6,24
    38:25,25 42:18
    43:1 46:6
    55:20
**firms** 20:12 26:9
    31:13,20
**first** 19:19 44:24
    60:3
**Five** 35:10
**Fla** 30:20 53:8
    53:24
**Florida** 1:1,25
    2:4,10,15,20
    5:3,12 8:23
    11:19 12:8,17
    12:19,23 13:3
    13:10 18:13
    22:2,6,10,14
    27:1,20 29:9
    30:18 36:12,15
    36:17,20,22
    44:7 47:3,11
    47:15 49:22
    54:1 56:10
    60:1 64:3,21
    65:2
**Florida's** 56:9
**follow** 30:11
    41:20
**followed** 48:16
**following** 46:10
**follows** 16:14
**foregoing** 65:8
    65:10
**form** 14:6 25:12
    25:16,17 26:2
    26:3,12,13
    27:10,14,15,18
    27:19,24,25
    28:13,14,19,25
    29:1,6,7,13,14
    29:24 31:15,16
    31:23,24 32:10
    32:20 33:2,11
    33:12,23,24
    34:3,4,13,19

34:22 37:5,6
37:22,23 38:3
38:4,13,14
39:2,3,9,12,16
39:17,24,25
40:5,6,13,17
40:18 41:5,6
41:11,17,23,24
42:13,17,20,21
43:2,10,11,19
43:20,25 44:1
44:8,12 45:16
45:25 46:9,16
46:18 47:19,20
48:1,2,8,9,21
48:22 49:6,7
49:12,13 50:1
50:2,11,12,22
50:25 51:14,15
51:23,24 52:5
52:6,10,11,19
52:20,25 53:2
53:3,10,11,14
53:21 54:6,7
54:21,22 55:5
55:6,9,14,15
55:21 56:13,14
56:21 57:1,2,5
57:6,8,9,16,17
57:21,22 58:3
58:11,19,24,25
59:10,13 60:6
60:13,14,20,21
**Fort** 1:25
**forth** 14:13
22:21 32:22
33:18 35:21
36:10 37:16
38:18 39:20
47:15 51:17
56:15 60:19
**fortunate** 61:3
**forward** 25:23
26:11 31:8
**found** 37:23
47:2
**Foundation** 8:23

27:8
**four** 35:4,5
**frauds** 20:19
**fraudulently**
47:9,16,18
**fraudulently'**
47:3
**frequently** 34:11
36:9
**frivolous** 40:16
40:19
**front** 56:3
**fulfilled** 35:23
**full** 10:9 16:12
**fully** 44:11
**funding** 26:20
28:4
**furnished** 61:21
**further** 13:23
31:21 32:7
65:12
**furtherance**
35:24
**furthered** 49:10
50:19
**Furthermore**
9:8

**— G —**
**Gail** 1:22 5:2,18
61:25 64:21
65:5,21
**game** 37:15
**Gaza** 29:2
**general** 36:6
37:1 40:23
41:8,20 42:1
43:3,4,13,21
43:22
**generally** 36:14
36:16
**give** 6:13 13:10
16:19 19:2
58:17 59:7
**given** 7:2 31:2
38:21,21 45:22
47:24

**gives** 19:1,17
20:4 22:15
**go** 18:2 23:22
28:9,18 29:18
33:3 38:15
47:20 54:8,13
61:5 62:6
**goal** 38:16
**goes** 29:17
**going** 7:1,8 9:2
12:23 13:13
16:9 26:15,16
28:15 29:2
30:7 33:3,13
35:12 36:3
60:23 61:1,12
62:11
**good** 5:5 6:1
18:21,22 19:22
23:4 32:13
55:3
**granting** 56:8
**great** 55:8
**Green** 14:14
**grounds** 9:4
**Group** 2:3,13
5:9 6:5
**gun** 42:9

**— H —**
**H** 4:1
**Hamas** 27:13
28:12,21
**hand** 6:12,18
**handle** 19:9
**happen** 30:25
41:7 43:13,14
**happened** 25:19
31:16 47:17
52:25 59:1
**happy** 59:15
**hard** 34:6
**hearing** 10:17
15:22,23 45:5
61:8
**Held** 1:19
**help** 33:13 55:22

55:23
**HH406786**
64:22
**history** 26:23
27:3
**hit** 54:18
**Hmielewski** 1:22
5:2,18 64:21
65:5,21
**Holy** 27:8
**hope** 11:1
**hoping** 42:15
**hostages** 28:24
**hour** 61:3
**hours** 6:23 7:2
**huh** 55:4
**hundred** 20:2
55:4
**hundreds** 19:10

**— I —**
**idea** 39:25 40:7
60:7
**identification**
7:16 8:11 16:7
24:11 35:8
44:17 46:24
**illegal** 20:16,16
**illegality** 12:12
**Illoominate** 5:8
5:23 10:24
11:7,12,14,21
12:5 14:3
15:19 16:3,24
17:14,16 21:14
22:23 23:14,17
24:2,22,25
25:9 30:18
31:22 32:19
34:16 35:15
36:1 38:11
41:21 42:16
45:24 46:8
47:14 49:5
54:17 56:6,24
**Illoominate's**
30:10

**immediately**
16:11
**important** 44:3
44:4
**inaccurate**
56:24
**include** 40:14
**including** 18:6
19:25 21:22
28:23 56:5
**inclusive** 65:10
**incorrect** 19:9
**increase** 54:19
**independent**
47:23
**independently**
37:3
**induce** 43:17
**inflated** 38:12
**inform** 10:25
11:6
**Information**
16:15
**informed** 16:17
34:15 35:20
44:3,11
**initial** 42:2
**initiate** 60:2
**injunctive** 32:7
32:18 48:17
49:1,4,10,19
50:19
**inquiries** 35:21
**instructing**
30:12
**instructions**
31:3
**intended** 9:9
58:1
**intentionally**
47:7
**interest** 39:1
**interested** 65:16
**interpret** 21:6
**intrusive** 9:5,14
**invalid** 31:8
32:15 34:8

Page 71

invalidate 31:4
33:4,17 38:17
55:24 56:17
invalidating
54:10
involved 20:13
39:20 41:1,13
irrelevant 9:11
13:19 14:4,7
Israel 28:22 29:2
issue 13:3,4
57:12
issued 56:8
issues 30:16
items 33:10

**J**

Jeff 2:25 5:17
Jersey 36:18
job 55:8 57:20
join 31:25 37:7
39:4
joined 32:20
47:3,8,16,18
50:8 59:16
joining 31:17
40:19 47:17
50:6 53:15
Joint 56:9
judge 10:19 47:2
47:9 55:12
judgment 10:10
18:7 19:25
25:21 31:4,7,8
32:12,15 33:2
33:5,12,17
34:8,14 38:17
38:19 39:5,14
41:1,22 43:7
47:24 50:3,5
50:14 53:16,17
54:8,10 55:22
55:24 56:15,17
59:3,16 60:22
Judicial 1:1 5:11
June 24:23
25:20 64:22

jurisdiction
47:12
justified 26:1

**K**

K-A-I-R 9:21
keep 16:15 17:4
35:19 44:7,11
keeping 17:1
44:3
killed 28:22
killing 20:18
28:24
KISSANE 2:9
Klayman 2:3,3
3:5 4:13 5:17
5:22,22 6:20
6:22 7:13,17
8:12 16:8 17:3
19:7,8,8,9 24:8
24:12 25:13,22
26:7,22 27:11
27:16,21 28:6
28:16 29:3,10
29:20 30:1
31:11,18 32:1
32:4,16 33:20
34:1,10 35:5,9
37:8,25 38:6
38:23 39:6,10
39:22 40:2,10
40:21 41:9,12
42:10,24 43:15
43:23 44:5,18
44:19 46:25
47:22 48:5,12
48:24 49:9,15
50:7,17,23
51:10,18 52:2
52:8,13,23
53:5,12 54:16
55:2,7,18
56:18 57:4,13
57:18,24 59:5
59:11,23 60:17
60:25 61:16,24
62:8,10,11,21

62:23
knew 16:24
know 15:16
26:21 27:2
36:16,17 40:6
44:10 51:24,25
53:16 62:5
knowledge
24:19 27:3
36:14
known 59:24
60:9

**L**

lack 47:11 57:25
58:1,4
Lakes 2:20
Land 27:8
language 19:1
large 5:3
Larry 2:3 4:13
5:17,22
latest 17:23
Lauderdale 1:25
Laura 1:4 2:23
5:7,22 10:16
11:21 20:23
21:11 35:15
39:18
law 2:3,13 5:9
6:5 10:19 19:5
20:2,12 26:8
26:14 31:13,20
32:6,24 36:20
38:24,25 42:18
43:1 47:4
55:19
lawsuit 9:23
10:11 14:4
20:11 25:8
29:25 40:3,16
40:20 60:3,8
60:10
lawyer 18:11,15
18:17,21,22
24:21
lawyers 34:11

34:13
leave 61:1
left 61:17
legal 2:19,24
4:12 10:5,12
13:11 20:11
29:11 30:17
35:10,18,21,24
36:20 46:7
legally 11:25
37:4
leklayman@g...
2:5
length 12:7,13
let's 13:13 16:1
18:2 19:12
46:20
LEXIS 30:19
liability 56:7,25
57:7,10
liable 16:11
21:14
license 44:7
licensed 36:11
36:18
Likewise 40:22
limited 7:1 56:7
56:25 57:6,10
line 19:14 32:25
33:9 60:9
linked 27:12
28:3
litany 56:3
litigate 32:7
litigated 48:16
little 13:14 19:15
LLC 2:19 5:8
local 11:16
30:11 35:14
36:6 37:1
58:12
log 45:4
long 20:15 22:1
longer 11:22
18:17 46:3,7
look 38:15 47:20
looked 38:7

59:14
looking 52:21
53:11 54:23
looks 61:10
Loomer 1:4 2:23
5:8,23 9:24
10:16,24 11:7
11:10,21 12:4
14:3 15:19
16:2,23 17:14
17:16 20:22
21:8,11,13,19
22:23 23:1,13
23:16 24:1,22
24:24 25:9,24
26:4 27:22
31:3,21 32:13
32:19 33:5,14
34:15,23 35:11
35:25 37:3,20
38:11,20 39:19
41:21 42:2,15
43:5 45:24
46:8,11 47:13
49:5 51:8 54:9
54:17 55:23
56:16 58:15
60:18
Loomer's 28:7
29:19 35:15
lost 11:22 21:21
46:2
lot 39:11,13
lower 6:17 54:3
54:12
lowering 55:10
LUCIE 64:4
65:3

**M**

Magistrate 56:7
main 33:3 38:16
majority 20:2
making 10:12
17:15 22:5,7
33:21 34:16,20
malpractice

10:11 11:5,17
20:5,11 29:22
42:19,23 46:6
46:11
**Mandelbaum**
2:7 5:9 6:3,6,7
47:3,6 48:15
49:3,17 51:13
51:21 52:17
**mark** 7:8 35:3
**marked** 7:15
8:10 16:6
24:10 35:7
44:16 46:22,23
61:22
**materials** 36:5
**math** 18:22
54:23
**matter** 5:7 10:4
11:3 20:23
21:11 22:9
30:4 32:21
36:23 58:14,15
58:19 59:4
**meaning** 19:20
20:2
**means** 9:6
**Media** 5:8,23
10:24 11:7,12
11:21 12:5
14:3 15:20
16:3,24 17:15
17:17 21:14
22:23 23:14,17
24:2,22,25
25:9 30:18
31:22 32:19
34:16 35:15
36:1 38:11
41:21 42:16
45:24 46:8
49:5 54:17
56:6,24
**Media's** 11:15
47:14
**mentioned**
51:16

**meritorious**
25:15,18 26:1
28:4 40:20
**merits** 26:10
58:8,18,23
59:8,14
**messages** 15:2
**methods** 9:14
**Miami** 2:17
**Military** 2:15
**minimum** 54:1
**misstate** 51:1
**misstates** 50:22
**mistake** 57:19
57:22
**monetary** 20:7
**money** 21:12
28:14,17 29:5
29:12 39:11,13
**monies** 28:9
**month-and-a-...**
11:11
**morning** 5:5 6:1
**motion** 10:17
15:21,24 26:6
26:25 28:2
30:12 32:23
36:10 37:12
38:7 56:9
58:13 59:2,21
61:2,9,18
**move** 7:5
**multiple** 31:6

_____

**N**

**N** 2:15 3:1
**name** 6:21,24
19:6
**named** 27:6
28:10
**nature** 20:19
**nearly** 28:22
**need** 21:9 61:4,4
**needed** 26:24
27:2 58:21
59:17
**negotiate** 28:8

**negotiated** 9:20
10:22 11:4
12:7,13 22:11
**negotiating** 10:6
10:25
**negotiations**
23:24
**neither** 16:23
38:24 55:19
**never** 13:9 17:5
17:7,7,9 31:13
34:15 36:19
38:10 39:7
42:21 48:15
60:2
**New** 36:18
**non-meritorious**
25:9
**nonmonetary**
31:9 33:19
**nonparty** 10:6
20:10
**nontaxable**
30:15
**noon** 6:24
**Northeast** 1:24
**Notary** 5:2
64:21
**note** 30:8,8
**notes** 44:20,23
45:1 65:11
**notice** 4:6,9 7:10
7:20,23 16:19
**nullified** 51:4
**number** 4:4 9:19

_____

**O**

**oath** 3:6 24:15
64:1
**object** 14:6
25:12,16,17
26:2,3,12,13
27:10,14,15,19
27:25 28:13,14
28:19,25 29:1
29:6,14,24
31:15,16,23,24

32:10,20 33:2
33:11,12,23,24
34:4,13,19,22
37:5,6,22,23
38:4,13,14
39:2,3,9,12,17
39:25 40:6,13
40:17,18 41:5
41:6,11,17,23
41:24 42:13,20
42:21 43:2,11
43:20,25 44:1
44:8,12 45:25
46:9,16,18
47:19,20 48:1
48:2,9,21,22
49:6,7,13 50:1
50:2,12,25
51:15,23,24
52:6,11,19,20
52:25 53:3,14
53:21 54:6,7
54:21,22 55:6
55:9,14,15,21
56:13,14,21
57:2,9,16,17
57:21,22 58:3
58:11,19,24,25
59:10,13 60:6
60:13,14,20,21
**objecting** 33:9
**objection** 8:3
9:4 13:16 32:9
45:3,16 50:25
51:5,6 53:7,21
**objections** 4:7
8:15 32:25
**objective** 52:4
**objects** 9:13
30:15
**obligation** 27:23
29:11,22
**obtain** 18:9
38:20 48:17
54:14
**obtaining** 9:14
55:17

**obviously** 45:8
**occur** 7:2
**occurred** 50:9
**October** 28:22
47:9
**offer** 10:10
17:22 18:7
19:25 24:3
31:4,8 32:15
33:4,17 34:7
38:17 39:5,14
40:25 41:22
43:7 50:3,14
50:14 54:10
55:24 56:17
59:2 60:15,22
**offered** 39:14,17
**offering** 42:17
**Oh** 18:19 19:7
**okay** 8:23 16:1
18:15,22 22:5
61:3,22
**once** 7:6 21:24
28:19 45:20
46:5 48:15
54:22 55:21
**open** 7:5 60:10
61:1,17
**opinion** 57:19
58:20
**opposite** 25:14
**opposition** 28:1
**order** 4:10 14:18
15:22,24 31:1
32:11 33:15
47:10 56:8
62:1,3,11
**ordered** 23:12
37:20 54:2
55:12 62:13
**ordering** 62:9,10
**organization**
26:19 28:4,10
31:6 33:7
38:22 42:8
60:24
**outside** 29:24

43:3
owe 11:24 12:2
21:16 24:1
45:23 46:14,18
owed 20:7 23:13
29:19 34:5

**P**

P.A 2:3,9
P.C 2:7 5:9
P.L 2:14
page 3:2 4:4
16:5 24:13
37:11 38:18
Pages 65:10
paid 28:18,20
35:25
Palm 1:1 5:11
Palmetto 2:4
paragraph 16:5
16:13 17:18
22:21 30:2,7
32:23 35:17,17
36:3 40:22
42:12 43:9
46:21 47:1,15
48:13,25 49:16
49:23 53:6,13
53:20,22 56:1
56:20 58:5
59:24 60:19
Park 2:4
part 22:22 24:5
44:10 56:8,9
particular 39:15
particularity
30:14
parties 5:20 9:11
9:20,21 65:14
parties' 65:15
party 6:8 9:23
10:4 47:4
49:14
pay 23:18 26:15
26:17 28:9
29:5,11,22,25
31:5 37:20

38:21 49:21
50:4,15 51:4
53:25
paying 26:19
29:8,18
payments 16:13
people 28:23,24
percent 20:2
37:17 54:14,19
54:24,25 55:10
55:13,17
Perfect 19:16
period 17:2
18:23 48:14
personal 24:18
pertinent 9:7
phone 2:10,16
34:22
phrase 20:25
picture 34:6
place 60:3
plain 18:25
plaintiff 2:23
5:16 9:13,16
16:13
Plaintiff's 8:16
9:8 16:6 60:9
plaintiffs 1:5,14
2:2 5:23 8:24
10:13,20 16:10
16:15,19 18:7
21:8 22:12
48:18 49:20,20
53:24 58:7
59:24 60:2,10
plaintiffs' 4:3,8
7:15 8:10 18:5
19:24 20:3
21:5 22:16
23:8 24:10
35:7 44:16
46:23
plan 37:15 59:20
plans 61:14
pleading 56:19
56:22,23
please 6:10,12

6:21 19:14
32:2
pled 47:6
plenty 36:23
plus 39:1 54:18
54:20
point 12:12 13:2
17:15 20:21
21:2 22:1 25:1
25:23 26:10
50:9 61:4,17
points 21:3
Pollack 6:4
POLLOCK
2:14
position 10:18
possibly 23:4
28:18
power 10:9 18:3
18:4,4 19:2,3
19:19,20,21
20:4 21:1,3,4
22:22,25 23:1
23:20,21
powers 19:19
practice 13:6
36:6,15,20
37:2 40:24
practices 36:16
practicing 36:17
prank 39:19,21
39:23 40:1,3,7
prayer 32:7
predates 59:16
60:6
prefer 13:24
present 2:22
5:20 9:12
prevented 16:25
17:17 33:21
previous 17:21
previously 8:5
11:10 45:3,7
50:18
primary 33:25
34:2 51:2
prior 25:19

31:16 40:7,18
46:1 47:17
50:6 53:15
privilege 11:23
14:19 21:22,23
45:4,4,9,11,14
45:17 46:3
privileged 14:20
14:24
Pro 2:19 5:25
procedures 7:4
proceed 7:7
37:12
proceedings
16:18
process 40:8
produce 7:3,24
42:5 60:23
produced 8:1
14:17 15:1
producing 8:25
45:6
product 45:15
45:19,20
production 4:8
8:5,13,16
professional
11:20 12:17,20
44:6 58:2
progress 35:20
prohibited 13:7
propose 23:18
proposed 4:10
10:23 12:3,9
12:21 14:15
15:5 21:13
23:11 24:5
42:16 43:17
44:21
protective 15:22
15:24
provide 16:20
30:17 35:18
53:7
provided 47:7
58:7
provision 18:25

19:1 21:6
prudence 22:9
prudent 22:10
Public 5:3 64:21
pun 58:1
purport 9:19
purpose 9:10
20:16,16
pursuant 7:20
53:8
pursue 31:14
32:18 51:12,21
pursued 49:19
52:17
pursuing 49:4
52:4,7,12
put 7:9,13 8:8
12:9 16:4 24:9
31:7 36:9
38:18 42:11
43:16 44:15
51:17 52:20
56:3,15
putting 10:18

**Q**

Quantum 2:20
question 9:6
10:1 11:6
52:14 59:6,7
quite 18:22
29:21
quoting 30:20

**R**

R 2:14 30:20
53:8,24
raise 6:11 34:17
raping 28:23
Raton 2:4,15
reach 20:4
reached 13:25
15:19 17:7
29:15,16
read 9:2 16:9
30:7 62:24
reading 63:1,2

**ready** 62:6
**real** 59:25
**really** 26:16 38:4
**reason** 29:25
**reasonable**
  16:19,21 30:14
  35:19 37:20,24
  38:2
**reasonably**
  35:18
**reasoning** 54:13
**rebut** 47:8
**recall** 48:3,10
**receive** 7:6
  19:21,22 23:2
**recipient** 30:12
**record** 5:6 9:3
  62:7,8,15
  65:11
**Recording** 62:18
**recovery** 16:11
**redlined** 19:12
**reduce** 55:20
**reduced** 54:24
**reduction** 37:17
  54:15 55:17
**refer** 8:21 14:11
**reference** 38:16
**referred** 56:19
**referring** 15:23
  56:5
**refers** 23:1
**refusing** 7:3
**regard** 14:15
  15:5 21:19
  49:3
**regarding** 23:3
  28:3
**regards** 17:2,23
  22:3 28:1
  29:14 32:13
  36:22 59:21
**regular** 62:22
**Reinhart** 56:7
**reject** 17:13
**rejected** 17:11
  17:14 42:3

43:6 50:14
  59:3 60:15,22
**rejection** 50:3
**relate** 8:21 11:20
  14:12
**relation** 14:8
**relationship**
  9:17
**relative** 65:13,14
**relevance** 8:3
  9:5 13:16 45:2
**relevant** 14:21
  14:22 15:16
  45:17,21
**relief** 31:9,14,22
  32:7,18 33:19
  34:9 48:18
  49:1,4,10,19
  50:19 51:3,12
  51:21 52:4,7
  52:12,18,22
**remand** 47:10
**reminder** 53:6
**remotely** 1:19
  5:2 64:8 65:7
**Remy** 14:13
**rendering** 9:11
**repeat** 32:3
  41:14
**repeated** 31:6
**reply** 60:11
**report** 65:7
**reporter** 3:7
  5:18 6:10,11
  6:17 7:8 35:2
  62:21,24 65:1
**Reporting** 1:23
  5:19
**represent** 5:21
  14:14 35:19
**representation**
  35:24 48:14
**represented**
  11:10 12:14
**representing** 6:7
**request** 4:8 5:16
  8:5,13,16,18

8:19 14:11
  33:18 45:5
  61:20
**requested** 8:24
  25:3 30:3 33:6
  33:10 51:9
  55:23 56:16
  65:9
**requesting** 34:9
**require** 12:17
**required** 7:6
  11:9 24:25
  35:18 44:8
  58:14
**rescue** 41:2
**research** 27:17
  33:16
**researched**
  26:23
**Resolution**
  16:10
**respond** 26:6,25
  32:2 35:20
  37:9 50:24
**responded** 9:2
  13:18
**responding**
  59:21
**response** 8:14,17
  9:4 58:13
**Responses** 4:7
  8:15
**responsibilities**
  58:16
**responsibility**
  11:19 12:17,20
  21:25 36:25
**resulted** 50:15
**retained** 30:10
  58:9,11
**retainer** 4:12
  35:10,22
**review** 12:14
  17:10 24:25
  37:15 38:8
  48:2,7,20
  49:24 51:19

53:18 60:5
  65:8
**reviewed** 15:12
  15:15 19:10,12
  25:4,5 30:3,4
  31:12 40:11
  41:10,15,17
  47:24 50:12,13
  52:16 56:19,21
  58:7,19,25
**reviewing** 21:9
  25:7 31:19
  32:5 33:16
**rid** 42:6
**right** 6:11 10:3
  11:14 12:24
  17:11 18:21
  20:9 45:12
  51:4 61:16
**rights** 20:6
**Road** 2:4
**role** 36:4 37:13
  37:15
**Ron** 6:2 11:16
  20:12 30:3
  36:5 37:1,14
  41:25
**Ronald** 1:7 2:6
  5:8 35:16
**Roughly** 15:7
**rubber** 37:13
**Ruiz** 47:2,9
**rule** 12:1,22
  22:2,3 44:2
**rules** 7:4 11:19
  12:17,19,25
  13:5 20:15
  21:21 22:2,14
  30:11,24 32:22
  36:6 37:2 46:9

**S**

**S** 2:8,9 4:1
**S.D** 30:20 53:8
  53:24
**sanctions** 61:2
  61:18

**Sando** 2:8 6:1,1
  25:12,17 26:2
  26:12 27:10,14
  27:18,24 28:13
  28:25 29:7,13
  31:15,23 32:9
  33:11,23 34:3
  35:4 37:5,22
  38:3,13 39:2,9
  39:16,24 40:5
  40:17 41:5,11
  41:23 42:20
  43:10,19,25
  47:19 48:1,8
  48:21 49:6,12
  50:1,11,22
  51:1,5,14,23
  52:5,10,19
  53:2,10 54:6
  54:21 55:5,14
  56:13 57:1,8
  57:16,21 58:24
  59:10 60:13,20
  61:20 62:3
**save** 42:25
**saw** 26:18
**saying** 14:1,5
  20:25 21:2
  37:19,21 40:4
  41:19,22 46:5
  46:14,17
**scared** 42:4
  60:23
**schedule** 61:10
**SCOTT** 2:9
**screen** 7:9,14
  8:9 16:4 19:15
  24:9 35:12
  44:15
**scrolling** 19:13
**Se** 2:19 5:25
**Sebastian** 2:8
  6:2
**sebastian.agui...**
  2:12
**second** 35:17
  39:8

**secretly** 14:1
17:16
**section** 16:25
17:17,21,25
18:2 19:17
21:1,3 38:14
**see** 19:12 47:14
47:21 52:3
61:10
**seen** 7:18 15:18
**semicolon** 23:9
**sending** 27:13
**sense** 13:22,23
**sent** 37:14 44:14
**sentence** 44:24
**Sep** 30:20
**separate** 20:11
22:25 23:7,9
**served** 7:11 8:5
48:23 49:8,18
52:1
**services** 35:18
**serving** 50:6
**set** 19:14 22:21
32:22 33:18
35:21 37:16
39:20 60:19
**sets** 47:15
**settle** 10:8 13:21
13:24 17:3
18:6,7 19:3,24
20:3,11,23
21:5,11 22:16
23:8
**settlement** 8:22
9:6,10,17,20
10:4,6,11,13
10:16,20,22,23
10:25 11:2,3,5
12:3,9,21
13:22,25 14:2
14:12,15 15:5
15:18 16:1,17
16:20 17:7,8
17:18,21,24
18:3,10 19:2
19:20,22 21:13

22:11,22 23:2
23:3,6,21 24:4
24:5 28:8
29:15 42:16
43:17 44:22,25
45:10 46:12
50:14 60:16
**settlements** 20:5
**settling** 60:10
**seven** 61:22
**sexual** 20:17
**Shendell** 2:14
6:4
**show** 12:25 13:2
13:8,13 35:2
52:3
**showed** 10:17
15:21 49:7
**showing** 34:4
**shown** 22:16
23:8 35:12
39:18
**shows** 48:22
51:25 57:25,25
58:1
**sign** 12:5 18:4
19:20
**sign-off** 19:19
21:3 23:20,23
**signature** 24:13
**signed** 10:16
11:4 20:5 24:6
24:15 35:11
64:12
**significance**
21:1
**significant** 55:1
**significantly**
54:2,12,19
**simple** 34:7
57:22 58:3
**simply** 41:25
**skin** 42:25
**small** 23:18
**smaller** 19:15
**smoking** 42:9
**solely** 9:10 32:21

**solemnly** 6:12
**somewhat** 29:2
**sorry** 19:13
**sort** 12:25 19:20
23:21 28:2,3
34:5 42:7,8
46:7,15 54:25
57:11
**speak** 15:14
**speaking** 15:7
**specific** 32:24
**specifically** 9:15
48:4,11
**specificity** 15:6
15:15
**specified** 17:2
32:24
**speculate** 38:4
**spoke** 17:24
**spoken** 50:13
**ST** 64:4 65:3
**stage** 30:21 41:1
**stamp** 37:13
**stance** 26:17
34:6
**stand** 41:3 45:2
45:13
**standard** 40:23
41:8,20 42:1
42:14 43:4,13
43:22
**start** 6:22
**state** 5:3,20 6:21
8:19 15:6
28:15,20 29:9
36:11 45:2,11
45:12 64:3,21
65:2
**stated** 30:24
31:9 44:19,24
45:8
**statement** 7:1
27:22 30:23
36:7,8 41:4,7
43:12 48:19
49:23 53:9,19
54:4 56:12

60:4,12
**states** 13:7
**stating** 31:1
32:11 41:24,25
**statute** 20:19
**Stenographer**
1:22 64:21
65:5,21
**stenographic**
65:11
**stenographica...**
65:7
**steps** 35:19
**stipulated** 9:17
**Stipulation** 4:9
**stop** 19:13
**stopped** 62:18
**strictly** 13:6
**strike** 22:19 33:8
**strong** 27:22
**stronger** 51:11
**subject** 21:13
22:2 61:1,18
**subjected** 49:21
50:4 53:25
**submit** 24:17
**Subpart** 22:22
**substantial**
10:10 20:22
**substantive**
16:21 18:5,9
19:24 20:1
21:4,10 22:15
22:18,20 23:1
23:7,21 59:25
**successful** 55:9
55:11,17
**successfully**
54:14
**sued** 11:23
21:22 29:21
46:2
**sues** 21:24
**suggest** 42:9
**suit** 11:17 49:18
58:6,8,18,23
59:8,14

**Suite** 1:24 2:9
2:15,20
**supporting**
30:17
**sure** 34:24,25
44:1
**surprise** 56:2
**swear** 6:10,12
6:16
**sweetener** 43:16
43:20
**sworn** 42:17
64:10

**T**

**T** 4:1
**take** 13:23 23:24
31:20 35:19
44:6 45:5
62:12,17,19
**taken** 1:14,16,22
5:2,15 25:25
25:25 26:10
37:4 49:1,3
**talking** 21:7
**tecum** 4:6 7:21
7:23
**tell** 23:6
**ten** 15:8,9,10
**terms** 8:24 31:14
**terrorism** 26:20
28:4,11
**terrorist** 26:18
28:3 31:6 33:7
38:22 42:8
60:24
**testified** 40:12
43:8 50:18
51:6 57:14
**testifying** 17:12
**testimony** 3:4
6:13 42:17,18
45:13,23 50:22
51:1
**Texas** 27:8
28:11
**text** 15:1

texts 44:20,22
  45:1
Thank 6:9,17
  19:16 61:19
think 23:16
  27:23
Third 4:8 8:16
Thirty-three
  53:14
thorough 48:6
thoroughly 25:5
  30:4
thought 38:22
  40:8 54:8
thoughts 40:14
thousands 19:11
three 19:18,23
  20:6 21:3
  23:10 62:23
throw 43:1
throwing 43:2
time 1:17 5:14
  18:23 25:2
  30:5,14 32:3
  40:7 48:9 50:9
  53:4 59:19
  62:14
timeline 34:25
times 31:7
timing 61:11
title 8:14
today 7:10 9:24
  14:5 45:14,23
  61:22
Today's 5:14
told 26:3,14 43:6
  44:21 59:3
  60:15,21
tomorrow 45:6
total 56:11
totally 14:4
Trail 2:15
transcript 62:1
  62:3,10,20
  63:2 65:9,10
trial 28:11
tried 15:25 17:3

28:8
true 22:18,20
  24:18 41:6
  43:8,11 54:4
  65:11
truth 6:14,14,15
try 42:25 43:17
trying 13:21
  42:6
turn 16:1,4
  46:20
turned 47:5
turning 24:13
  30:2
twelve 15:10
twice 13:17
Twitter 48:22
  49:8,14,18
  50:5,6 51:25
  52:22 60:1
two 6:23 7:2
  34:18 57:7
  61:7,12,15
typo 57:2,3,5,15
  57:17,20

—————
**U**
—————
U.S 30:19
ultimate 11:2
ultimately 54:18
UMC 45:5 61:8
underlying
  11:17
undersigned
  16:16 64:7
understand 25:1
understanding
  36:4
understood
  32:22
undertook 22:11
unethical 43:24
unindicted 27:7
  28:10
unreasonable
  38:12
up-to-date 17:1

17:4
updates 16:21
uphill 26:16
use 20:25

—————
**V**
—————
v 5:8 9:24 30:18
vacation 61:12
  61:14
valid 8:3 22:13
  22:15 27:1,19
  28:15,20 29:8
  29:17
verified 4:14
  14:9,23 15:17
  45:18,22 46:21
versus 57:10
veto 10:9 18:3,4
  19:2,21,21
  20:25 21:4
  22:22,25 23:1
  23:5,20,23
video 5:6 62:15
videoconference
  1:11,14,19 2:1
  5:1 64:9 65:7
videographer
  2:25 5:5,17 6:9
  62:6,14
Videotaped 1:11
  5:1
view 21:18
  40:23 41:1
  42:11 43:3,21
viewed 31:5
vs 1:6

—————
**W**
—————
W 2:19 4:11
waive 62:25
  63:1
waived 30:22
  31:2 63:3
want 6:22 12:4
  21:20 26:17
  31:5 38:21
  44:20

wanted 31:3
  32:14,14 33:4
  33:14,14 37:11
  37:12 38:20
  45:1 54:9
wasn't 23:4
  55:15
way 8:22 14:12
we'll 8:4 12:3
  35:5 61:10,17
  62:12
we're 62:8,11
weaken 34:2,4
weakened 33:24
  54:11
website 61:10
Wednesday 1:16
weeks 15:25
  61:7,13,15
went 14:13 15:2
  15:4 28:7
West 2:4
whatsoever
  48:17 57:12
willfully 47:6
William 2:18 4:7
  5:10,24 8:15
willing 43:1
witness 1:22
  6:10 25:18
  29:8 64:8
women 28:24
word 20:1
work 19:4 45:15
  45:19,20
writing 34:21
written 10:15
  18:8 19:17
  20:20 43:9
wrong 54:23

—————
**X**
—————
X 3:1 4:1

—————
**Y**
—————
Y-o-u-n-g 6:25
yeah 20:20

62:11
years 18:16
  48:10
yesterday 44:14
Young 1:12 2:18
  2:19 3:4 4:11
  4:13 5:2,7,10
  5:24,24 6:16
  6:25 7:18
  52:14 56:5
  58:5 61:19,25
  62:5,12,24
  63:1 64:8 65:8
Young's 4:7
  8:15

—————
**Z**
—————
zero 47:7
Zoom 5:16

—————
**0**
—————

—————
**1**
—————
1 4:6 7:15 49:18
  65:10
10(11th 30:19
10:01 1:17 5:15
100 2:20
101 1:24
11 30:7 32:23
11:10 1:17 62:14
  63:4
12 15:13
124,000 20:8
  54:25
124,423.37
  56:11
14 30:13,24 36:3
140,000 54:18
1400 2:9
144,000 54:20
144,931.87
  38:25
150 2:15 54:23
1500 1:24
153,000 54:24
15th 5:11 7:12

Page 77

| | | | | |
|---|---|---|---|---|
| **16** 4:9 | **33426** 2:20 | **7th** 28:22 | | |
| | **33431** 2:15 | | | |
| **2** | **33433** 2:4 | **8** | | |
| **2** 4:7 8:9,10 | **34** 53:6,22 | **8** 30:2 | | |
| 35:17 38:14 | **35** 4:12 | **8/20/2024** 4:13 | | |
| 49:19 | **37** 58:5 | | | |
| **2,000** 28:22 | **39** 56:1,20 | **9** | | |
| **20** 37:17 44:14 | **3rd** 1:24 | **9150** 2:9 | | |
| 54:14,19,24,25 | | | | |
| 55:10,13,17 | **4** | | | |
| **2013** 18:20 | **4** 4:11 24:10 | | | |
| **2016** 18:14 | 35:3 36:4 56:5 | | | |
| **2021** 24:23 56:5 | **43** 59:24 60:19 | | | |
| **2022** 30:19,20 | **44** 4:13 | | | |
| **2024** 1:16 5:14 | **46** 4:14 | | | |
| 7:11 44:14 | | | | |
| 64:9,12 65:17 | **5** | | | |
| **2027** 64:22 | **5** 4:12 35:7,10 | | | |
| **21** 1:16 | 64:22 | | | |
| **21st** 5:14 7:11 | **5,000** 29:18 36:2 | | | |
| 64:9 | **50** 13:7 | | | |
| **22** 40:22 42:12 | **50-2023-CA-0...** | | | |
| 43:9 | 1:2 5:13 | | | |
| **22nd** 47:9 | **561-241-2323** | | | |
| **24** 4:11 | 2:16 | | | |
| **25** 46:21 47:1,15 | **561-241-2330** | | | |
| **2500** 2:20 | 2:16 | | | |
| **26th** 64:12 65:17 | **561-558-5336** | | | |
| **27** 48:13,25 | 2:5 | | | |
| **2700** 2:15 | **561-568-1000** | | | |
| **27435** 30:19 | 2:21 | | | |
| **29** 49:16,23 | **6** | | | |
| **29th** 24:23 25:20 | **6** 3:5 4:13 44:13 | | | |
| **3** | 44:16 | | | |
| **3** 4:9 16:5,5,6 | **63** 65:10 | | | |
| 17:18 24:13 | **64** 3:6 | | | |
| **3(a)** 17:6,21,25 | **65** 3:7 | | | |
| **3(b)** 19:17 22:17 | **7** | | | |
| **30** 30:20 | **7** 4:6,7,14 46:22 | | | |
| **305-350-5365** | 46:23 | | | |
| 2:10 | **7.3(a)** 30:20 | | | |
| **305-373-2294** | 53:8,24 | | | |
| 2:11 | **7050** 2:4 | | | |
| **33** 53:13,20 | **73,500** 20:8 | | | |
| **33256** 2:10 | 21:17 23:15 | | | |
| **33301** 1:25 | | | | |



ORIGIN ID:FPRA   (520) 870-9791
LAURA LOOMER

PO BOX 651444

VERO BEACH, FL 32965
UNITED STATES US

SHIP DATE: 30SEP24
ACTWGT: 0.50 LB
CAD: 105024589/INET4535

BILL SENDER

TO  MS. ANGELA E. NOBLE
CLERK OF THE COURT
UNITED STATES DISTRICT COURT
S.D. FLORIDA
400 NORTH MIAMI AVENUE
MIAMI FL 33128
(305) 523-5510           REF:



FedEx Express

TUE - 01 OCT 10:30A

FedEx

TRK# 7789 2195 0204
0201

TUE - 01 OCT AA
PRIORITY OVERNIGHT

XG MPBA

33128
FL-US
MIA

736430 01Oct2024 MHRA: 681G2/B264/C098